## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.04-60001-CR-Cooke(s)(s)
**18 U.S.C. § 371**
**18 U.S.C. § 2339A**
**18 U.S.C. § 922(g)(5)(B)**
**18 U.S.C. § 1001(a)**
**18 U.S.C. § 1621(1)**
**18 U.S.C. § 1505**
**18 U.S.C. § 924(d)(1)**
**18 U.S.C. § 2**
**21 U.S.C. § 853**

**UNITED STATES OF AMERICA**

**v.**

**ADHAM AMIN HASSOUN,**
    **a/k/a "Abu Sayyaf," and**
**MOHAMED HESHAM YOUSSEF,**
    **a/k/a "Abu Turab,"**



                          **Defendants.**
_____/

### SECOND SUPERSEDING INDICTMENT

The Grand Jury charges that:

### INTRODUCTION

At times material to this Indictment:

1. In the late 1980's, a loose, transnational network of radical Islamists launched a holy war to drive American military forces from the Arabian peninsula, erode American support of Israel, undermine American support of regimes in the Middle East that were viewed as insufficiently Islamic, and participate in armed confrontations around the world to establish Islamic states under

Sharia, meaning strict Islamic law, as ordained by the Caliph, the name of the successor to the Prophet Mohammad and supreme Islamic ruler.

2. This network was heavily influenced by Islamic religious fundamentalism, which sought to establish a pure Islamic state and regarded modern Western civilization as a symbol of evil, spreading idolatry and secularism. Groups espousing this radical Islamic fundamentalism include the Islamic Group, a/k/a "Gama'a al-Islamiya," a/k/a "IG;" Egyptian Islamic Jihad, a/k/a "Islamic Jihad," a/k/a "al-Jihad," a/k/a "EIJ;" and al Qaeda, which oppose countries, governments, institutions, and individuals that do not share their view of Islam. These groups consider their enemies to be infidels, and embrace the concept of a "violent jihad" or holy war, as a means to oppose the infidels by force and violence.

3. . A number of individuals residing in South Florida joined the armed cause of Islamic religious fundamentalism. As alleged in this Indictment, **ADHAM AMIN HASSOUN** (hereinafter **"HASSOUN"**) engaged in recruiting and fundraising to send individuals, including **MOHAMED HESHAM YOUSSEF** (hereinafter **"YOUSSEF"**) and Unindicted Coconspirator #2, to overseas conflicts for the purposes of fighting violent jihad and supporting a terrorist agenda.

4. As used in this Indictment, jihad means "violent jihad," which includes planning, preparing for, and engaging in physical acts of violence against those who are deemed to be enemies of Islamic fundamentalism, which violence includes murder, kidnapping and hostage taking, maiming and other injury, and damage to and destruction of property.

## COUNT 1

### (Conspiracy to Provide Material Support for Terrorists)

The Introduction set forth in paragraphs 1 through 4 of this Indictment are realleged and

incorporated by reference as though fully set forth herein.

5.  Beginning in or about early 1994, and continuing until on or about May 8, 2002, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
a/k/a "Abu Sayyaf,"and
**MOHAMED HESHAM YOUSSEF,**
a/k/a "Abu Turab,"

within the United States, did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, that is, providing material support and resources, as defined in Title 18, United States Code, Section 2339A(b), and concealing and disguising the nature, location, source, and ownership of material support and resources, knowing and intending that they be used in preparation for and carrying out a violation of Title 18, United States Code, Section 956 (a)(1), that is, a conspiracy to murder, kidnap, and maim persons in a foreign country; and did commit one or more acts to effect the purpose and object of the conspiracy.

**PURPOSE AND OBJECT OF THE CONSPIRACY**

6.  It was a purpose and object of the conspiracy to advance violent jihad, including supporting, and participating in, armed confrontations in specific locations outside the United States, and committing acts of murder, kidnapping, and maiming, for the purpose of opposing existing governments and civilian factions and establishing Islamic states under Sharia.

