UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60001-CR-COOKE/McAliley (s)(s)(s)(s)

UNITED STATES OF AMERICA

vs.

ADHAM AMIN HASSOUN and
KIFAH WAEL JAYYOUSI,

        Defendants.
_____/

GOVERNMENT'S RESPONSE TO DEFENDANTS' JOINT MOTION TO
TERMINATE ADMINISTRATIVE DETENTION OR FOR HOUSE ARREST

I. INTRODUCTION

In this terrorism prosecution, where Defendants Adham Amin Hassoun and Kifah Wael Jayyousi ("Defendants") have been indicted for supplying funds, war-fighting material, and personnel to overseas jihad conflicts, Defendants make the extraordinary claim that they pose no security threat and are entitled to normal pretrial detention conditions, even to the point of proposing house arrest. At bottom, Defendants assert that their administrative detention in the Special Housing Unit ("SHU") of the Federal Detention Center-Miami ("FDC") is too restrictive and punitive. However, FDC officials have placed these individuals in the SHU for their own safety and the safety of the institution, while attempting to accommodate their need for familial contact and legal consultation. Despite these efforts, Defendants now want to coax this Court into adjudicating the details of their daily regimen, asking it to in essence to start running the local prison. This Court should decline Defendants' invitation, and instead mandate that they exhaust administrative remedies or endure their conditions of confinement, which are right and reasonable under the circumstances.



## II. ARGUMENT

**A.   Defendants Have Failed to Exhaust Their Administrative Remedies.**

Defendants have failed to exhaust the Bureau of Prison's ("BOP's") Administrative Remedy Program ("ARP"), 28 C.F.R. § 542.10 et seq., a prerequisite for judicial intervention in the highly-specialized field of prison administration. Under the APR, Defendants can file an administrative remedy seeking a formal, written response from the Warden regarding their placement in administrative detention and restrictions on family and attorney visits. If dissatisfied with the Warden's response, Defendants can file an appeal with the BOP's Regional Director in Atlanta, Georgia, with further recourse to the Director of the BOP, through the Office of the General Counsel. 28 C.F.R. § 542.15. Either the Regional Director or the Director may overturn the Warden's decision to place Defendants in administrative detention. It would be inequitable to provide Defendants with their requested relief at this point when their claims have not been properly presented to the BOP to resolve, one way or the other.

In this case, Hassoun has commenced the administrative remedies process by filing at the institutional and regional levels. Hassoun's sole complaint in his administrative petition was that he should be placed in the prison's general population. Unsuccessful on the institutional and regional levels, Hassoun did appeal the denial of his request to the Office of the General Counsel, though his appeal was not timely filed. On June 22, 2005, the Office of General Counsel sent notice to Hassoun regarding the untimeliness of his appeal. The notice advises Hassoun that his appeal was not filed timely, but if he could submit verification from FDC-Miami that the delay was not his fault, then his appeal would be accepted. It is not known if that notice has been received by Hassoun as of this date. Jayyousi has shown no such inclination to follow proper procedure, and has instead

2

ignored the administrative review process altogether in favor of requesting direct judicial intervention.

The doctrine of exhaustion is based on the premise that administrative agencies are specialized entities and that courts should not interfere with their function until they have been given a chance to exercise and explain their decision-making. McKart v. United States, 395 U.S. 185, 194 (1969). Here, the exhaustion requirement is a statutory prerequisite. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, requires that federal pretrial detainees exhaust their administrative remedies prior to seeking judicial relief. In promulgating the PLRA, Congress mandated:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C.A. § 1997e(a). Thereafter, the Eleventh Circuit ruled that because the exhaustion requirement is Congressionally-mandated, courts lack the discretion to waive it. See Alexander v. Hawk, 159 F.3d 1321, 1325-26 (11th Cir. 1998) (quoting McCarthy v. Madigan, 503 U.S. 140, 144 (1992)) ("Where Congress specifically mandates, exhaustion is required."). This Court therefore must deny Defendants' request for redesignation as improvident because they have failed to exhaust the BOP's administrative remedies.[1]

---

[1] In habeas corpus cases, the Supreme Court has upheld the PLRA's exhaustion requirement. Two recent decisions, Porter v. Nussle, 534 U.S. 516 (2002), and Booth v. Churner, 532 U.S. 731 (2000), convey that exhaustion is required for all lawsuits seeking redress for prison circumstances or occurrences.

B.  **Defendants Have Not Shown a Valid Theory for Granting Relief.**

Even if Defendants' claims were not procedurally barred, Defendants have failed to show how their placement in administrative detention violates either BOP policy or their constitutional rights. Administrative detention entails confinement in special housing and removes an inmate from the general population. 28 C.F.R. § 541.22. This regulation, the reasonableness of which is presumed, see Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (presumption of reasonableness attaches to prison security regulations), allows the BOP to place an inmate in "administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution." 28 C.F.R. § 541.22(a)(3). FDC-Miami has acted consistent with this policy and has done so with adequate justification, such that Defendants cannot show entitlement to any redress or relief.

