## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 04-60001-CR-COOKE/Brown (s)(s)(s)(s)(s)

**UNITED STATES OF AMERICA**

**vs.**

**ADHAM AMIN HASSOUN,**
**KIFAH JAYYOUSI and**
**JOSE PADILLA, et al.,**

      **Defendants.**

_____/

### GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANTS' OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORTS

The United States of America, through the undersigned Assistant United States Attorneys, files this Sentencing Memorandum, which includes our response to the Defendants' Objections to Presentence Investigation Reports (PSIs) in this case. In this memorandum, we set forth why this Court should sentence each defendant to life imprisonment, which is the properly-calculated advisory Guidelines sentence for Hassoun and Jayyousi and is the top of the properly-calculated Guidelines range for Padilla. We first address the defendants' unconvincing objections to the Probation Office's Guidelines calculations. We then address the defendants' unpersuasive requests for a departure on various grounds. Finally, we explain why a sentence of life imprisonment would be reasonable and consistent with the statutory sentencing factors in 18 U.S.C. § 3553.

We will not belabor here the reasons for our request, which should be clear to anyone familiar with the record in this case. In furtherance of a twisted version of Islam, with the ultimate goal of creating Islamic governments under Sharia in present and former Muslims lands, these defendants supported killings and other extreme violence. During an eight-year conspiracy, these men aided mujahideen fighters and organizations aligned with terrorists, claimed membership in

terrorist groups, communicated with convicted terrorists, and attended terrorist training camps. They did so knowingly, intentionally and willfully, fully prepared to kill any "infidels" in their path. For months, these defendants stood before a jury in this District, disputing the same facts and raising the same weak arguments they offer today in hopes of leniency.  The jury properly and soundly rejected those arguments, and convicted all defendants on all counts.  The Court should now impose sentences on these defendants that are consistent with the verdict and the seriousness of their crimes; and by doing so, deter others who may seek to use the freedoms of the United States to pursue a terrorist agenda overseas.[1]

## Background

On August 16, 2007, the jury returned its verdict in this case.  The jury found each defendant guilty of conspiring to murder, maim and kidnap persons overseas, in violation of 18 U.S.C. § 956(a)(1) (Count One), conspiring to provide material support to such a conspiracy, in violation of 18 U.S.C. § 371 (Count Two), and providing material support to such a conspiracy, in violation of 18 U.S.C. § 2339A (Count Three).  In each count, the indictment charged that the offense continued from in or about October 1993 until November 1, 2001.  The jury agreed that the objects of the Count One conspiracy included murdering people overseas, maiming persons overseas, and kidnaping persons overseas.  On November 21, 2007, this Court denied each defendant's motion for a judgment of acquittal or for a new trial.  *See* DE 1269, 1270.

The Probation Office has prepared separate PSIs for each defendant.  Probation used the 2001 edition of the Guidelines, as the defendants' charged misconduct continued until and ended during the period that manual was in effect.  The offense conduct section of each defendant's PSI

---

[1]A table of contents for this memorandum is attached as Exhibit A.

is identical.   The PSI for defendant Hassoun calculates his sentence at life imprisonment, recommending Guidelines enhancements for terrorism and for aggravating role.   The PSI for defendant Jayyousi does the same, putting his sentence at life and imposing enhancements for terrorism and for aggravating role.   The PSI for defendant Padilla does not include a role adjustment, but does impose the terrorism enhancement, putting his sentencing range at 360 months to life.[2]

Each defendant has objected to his PSI, challenging all of the enhancements and proposing alternative sentences that can only be described as absurd in light of the verdict and the nature of the charges.   Hassoun claims that his Guidelines sentence should be 46-57 months, which would mean that this defendant, having admitted membership in Al Qaeda affiliates and having been convicted of participating in an eight-year murder conspiracy, would receive a sentence below that of the typical drug mule seized at the airport.[3]   Jayyousi thinks even that punishment too severe for him, and asks for a mere 15-21 months.   As for Padilla, it is unclear what range he ultimately thinks appropriate, but he seems to envision a sentence similar to Hassoun's which would include a minor role adjustment for this man who trained with Al Qaeda.

These arguments demonstrate again that the defendants still have no conception of the seriousness of their crimes.   Fortunately the jury did not share that view, and the Court has now upheld the verdict.   In all respects, the Court should overrule the defendants' PSI objections, deny

---

[2] Separate and apart from the terrorism enhancement, which requires that a defendant's Criminal History category be set at VI, Padilla's PSI finds that he is a career offender, and therefore places him in Criminal History category VI on that basis as well.  Padilla PSI ¶ 172.

[3] Perhaps recognizing that this request is unreasonable even by his standards, in his latest filing with this Court (his sentencing memorandum discussing the 18 U.S.C. § 3553 factors, DE 1276), Hassoun ups the range he thinks appropriate for his punishment, to "somewhere between 51 and 78 months."  DE 1276 at 21.  He is still way off.

their departure requests, and sentence the defendants to life imprisonment, a punishment that would be within their properly-calculated advisory Guidelines range and supported by the factors in § 3553. Only a sentence of that length would adequately capture the danger posed by their misconduct and sufficiently deter others from committing similar crimes.

<u>**Sentencing Procedures and the Format of this Memorandum**</u>

The United States recognizes, of course, that the Sentencing Guidelines are now advisory, and that a defendant's sentence must be consistent with the factors set forth in 18 U.S.C. § 3553. *See United States v. Booker*, 543 U.S. 220, 245 (2005). Nonetheless, even after *Booker*, the advisory Sentencing Guidelines remain an important (and indeed mandatory) consideration. The Eleventh Circuit has emphasized that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *United States v. Scott*, 426 F.3d 1324, 1330 (11th Cir. 2005)*; see also United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005) (court should calculate the sentencing range "correctly" even though it is only advisory). As the Supreme Court itself recently held, the Guidelines generally can be assumed to be a "rough approximation" of a sentence that would "achieve § 3553(a)'s objectives." *Rita v. United States*, 127 S. Ct. 2456, 2458 (2007).

As a first step in sentencing, therefore, a court must look to the PSI and properly calculate the defendant's advisory Guidelines range. To that end, in Section I of this memorandum, we discuss – and suggest a sensible approach to handling – the defendants' myriad factual objections to the offense conduct section of the PSIs. This discussion pertains to all defendants, as the offense conduct section is the same for each. We turn next, in Section II of this memorandum, to the

4

specific enhancements challenged by the defense.[4]  Initially we address the one enhancement applied uniformly to all defendants, which is the terrorism enhancement in USSG § 3A1.4.  We then address separately the defendants' varying objections about their role in the offense under USSG §§ 3B1.1 and 2.  We then consider the defendants' remaining objections, which can be dealt with concisely.[5]

Next, in Section III of this memorandum, we address the defendants' requests for a departure from the Guidelines range.  As this Court is aware, departures continue to be part of the sentencing process, since the Court must consider any departure requests in setting the advisory Guidelines range.  *See United States v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005).  Finally, in Section IV of this memorandum, we address the § 3553 factors, and explain why life imprisonment is the only reasonable sentence that could be imposed in this case.

<u>**Argument**</u>

**I.   The Defendants' Objections to the Offense Conduct Section of the PSIs Either Contradict the Verdict, Are Incorrect or Need Not Be Addressed.**

**A.   The terms "Terrorism" and "Terrorists" are properly included in this section.**

Before turning to defendants' specific objections to the contents of the offense conduct section of the PSIs, one broader issue must be addressed.  Hassoun objects to the use of the terms "terrorism" and "terrorists" throughout that section to describe the intended results and recipients of the material support activities charged in Counts Two and Three.  He further claims that, because

---

[4]The government does not have any objections of its own to the offense level calculations of the PSI.  Depending upon the Court's rulings, however, we reserve the right to seek any departure necessary to ensure that the defendants' advisory Guidelines range remains as it stands now.  *See also* n.20 & 25 *infra*.

[5]These include Padilla's request for a different base offense level for Counts Two and Three and Jayyousi's request that he be sentenced using a different manual, his request for acceptance of responsibility, and his request for a reduction based upon substantial assistance.

these terms were redacted from the indictment that was given to the jury, they cannot now find their way into the PSI.

Because this will be a bench sentencing, Hassoun's complaint is an incredible example of placing form over substance. The government has not urged this Court to sentence Hassoun based on the labels affixed to the charges, but on the facts adduced at trial and the jury's ultimate verdict.[6] Nor would the government expect this Court to do otherwise. The critical issue for sentencing is not whether "terrorism" and "terrorists" were labels that were included in the indictment sent to the jury, but whether the underlying facts proven at trial would support the "terrorism" enhancement. As we argue below, the "terrorism" enhancement is proper, making it all the more appropriate to use these terms as descriptors for the charges in Counts Two and Three. Ultimately, it is irrelevant whether the PSI uses these terms; the labels affixed to the charges, as opposed to the facts of the underlying conduct, are not a proper basis for sentencing.[7]

---

[6]In fact, when the government agreed to redact the words "for terrorists" from the headings of the material support counts solely for purposes of the jury's deliberations, it reserved the right to insist that other "terrorism" references in the indictment remain, given that the evidence in the case touched upon "terrorist tactics, terrorist training camps, and terrorist groups that the defendants either supported or claimed to be members of." DE 1179, at 2 n.1.

[7]As the government has argued elsewhere, the word "terrorist" is used in the indictment precisely as Congress intended it. The exact and official title of one of the crimes originally charged in Count Two was "Conspiracy to Provide Material Support to Terrorists," *see* 18 U.S.C. § 2339A(a) (the remaining conspiracy charge in Count Two is merely the 18 U.S.C. § 371 version of the same offense, incorporating the substantive material support for terrorists offense), and the same goes for the offense in Count Three, named "Material Support of Terrorists." *See* 18 U.S.C. § 2339A(a). Section 2339A itself is located in Chapter 113B of Title 18, which is entitled "Terrorism." And 18 U.S.C. § 2331 provides definitions for "international terrorism" and "domestic terrorism." *See* 18 U.S.C. §§ 2331(1) and (5). Whether Hassoun likes it or not, Congress has deemed cases like this to be about terrorists and their organizations. The proof at trial showed that there is no more accurate characterization for the type of individuals and organizations with whom Hassoun and his coconspirators were closely affiliated.

**B.**     **Defendants' specific factual objections are misplaced.**

Each defendant posits a long list of factual objections to paragraphs in the offense conduct section, which collectively and, in some instances, individually, amount to a general denial of criminal wrongdoing.  The offense conduct section is based on facts taken directly from the evidence, and this section consists of either the literal words that were spoken or other uncontroverted facts, such as the words contained in certain documents.  The PSI does not contain "inferences" or one-sided versions of events.  Instead, it includes a straightforward rendition of the evidence without shading or slanting the facts to make them inconsistent with the jury's verdicts. To be sure, the defense in this case was premised on the unfounded belief that the government was misinterpreting the literal words of the defendants and their associates, but the time has now passed for the defense trying to argue the best face of unfavorable evidence.