**MANNER AND MEANS OF THE CONSPIRACY**

7.  The manner and means by which the defendants and their coconspirators sought to accomplish the purpose and object of the conspiracy included the following:

3

a. Members of the conspiracy would and did recruit, and attempt to recruit, others for the purpose of participating in a violent jihad, which would involve armed confrontations and committing acts of murder, kidnapping, and maiming.

b. Members of the conspiracy would and did solicit and raise monies to support and train the mujahideen fighters who would engage in the violent jihad.

c. Members of the conspiracy would and did transfer monies from places inside the United States to places outside the United States to support the violent jihad.

d. Members of the conspiracy would and did seek support and training to serve as mujahideen fighters in the violent jihad.

e. Members of the conspiracy would and did utilize codes and other techniques to conceal and disguise the true nature of their activities and identities.

**OVERT ACTS**

In furtherance of the conspiracy and to effect its purpose and object, at least one of the coconspirators committed, or caused to be committed, at least one of the following overt acts within the United States, in the Southern District of Florida, and elsewhere:

8.   On or about June 13, 1994, **HASSOUN** wrote a $1,000 check to Unindicted Coconspirator #1 with the memo line stating, "support for the person."

9.  On or about July 25, 1995, **HASSOUN** wrote an $8,000 check to the Canadian Islamic Association with the memo line stating, "for tourism."

10. On or about August 2, 1995, **HASSOUN** wrote a $5,000 check to American Worldwide Relief with the memo line stating, "for brothers."

11.  On or about August 31, 1995, **HASSOUN** wrote a $3,000 check to the Canadian I.

4

Association with the memo line stating, "for tourism and tourist."

12.  On or about November 15, 1995, **HASSOUN** wrote a $1,000 check to the Holy Land Foundation with the memo line stating, "for tourism."

13.  On or about January 16, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF** about travel to "an area that is active," such as "Afghanistan . . . Bosnia."

14.  On or about February 16, 1996, **HASSOUN** wrote a $600 check to Unindicted Coconspirator #1 with the memo line stating, "Chechnya."

15.  On or about February 17, 1996, **YOUSSEF** departed the United States for Egypt.

16.  On or about April 17, 1996, Unindicted Coconspirator #2 obtained his United States passport in Miami, Florida.

17.  On or about May 23, 1996, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #3, who was in Lebanon, in which **HASSOUN** asked if Unindicted Coconspirator #3 had a way to deliver "stuff to soccer teams in Chechnya or Bosnia."

18.  On or about May 30, 1996, **HASSOUN** and **YOUSSEF**, who was in Egypt, discussed their intention to "prepare" Unindicted Coconspirator #2 and send him to Egypt.

19.  On or about June 2, 1996, **HASSOUN** participated in a conversation with an individual about **HASSOUN's** plans to deliver a sermon on Chechnya for the purpose of raising funds for Chechnya.

20.  On or about June 8, 1996, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #4, who was in Canada, about Afghanistan, in which they discussed "the ones who want to go out and smell the air."

21.  On or about June 11, 1996, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #1 about **YOUSSEF** being someone who wants to "get some fresh air . . . find himself a route."

22.  On or about June 16, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, and told him that there would be a "trade agreement" completed within the month, and **YOUSSEF** responded, "by God, I am ready."

23.  On or about June 30, 1996, **YOUSSEF**, who was in Egypt, participated in a coded conversation with **HASSOUN**, and told **HASSOUN** that while he (**YOUSSEF**) was busy studying the Koran, this study was not his purpose and that he was waiting for the "trade" to take its "natural" course.

24.  On or about September 1, 1996, **YOUSSEF**, who was in Egypt, told **HASSOUN** that he was "ready for trade immediately," and **HASSOUN** responded, "by God, there is now trade in Somalia . . . get yourself ready to go down there to see," and clarified that "there is jihad" in Somalia.

25.  On or about September 2, 1996, **HASSOUN** participated in a conversation with Unindicted Coconspirator #1, who asked **HASSOUN** to look "for an open window for the Chechens," meaning "an opportunity for us to come over and do something for the Chechens."

26. On or about September 24, 1996, **HASSOUN** identified himself to an individual as "Abu Sayyaf of Maktab al Khadamat," and proceeded to quote Sheikh Azzam: "The only way to deal with the infidels is by the sword  . . . we do not flatter the infidel, nor do we smile to him."

27.  On or about September 30, 1996, **HASSOUN** wrote a $2,000 check to Unindicted Coconspirator #4 with the memo line stating, "one for Bosnia one for Libya."