In this case, the BOP has concluded that Defendants pose a serious threat to the safety of themselves, the staff, and other inmates. As grounds, FDC officials took into account that Defendants are charged with terrorism-related offenses, and have associated with radical Islamic organizations, including the Islamic Group of Egypt and al Qaeda. In fact, it is a matter of public record that Defendants hold Osama bin Laden in high esteem. Given the fact that Defendants hold views that are rather unpopular, even amongst pretrial detainees and convicted criminals, the BOP has decided that Defendants would be safer if removed from the general population. There were further concerns about institutional security, which itself has prompted Defendants to be earmarked for special housing. In this regard, Defendants are treated no differently than other terrorism suspects around the country. The BOP has concluded that Defendants are high-risk prisoners, and placing them in administrative detention is the most effective way to provide the close supervision

4

that they require.

Moreover, BOP officials are in the best position to determine how to manage the FDC and where to house its residents. The decision to house Defendants in administrative detention is based on a knowledge of the institution's resources, strengths, and weaknesses, as well as the heavy volume of daily activity in that facility. After taking all these variables into account, the BOP has concluded that a conservative approach in managing Defendants is required. Prison officials have determined that staff must closely monitor Defendants' telephone calls, mail, movement, and contacts. Moreover, the BOP has determined that because they cannot closely monitor the activities of Defendants if they are placed in the general population, their placement therein poses a serious threat to the safety of staff and inmates as well as to the security and orderly running of the facility. BOP officials have the discretion to make such a determination, and exercising their judgment in this regard does not violate the law.

Assuming that Defendants could point to a violation of constitutional rights related to denial of relatively free access to family members or their attorneys, they must nevertheless demonstrate that prison policy and practice is not reasonably related to a legitimate penological interest. Turner v. Safley, 482 U.S. 78, 89 (1987). However, the Eleventh Circuit has accorded a presumption of reasonableness to prison security regulations. Harris, 65 F.3d at 916. And the court has specifically found that restrictions on an inmate's visitation by family members and access to legal counsel may be justified by security considerations. See Caraballo-Sandoval v. Honsted, 35 F.3d 521, 525 (11th Cir. 1994) (commenting that "inmates do not have an absolute right to visitation, such privileges being subject to the prison authorities' discretion, provided that the visitation policies meet legitimate penological objectives"); Solomon v. Zant, 888 F.2d 1579, 1581 (11th Cir. 1989) (noting

that "restrictions on an inmate's access to counsel may be justified by security considerations"). The fundamental calculation is whether Defendants' housing designation, and its concomitant restrictions, are reasonable in light of legitimate penological interests.

In considering whether it is reasonable to house Defendants in administrative detention, this Court should consider the four factors outlined by the Supreme Court in Turner: 1) whether a valid rational connection exists between the policy and the legitimate government interest; 2) whether an alternative means of exercising the constitutional right is available to the prisoner despite the policy; 3) whether, and the extent to which, accommodation of the asserted right will have an impact on other inmates, prison staff, or the prison resources in general; and 4) whether the regulation represents an exaggerated response to prison concerns. Solomon, 888 F.2d at 1581 (citing Turner, 482 U.S. at 89-91).

In finding that an inmate's access to the courts is subject to reasonable restriction and limitations related to penological interests, the Turner Court cautioned that the judiciary is "ill equipped to deal with the increasingly urgent problems of prison administration and reform." Turner at 84 (citing Procunier v. Martinez, 416 U.S. 396, 405 (1974)). Thus, the Court strove to be "responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" Id. Accordingly, rejecting a strict scrutiny or even heightened standard of review, the Supreme Court declared that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89. See also Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000) ("Unlike the strict standards of scrutiny applicable to the constitutional rights of persons in free society, the Supreme Court has adopted a deferential standard for determining whether a prison regulation

6

violates an inmate's constitutional rights. A prison regulation, even though it infringes the inmate's constitutional rights, is an actionable violation only if the regulation is unreasonable.").[2]

Defendants' placement in administrative detention is premised on the threat that they poses to staff, inmates, security, and the institution's orderly operation, and there is no obvious alternative to this custodial arrangement. There is a valid, rational connection between providing the close supervision available in administrative detention and maintaining institutional security. Even where pretrial detainees are concerned, security is the central goal of prison administration, and prison officials must be free to take actions to protect security. Bell v. Wolfish, 441 U.S. 520, 546-47 (1979). Thus, a defendant's presumption of innocence notwithstanding, the Supreme Court has noted that pretrial detainees pose as much of a security risk to an institution as do convicted inmates, and that they may present even greater hazards regarding escape. Id. at 533, 546 n.28. Given these unique considerations, the Court has stated that "the operation of our correctional facilities is peculiarly within the province of the Legislative and Executive Branches of our Government, not the Judicial." Id. at 547-48.