The jury has rendered its verdict, which is consistent with the government's view of the facts. This view of the facts, and the verdict itself, has been judicially sustained under Fed. R. Crim. P. 29, and the defendants cannot now relitigate the trial evidence in the guise of PSI objections.  *See United States v. Schlaen*, 300 F.3d 1313, 1318 (11th Cir. 2004) (quoting *United States v. Costales*, 5 F.3d 480, 488 (11th Cir. 1993)) ("[A] district court cannot use the post-trial sentencing process to call a jury's verdict into question."); *see also United States v. Thayer*, 204 F.3d 1352, 1356 (11th Cir. 2000) (holding that district court cannot grant relief at sentencing that "completely nullifies the effect of the jury finding" of guilt).[8]

Thus, rather than undertake a point-by-point refutation of the defendants' voluminous

---

[8]*See also Costales*, 5 F.3d at 488 ("We are confident that the Commission did not intend the Sentencing Guidelines as an instrument for undermining confidence in a jury verdict.").

objections (between the three defendants, the government counts 86 total objections, some of which contain multiple arguments or pertain to more than one paragraph in the PSIs, or both), it is possible to view the objections through the lens of the following three-part framework:

- **First**, to the extent that the defendants want to add <u>facts</u> to the offense conduct section based on things said or evidence introduced at trial (as opposed to arguments or inferences about what certain statements mean, etc.), this Court can make those <u>facts</u> part of the PSI record.  The government has no objection to this procedure, provided these are true facts and not jury arguments about what previously-admitted trial evidence means.

- **Second**, to the extent that the defendants are making inferences and arguments based on trial evidence that is contrary to, or inconsistent with, the jury's verdicts, this Court cannot adopt them and any related defense objections should be denied.  This is the point of the *Schlaen* and *Costales* cases, cited above.

- **Third**, to the extent that any particular disputed fact is the linchpin of a particular enhancement and is not necessarily encompassed by the jury's verdicts, the government is prepared to call this Court's attention to the trial record or introduce additional evidence, or both, so that this Court can make a specific determination as to the meaning and significance of such evidence <u>*in the context of the specific enhancement at issue*</u>.

One need look no further than the defendants' first series of objections to the offense conduct section to see how this framework world work as a practical matter at sentencing.  Each defendant

challenges the characterization of the global Salafist movement as the "politico-religious" framework for violent jihad (roughly PSI ¶¶ 4-11). The defendants go further in claiming that these facts do not constitute relevant conduct, are inaccurate, and were not proven at trial. But this argument ignores the principles set forth in *Schlaen* and *Costales*, which indicate that, by returning guilty verdicts, the jury essentially adopted allegations of the defendants' belief in the "politico-religious" framework for violent jihad. In other words, the defendants could only have done what the jury convicted them of doing, with the proper intent, if they subscribed to the Salafist philosophy or theology set forth in the PSI. This is an example of how there are specific jury findings embedded within the general verdict, which now cannot be challenged in the guise of PSI objections. *Cf. United States v. Dowell*, 430 F.3d 1100, 1110-111 (10th Cir. 2005) (example of sentencing court relying on "implicit" jury finding of intent to interfere with actions of government agency for purposes of applying terrorism enhancement).

The remaining objections pertain more specifically to the conduct of the defendants themselves, but still fall into the category of objections inconsistent with the jury's verdicts. These objections either advocate a competing, more favorable inference for individual pieces of evidence (*i.e.*, the words of the conversations show only that Hassoun and Jayyousi sought to provide humanitarian relief and Padilla sought to study Islam), or consist of freestanding, outright denials of criminal wrongdoing, which are squarely inconsistent with the jury's findings (*i.e.*, Hassoun and Jayyousi did not provide material support and Padilla did not attend an Al Qaeda training camp).[9]

_____

[9]These are examples of the "inference"-type of objection: <u>Hassoun</u>: ¶¶ 11 (denying that "jihad" has violent connotation), 13, 60, 74, 75 (denying Hassoun's claimed affiliation with MAK as "puffing"), 71, 72 (denying Azzam advocated violent jihad), 78, 93 (denying Hassoun ordered Youssef to go to jihad and stay in touch), 80 (Hassoun wanted Youssef to be news correspondent), 87, 88 (Hassoun concerned with Egyptian authorities), 89 (Hassoun not acting as

Either way, the defendants use their objections as a mechanism for attempting to undermine the jury's conclusions. Other than on the issue of Jayyousi's participation in the substantive material support offense past October 26, 2001, the jury's verdict contained no skepticism or rejection of the government's allegations, either as set forth in the indictment or as proven at trial. The defense does not now have the latitude to seek a lower sentence based on a view of the isolated pieces of evidence, or of the case in general, that is inconsistent with the guilty verdicts.

Although the foregoing establishes the basic principles and general framework for considering the defendants' factual objections, the government will be prepared to address specific objections at the sentencing. Fed. R. Crim. P. 32(i)(3)(B) may be read to require a sentencing court to consider each specific factual objection, though the rules themselves must be read in conjunction with case law placing the burden on the defendant to lodge valid objections that do not simply seek to relitigate the jury's verdict. Here, most if not all of the defendants' objections seek to dispute the jury's conclusions about the underlying facts of the case, and therefore this Court need do no more than note the inconsistency with the jury's verdict and its inability to use a competing view of the facts to reduce the sentence. Rule 32(i)(3)(B) itself allows this Court to skirt any factual resolution

---

planner or advisor), 94 (denying Hassoun referenced Abu Fayez as source for weapons); 126-137 (denying Hassoun post-arrest statements are reliable); <u>Jayyousi</u>:  ¶¶ 13, 23 (denying Jayyousi followed Rahman and that "mujahideen" has violent connotation), 27, 32, 43, 59 (denying Jayyousi's words signified agreement), 28 (denying "preparation" means violent jihad); <u>Padilla</u>: ¶¶ 93, 94, 110, 114 (denying Padilla's knowledge of certain conversations and use of codewords).

By contrast, these are examples of the "outright denial"-type of objection:  <u>Hassoun</u>: ¶¶ 11, 71, 96 (denying that Hassoun provided material support); <u>Jayyousi</u>:  ¶¶ 13 (denying Jayyousi sent communications equipment to mujahideen), 17 (denying Jayyousi's involvement in recruiting mujahideen); <u>Padilla</u>:  ¶¶ 10, 11, 12, 14, 123 (denying Padilla was part of jihad support cell, that he traveled to Middle East for violent jihad, that he attended al Qaeda camp, and that he filled out Mujahideen Data Form).

on a disputed issue if the fact at issue would not, or could not, affect the ultimate sentence.  And the foregoing cases do not allow this Court to calculate a sentence, with the jury having now returned guilty verdicts, by taking disputed facts in the light most favorable to the defendants.[10]

**II.      The PSIs Properly Calculate the Defendants' Advisory Guidelines Range.**

      **A.      The terrorism sentencing enhancement should be applied.**

Defendants' objections to the "terrorism enhancement" of USSG § 3A1.4 are meritless. Section 3A1.4(a) calls for an increase in the defendant's offense level and Criminal History category if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." The enhancement reflects the fact that persons who support terrorism, or align themselves with terrorists, represent a unique danger to the community, and are less likely than others to be rehabilitated.  *See United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003) (noting that " terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus . . . terrorists and their supporters should be incapacitated for a longer period of time").

By its terms, the enhancement applies whenever one or more offense of conviction involved or was intended to promote a "federal crime of terrorism."  USSG § 3A1.4(a).  The Guidelines define "federal crime of terrorism" by referring to 18 U.S.C. § 2332b(g).  *See* USSG § 3A1.4, comment (n.1).  That statute, in turn, defines "federal crime of terrorism" as any offense that "is calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct" and that violates one of a number of specified federal statutes.

---

      [10]As stated above, the government is prepared to supplement the record with certain evidence that was proffered but ultimately not admitted at trial if needed to support specific sentencing enhancements.

18 U.S.C. § 2332b(g)(5); *Haouari* v. *United States*, 429 F. Supp. 2d 671, 682 (S.D.N.Y. 2006).[11]

Accordingly, to apply the enhancement in USSG § 3A1.4, the Court must make a legal as well as a factual determination. The Court must first determine, as a matter of law, whether the offense of conviction implicates one of the specified federal statutes that *could* give rise to a "federal crime of terrorism." This requirement may be met in one of two ways: either (1) the offense of conviction is actually among the statutes listed in 18 U.S.C. § 2332b(g), or (2) the offense otherwise involved, or was intended to promote, a violation of one of those statutes. In the second stage of the analysis, the Court must determine whether the offense *is* a federal crime of terrorism because it was "calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct." There can be no dispute that these requirements are met here.

> **1.      Each offense of conviction in this case implicates a specified federal statute that supports the terrorism enhancement.**

Each count of conviction in this case could trigger the terrorism enhancement. Most straightforward is Count Three, which alleges a violation of 18 U.S.C. § 2339A. The version of 18 U.S.C. § 2332b(g) existing at the time of this offense expressly identified section 2339A as one of the offenses supporting the terrorism enhancement.[12] So there is no question that defendants'

---

[11]The Court has heard several definitions of terrorism in this case, but this definition is the one that matters for purposes of the enhancement.

[12]As noted above, with one narrow exception, each defendant's participation in each of the offenses of conviction continued until November 1, 2001, the last date specified in each of Counts One, Two and Three. Accordingly, to define the universe of crimes that could support the terrorism enhancement, we look to the version of 18 U.S.C. § 2332b(g) existing as of November 1, 2001. *See, e.g., United States v. Inafuku*, 938 F.2d 972, 973 (9ᵗʰ Cir. 1995) (law in effect as of last day of a conspiracy offense applies because "[c]onspiracy is a continuing offense, which is charged and punished as one crime from beginning to end"); *see also* § II.C.2

conviction on Count Three could support the enhancement in this case. No further analysis is needed, because one qualifying offense is enough.

Nonetheless, the defendants' conviction on Count One – conspiracy to murder, main and kidnap persons overseas, a violation of 18 U.S.C. § 956(a)(1) – also supports the enhancement. Defendants contend that the version of 18 U.S.C. § 2332b(g) existing prior to October 26, 2001 did not refer to § 956(a)(1), but rather said merely "956 (relating to conspiracy to injury property of a foreign government)." They observe that only with passage of the Patriot Act, which took effect on October 26, 2001, did Congress include an express reference to § 956(a)(1).[13] Thus, by their logic, applying the terrorism enhancement here based upon their § 956(a)(1) conviction in Count One would violate the Ex Post Facto clause of the Constitution.

This argument is unconvincing. First, the jury found that the criminal conduct underlying Count One continued *after* October 26, 2001, until the end date of the charged conspiracy (November 1, 2001). That was the jury's finding, which this Court must follow at sentencing, and there was no finding or even argument by any defendant that he withdrew from the conspiracy before that date. It is the version of the statute in effect at the end of the conspiracy that defines the

---

*infra* (explaining that conspiracy that began before the effective date of a Sentencing Guidelines manual and continued after effective date is subject to the Guidelines because conspiracy is a continuing offense). The one exception concerns Jayyousi. As he observes, the jury found that his participation in the substantive material support charge (Count Three, 18 U.S.C. § 2339A) ceased on October 26, 2001. However, § 2339A has always been among the statutes triggering the terrorism enhancement (*i.e.*, it was not added for the first time after October 26, 2001), so Jayyousi's observation does not help him. Moreover, there was *no* finding by the jury with regard to Count One or Count Two that Jayyousi's criminal activity ceased in 1997 or anytime prior to November 1, 2001; rather, his participation in the unlawful conspiracies charged in those counts continued throughout their entire duration.