28.  On or about October 23, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, in which he told **YOUSSEF** to go to Ogaden to "smell fresh air."

29.  On or about October 25, 1996, **HASSOUN** told **YOUSSEF**, who was in Egypt, to "break away and go to the area I told you about . . . brothers have arrived and God willing, you will work with them when you are there . . . let go of your worldly brides and worldly home . . . God will provide for you . . . go forth in the cause of Allah."

30.  On or about November 30, 1996, Unindicted Coconspirator #3, calling from Turkey, participated in a conversation with an individual in the United States, and told the individual to instruct **HASSOUN** not to talk over the phone about sensitive matters, "not even in code like tourism."

31.  On or about December 31, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, in which **HASSOUN** reported that "56 brothers got married" in Somalia, and asked **YOUSSEF** to get news about Somalia.

32.  On or about January 26, 1997, **HASSOUN** participated in a conversation with Unindicted Coconspirator #3 about jihad in Ogaden, Ethiopia, in which **HASSOUN** reported that "58 brothers died . . . the attack was repelled but the Americans used their airplanes . . . and were bombarding them . . . so the situation was very harmful to the brothers, but thanks to God, they will be repaid two-fold," and that, with regard to fundraising, "whatever, we collect we will be sending over there . . . a few emirs have called specifically concerning the subject . . . emirs of certain war fronts ask for such."

33.  On or about January 26, 1997, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #4 and another individual, in which **HASSOUN** reported that "because

they are playing football in Somalia . . . things are heating up so we are sending soccer uniforms and sneakers."

34.  On or about January 31, 1997, **HASSOUN** wrote a $2,000 check to Unindicted Coconspirator #4 with the memo line stating, "Somalia."

35.  On or about February 8, 1997, **HASSOUN** participated in a coded conversation with an individual about raising funds for Somalia, stating that the "brothers have an urgent need."

36.  On or about April 6, 1997, **YOUSSEF**, who was in Egypt, left a coded message for **HASSOUN**, indicating that it was important for **HASSOUN** to call back because **YOUSSEF** needed to confirm things before going on a "picnic, God willing."

37.  On or about April 6, 1997, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt,  and discussed another "brother" who was "going on a picnic," and **HASSOUN** asked if **YOUSSEF** would be going with this "brother," and **YOUSSEF** responded that he planned to join a group of possibly ten others who were going to "smell fresh air and eat cheese."

38.  On or about July 28, 1997, **HASSOUN** participated in a conversation with Unindicted Coconspirator #2, and asked Unindicted Coconspirator #2 if he was "ready" for jihad, and Unindicted Coconspirator #2 replied that "it's gonna happen soon."

39.  On or about May 1, 1998, **HASSOUN** participated in a conversation with an individual about jihad, in which **HASSOUN** instructed the individual not to talk about "jihad" over the phone.

40.  On or about June 17, 1998, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, about **HASSOUN** sending $5,000 to fund the travel for five "partners."

41.  On or about June 21, 1998, **HASSOUN** participated in a coded conversation with

8

YOUSSEF, who was in Egypt, about 20 "other partners" and HASSOUN wiring YOUSSEF money via the Thomas Cooke wire transfer company in Cairo.

42. On or about June 22, 1998, HASSOUN wrote a $5,000 check to cash with YOUSSEF's name on the memo line, and then used the funds to purchase an official check from Barnett Bank payable to YOUSSEF.

43. On or about June 24, 1998, HASSOUN sent a $5,000 Western Union wire transfer to YOUSSEF in Cairo, Egypt.

44. On or about June 24, 1998, YOUSSEF, who was in Egypt, called HASSOUN, who reported that the funds were available.

45. On or about July 5, 1998, YOUSSEF traveled to Albania.

46. On or about July 7, 1998, YOUSSEF called HASSOUN from Albania en route "to the inside," and HASSOUN promised to wire $5,000 to him.

47. On or about July 13, 1998, HASSOUN participated in a conversation with an individual and stated that he had received a report about Kosovo, and asked the individual how much money he had raised for Kosovo.

48. On or about July 18, 1998, YOUSSEF called HASSOUN on a satellite telephone, and reported that he had entered Kosovo under bombing from the Serbs, and HASSOUN told YOUSSEF that he was sending $5,000 with Unindicted Coconspirator #2.