Considering whether, and the extent to which, accommodation of Defendants' asserted rights will have an impact on other inmates, prison staff, or prison resources in general, this Court should bear in mind the concerns that the BOP factored into their ultimate decision for the SHU. Prison officials believe that the menacing presence of these individuals in the general population can interfere with the ability of officers to properly run the FDC's regular housing units. This has

---

[2] Because the BOP has valid reasons for placing Defendants in the SHU, this Court's analysis can end here. See Pope v. Hightower, 101 F.3d 1382, 1384-85 (11th Cir. 1996) ("When considering a constitutional challenge to a prison regulation, courts are obliged to ensure that the restriction bears a reasonable relation to a legitimate penological objective. If such a relation exists, the inquiry is at an end.").

implications regarding the well-being of the general prison population. Additionally, once in the general population, Defendants would also have access to the institution's main visiting room and the approximately 2,500 individuals passing through it on a weekly basis. Furthermore, the BOP would have a very limited ability to monitor and control Defendants' telephone activity once they are released from administrative detention. Again, as terrorism suspects go, Defendants are not being singled out for particularly harsh conditions of confinement.

Finally, with respect to whether the BOP's response to its own concerns is impermissibly exaggerated, Defendants bear the burden of providing "substantial evidence on the record to indicate that [prison] officials have exaggerated their response" to legitimate concerns. Id. at 548. Absent such a showing, this Court should defer to the BOP's determination regarding Defendants' placement in administrative detention. Thus far, Defendants have failed to provide any evidence that the BOP's decision in favor of the SHU is in any way an exaggerated response. Rather, Defendants allege summarily, and incorrectly, that the BOP's decision is an arbitrary one and presume that the BOP's methods are unfounded. As stated above, the nature of Defendants' charges, and the credible information available about their illegal activities, dictate the cautious and measured response to their presence at the FDC.

C. **Defendants Are Not Being Punished.**

Because Defendants have not shown a constitutional infirmity regarding their placement in administrative detention, the analysis turns to whether they have a liberty interest in remaining free from administrative detention. In this regard, the proper inquiry is whether the restrictions and conditions they experience therein as pretrial detainees are intended to punish them. In Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court explained that "[n]ot every disability imposed

8

during pretrial detention amounts to 'punishment' in the constitutional sense . . . . the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" Id. at 537. The Court further wrote:

> Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination will generally turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it . . . Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"

Id. 538-39. Because the restraints imposed upon Defendants are reasonably related to maintaining jail security, those restraints do not, without more, constitute unconstitutional punishment warranting judicial involvement in the FDC's administration. Id. at 540. In fact, effective management alone may justify imposition of restrictive conditions upon a detainee and dispel any inference of punishment. See Zarnes v. Rhodes, 64 F.3d 285, 292 (7th Cir. 1995) (explaining the government cannot place a pretrial detainee in segregation for no reason, but maintaining jail security is an appropriate justification for inflicting restrictions on detainees).

The only determination for this Court is whether Defendants' placement in administrative detention is reasonably related to the BOP's interest in the FDC's safe, secure, and orderly operation. In doing so, the Supreme Court has cautioned that considerations regarding prison management "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Bell, 441 U.S. at 540. To that end, the Court explicitly rejected the Second Circuit's compelling necessity

standard for reviewing jailhouse restrictions. See id. at 523 (reversing Second Circuit's ruling that pretrial detainees may "be subjected to only those restrictions and privations which inhere in their confinement itself or which are justified by compelling necessities of jail administration"). Presently, the BOP's reasons for housing Defendants in administrative detention are reasonably related to legitimate objectives of maintaining institutional order and security, as well as ensuring the safety of inmates and staff. For these reasons, Defendants are not being punished.

### D.   FDC Officials Have Eased Restrictions on Defendants.

Defendants have advanced a series of complaints about their conditions of confinement, most of which FDC officials are attempting to address consistent with the interests of institutional safety. Although it is apparent that these terrorism suspects would like to return to the general population, if not leave prison altogether and be placed on house arrest, it has been determined that the SHU is the only appropriate housing option for these inmates. Moreover, given the nature of the charges and the fact that courts have consistently ruled that pretrial detention is appropriate here, Defendants' suggestion of house arrest borders on the absurd. Defendants have been deemed to pose a serious security risk, but despite their risk classification, FDC officials are taking steps to provide greater freedom to Defendant than would normally be the case in the SHU. The government's response to Defendants' specific complaints regarding their detention conditions are as follows:

#### 1.   Defendants' Family Visitations

Hassoun alleges that his social visitation is limited to Mondays from 12 p.m. to 3 p.m.. Jayyousi alleges that his social visitation is limited to Monday mornings. According to BOP policies, inmates housed in the SHU are allowed visitation during the week and not on weekends. Their visitation days are particular to the unit to which they are assigned. Visiting hours in the SHU

are between 7:00 a.m. and 3:00 p.m. Defendants's family visitation arrangements are consistent with this policy. Jayyousi further complains that his minor children are not allowed to visit him in the SHU. Although Jayyousi claims to have requested a waiver of this restriction, he does not state to whom the request was directed. Jayyousi can request a special family visit with his two minor daughters, which the FDC officials will address, at a minimum, on a quarterly basis. Hassoun himself was recently allowed to visit with his minor children.