[13]The relevant portion of 18 U.S.C. § 2332b(g) now reads: "956(a) (1) (relating to conspiracy to murder, kidnap, or maim persons abroad)."

potential federal crimes of terrorism for these defendants. *See* note 11, *supra*. Accordingly, because the defendants' violation of § 956(a)(1) continued after the express reference to that section was added by the Patriot Act to 18 U.S.C. § 2332b(g), there is no Ex Post Facto issue.

Second, defendants' reading of the pre-Patriot Act version of 18 U.S.C. § 2332b(g) is too narrow. The pre-Patriot Act version, as quoted above, *did* refer generally to § 956, and that reference is sufficiently broad for our purposes. Defendants focus solely the parenthetical which appeared immediately after the general reference to § 956, and treat that parenthetical as a limitation on the particular kind of § 956 offenses that could qualify for the terrorism enhancement. But there is no evidence that Congress ever meant that parenthetical to limit the range of § 956 violations triggering the enhancement. It is absurd to think that Congress meant the enhancement to apply to a violation of § 956 involving property damage, but not to one involving a conspiracy to murder, maim and kidnap human beings.[14] In *United States v. Sattar*, the district court rejected the same argument made by defendants here, finding the parenthetical to be merely an inaccurate description of the statute and holding that a pre-Patriot Act violation of § 956(a)(1) could support the terrorism enhancement. *See* Transcript of Sentencing Hearing in *United States v. Sattar*, Oct. 16, 2006, at 29-31.

Defendants' conviction on Count Two also supports the terrorism enhancement in this case.

_____

[14]The present subsection (a) was added to § 956 in 1996. Prior to that time, the statute addressed only property damage – hence the descriptive language in the parenthetical. There is no indication that Congress, during the period between the addition of subsection (a)(1) to § 956 in 1996 and passage of the Patriot Act in 2001, knowingly meant 18 U.S.C. § 2332b(g) to include § 956 violations involving property damage, but exclude those involving loss of life. Indeed, the fact that Congress, as part of its Patriot Act amendment, struck § 956's property damage clause altogether from the list of offenses in § 2332b(g) shows that the legislature had precisely the opposite aim.

Count Two charged the defendants with violating 18 U.S.C. § 371 by conspiring to violate § 2339A, the material support statute. Section 371 itself, the general federal conspiracy statute, is not listed among the enumerated offenses that could support the terrorism enhancement. However, the underlying crime – § 2339A – is listed, as noted above. In a similar situation, the Eleventh Circuit recognized that the terrorism enhancement could apply even though the offense of conviction was a conspiracy charge that was not among the list of enumerated offenses, so long as the underlying crime *was* among those listed. *See United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004). As the panel explained in that opinion:

> A "federal crime of terrorism" is defined as any offense that: (1) "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and, (2) is one of the offenses listed in 18 U.S.C. § 2332b(g)(5)(B). 18 U.S.C. § 2332b(g)(5)(A). The object of Mandhai's conspiracy - destroying buildings used in interstate commerce by fire or explosives under 18 U.S.C. § 844(I) - is specifically listed as a federal terrorism crime in 18 U.S.C. § 2332b(g)(5)(B). But conspiracy to do so under 18 U.S.C. § 844(n) is not. In light of this, Mandhai argues, he did not commit a federal crime of terrorism to which the enhancement applies.

> We reject the argument. . . . Had the Guideline drafters intended that § 3A1.4 apply only where the defendant is convicted of a crime listed in 18 U.S.C. § 2332b(g)(5)(B), they would have included such limiting language. Instead, they unambiguously cast a broader net by applying the enhancement to any offense that "involved" or was "intended to promote" a terrorism crime. The term "involve" means to "include." *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001). The phrase "or intended to promote" in turn, must have additional meaning. *See United States v. Drury*, 344 F.3d 1089, 1099 (11th Cir. 2003) (statutes must be read so that no words are discarded as meaningless, redundant, or surplusage). In ordinary usage, to "promote" means "to bring or help to bring . . . into being. . . ." Webster's Third New Int'l Dictionary, p. 1815 (1976). Under a plain reading, the phrase "intended to promote" means that if a goal or purpose was to bring or help bring into being a crime listed in 18 U.S.C. § 2332b(g)(5)(B), the terrorism enhancement applies. *Graham*, 275 F.3d at 516-18.

375 F.3d at 1247-48. The district court in *Sattar* recently relied upon the Eleventh Circuit's logic in *Mandhai* to conclude that a § 371 conspiracy conviction supported the terrorism enhancement

when the object of the conspiracy was a violation of § 956, a statute listed among the enumerated offenses of 18 U.S.C. § 2332b(g).  *See Sattar* Tr. at 27-28; *see also United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006) (applying enhancement where the offenses of conviction themselves were not listed in § 2332b(g), but the underlying conduct was meant to promote an offense that was listed in that section).  The outcome should be identical here.  In our case, the crime of conspiring to provide material support to a murder conspiracy obviously involved or intended to promote a crime listed in 18 U.S.C. § 2332b(g)(5):  that is, actually providing material support to such a conspiracy.

In short, each count of conviction for each defendant in this case supports the terrorism enhancement.

> **2.**   **The defendants' conduct was "calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct," because the very heart of the scheme was displacing un-Islamic governments with Sharia.**

The remaining issue, therefore, is whether the defendants' conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," such that their offenses do constitute federal crimes of terrorism.  The evidence on that front is overwhelming.  Overall, and in specific instances, the defendants' activities were meant to displace or alter governments that did not adhere to Sharia law.  That was the heart of their violent agenda, and was the driving force behind all of their misconduct.[15]

In fact, the jury's verdict already encompasses a finding that the defendants intended to affect

---

[15]By the plain language of the statute, the government in question could be any government, not merely the United States.  *See United States v. Blanco Puerta*, – F.3d –, 2007 WL 2891114 (5th Cir. Oct. 2, 2007) at *1; *United States v. DeAmaris*, 406 F. Supp. 748, 750-51 (S.D. Tex. 2005).

or retaliate against governments.  In paragraph 1 of the Fifth Superseding Indictment, the grand jury

charged that supporters of the radical Salafist ideology such as these defendants "encouraged and

promoted 'violent jihad' to be waged by 'mujahideen' using physical force and violence *to oppose*

*governments* . . . that did not share their view of Islam" (emphasis added).  This allegation was

expressly incorporated into each Count of the indictment – One, Two and Three.  Moreover, both

Count One and Count Two of the indictment additionally alleged that:

> It was a purpose and object of the conspiracy to advance violent
> jihad, including supporting and participating in armed confrontations
> in specific locations outside the United States, and committing acts
> of murder, kidnaping and maiming, *for the purpose of opposing*
> *existing governments* . . . .

Fifth Super. Ind. ¶ 13 (emphasis added).  Given these allegations, the jury's verdict necessarily

encompasses a finding that the defendants' actions were intended to oppose governments.  That

finding brings these offenses easily under the definition of "federal crime of terrorism."  To reach

a different conclusion at sentencing would contradict the verdict and be improper.  To reiterate the

words of the Eleventh Circuit:   "'[A] district court cannot use the post-trial sentencing process to

call a jury's verdict into question.'"  *Schlaen*, 300 F.3d at 1318; *see also Dowell*, 430 F.3d at 1110-

1111 (applying terrorism enhancement at sentencing based upon jury's implicit finding that the

defendant meant to interfere with actions of government agency).

Even looking beyond the verdict to the trial record, which this Court need not do, there is

overwhelming proof that defendants' goal was to bring about the downfall of governments that

either were not Islamic or were not sufficiently Islamic for their radical taste.  By their actions, they

meant not only to affect or retaliate against these governments, but to eliminate them altogether.

For example, Jayyousi spoke emphatically in calls about his desire to impose Sharia law

throughout Asia, the Middle East and the Persian Gulf, toppling existing governments in the process. *See* GX 126 at 16-18, 26-30; GX 12; Tr. 6/26/07 at 64-67. His *Islam Report* repeatedly instructed readers to take action against un-Islamic regimes in the form of donations or support for mujahideen. In one, he preached unambiguously:

> May Allah help the mujahideen topple these un-Islamic and illegal
> puppet regimes in our Muslim lands.

GX 802. *See also* GX 801 (discussing the "weakening" of the "corrupt Egyptian regime" and stating with regard to Algeria, a non-Sharia Muslim state: "May Allah curse this Satanic regime, which is fueled by the West and its Satanic dogs in the Middle East. . . . Help your Algerian Brethren, Donate to free Algeria").

Hassoun was equally extreme, repeatedly railing against infidel "dogs" at the helm of secular governments and pledging allegiance to Abdullah Azzam, who sought to eliminate existing governments and substitute radical Islamist states in all of the lands formerly occupied by Muslims. *See* GX 70, 83; Tr. 6/25/07 at 142-45; Tr. 7/2/07 at 107, 138; Tr. 7/10/07 at 138-141. Jayyousi as well enthusiastically supported radicals such as Bin Laden and the Blind Sheik who believed in Azzam's "jihad jurisprudence." *See* GX 52, 53, 84, 85, 126. Both Hassoun and Jayyousi also championed violent upheaval in Egypt, Saudi Arabia and elsewhere. *See* Tr. 6/26/07 at 19-21, 39-40, 61-62; GX 52 at 6-8; GX 53 at 2-3. *See also* Tr. 6/26/07 at 167-68.

Padilla shared his co-defendants' commitment to violent jihad, and to removing un-Islamic governments by any means. We know this because the organization he sought out and trained with was Al Qaeda, the poster child of global terrorism. Dr. Gunaratna testified at length about Al Qaeda and its mission, including its commitment to using violence to influence the actions of governments

in the Middle East and the West.  *See, e.g.,* Tr. 6/26 at 26-27; Tr. 6/28 at 153; Tr. 6/29/07 at 7-11.

There is no requirement for purposes of the terrorism enhancement that a defendant's scheme be directed only at government agents.  It is sufficient if the defendants' conduct was meant to affect, or retaliate against, government conduct – whether the targets of their violence were government personnel, civilians or both.  *See* USSG § 3A1.4.  Nonetheless, the particular conflict zones to which these defendants sent support and recruits certainly involved violence targeted directly at government personnel and institutions.[16]  In Ogaden, for example, defendants provided support for mujahideen trying to expel the Ethiopian government from land that was geographically part of Ethiopia and impose instead an Islamic state.  *See* GX 75 at 4-6; GX 77 at 3-4; GX 49 at 4; Tr. 7/10/07 at 150.  In so doing, defendants aimed to thwart the American government's support for Ethiopia.  *See* Tr. 6/26/07 at 81, 85-86. Hassoun said expressly that "retaliation will be twofold," after discussing Ethiopian attacks with American-supplied helicopters on rebellious mujahideen, adding that "in spite of the infidels and in spite of those listening on the line, Islam will be victorious." GX 77.