49. On or about July 18, 1998, HASSOUN participated in a coded conversation with an individual, in which he reported that YOUSSEF was "playing football yesterday . . . and they had casualties," and HASSOUN asked the individual, "are you ready?"

50. On or about July 28, 1998, HASSOUN participated in a coded conversation with an

individual, and described **YOUSSEF's** activities in Kosovo as "tourism completely."

51. On or about July 29, 1998, **HASSOUN** participated in a coded conversation with an individual about jihad areas, and reported that he was "concentrating" on "a new area that opened up" and had some "loved ones that have gone there."

52. On or about August 3, 1998, **HASSOUN** wrote a $1,300 check to cash with the memo line stating, "Kosovo."

53. On or about August 10, 1998, **YOUSSEF**, who was in Egypt, called **HASSOUN**, and participated in a coded conversation describing his jihad activities, including the fact that "seventy got completely married," that they all "went in ambush sites, well equipped and well prepared ambush sites," and that "sports equipment" was used "to launch an attack on the other team."

54. On or about August 17, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, in which **HASSOUN** agreed to send Unindicted Coconspirator #2 to him.

55. On or about August 18, 1998, **HASSOUN** wrote a $5,000 check to Global Relief Foundation (hereinafter "GRF") with the memo line stating, "Kosovo."

56. On or about August 28, 1998, **HASSOUN** participated in a conversation with an individual, and attempted to solicit a donation for Unindicted Coconspirator #2's travel, to which the individual agreed, and stated that he had already contributed "to his cause" in the past.

57. On or about September 5, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and advised him that Unindicted Coconspirator #2 would be arriving on Sunday, and that **YOUSSEF** should meet Unindicted Coconspirator #2 at the airport.

58. On or about September 5, 1998, Unindicted Coconspirator #2 flew from Miami

10

International Airport in Miami, Florida, to Cairo, Egypt.

59.  On or about October 20, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and inquired about the welfare of Unindicted Coconspirator #2.

60.  On or about February 8, 1999, **HASSOUN** participated in a conversation with **YOUSSEF's** brother, and stated that he provides financial support to both **YOUSSEF** and Unindicted Coconspirator #2, and expressed the importance of **YOUSSEF** "always having money on his side until further notice" to support Unindicted Coconspirator #2 and others like him that were to follow.

61.  On or about February 8, 1999, **HASSOUN** participated in a three-way conversation with **YOUSSEF** and Unindicted Coconspirator #2, who were in Egypt, in which **HASSOUN** asked Unindicted Coconspirator #2 about the progress of his studies and if he still had money.

62.  On or about April 5, 1999, **HASSOUN** wrote a $3,000 check to GRF with the memo line stating, "Kosovo."

63.  On or about April 15, 1999, **HASSOUN** wrote a $600 check to GRF with the memo line stating, "to support Kosovo."

64.  On or about July 25, 1999, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #2, who was in Egypt, in which Unindicted Coconspirator #2 reported that he had requested an "army jacket, book bag, and sleeping bag" because there "was a rumor here that the door was open somewhere."

65.  On or about July 25, 1999, **HASSOUN** participated in a coded conversation with an individual, in which **HASSOUN** discussed a plan to give money to the individual so that the individual's wife can withdraw the money in Egypt to give to Unindicted Coconspirator #2.

66. On or about August 1, 1999, **HASSOUN** wrote a $1,000 to an individual with Unindicted Coconspirator #2's name on the memo line.

67. On or about August 13, 1999, **HASSOUN** wrote a $4,400 check to an individual with the memo line stating, "50 Dagastan."

68. On or about October 1, 1999, **HASSOUN** wrote a $2,500 check to GRF with the memo line stating, "Tourism, Propaganda, Chechnya."

69. On or about October 17, 1999, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #2, who was in Egypt, in which **HASSOUN** told Unindicted Coconspirator #2 that he must "prepare [himself] financially" so that Unindicted Coconspirator #2 can "move . . . to some close area."

70. On or about October 20, 1999, **HASSOUN** wrote a $2,500 check to GRF with the memo line stating, "from Al Iman in Chechnya."