### 2. Defendants' Telephone Calls

Hassoun and Jayyousi allege that they are entitled to only a single social telephone call per week, and that the call is usually allowed in the evenings, which is an inconvenient time for Hassoun's family. However, FDC-Miami's rules about telephone privileges are actually liberal when compared to the national norm. The BOP's national policy is that inmates housed in the SHU are allowed <u>one</u> social telephone call every <u>fifteen</u> days. FDC-Miami's policy provides for <u>one</u> such social call every <u>seven</u> days. Because FDC is now aware that Hassoun has difficulty speaking with his family in the evenings, his telephone privileges will be rescheduled during the daytime shift. Jayyousi claims that there is no set time for his weekly social call, which causes an inconvenience to himself and his family. Nevertheless, FDC cannot guarantee a specific time each week because other staffing issues in running the prison may take priority from time to time over providing Jayyousi with a social call.

### 3. Defendants' Mail

Hassoun and Jayyousi allege that they have experienced long days in receiving their mail. Hassoun and Jayyousi write in Arabic, and given the nature of the pending charges, their mail must be monitored pursuant to BOP policy as a security precaution. Because Hassoun and Jayyousi are

11

writing in a foreign language, their mail must be translated before it is forwarded back to them. At times, Hassoun's and Jayyousi's mail must be forwarded to FBI translators, which further delays their mail delivery. Non-negotiable security needs dictate that Hassoun's and Jayyousi's mail be intercepted and translated. The mail is forwarded back to them as soon as practicable. Nothing contained in these mail intercepts has been communicated to the United States Attorney's Office for use at trial, though any such non-privileged communications could be so used.

 4. **Defendants' Attorney Visitations**

Defendants claim that arrangements in the SHU are inadequate for attorney-client visits. More to the point, they complain that their visitation room itself is inadequate for reviewing documents with counsel, and that the requirement of the three-guard escort often delay the start of attorney visits. FDC officials advise that the Defendant's attorneys can make arrangements to visit with them in the contact visiting room in the SHU. The contact visiting room is available on a first-come, first-served basis, and counsel can make arrangements through the Legal Liaison at FDC-Miami in advance. However, after consultation with the United States Attorney's Office, the FDC is now making arrangements for Defendants to access a workroom and computer, which will allow easier review of documents and various other forms of discovery (recordings, CDs, videotapes, etc.). Defendants will be provided pencils and paper, and will be allowed access to this document/consultation room in two- to three-hour time blocks. Without further specifics regarding the alleged delays in escorting attorneys to their clients, or vice versa, the FDC cannot assess or address this issue.

### III. CONCLUSION

For all of the foregoing reasons, Defendants' joint motion to terminate administrative detention or to be placed on house arrest should be denied without further hearing.

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Russell R. Killinger
Fla. Bar No. 0312851
Brian K. Frazier
Court No. A5500476
Assistant United States Attorneys
99 N.E. 4th Street, 8th Floor
Miami, Florida 33132
Tel: (305) 961-9000
Fax: (305) 530-7087

Julia A. Paylor
Fla. Bar No. 0724785
Assistant United States Attorney
500 South Australian Avenue, Suite 400
West Palm Beach, Florida  33401
Tel: (561) 820-8711
Fax: (561) 802-1787

Stephanie K. Pell
Court No. A5500301
Trial Attorney, Counterterrorism Section
United States Department of Justice
10th and Constitution Avenue, N.W., Room 2649
Washington, DC  20530
Tel: (202) 353-2357
Fax: (202) 514-8714

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing has been sent via first-class United States Mail, postage prepaid, on this the 6th day of July, 2005, to:

>Kenneth M. Swartz, Esq.
>Swartz & Lenamon
>New World Tower, Suite 2100
>100 North Biscayne Boulevard
>Miami, Florida  33132
>Counsel for Defendant
>Adham Amin Hassoun
>
>William W. Swor, Esq.
>3060 Penobscot Building
>645 Griswold Street
>Detroit, Michigan  48226
>Counsel for Defendant
>Kifah Wael Jayyousi

_____
Russell R. Killinger
Assistant United States Attorney