In Chechnya, defendants provided support for mujahideen trying to expel the Russian government from land that was geographically part of Russia.  The mujahideen directed wanton violence at Russian forces and politicians in furtherance of an independent Islamic state; their tactics included suicide bombings and assaults on the presidential palace.  *See* GX 10 at 3-12; GX 12 at 15-16; Tr. 6/21/07 at 128-29; Tr. 6/28/07 at 108, 111-12; Tr. 7/10/07 at 156, 158.  Even when the mujahideen under Basayev and Khattab attacked civilian targets, as they did when invading

---

[16]In fact, defendants' agenda allowed them to support the killing of anyone who stood in the way of opposing existing governments and establishing Islamic regimes.  *See* Tr. 6/26 at 20-21.

Dagestan and seizing a hospital in 1995, they did so to affect the conduct of the Russian government. Tr. 6/28/07 at 138.

In Lebanon, defendants provided support for (and in Hassoun's case, actually joined) Usbat Al Ansar, which used violence to try to oust that country's secular government, including killing three judges. *See* Tr. 6/26/07 at 91; 7/10/07 at 153. Usbat Al Ansar's violence also included the assassination of a moderate political leader. *Id.* at 95; GX 79 at 25-29. After that murder, Jayyousi engaged in a lengthy discussion about sending messages of "threat and warning" to Lebanese Embassies around the world to deter the Lebanese government from executing the perpetrators of that crime. *See* GX 35. This Court can find by a preponderance of the evidence that Jayyousi sent the messages (he promised to do so, and there is no contrary proof that he did not), but at a minimum this call further demonstrates his desire, and intent, to influence government action.

Simply put, defendants' agenda, as proved at trial, was the establishment of Islamic governments under Sharia, and the change or removal of so-called "infidel" regimes. They meant to affect, and supported retaliation against, Islamic governments that opposed the Islamist agenda (*e.g.*, Lebanon, Algeria). They supported fighting by any means necessary against non-Islamic governments in regions that they thought should be governed by Muslims (*e.g.*, Ogaden, Chechnya, Kosovo). They belonged to and trained with groups that used terrorist tactics to intimidate secular governments worldwide (Al Qaeda). The government's proof, and the jury's verdict, point inescapably to one conclusion: these defendants' purpose – the *whole reason* they provided support and recruits overseas – was to "influence or affect the conduct of [infidel] government[s] by intimidation or coercion, or to retaliate against [infidel] government conduct."

Defendants' argument that their acts were not intended to influence or retaliate against

government ignores the record.  The jury soundly rejected their argument that they merely provided recruits and supplies for relief work and did not actually support violence.  The Court has now upheld that verdict with its Order denying defendants' Rule 29 motions.[17]

Defendants also mistakenly persist in confusing intent with motive.  They contend that their acts were meant only to protect oppressed Muslims in conflicts overseas.  As noted above, and as the jury found, that claim is untenable on this record.  But for purposes of evaluating the terrorism enhancement, it is also incomplete.  Even if a defendant's motive was benign, all the enhancement requires on this prong is that the defendant intended by his acts to affect or retaliate against the conduct of a government.  *Why* he did so is immaterial.  If the defendant had the requisite intent, it matters not whether he acted out of perceived religious duty, belief in the superiority of Sharia law to secular government, to prevent a perceived humanitarian crisis, or to aid beleaguered fighters.  A core purpose of anti-terrorism laws is to prevent individuals from using their own value-systems to decide when it is appropriate to influence government conduct through violence.  The defendants in this case ignored that tenet of civil democracy, and do so still today.

None of the cases cited by the defendants precludes this Court from applying the terrorism enhancement on this record.  Defendants' reliance on *United States v. Awan*, 2007 WL 2071748 (E.D.N.Y. Jul. 17, 2007) is especially misplaced.  In *Awan*, an unpublished district court opinion,

---

[17]Hassoun in particular tries to argue against this enhancement by making the same hollow factual arguments he made, unsuccessfully, to the jury.  *See* Hassoun Obj. at 19-20.  Accepting these arguments is tantamount to repudiating the verdict.  There was substantial evidence, beyond any reasonable doubt, that Hassoun wrote the checks he did and recruited mujahideen as he did in furtherance of his Islamist agenda, not to provide relief.  Lest the Court forget, it was Hassoun who proudly proclaimed his membership in Al Qaeda's precursor and its anti-government associate group in Lebanon, and who revealed his state of mind by saying after hearing Bin Laden's violent anti-secular screed "O Allah . . . what words . . . may Allah protect him."  *See* GX 79, 19, 69, 53.

the court declined to apply the terrorism enhancement to a Muslim defendant who supported a non-Muslim Sikh terrorist group, because the court felt the defendant did not intend to intimidate or retaliate against any government. Rather, said the court, "the evidence supports a factual finding that the defendant had private purposes in mind, that he enjoyed associating with terrorists such as enjoying the prestige or potential influence obtained by associating with Panjwar, a leader of the [Sikh group], and with the Pakistani intelligence services." *Id.* at *4. The court stated that the government itself made this point. *Id.* In this case, by contrast, there is no evidence or claim by anyone that the defendants supported terrorism only for selfish personal gain. Rather, their support for terrorism was intended to accomplish a greater goal – the establishment of Islamic governments under Sharia throughout the globe. There is no evidence of any purely private purpose for these defendants' actions, nor would such evidence, if it existed, overcome the substantial proof that displacing un-Islamic governments was at the very heart of their misconduct. Accordingly, even assuming *Awan* is correct on the record of that case, it has no relevance here.[18]

Defendants' other tack is to argue that the government's burden of proof for this enhancement is a high one. Our proof easily satisfies any standard of proof (and as noted above, the jury's finding of guilt beyond a reasonable doubt on the indictment implicitly includes a finding that the requirements of the enhancement are met). That said, even cases upon which defendants rely apply the ordinary preponderance-of-the-evidence standard to the terrorism enhancement just as they

---

[18]The few other cases cited by defendants where the court did not apply the enhancement are equally inapposite. *United States v. Aranout*, 282 F. Supp. 2d 838 (N.D. Ill. 2003), discussed by Hassoun, was actually vacated and reversed for resentencing on appeal, 431 F.3d 994 (7th Cir. 2005), and in any event turned on a legal analysis later rejected by the Eleventh Circuit in *Mandhai*. *United States v. Leahy*, 169 F.3d 433 (7th Cir. 1999), discussed by Padilla, did not even involve application of USSG § 3A1.4, but rather an upward departure that the district court analogized to that provision.

do in making other factual findings at sentencing. *See Awan*, 2007 WL 2071748 at *3; *see also Graham,* 275 F.3d at 517 (same); *United States v. Salim*, 287 F. Supp. 2d 250, 324 (S.D.N.Y. 2003) (same).

There is no case law in the Eleventh Circuit allowing this Court to deviate from the normal preponderance standard for purposes of the terrorism enhancement. What's more, the Eleventh Circuit has already rejected case law from elsewhere suggesting that a higher burden of proof should be used when resolution of a particular factual dispute at sentencing will have an allegedly disproportionate effect on the ultimate sentence. *See United States v. Whitesell*, 314 F.3d 1251, 1255 (11th Cir. 2002) (summarily rejecting argument for clear-and-convincing standard despite the significant impact of an enhancement upon the defendant's sentence, because "'a federal defendant's due process rights are satisfied by the preponderance of the evidence standard'") (quoting *United States v. Jackson*, 57 F.3d 1012, 1019 (11th Cir. 1995)); *United States v. Lewis*, 115 F.3d 1531, 1537 (11th Cir. 1997) (expressly declining to follow case law from other Circuits applying a clear-and-convincing standard to certain sentencing factors); *cf. also United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005) (re-affirming preponderance standard after *Booker*). The Guidelines themselves call for use of a preponderance standard, and do not carve out an exception for the terrorism enhancement. *See* USSG § 6A1.3, cmt. ("use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case"). There is no support in the Guidelines or binding Eleventh Circuit precedent to deviate from the norm and impose a higher standard in this

case – nor would such a standard make the enhancement any less applicable here.[19]

In sum, all of the criteria for the terrorism enhancement in USSG § 3A1.4 are met in this case. The Court should adopt the PSI on this issue, and overrule the defendants' objections.[20]

### B.      The PSIs correctly assess each defendant's role in the offense.

Hassoun and Jayyousi object to the three-level increase based on their managerial and supervisory roles and instead argue for a mitigating role reduction. Padilla objects to the absence of a mitigating role, asserting that he is less culpable than most other participants. For the reasons that follow, the Probation Officer correctly assessed the roles in the offense of Hassoun, Jayyousi and Padilla. Their objections should be overruled.

With one possible exception noted below, the law in this Circuit is well-settled regarding role in the offense. To merit a three level increase as a manager or supervisor, the Court should consider

---

[19]Defendant Padilla does not address the Eleventh Circuit case law against his position, arguing only from broad principles in inapposite Supreme Court opinions. Padilla also ignores the fact that there is nothing disproportionate about imposing upon him a sentence consistent with the terrorism enhancement – this is the man, after all, who attended and graduated from an Al Qaeda terrorist training camp. Meanwhile, defendant Jayyousi bizarrely invokes *Apprendi* to suggest that the facts supporting this enhancement must be found by the jury beyond a reasonable doubt. He too offers no support for that argument. There is no *Apprendi* issue here because applying the terrorism enhancement does not increase the statutory maximum penalty for his offense. His other *Apprendi*-type arguments about factfinding at sentencing are obsolete under the advisory Guidelines scheme now mandated by *Booker. See, e.g., United States v. Chau*, 426 F.3d 1318, 1323-24 (11th Cir. 2005).

[20]In the event the Court finds that the defendants do not qualify for terrorism enhancement under USSG § 3A1.4, and depending upon the basis for the Court's ruling, we reserve the right to seek an upward departure based upon the defendants' terrorist motive. The 2001 edition of the Guidelines gave the Court the authority to depart upward under § 5K2.0. The following year, the Sentencing Commission clarified that authority by recognizing that courts may depart upward based upon a defendant's support for terrorism even when the case does not technically fit under § 3A1.4. *See* USSG § 3A1.4, comment (n.4) (2007); *Jordi*, 418 F.3d at 1216-17. We will address this issue further if and when it becomes necessary (it should not, as the enhancement clearly applies).

whether the defendant exercised decision making authority, the nature and participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  USSG § 3B1.1, comment (n.4); *United States v. Perry*, 340 F.3d 1216, 1217-18 (11th Cir. 2003).  A three-level increase requires that the defendant play a managerial or supervisory role in criminal activity involving five or more participants or that was otherwise extensive.[21]  A participant is any person who is criminally responsible for the commission of the offense, whether or not he was charged or convicted.  USSG § 3B1.1, comment (n.1); *see also United States v. Markovic*, 911 F.2d 613, 616-17 n.6 (11th Cir. 1990).  The defendant is counted as one of the five participants.   *United States v. Rodriguez*, 981 F.2d 1199, 1200 (11th Cir. 1993).  The assertion of control or influence over only one participant is enough to support the enhancement.  *United States v. Jimenez*, 224 F.3d 1242, 1251 (11th Cir. 2000).  Similarly, evidence that a defendant recruited one individual is sufficient to support the enhancement.  *Mandai*, 375 F.3d at 1248.