71. On or about January 20, 2000, **HASSOUN** wrote a $2,000 check to GRF with the memo line stating, "Chechnya."

72. On or about April 10, 2000, **HASSOUN** participated in a conversation with Unindicted Coconspirator #2, who was in Egypt, in which they discussed the possibility of Unindicted Coconspirator #2 traveling to Yemen, but Unindicted Coconspirator #2 indicated that he needed a recommendation to go there.

73. On or about July 24, 2000, Unindicted Coconspirator #2 filled out a "Mujahideen Data Form" in preparation for violent jihad training in Afghanistan.

74. On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, who indicated that he would be traveling "there by Usama . . .

12

Khattab's company," and that Unindicted Coconspirator #2 "is a little farther South, he is supposed

to be by Usama and then he could be able to go to Kh . . . little farther North."

75.   On or about September 3, 2000, **HASSOUN** participated in a conversation with

**YOUSSEF**, who was in Egypt, and **YOUSSEF** stated that Unindicted Coconspirator #2 "went to

the area of Usama."

76.   On or about September 3, 2000, **HASSOUN** participated in a conversation with

**YOUSSEF**, who was in Egypt, about sending people to Baku, Azerbaijan.

77.   On or about October 9, 2000, **YOUSSEF**, who was in Saudi Arabia, called **HASSOUN**,

and gave **HASSOUN** a telephone number in the Republic of Georgia, at which **YOUSSEF** could

be reached in a few days.

78.   On or about October 15, 2000, **HASSOUN** participated in a conversation with

individuals who were in the Republic of Georgia, who told **HASSOUN** that **YOUSSEF** is in

"Baku," and that Unindicted Coconspirator #2 is "currently in Afghanistan," and **HASSOUN**

responded, "I would like to come over by you to get some fresh air."

79.   On or about October 15, 2000, **HASSOUN** participated in a conversation with

**YOUSSEF**, who was in Baku, Azerbaijan, in which **HASSOUN** told **YOUSSEF** to join Unindicted

Coconspirator #2, and **YOUSSEF** responded, "I have already reached the front line, why should I

return? And also I [have] previous experience, so why should I go there to get the experience I

already have?"

80.   On or about January 12, 2001, **HASSOUN** wrote a $500 check to an individual with the

memo line stating, "tourism."

81.   On or about May 16, 2001, **HASSOUN** wrote a $700 check to GRF with the memo line

stating, "tourism and travel."

82. On or about November 1, 2001, **HASSOUN** wrote a $2,000 check to GRF with the memo line stating, "Afghan relief."

83. On or about May 8, 2002, Unindicted Coconspirator #2 returned to the United States carrying papers containing **HASSOUN's** name and telephone number.

All in violation of Title 18, United States Code, Sections 371 and 2339A(a).

### COUNT 2

### (Material Support for Terrorists)

The Introduction set forth in paragraphs 1 through 4 and the Overt Acts set forth in paragraphs 8 through 83 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

Beginning in or about early 1994, and continuing until on or about May 8, 2002, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf," and**
**MOHAMED HESHAM YOUSSEF,**
**a/k/a "Abu Turab,"**

within the United States, did provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), and did conceal and disguise the nature, location, source, and ownership of material support and resources, knowing and intending that they be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956(a)(1), that is, a conspiracy to murder, kidnap, and maim persons in a foreign country; all in violation of Title 18, United States Code, Sections 2339A(a) and 2.

14

## COUNT 3

### (Unlawful Possession of Firearm)

On or about June 12, 2002, in Broward County, in the Southern District of Florida, the

defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

being an alien admitted to the United States under a nonimmigrant visa, did knowingly possess a

firearm in and affecting interstate commerce, that is, a Smith & Wesson 9 millimeter pistol, in

violation of Title 18, United States Code, Section 922(g)(5)(B).