In considering a mitigating role request, the Court engages in a two-prong inquiry.  In the first prong, "the district court must measure the defendant's role against the relevant conduct for which [he] has been held accountable."  *United States v Rodriguez De Varon*, 175 F.3d 930, 940

---

[21]None of the defendants disputes that their conspiracy involved five or more participants. Accordingly, in addressing the appropriateness of an aggravating role adjustment for Hassoun and Jayyousi, the Court need not consider the alternative "otherwise extensive" clause.  That said, this offense clearly meets that standard as well.  See, e.g., USSG § 3B1.1, comment (n.3).

(11th Cir. 1999) (*en banc*).  The second prong instructs the district court to assess a defendant's relative culpability vis-a-vis "other participants in the relevant conduct."  *Id.* at 944.  However, "[t]he fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, *since it is possible that none are minor or minimal participants*."  *Id.* (emphasis added); *see also United States v. Zaccardi*, 924 F.2d 201, 203 (11th Cir. 1991) (rejecting argument that would require sentencing courts to regard the least culpable participant in a conspiracy as a minor participant, regardless of the extent of that member's participation).  Where the relevant conduct attributed to the defendant is identical to his actual conduct, he cannot prove entitlement to a minor role adjustment simply by pointing to some broader criminal scheme in which he was a minor participant but for which he was not held accountable. *Id.* at 941.  It is "the conspiracy on which a defendant's base offense level is founded [that] is the relevant conspiracy for determining role in the offense."  *Id.* (quoting *United States v. Fernandez*, 92 F.3d 1121,1123 (11th Cir. 1996)).

The only possibly unsettled question in this area concerns whether an aggravating and a mitigating role adjustment can apply to the same defendant for the same offense.  The Eleventh Circuit has declined to address this issue, *see United States v. Perry*, 340 F.3d 1216, 1219 (11th Cir. 2003), but at least one Circuit has already described the argument as "close to whimsical."  *United States v. Conley*, 156 F.3d 78, 86 (1st Cir. 1998).   The *Conley* court explained that "an upward adjustment for a managerial role is fundamentally inconsistent with according the same individual, in respect to the same offense, a downward adjustment for a minor or minimal role."  *Id.*[22]   It

---

[22]The Third and Seventh Circuits have said that, in theory, an aggravating and mitigating role adjustment can co-exist, but there is no case law in those Circuits – or anywhere to our knowledge – actually applying such adjustments simultaneously.  *See United States v. Tsai*, 954

follows inexorably that a defendant who plays a managerial role in the offense is not "substantially less culpable than the average participant." *Id.*; USSG § 3B1.2, comment (n.3(A)).

Having set forth the relevant legal principles, one other over-arching subject remains.  In an effort to diminish their respective roles, all defendants assert that their relevant conduct is coextensive with the entire global Salafi jihad movement.   They are wrong.  The Superseding Indictment alleged and the trial evidence showed that the defendants were part of a covert North American support cell that funded, recruited for, and supplied various mujahideen groups overseas with the intent to prepare for or carry out acts of murder, kidnaping and maiming.  But the violence committed by these participants in the wider global Salafi jihad movement, while relevant as background to demonstrate the defendants' intent, has not been attributed to them as relevant conduct.  The PSI makes no attempt to hold the defendants responsible for the numerous murders committed by Al Qaeda and other terrorist groups during the existence of the conspiracy.

We can turn now to why each defendant, based upon his conduct, deserves the role that the Probation Office has assigned to him:

---

F.2d 155, 167 (3d Cir. 1992); *United States v. Jackson*, 207 F.3d 910, 922 (7th Cir. 2000).  For example, although the court in *Jackson* noted the theoretical possibility that both adjustments could apply in the same case to the same defendant, it reversed as plain error the district court's application of a mitigating role in the case, holding that as supervisors, "they clearly were not less culpable than 'most' of the participants, and so they were not entitled to the section 3B1.2 reduction."  207 F.3d at 922.  The government submits that the First Circuit in *Conley* has the right perspective, and this Court should reject Hassoun's and Jayyousi's request for a mitigating role reduction on legal as well as factual grounds.

### 1.    The PSI correctly assigns Jayyousi an aggravating role enhancement.

Jayyousi founded the American Islamic Group (AIG) which he used as a cover to support violent jihad. Tr. 6/4/07 at 58; GX 801, 802 and 803. When Mohamed Zaky was killed fighting in Chechnya, Jayyousi took control of his organization, American Worldwide Relief (AWR), which was based in San Diego, California, and had offices in New Jersey and Baku, Azerbaijan Tr. 6/4/07 at 72,122, 123; GX 216, 800(o). Jeremy Collins was a volunteer employee working for Jayyousi at both AIG and AWR who functioned as a clerk. Tr. 6/4/07 at 123. Jayyousi used the cover of AIG and AWR to purchase satellite phones, walkie talkie radios, sleeping bags and boots for the mujahideen. Tr. 6/4/07 at 83-87, 89,112; GX 206F, 207F, 800. Jayyousi made all the decisions for AIG and AWR as to whom and when to send checks or wire transfer money. Tr. 6/4/07 at 111-112; Tr. 6/5/07 at 16.[23]

Jayyousi did manage and supervise the activities of Salwa Shishani and Wiam Azhak, who manned the AWR offices in New Jersey and Baku, Azerbaijan, respectfully. They are both counted as participants even though they were not indicted. USSG § 3B1.1, comment (n.1). Salwa Shishani is the daughter of Sheikh Fat'hi Shishani, a mujahideen commander in Chechnya. GX 203. She was a connecting link between the Chechen mujahideen and AWR, and was aware of the needs of the mujahideen. JE 112, GX 203, GX 204. The satellite phones purchased by Jayyousi were shipped to Salwa Shishani in New Jersey for forwarding to the mujahideen in Chechnya. GX 800. She was

---

[23]Jayyousi is correct that Jeremy Collins is not a criminally responsible participant. This is because Jayyousi hid the true purpose of his criminal activities from Collins by maintaining the facade of relief work. Tr. 6/4/07 at 87-88, 90, 117. Jayyousi's exertion of control and influence over the affairs of AIG, AWR and Collins is still relevant for role assessment. USSG § 3B1.1, comment (n.3) (in assessing whether organization was "otherwise extensive," all persons involved during the entire offense are to be considered, including outsiders who provide unknowing services).

used to speaking with Mohamed Zaky in code, and became concerned that Jayyousi spoke too openly on the phone. GX 23. Jayyousi sent Salwa Shishani a fax instructing her not to discuss any matters over the phone and directing her to send all questions to him. GX 205. Jayyousi's exertion of control and influence over Salwa Shishani alone is sufficient to support the enhancement. *See Jimenez*, *supra*, 224 F.3d at 1251.

### 2. The PSI correctly assigns Hassoun an aggravating role enhancement.

Hassoun's objections to the role enhancement are nothing more than an argument for a more favorable view of the evidence, a view the jury rejected. The evidence clearly supports the PSI's conclusion that Hassoun recruited, encouraged and groomed individuals, specifically Padilla and Youssef, to fight in violent jihad conflicts overseas.[24] Hassoun represented at least six (6) mujahideen organizations, including Maktab al Khidimat (MAK) (the predecessor to Al Qaeda), the mujahideen platoon in Bosnia, and Gulbuddin Hekmatyar's mujahideen party (Hizb-e-Islami) in Afghanistan. GX 69, GX 711. Hassoun would frequently seek to enroll mosque congregates as mujahideen. Tr. 5/31/07 at 50, 75. Once enrolled in the cause, Hassoun would continue to exert control and influence over his recruits by directing their activities and supporting them financially. GX 54 (Youssef discusses the itinerary for Afghanistan and that Hassoun told him the best preparation is at Hekmatyar's. Hassoun tells Youssef there is nothing there, and to stick with the first arrangement he told him about); GX 67 (Hassoun tells Youssef there is "trade" in Somalia and to get himself ready to go there so they could "open up a market there"); GX 72 (Hassoun tells

---

[24]As a transitive verb, recruit means (1) to fill up the number of (as an army) with new members; to enlist as a member of an armed service; to secure the services of; to seek to enroll; (2) replenish; (3) to restore or increase the health, vigor, or intensity of. *Merriam-Webster's Online Dictionary.*

Youssef to go to the area he told him about because brothers have arrived and Youssef can go start a company with them); GX 82 (Youssef calls Hassoun to tell him a brother is going on a picnic to a country in the South and wants to know if his route is safe and if there is anyone waiting for him there.  The brother gets on the phone and Hassoun assures him that the time is right and he should go there and "don't look behind you"); GX 88 (Hassoun tells Padilla that he told Youssef to do something and he did not do it.  Hassoun tells Padilla the most important thing is that Padilla told him he was ready); GX  601 (Hassoun wires $5,000 to Youssef so that Youssef and four other brothers could travel to Kosovo for jihad); GX 97TR (Hassoun tells Youssef it is important that he go there, inspect the matter and report back to him); GX 9R (Hassoun tells Youssef that Abu Fayez could help in obtaining an iron (firearm) and Youssef should mention Hassoun's name); GX 100 (Hassoun tells Youssef he will send more money to him in Kosovo with Padilla); GX 101 (Hassoun tells Kamal Alnaji about Youssef fighting in Kosovo and asks Alnaji if he is ready); GX 113 (Padilla gives Hassoun a phone number in Egypt where Hassoun can reach him "in case a door opened"); GX 114 (Hassoun tells Padilla that he will pay Marwa (Padilla's wife) for the sleeping bag, book bag and army jacket she bought him); GX 600(e) (Hassoun sends a $1,000 check to Padilla in Egypt); GX 116 (Hassoun tells Padilla to go to an area close by and find your way in); GX 117 (Hassoun tells Padilla that he prepared him psychologically before he went to Egypt); GX 119 (Hassoun tells Youssef that he has many "employees" who want to "submit resumes," but he needs a "tour guide" to receive them over there); GX 124 (Youssef tells Hassoun to call Abu Hamza and introduce himself as "the teacher, the professor, the big boss and mentor of Youssef").

Hassoun's upward role adjustment is fully supported by the facts.  His objection should be

30

overruled.[25]

**3.     The PSI correctly declines to give Padilla a mitigating role reduction.**

Padilla's request for a role reduction on this record is astonishing.  Padilla stands before the Court as a trained Al Qaeda killer.  He is an instrument of the scheme itself, an indispensable and essential part of the murder conspiracy.  Padilla's suggestion that he is substantially less culpable than the average participant in this conspiracy is tantamount to a hit-man suggesting that he is only a minor participant in a murder for hire scheme.  He is not entitled to any role reduction.  *See, e.g., United States v. Rotolo*, 950 F.2d 70, 71 (1st Cir. 1991) (Breyer, J.) (recognizing that "one, who say, points a gun at a bank teller and seizes the money is not entitled to a downward adjustment simply because someone else in the gang supervises his activities"); *see also United States v. Ravelo*, 370 F.3d 266 (2nd Cir. 2004) (denying minor role to defendant gang member who pleaded guilty to conspiracy to commit assault in aid of racketeering and who provided the car, knew gang was going to attack rival gang, and provided support by his presence in the car even if he did not commit or intend to commit the assault himself); *United States v. Castano*, 224 F.3d 111 (2nd Cir. 2000) (denying minor role to defendant in a murder for hire scheme who showed photograph of victim to persons hired by husband to do the killing, identified victim at restaurant the night of the murders, coordinated payment of subcontractors, and received money for her

---

[25]The facts established at trial clearly demonstrate that both Hassoun and Jayyousi exercised control or influence over at least one other criminally responsible participant.  Should this Court find otherwise, the government reserves the right to request a three-level upward departure pursuant to USSG § 3B1.1, comment (n. 2).  The Guidelines also provide for an upward departure in the case of a defendant who did not manage or supervise another participant, but who nonetheless exercised management responsibility over the property, assets, or activities of a criminal organization.  USSG § 3B1.1, comment (n.2); *United States v. Glover*, 179 F.3d 1300 (11th Cir. 1999).

participation).