## COUNT 4

### (False Statement)

On or about June 12, 2002, in Broward County, in the Southern District of Florida, the

defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

in a matter within the jurisdiction of the executive branch of the Government of the United States,

that is, the DHS and the FBI, did knowingly and willfully make a materially false, fraudulent, and

fictitious statement and representation, in that **HASSOUN** stated to a Special Agent of the DHS and

to a Special Agent of the FBI that:

(1) he neither encouraged nor assisted an individual named Mohamed Youssef regarding

travel to any foreign country, when in truth and in fact, and as the defendant then and there well

knew, he encouraged Youssef to travel to Somalia and Ethiopia, and provided funds for Youssef to

travel to Kosovo for the purpose of fighting in a jihad; and

15

(2) he was not aware of Mohamed Youssef visiting any foreign country other than Egypt, when in truth and in fact, and as the defendant then and there well knew, Mohamed Youssef had traveled to Kosovo, and had actually entered that country under heavy bombing by Serbian forces, for the purpose of fighting in a jihad.

All in violation of Title 18, United States Code, Section 1001(a).

## COUNT 5

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his recruitment of Mohamed Youssef to fight in a jihad and discussions about jihad over the telephone with Mohamed Youssef, as herein set forth below:

Q. And was he one of your recruits as has been said in the affidavit?

A. I never recruited him.

Q. And how - what's your phone contacts with Mr. Yousef?

A. At that time after he left to Egypt?

Q. Yes.

16

A.   When he left to Egypt he kept in touch and he used to call to ask about how the community doing over here and how the family is doing and that was it.

The aforementioned testimony by **HASSOUN** as he then and there believed, was a false material statement, in that **HASSOUN** did recruit Mohamed Youssef to fight in a jihad and did discuss jihad over the telephone with Mohamed Youssef.

All in violation of Title 18, United States Code, Section 1621(1).

**COUNT 6**

**(Perjury)**

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his purpose for providing financial assistance to Mohamed Youssef, as herein set forth below:

Q.   And did you ever provided anything - any monetary financial assistance to him?

A.   At one point he wanted money to prepare a land that he has, this is what he said, and that land, I believe, is close to the Suez canal, somewhere like that.   And he asked if the community can help him to fix the land and the community responded and we helped him.

17

Q. Okay. And was there any other purpose other than the land that you owned there?

A. This is what he asked and this is what we respond.

* * * *

Q. Right. And you said the money was for what?

A. To fix his land, fix his house.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did provide financial assistance to Mohamed Youssef for the purpose of fighting in a jihad.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 7

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his use of coded language with other individuals, including Mohamed Youssef, when discussing jihad activities, as herein set forth below:

Q. Did you speak with him in code language?

18

A. Never.

Q. Do you have any code languages with any –

A. No, I don't.

* * * *

Q. And in 1998 it's alleged that you have a conversation, you talk about you have soccer equipment. Did you recall any conversation like that?

A. No. I know he wanted - he wanted to open a business, you know, and he wants to get something from here, buy equipment and stuff like that.

Q. Do you recall what equipment he was talking about?

A. Soccer maybe, or football, something like that. But I asked him to come over here and pick up whatever he wants.

* * * *

Q. Sir, in your - you talked about this in direct examination, but in your - one of your telephone conversations in 1998 with Mr. Yousef you discussed soccer equipment?

A. He discussed, yes.

Q. Okay. Well –

A. Yes, go ahead.

Q. - he discussed it with you?

A. Uh-huh.

Q. Right. And your assertion is that he was directly speaking just of soccer equipment?

A. Yes, he gave me the impression that he wants to open a business and he wants to do some trade. In my - you want to hear my (unintelligible).

Q. No.  Sir, isn't it true that during that conversation you also asked, even though you were speaking about soccer equipment, you asked him if he had enough to launch an attack on the enemy?

A. What enemy?

Q. Did you say those words or something close to those words?

A. Not that I recall.

Q. Do you recall discussing with him an attack?

A. Where was he, in Egypt?

Q. Yes.

A. What enemy?

Q. Well I'm asking you, sir.

A. No.

Q. Did you discuss with him having enough equipment to engage an enemy?

A. I don't recall that.

Q. But you may have?

A. I don't recall that.

Q. Well –

A. I'm trying to put where you're going.  If I may –

Q. Well, it's a very specific question, sir.

A. Go ahead.

Q. The question is: In your conversation in 1998 with Mr. Yousef in which he discussed soccer equipment did you or did you not talk to him about having enough equipment to

engage an enemy?