     **C.**    **Defendants' Other Objections to the Calculation of their Guidelines Range Are Meritless – and in Some Instances, Border on Frivolous.**

     **1.**    **Padilla's argument for a lower base offense level with regard to Counts Two and Three is of no moment – and also incorrect.**

The PSI correctly sets the base offense for each defendant at 28.  Everyone agrees that Count One yields a base offense level of 28.  *See* USSG §§ 1B1.2(a), 2A1.5, and App. A.[26]

Everyone except Padilla also agrees that Counts Two and Three, viewed in isolation, likewise yield a base offense level of 28.  Padilla thinks the base offense level for those counts, viewed in isolation, should be 25.  But because those counts are grouped with Count One, this debate is academic; the Court must use the base offense level for the most serious of the counts comprising the group, which is Count One, so the base offense level for our purposes is 28 whether Padilla is right or wrong in his argument.  *See* USSG §§ 3D1.1-3; PSI ¶¶ 151, 152.  Nonetheless, he is wrong:  the base offense level for those counts, standing alone, would also be 28.[27]

_____

[26]Although not applicable here, we note that the base offense level for conspiracy to commit murder was increased from 28 to 33 on November 1, 2004.  *See* Amendment 663, Supplement to Appendix C - Amendments to the Guideline Manual (2005).  The increase was triggered by longstanding concerns that prior Guidelines penalties for homicides were inadequate and in need of review.  *Id.* at 10.

[27]Padilla's contrary view relies on faulty legal analysis and misapplication of the relevant Guidelines provisions.  He reaches his conclusion by contending that USSG § 2X1.1(b)(2) operates to reduce by three levels the "substantive" or "underlying" offense for each of Counts Two and Three.  His argument fails for two reasons.  First, USSG § 2X1.1(b)(2) does not apply.  Second, even if it applied, the defendants cannot benefit from that provision because they "completed all the acts ... necessary on their part for the successful completion of the substantive offense."  *Id.; United States v. Lee*, 427 F.3d 881, 894 (11th Cir. 2005) (denying the reduction where defendants had completed all the steps they believed necessary to complete the offense and were only prevented from completing it by the bank's refusal to honor their checks); *see also* USSG § 2X1.1, comment. (backg'd.) (observing that in most conspiracies no reduction of offense level is warranted because the substantive offense was substantially completed).  In this

**2.     Jayyousi's argument for a different guidelines manual is mistaken.**

Defendant Jayyousi objects to the use of the 2001 Guidelines manual, and does so on the ground that the jury specially found that his criminal conduct had ceased by December 20, 1997. No other party challenges the use of the 2001 Guidelines manual. Jayyousi thinks the 1997 manual should apply instead, but he is incorrect.

Jayyousi relies on the principle that a sentencing court must apply the Guidelines in effect on the date of sentencing, or if there is an Ex Post Facto problem, the Guidelines in effect when the

---

case, all the defendants were convicted of the substantive crimes charged. Accordingly, USSG § 2X1.1(b)(2) is no help to them.

More must be said, however, regarding Padilla's erroneous argument, because it represents another effort to take this Court down the path that the Eleventh Circuit rejected when it overturned the Court's multiplicity ruling. Contrary to Padilla's assertion, the Probation Officer correctly concluded that the substantive offense for the Count Two § 371 conspiracy was providing material support. *United States v. Hassoun*, 476 F.3d 1181, 1184 (11th Cir. 2007). The guideline for a § 371 conspiracy is § 2X1.1. "Substantive offense," as used in USSG § 2X1.1, means the offense that the defendant was convicted of soliciting, attempting, or conspiring to commit. USSG § 2X1.1, comment. (n.2). In this case, the "substantive offense" for Count Two is providing material support in violation of 18 U.S.C. § 2339A. *Hassoun*, 476 F.3d at 1184. With no guideline for § 2339A, the Probation Officer correctly applied the aiding and abetting guideline as the most analogous. See USSG §§ 2X5.1, 2X2.1. That guideline provides that the offense level is the same as that for the "underlying offense." "Underlying offense" is defined as the offense the defendant is convicted of aiding and abetting. USSG § 2X2.1, comment. (n.1). In this case, the "underlying offense" is the conspiracy to murder. The base offense level for that offense is 28. Neither USSG § 2A1.5 nor USSG § 2X2.1 provide for a three level reduction. Thus, the base offense level of 28 for Count Two as calculated by the Probation Officer is correct, and Padilla's argument to the contrary fails.

The same is true for Count Three. This count, contrary to Padilla's assertion, <u>does not</u> allege that the defendants provided material support to a conspiracy to provide material support to a conspiracy to murder. *Hassoun*, 476 F.3d at 1188 (noting that the object offense for Count Three is the § 956 offense). Using the same method as above, the "underlying offense" for Count Three is conspiracy to commit murder which has a base offense level of 28. USSG § 2A1.5. USSG § 2X1.1 does not even factor in calculating the base offense level for Count Three. Thus, Padilla's argument fails regarding Count Three as well.

33

criminal conduct ceased.[28]  Jayyousi claims that there is an Ex Post Facto problem with applying the 2001 manual instead of the 1997 one, but he does not say why the later guidelines are more onerous than the earlier ones.  The government does not believe that there is any such problem whatsoever. In any event, Jayyousi is wrong when he claims that the jury concluded that all of his criminal conduct had ended before the effective date of the 2001 manual (November 1, 2001), a fact that renders moot the whole issue of whether the later Guidelines are worse for him.

Far from finding that Jayyousi's criminal conduct ceased by December 20, 1997, the jury concluded only that he undertook no substantive acts of material support, for purposes of Count Three alone, beyond October 26, 2001.  Of course, Jayyousi was also charged with two conspiracies, one to murder, kidnap, and maim persons overseas, and another to provide material support to terrorists.  The jury found Jayyousi guilty of these offenses without any restriction as to the timeframe.  Because these conspiracies continued through at least November 1, 2001, the date of the last charged overt act, and Jayyousi did not withdraw from these conspiracies, the 2001 Guidelines manual is applicable to all of his offenses of conviction.

In sum, the jury did not exonerate Jayyousi of criminal conduct after December 20, 1997. Nor would such a finding have been warranted.  Conspirators like Jayyousi remain culpable until the conspiracy ends or they withdraw.  *See United States v. Young*, 39 F.3d 1561, 1571 (11th Cir. 1994); *see also United States v. Dabbs*, 134 F.3d 1071, 1083 (11th Cir. 1998) (mere cessation of

---

[28]There is a statutory requirement that the guidelines applicable at sentencing are those in effect on the date of the sentence.  18 U.S.C. § 3553(a)(4); USSG § 1B1.11(a); *United States v. Lance*, 23 F.3d 343, 344 (11th Cir. 1994).  The statute is subject to the Ex Post Facto Clause of the United States Constitution, art. I, § 9, cl. 3, which may require application of an earlier manual in effect on the date the crime was committed if the guidelines were amended after that date to the detriment of the defendant.  USSG § 1B1.11(b)(1); *Miller v. Florida*, 482 U.S. 423, 431-33 (1987).

participation does not establish withdrawal) *and* n.11 *supra*. To establish withdrawal <u>the defendant</u> must prove that he took affirmative steps to defeat the conspiracy's objective and made a reasonable effort to communicate these acts to his co-conspirators or to disclose the scheme to law enforcement. *Young*, 39 F.3d at 1571. The "straddle conspiracy" cases convey that conspiracy is a continuing offense, and therefore absent withdrawal, there is no Ex Post Facto problem in applying the guidelines in effect at the time the conspiracy ceased. *See United States v. Diaz*, 190 F.3d 1247, 1256-57 (11th Cir. 1999) (conspiracy that began before effective date of Guidelines and continued after effective date is subject to Guidelines sentence; defendant must have taken affirmative steps prior to effective date to terminate and disavow any participation in conspiracy to avoid Guidelines sentence); *see also United States v. Nixon*, 918 F.2d 895, 906-07 (11th Cir. 1990) (rejecting Ex Post Facto claim of conspiracy defendant sentencing under operative Guidelines who had not proven withdrawal; government need not prove any act in furtherance of conspiracy after effective date of operative Guidelines or that defendant knew that coconspirators had acted after that date); *United States v. Pippin*, 903 F.2d 1478, 1480-82 (11th Cir. 1990) (same); *United States v. Terzado-Madruga*, 897 F.2d 1099, 1123 (11th Cir. 1990) (conspiracy that began before the effective date of Sentencing Guidelines and continued after effective date is subject to Guidelines sentence because "conspiracy is a continuing offense").

In the instant case, the jury concluded that while Jayyousi's substantive material support offense had concluded before October 26, 2001, his involvement in the charged conspiracies continued through at least November 1, 2001. Thus, while one of his offenses of conviction (Count Three) would, standing alone, be subject to an older Guidelines manual, his other offenses of conviction (Counts One and Two) fall under the manual in effect at the time his criminal liability

ceased.   The Guidelines themselves counsel exactly what to do in this situation.   Section 1B1.11(b)(3) states that if the defendant is convicted of two offenses, the first committed before, and the second committed after, a revised edition of the Guidelines manual became effective, the revised edition is to be applied to both offenses.   This is true even if the result is a higher penalty for the first offense.   USSG.§ 1B1.11(b)(3), comment (n.2).   This means that, because Jayyousi is subject to the 2001 Guidelines manual for at least one (in fact, two) of his offenses of conviction, that manual applies to all crimes for which he will be sentenced.   The 2001 manual clearly applies here – as every party other than Jayyousi concedes.

### 3.        Jayyousi is not entitled to a reduction for accepting responsibility.

Jayyousi's suggestion that he receive a two-level decrease in offense level for acceptance of responsibility is preposterous.   His reference to defense counsel's attempt to initiate discussions about resolving this case as early as March 2005 actually was nothing more than a brief inquiry made by his attorney in Detroit, Michigan, at the time of the Jayyousi's detention hearing, about what the government was looking for in this case.   That comment was further cabined with a disclaimer from Jayyousi's counsel that he had not yet talked with his client regarding a resolution of the case.   The subject was left with a comment by government counsel that any further discussions along these lines would have to take place in Miami after defense counsel had spoken to his client.   That is all.

Jayyousi was free to enter a guilty plea at any time, but did not.   Neither did he affirmatively accept responsibility post-trial.   Acceptance of responsibility, whether after guilty plea or conviction at trial, is demonstrated by truthfully admitting the conduct comprising the offenses of conviction. *See* USSG § 3E1.1, comment (n.3); *United States v. Spraggins*, 868 F.2d 1541, 1542-43 (11th Cir.

1989).