A. No.

Q. You did not?

Q. Did you discuss with him anti-armor tools?

A. I don't recall.

Q. But you might have?

A. What is that again?

Q. Anti-armor tools. Did you discuss tools with him?

A. I don't recall what we spoke. I know that we spoke that he wants to trade and he wants to have a soccer team and stuff like that. Other than that, I don't recall. I know that part.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did speak in coded language with other individuals, including Mohamed Youssef, when discussing jihad activities.

All in violation of Title 18, United States Code, Section 1621(1).

<u>**COUNT 8**</u>

**(Perjury)**

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an

21

Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his conversations with Mohamed Youssef about the experience of fighting in a jihad conflict, as herein set forth below:

Q. Sir, have you ever discussed with Yousef in any phone call his experiences on the front lines?

A. What front lines?

Q. Front lines of any battle.

A. What battle?

Q. Any battle, any armed conflict.

A. He never spoke to me about any armed conflict.

Q. So you've never discussed with him his activities on the front lines in any armed struggle or conflict?

A. I don't recall any of that happening.

Q. But it could have?

A. Not really.  No.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did participate in conversations with Mohamed Youssef about the experience of fighting in a jihad conflict.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 9

### (Perjury)

Beginning on or about July 22, 2002, and continuing until on or about August 1, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his participation in conversations about killing a woman in Lebanon, as herein set forth below:

Q. Now you have read the allegations in the affidavit provided by the Government written by Officer Arena -

A. Yes, I did.

Q. - FBI Agent. I'm going to direct your attention to that affidavit. First, we're going to go to Paragraph 17 where it has the allegation that sometime in August, 1997, you had a conversation with someone identified as an associate concerning a female, the way I understood, was stuck in Lebanon, and the Government, in cooperation with CIA and State Department, was trying to bring her here. And you made some comments. Do you recall any of those comments?

A. No.

23

Q. Do you recall any female stuck in Lebanon -

A. No, I don't.

Q. - In 1997?

A. No.

Q. Do you recall you ordering the assassination of that female?

A. Never.

Q. I remind you are under oath.

A. I am under oath.

Q. And I want you to - five, six, years ago, which incident has been explained here, and do you recall saying that "I have to speak with brothers in Lebanon to take care of her."

A. Never.

Q. Do you recall any conversation?

A. Never. Never happened.

* * * *

Q. Do you recall any of this, which is said in paragraph 17, if it ever happened?

A. Never happened. I read it many times through the weekend, through the whole week since I had this, none of that happened.

* * * *

Q. And, sir, do you still claim that at no time you had a conversation about a female who had traveled from the United States to the Middle East, that conversation discussing the issue of having her killed?

A. Do I what?

24

Q. Did you ever have a conversation with somebody about killing a woman?

A. No, no, never.

* * * *

Q. Hassoun, you know that there's a - someone named "associate" mentioned in - in paragraph 17 of Agent Arena's declaration. Do you know who that person is?

A. No.

Q. Have you ever spoken to anyone who can say I overheard you saying that you want to kill someone, plot to kill someone?

A. No.

Q. Did you ever have in your mind ill - will against anyone?

A. Never.

Q. Do you know this female mentioned in paragraph 17?

A. I have no idea.

Q. So it's an absolute denial?

A. Absolute denial.

Q. You under oath.

A. I am under oath.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did participate in conversations about killing a woman in Lebanon.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 10

### (Obstruction of Proceedings)

Beginning on or about June 12, 2002, and continuing until on or about September 30, 2002, in Broward and Miami-Dade Counties, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

did knowingly and willfully corruptly endeavor to influence, obstruct, and impede the due and proper administration of law under which a pending proceeding, that is, an Immigration Court proceeding, was being had before a department and agency of the United States, in violation of Title 18, United States Code, Section 1505.

## FORFEITURE

1.     The allegations in Count 1 of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America of property in which the defendant has an interest, pursuant to the provisions of Title 18, United States Code, Section 924(d)(1), as incorporated by Title 28, United States Code, Section 2461(c), and the procedures outlined in Title 21, United States Code, Section 853.

2.     Upon the conviction of any knowing violation of Title 18, United States Code, Section 922(g)(5)(B), the defendant shall forfeit to the United States any firearm involved in or used in the commission of said violation.

3.     The property subject to forfeiture includes, but is not limited to, a Smith & Wesson 9 millimeter pistol seized from the defendant on June 12, 2002.