Because he put the government to its burden of proof at trial by denying the essential factual elements of guilt, and has never accepted responsibility for his crimes, he is plainly not entitled to any reduction for acceptance of responsibility. *See United States v. Saget*, 991 F.2d 702, 714 (11th Cir. 1993) (affirming denial of acceptance of responsibility of defendant who went to trial because he never admitted being part of the conspiracy, despite the jury's verdict).

> **4.      Jayyousi is not entitled to a reduction for substantial assistance**.

Jayyousi's request for a departure for substantial assistance is equally spurious. USSG § 5K1.1 requires a motion from the government before substantial assistance may be considered by the court, and a district court cannot grant a downward departure for substantial assistance absent a motion from the government. *See United States v. Forney*, 9 F.3d 1492, 1500 (11th Cir. 1993).   Jayyousi has not provided substantial assistance to the government in the investigation or prosecution of another person who has committed an offense.   Accordingly, the government has no intention of filing a motion on Jayyousi's behalf.   Because the government has not filed a substantial assistance motion, no discussion of Jayyousi's assertion that he was truthful and complete during his interviews is needed.   (Suffice it to say, though, he was not.)

**III.    Defendants Do Not Meet their Burden of Proving that any Departure is Warranted.**

**A.      Hassoun is not entitled to a departure on the ground that Criminal History category VI overstates his past misbehavior.**

As a result of the terrorism enhancement in §3A1.4, Hassoun's Criminal History category is increased from I to VI.   Hassoun argues that such an increase would overstate his Criminal History status, and accordingly he seeks a departure on that basis under USSG § 4A1.3.   His argument has no merit, and no departure is warranted.

As explained above, when the terrorism enhancement in § 3A1.4 applies, the sentencing court must (1) increase the defendant's offense by 12 levels or to offense level 32, whichever is greater; and (2) increase the criminal history to Category VI. Courts have recognized that USSG § 3A1.4 "legitimately considers a single act of terrorism for both the offense level and the criminal history category." *Meskini*, 319 F.3d at 92; *see also Salim*, 287 F. Supp. 2d at 322 n.100. As the Second Circuit put it, "[c]onsidering the serious danger posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level." *Meskini*, 319 F.3d at 92.

Hassoun seeks a departure because of his alleged lack of criminal history. Section 3A1.4's criminal history enhancement is applicable even for someone without any prior convictions, however:

> Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists *with no prior criminal behavior* are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.

*Meskini*, 319 F.3d at 92 (emphasis added); *see also United States* v. *Lindh*, 227 F. Supp. 2d 565, 571 (E.D. Va. 2002) ("Although the defendant has no prior criminal record, he is appropriately categorized in Criminal History category VI, rather than I, pursuant to USSG § 3A1.4.").

Even assuming that this Court has the authority to depart downward under USSG § 4A1.3 in this case,[29] Hassoun should not receive such an exceptional departure. Section 4A1.3(b) states that a departure may be warranted if reliable information indicates that the defendant's criminal

---

[29]A district court's refusal to depart from the Guidelines will not be reviewed on appeal by the Eleventh Circuit, as long as the district court recognizes that it had the authority to depart if it had wanted to. *See United States v. Ortega*, 358 F.3d 1278, 1279 (11th Cir. 2003).

history category *substantially* over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes" (emphasis added). Hassoun cannot meet that burden.

The criminal conduct in this case could hardly be more serious. The jury convicted Hassoun of conspiring to murder, maim and kidnap people overseas, and of providing support to others engaged in those violent crimes. The danger he poses to society is enormous, and properly reflected in a designation of Criminal History category VI. Moreover, Hassoun's criminal activity in this case was not isolated; on the contrary, it extended over the length of an eight-year conspiracy. During that time, Hassoun continued to engage in unlawful conduct even when he suspected that government agents were listening to his calls, and he also attempted to obstruct justice by destroying potential computer evidence of his crimes. *See* GX 28, 45, 73, 88, 90. Hassoun freely espoused his commitment to violence, stating on one occasion that the only way to deal with the infidels – in his eyes, anyone who did not want to live under a Sharia government – is through the sword. *See* GX 69. Hassoun, to this day, remains unrepentant, and has never disavowed his belief in violence.

In addition, Hassoun has not been otherwise law-abiding. Since arriving in the United States 18 years ago, Hassoun has spent eight years engaged in a criminal conspiracy (1993-2001), one year committing multiple other crimes (2002), and five years in custody with no opportunity to break the law again. His track record of law-abidingness, therefore, consists only of his first few years in this country. Since that time, aside from the misconduct proved at trial, he has violated the immigration laws, resulting in a deportation order. He also is currently awaiting trial before this Court on eight additional charges, including perjury, making false statements to federal officers and possessing a loaded firearm despite his status as an alien. Hassoun has no tenable defense to those charges,

especially the firearms charge that underscores his danger to the community.  There is no way to say, on this record, that Hassoun's Criminal History category VI *substantially* overstates either his past misconduct or his present threat.  The concern about recidivism that underlies the Criminal History enhancement of USSG § 3A1.4 is well-founded with respect to Hassoun, and this Court should not nullify that enhancement with a horizontal departure or any other departure for this defendant.

**B.    Hassoun and Jayyousi are not entitled to a departure based upon "victim conduct."**

Hassoun and Jayyousi seek a departure under USSG § 5K2.10, which permits a downward departure in unusual cases "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior."  Under this provision, as under all other downward departure provisions, the <u>*defendant*</u> bears the burden of proving, by a preponderance of the evidence, that he is entitled to a departure.  *See United States v. Onofre-Segarra*, 126 F.3d 1308, 1310 (11th Cir. 1997).  Defendants cannot meet their burden.

At the outset, this is *not* a case involving a specific identifiable victim, so a departure under this provision would be improper.  Section 5K2.10 is couched in terms of the wrongful conduct of an identifiable victim of the offense.  Thus, all of the cases upholding a departure under this provision have highlighted the wrongful conduct of a specific individual, <u>*a real person*</u>, who targeted the defendant leading up to the crime.  That may explain why neither Hassoun nor Jayyousi cites for this Court a single case granting a departure, let alone sustaining it on appeal, under § 5K2.10.

In our case, by contrast, there is no such person.  Indeed, the Court expressly instructed the jury that these offenses do not require an identifiable victim:

It is not necessary for the government to prove the identity of any

> specifically contemplated victim of the conspiracy to murder, kidnap or maim, or the specific location outside the United States where the contemplated murder, or kidnaping, or maiming, was to occur.

*See* Court's Instructions to the Jury, Tr. 8/13/07. That instruction was not only legally sound (and unopposed by the defense), it dovetailed perfectly with the proof, which establish that the contemplated victims of the defendants' scheme included anyone who opposed violent jihad.

More broadly, the defendants' crimes – as we argued at trial and as the jury necessarily agreed – were not provoked at all, but rather were taken in furtherance of a deliberate premeditated scheme inspired by a violent political-religious agenda. *See, e.g., United States v. Waloke*, 962 F.2d 824, 831 (8th Cir. 1992) (departure properly denied when evidence did not establish that victim's misconduct, if any, substantially provoked the defendant's violence). Once again, the defendants' version of the facts collides with the verdict. Our defendants acted as they did because they wanted to establish Islamic states under Sharia, not because they were provoked. The only provocation it took for our defendants to support violence was the refusal of infidel "dogs" anywhere to bow down to radical Islamist pressure.

While defendants may have thought that refusal wrongful, this is not the kind of provocation upon which a court can predicate a departure under § 5K2.10. *See United States v. Morin*, 80 F.3d 174 (4th Cir. 1996) (departure improper where victim's wrongful conduct was "imagined rather than real"). This Court should not be the first to hold that a convicted criminal defendant was provoked into becoming a terrorist.

For these reasons, there is an obvious disconnect between the charges and allegations in this case and the very idea of a departure based upon supposed misconduct of the victim. The entire exercise of considering a § 5K2.10 departure is untenable, because there is absolutely no way to

apply this provision without colliding with the Court's instructions and the jury's implicit findings.

That said, the factual record is, at best, incomplete regarding the supposed wrongful conduct of the victims of defendants' schemes.  The text of § 5K2.10 requires that a defendant prove with reliable record evidence that the victim actually engaged in wrongful conduct.  USSG § 5K2.10; *United States v. Desormeaux*, 952 F.2d 182 (8th Cir. 1991) (holding that victim's conduct must be more than provocative, it must also be wrongful).  Defendants point to atrocities committed by Serb or Russian forces during the conflicts in Bosnia, Kosovo and Chechnya.  But sweeping generalities about atrocities at various times in various places cannot substitute for evidence that links specific acts of misconduct by our defendants to specific wrongful acts by the victim that supposedly provoked the crimes of conviction.  Especially in our case, where many theaters of violent jihad – such as Lebanon, Afghanistan and Algeria – did not involve wrongful victim conduct, and other theaters – such as Bosnia – were not developed before the jury, defendants' broad-brush approach is totally inadequate.  Defendants want to convert this departure provision into exactly the kind of free-floating jury nullification that the Court properly limited at trial, and § 5K2.10 does not allow that.  *See, e.g., United States v. King*, 226 Fed. Appx. 305 (4th Cir. 2005) (refusing to permit departure in felon-in-possession case despite defendant's argument that his possession of the gun was justified by another's threats, because "Congress criminalized [his] possession of a firearm, regardless of whether that possession was designed to defend a family member").

Section § 5K2.10 also lists a variety of subsidiary factors relevant to the departure, but those too weigh against defendants here.  One factor the Court must consider is the extent of "[t]he danger reasonably perceived by the defendant . . ."  USSG § 5K2.10( c).  The Court must also consider the "the danger actually presented to the defendant by the victim."  USSG § 5K2.10(d).  There is no

evidence, nor could there be, that our defendants were in any physical danger from the victims of their crimes.   Likewise, § 5K2.10 compels the court to consider the proportionality of the defendant's response.  *See Morin*, 80 F.3d at 128; *United States v. Shortt*, 919 F.2d 1325, 1328 (8th Cir. 1990).[30]   Supporting terrorists is not an appropriate, or proportional, response to alleged atrocities against Muslims.  For example, defendants could have worked within the law, and the political process, to remedy any perceived wrongful acts by individuals or forces opposing Chechen independence.   Instead, they took it upon themselves to champion Chechen terrorists such as Basayev and Khattab.  That was not accidental, because defendants were interested in setting up Chechnya as an Islamic state, not merely securing its independence – hence their effort discussed in the calls to steer funds away from the more moderate Chechen leader Dudayev.  *See* GX 28; *see also* Tr. 6/28/07 at 102-130; GX 12; GX 118.  But accidental or not, supporting terrorists can never be a proportional response.

Finally, the lack of case law applying § 5K2.10 to murder and material support conspiracies demonstrates just how far afield we are from a legally sustainable departure on this basis.  Indeed, we are aware of just one case in the Eleventh Circuit upholding a departure under § 5K2.10, and that case underscores the need for proof of provocation which is absent here.  *United States v. Dailey*, 24 F.3d 1323, 1327-28 (11th Cir. 1994).  *Compare United States v. Hatney*, 80 F.3d 458 (11th Cir. 1996) (reversing departure because victim did not provoke the defendant's illegal acts).  The Court should recognize that it has the authority to depart under § 5K2.10, but decline to do so.