26

All pursuant to Title 18, United States Code, Section 924(d)(1), as incorporated by Title 28,

United States Code, Section 2461(c), and the procedures outlined in Title 21, United States Code,

Section 853.

A TRUE BILL

FOREPERSON

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

RUSSELL R. KILLINGER
ASSISTANT UNITED STATES ATTORNEY

STEPHANIE K. PELL, TRIAL ATTORNEY
COUNTERTERRORISM SECTION
UNITED STATES DEPARTMENT OF JUSTICE

JULIA A. PAYLOR
ASSISTANT UNITED STATES ATTORNEY

27

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

**vs.**

**ADHAM AMIN HASSOUN,**
a/k/a "Abu Sayyaf,"

**MOHAMED HESHAM YOUSSEF,**
a/k/a "Abu Turab"

**Defendants.**

_____/

**CASE NO.** ___04-60001-CR- Cooke (s)(s)___

### CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

New Defendant(s)          Yes  _x_      No ____
Number of New Defendants              _1_
Total number of counts                _10_

**Court Division:** (Select One)

_x_   Miami       ____ Key West
____  FTL         ____ WPB   ____ FTP

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:   (Yes or No)   ___Yes___

   List language and/or dialect   ___Arabic___

4. This case will take   _90_   days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)                                          (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | | _____ |
| II | 6 to 10 days | _____ | Minor | | |
| III | 11 to 20 days | _____ | Misdem. | | _____ |
| IV | 21 to 60 days | _____ | Felony | | _X_ |
| V | 61 days and over | _X_ | | | |

6. Has this case been previously filed in this District Court?  (Yes or No)   _Yes_
If yes:
Judge: _____Cooke_____      Case No.   _04-60001-CR-Cooke (s)_
(Attach copy of dispositive order)
Has a complaint been filed in this matter?   (Yes or No) _____
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of   _January 12, 2004_____
Defendant(s) in state custody as of _____
Rule 20 from the _____ District of _____

Is this a potential death penalty case? (Yes or No) ___No___

7. Does this case originate from a matter pending in the U.S. Attorney's Office prior to April 1, 2003?   _X_ Yes  ___ No

8. Does this case originate from a matter pending in the U. S. Attorney's Office prior to April 1, 1999?  ___Yes  _X_ No
   If yes, was it pending in the Central Region? ___ Yes ___ No

9. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?  ____ Yes  _X_ No

10. Does this case originate from a matter pending in the Narcotics Section (Miami) prior to May 18, 2003 ?   ____ Yes  _X_ No

_____
RUSSELL R. KILLINGER
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 312851

Penalty Sheet(s) attached

REV.1/14/04

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** ADHAM AMIN HASSOUN, a/k/a "Abu Sayyaf"

**Case No:** 04-60001-CR-Cooke (s)(s)

Count #: 1

Conspiracy to Provide Material Support to Terrorists
18 U.S.C. § 2339A and 371
* **Max.Penalty**: Fifteen (15) years' imprisonment

Count #: 2

Providing Material Support to Terrorists
18 U.S.C. § 2339A
*Max. Penalty: Fifteen (15) years' imprisonment

Count #: 3

Unlawful Possession of a Firearm
18 U.S.C. § 922(g)(5)(B)
*Max. Penalty:  Ten (10) years' imprisonment

Count #: 4

Making a False Statement
18 U.S.C. § 1001(a)
*Max. Penalty: Five (5) years' imprisonment

Count #:  5, 6, 7, 8, and 9

Perjury
18 U.S.C. § 1621(1)
* Max. Penalty: Five (5) years' imprisonment

Count #:  10

Obstruction of Justice
18 U.S.C. § 1505
*Max. Penalty: Five (5) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: **MOHAMED HESHAM YOUSSEF, a/k/a "Abu Turab"**

**Case No**: **04-60001-CR-Cooke (s)(s)**

Count #: 1

Conspiracy to Provide Material Support to Terrorists
18 U.S.C. § 2339A and 371

**\* Max.Penalty**:  Fifteen (15) years' imprisonment

Count #: 2

Providing Material Support to Terrorists
18 U.S.C. § 2339A
**\*Max. Penalty:** Fifteen (15) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**