---

[30]The current edition of the Guidelines expressly requires the court to address the "proportionality and reasonableness of the defendant's response to the victim's provocation." USSG § 5K2.10(6).  The 2001 edition did not contain that language, but as cases such as *Morin* and *Shortt* discuss, proportionality has always been a consideration in evaluating a proposed departure under this provision.

## VI.     Considering the Factors in 18 U.S.C. § 3553, the Court Should Impose Life Imprisonment on Each Defendant.

The government submits that a life sentence for each defendant is not only within each defendant's properly-calculated advisory Guidelines range, it is also reasonable and, in fact, demanded by the statutory sentencing factors under 18 U.S.C. § 3553. That statute provides that courts, in imposing a reasonable sentence, must consider, among other factors: (1) the applicable guidelines range; (2) the nature and circumstances of the offense; (3) the history and characteristic of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect of the law, and to provide just punishment for the offense; (5) the need for adequate deterrence; (6) the protection of the public; and (7) the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553. An explicit recitation of how the each defendant's sentence comports with each of these factors is not required; the sentencing court instead must acknowledge that it has considered the defendant's arguments in light of the aforementioned statutory sentencing factors, and has factored that analysis into the ultimate sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005) (per curiam); *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005).

Taking these factors into account, defendants should receive terms of life imprisonment, as their properly-calculated Guidelines suggest. The conspiracies to which each of the defendants belonged involved zealous attempts to fund, equip, and assist mujahideen fighters, who themselves employed ruthless, terrorist tactics to establish Islamic states out of various regional conflicts. The mujahideen, and their supporters, capitalized on human misery born of ethnic or nationalist strife, and sought to compound that suffering by imposing a repressive form of Islamic rule. The rhetoric that Hassoun and Jayyousi used in their conversations (such as when Hassoun advocated dealing with the infidels by the sword, even if 3/4 of the Muslim population is killed in the battle) or their

44

publications (such as when Jayyousi used the *Islam Report* to propagate information and raise funds for murder, maiming, and kidnaping) show the level of their commitment and their taste for, and approval of, the bloodthirsty activities of the mujahideen.  The mujahideen that Hassoun and Jayyousi supported used assassination, hostage takings, suicide bombings, and beheadings to achieve their goals of political and religious change; Hassoun and Jayyousi had direct knowledge of these actions.  Expert testimony established that Hassoun and Jayyousi were typical support cell leaders, and that their efforts made possible these types of violence.

Hassoun and Jayyousi made a sustained commitment to these support activities, and undertook support efforts all over the globe.  Theirs were not crimes of the moment, but rather offenses that were informed by a sustained and fanatical commitment to their extreme religious views.  The common thread linking each of their instances of providing material support, regardless of whether it was in Lebanon, Afghanistan, Kosovo, Chechnya, or Somalia, was the establishment of Islamic states, through Al Qaeda and its proxies, by whatever means necessary.  They kept well-informed of mujahideen movements and activities, such that they harbored no illusions about the carnage that these fundamentalist battalions left in their wake.  Hassoun and Jayyousi did not repudiate the mujahideen's acts, or the "politico-religious" justifications of Osama bin Laden, Abdullah Azzam, and Omar Abdel Rahman.  Hassoun and Jayyousi celebrated these "scholars" and the mujahideen they inspired, even when they were in direct conflict with United States allies and foreign policy.  Hassoun's attempts to recruit for the Al Qaeda affiliate in Somalia, which he believed had attacked helicopters flown by the American military, as well as his check to Global Relief Foundation for "Afghan Relief," codewords for funding mujahideen resistence to the American invasion, show how deserving he and his coconspirators are of a life sentence.

For his part, though Padilla was a mujahideen recruit, he was no marginal player, but a concrete embodiment of what Hassoun and Jayyousi wanted to achieve in support of their worldwide Islamic army.  Although Hassoun and Jayyousi provided various forms of material support–ranging from donations of money and equipment to providing encouragement and advice to recruiting and funding mujahideen–neither actually provided the ultimate form of support, themselves.  This is why Padilla's contribution to the charged conspiracies was unique, and uniquely fanatical and dangerous. Padilla showed himself to be careful, secretive, and deliberate about preparing himself for violent jihad.  To be sure, he would speak with Hassoun, who provided encouragement, but Padilla showed himself to have independence and his own mind about how to achieve the conspiracy's goals. Padilla even criticized Hassoun for speaking openly to Youssef about jihad matters, and volunteered his thoughts about the discipline and patience needed to serve as an Islamic holy warrior.

More than that, Padilla provided himself to Al Qaeda, a ruthless terrorist organization bent on the destruction of the United States and its allies, which the evidence showed to have a murder conspiracy as its core function.  Padilla himself made contacts in the Middle East that would get him to the Al Qaeda training camps in Afghanistan.  Once there, he filled out the Mujahideen Data Form that all new recruits complete and then undertook a roughly six-week basic training course.  The testimony from Yahya Goba and Dr. Gunaratna demonstrated that there was no innocent purpose to this training, which consisted of weapons courses, explosives training, warfighting tactics instruction, and similar military-style courses.  The sole and exclusive purpose for attending these camps was to fight in violent jihad, something we know Padilla intended to do in Chechnya, one of the most ferocious jihad theaters in which the mujahideen engaged in hostage-takings and suicide bombings.   Although Hassoun and Jayyousi were leaders who marshaled support for the

46

mujahideen, Padilla trained to be a holy warrior himself, an ignoble distinction placing him at the heart, rather than at the periphery, of the charged conspiracies.

Imposition of life sentences will serve the ends of justice and deterrence, and signal that United States criminal courts are prepared to mete out strong punishment while applying the terrorism laws that Congress has enacted.  Hassoun, Jayyousi, and Padilla used United States soil as a springboard for supporting violent Islamist radicalism abroad, and threatened not only their intended individual victims, but also United States foreign policy in places like the Balkans and the Horn of Africa.  Strong punishment for the defendants' murder conspiracy and material support crimes would deter others who would abuse the freedoms that the United States offers those who live here, and would further ensure that the United States does not become a haven for supporters of violent jihad or violence of any stripe.  Aside from obviously guaranteeing that these radicals will never commit such crimes again, terms of life imprisonment will also send a strong message that no tribunal of the United States, including civilian ones, will tolerate terrorism and the abuse of human rights abroad, and that United States criminal courts are an integral, if not indispensable, instrument for fighting extremism and intolerance.

For all of these reasons, the § 3553 factors support imposing life imprisonment on each defendant, consistent with each defendant's properly-calculated advisory Guidelines range.[31]  The

---

[31]All of Hassoun and Jayyousi's arguments for a lesser sentence under § 3553 either rest on a version of events that the jury has rejected or are addressed elsewhere in this memorandum. Suffice it to say that imposing the light sentences they seek would make a mockery of the verdict and be, in our view, reversible error.  The same is true for Padilla.  Padilla, however, makes several unique arguments under that, while meritless, require brief comment.  In particular, he contends that his purported conditions of confinement while at the brig warrant a reduced sentence under § 3553.  This argument rests on the same unsubstantiated allegations made by Padilla's lawyers earlier in the case.  This Court has already held that the circumstances of Padilla's brig confinement are irrelevant to these criminal charges against him.  See DE 969 at 8

nature and circumstances of this violent offense, the need for the sentence imposed to reflect the

seriousness of the offense, to promote respect of the law, and to provide just punishment for the

offense, the need for adequate deterrence and the need to protect the public all support such a

sentence.  The history and characteristics of these defendants, including the past wrongdoing of

Padilla and Hassoun, and Jayyousi's abuse of the trust once placed in him, plus the need to avoid

unwarranted sentencing disparity within this case, further support life imprisonment for all three

---

(holding that the alleged "governmental conduct occurred at a time and place removed from the crimes charged").  For the Court to change direction now, and allow the sentencing process to devolve into a hearing on the conditions of Padilla's military confinement, which would necessarily also involve *why* he was designated an enemy combatant in the first place, would be improper.  (It would also profoundly alter the length and format of the sentencing hearing.)  Moreover, as the Court recognized in denying Padilla's Speedy Trial motions, the charges in this case are different from those underlying his enemy combatant designation, so events relating to his confinement as an enemy combatant have no connection with the § 3553 analysis that the Court must perform today based upon the crimes proved in this case.  In *United States v. Noriega*, 40 F. Supp. 2d 1378 (S.D. Fla. 1999) – the only opinion Padilla cites –  the court lowered Noriega's sentence based upon his conditions of confinement in the case for which he was tried and sentenced, not some earlier case.  (*Noriega* is inapposite on many other grounds.  It was a pre-Guidelines case where the defendant was originally sentenced to 40 years' imprisonment on drug charges, then sought a reduction ten years later based upon his post-sentencing conditions.  The court granted that request in part, but relied upon the substantially lighter sentences meted out to Noriega's co-defendants.)  In all respects, this Court has carefully, and properly, avoided allowing this murder conspiracy case to be consumed by a sideshow about the why, when and how of Padilla's enemy combatant status.  Padilla has now been convicted by a jury of three extraordinarily serious federal crimes, and those crimes should remain the focus of the sentencing process.

Likewise, speculation about Padilla's potential future conditions of confinement within BOP has nothing to do with the factors in § 3553 and is not a valid consideration at sentencing (that said, the idea of reducing a convicted terrorist's sentence up front because he may be treated as such in prison defies belief).  Finally, Padilla's attempt to analogize his case to two other Al Qaeda operatives (Goba and David Hicks) is queer, as neither was convicted by a jury, neither was guilty of joining a murder conspiracy in violation of a statute (§ 956) with a maximum sentence of life imprisonment, neither proceeded to trial (both pled), and Goba, of course, cooperated.  Despite the evidence of his Al Qaeda training and activities, Padilla persisted in denying his guilt, put the government to its burden at trial, was convicted by his peers of joining a murder conspiracy – and now deserves a punishment that fits his crimes.

defendants.  No lesser punishment, in our view, would be reasonable or proper under § 3553.

**Conclusion**

For all of the foregoing reasons, the Court should (1) adopt the PSIs including their calculation of each defendant's advisory Guidelines range, (2) deny the defendants' requests for a departure from the properly-calculated Guidelines range, and (3) after considering the factors in 18 U.S.C. § 3553, impose upon each defendant a sentence of life imprisonment.

Respectfully submitted,

R. ALEXANDER ACOSTA
United States Attorney

s/ John C. Shipley
RUSSELL R. KILLINGER
Fla. Bar No. 0312851
BRIAN K. FRAZIER
Court No. A5500476
JOHN C. SHIPLEY
Fla. Bar No. 069670
Assistant United States Attorneys
STEPHANIE K. PELL
Court No. A5500301
Attorney, United States Department of Justice
99 N.E. 4th Street, 8th Floor
Miami, Florida 33132
Tel: (305) 961-9000
Fax: (305) 530-4675
Russell.Killinger@usdoj.gov
Brian.Frazier@usdoj.gov
John.Shipley@usdoj.gov
Stephanie.Pell2@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 29, 2007, the undersigned electronically filed the foregoing document, Government's Sentencing Memorandum and Response To Defendants' Objections To The Presentence Investigation Reports, with the Clerk of the Court using CM/ECF.


s/ John C. Shipley
John C. Shipley
Assistant United States Attorney

50