UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 04-60001-CR-COOKE/(s)(s)(s)(s)(s)

UNITED STATES OF AMERICA,          :

        Plaintiff,                              :

        v.                                          :

ADHAM AMIN HASSOUN

        Defendant.                          :
_____:

_____

DEFENDANT HASSOUN'S
OBJECTIONS TO <u>REVISED</u>
PRESENTENCE INVESTIGATION REPORT[1]
_____

    Defendant Adham Amin Hassoun, through undersigned counsel, hereby files his

objections to the <u>Revised</u> PSI Report and Addendum.[2]

_____

[1] In order to provide the Court with a single pleading setting forth all of Hassoun's objections to the PSI, as revised, Hassoun repeats herein all of the objections contained in (1) his "Objections to Presentence Investigation Report" [DE 1264] (as originally filed except for correcting a number of spelling, typographical and formatting errors), (2) the two corrected pages he separately filed [DE 1267], and (3) the Supplement to his PSI Objections [DE 1275]. In addition, Hassoun adds new objections in response to the Revised PSI to new ¶176 and to the Addendum.

[2] Hassoun separately filed a request, pursuant to *United States v. Booker*, 543 U.S. 220 (2005), and *Rita v. United States*, 127 S.Ct 2465 (2007), that the Court sentence him below his advisory sentencing-guideline range based on the sentencing factors set forth in 18 U.S.C. §3553, as well as a request for a downward departure under §5K2.10 (Victim's Conduct).

**PART A:  THE OFFENSE**

*Preliminary Statement:*

Defendant Hassoun acknowledges the jury's verdict and recognizes that his disagreement with that verdict is not before this Court at this time.  However, even accepting that verdict for purposes of sentencing, defendant submits that The Offense section of the PSI is filled with factual inaccuracies, biased interpretations and assertions not proved at trial.  While it may not be necessary for the Court to resolve all of these factual disputes, it is necessary for the Court to have an accurate picture of what has been <u>proved</u> – *versus* the government's inflammatory, unsupported, speculative <u>assertions</u> – in order to impose a fair and reasonable sentence in this case.

<u>Charge(s) and Conviction(s)</u>

**Objection to PSI ¶1, page 4**:

Hassoun objects to the use in ¶1 of the terms "terrorism" and "terrorists" to describe the charges in Counts Two and Three, respectively, as these terms were <u>redacted</u> from the Indictment, at the government's request, before the Indictment went to the jury and, therefore, were not part of the charges considered by the jury.

<u>The Offense Conduct</u>

**General Objection to PSI ¶¶ 3-10, pages 4-6**:

Hassoun objects to the description of the so-called "wider theological, ideological, and geopolitical context" that is given in paragraphs 4 through 10.  As stated below these paragraphs contain misinformation, misconceptions, and inaccuracies.  These topics and issues surrounding the Global Salafi-Jihad Movement have not been described accurately in this PSI.  If anything, the offense conduct should be limited to

2

the facts of the offense of conviction and should not contain this attempt at a "Cliff notes" version of a very complicated historical period.

**Objection to PSI ¶4, page 4**:

Hassoun objects to the entirety of ¶ 4. In a sweeping over-generalization, based upon an exaggerated, distorted, and one-sided, biased view of the Islamic religion, this paragraph wrongly condemns a huge portion of the world as supporters of "murder, maiming and kidnaping." (It is no excuse that this paragraph parrots ¶¶1 and 3 of the Indictment since those Indictment-paragraphs should have been struck as surplusage – as inflammatory, prejudicial and irrelevant to the charged offenses.)

**Objections to PSI ¶¶5-7, page 5**:

Hassoun objects to all of the characterizations of Sheikh Azzam's views in ¶¶5-7 as these paragraphs are exaggerated, distorted, one-sided and biased and in many particulars completely inaccurate. Specifically, the statement that "Azzam's life revolved around a single goal, the establishment of Allah's rule on earth" is an incorrect statement of his views. This was not what he advocated. Furthermore, the quote in paragraph 5 that begins "jihad and the rifle alone…" is taken out of context and should not be seen as representing his views in general. This one sound-bite statement cannot be used as a general statement of his views or as a generalization of the views of Hassoun simply for quoting Azzam. This statement was made during the period when the Soviet Union launched an aggressive invasion against Afghanistan, an Islamic country. The invasion was opposed by the Muslim countries and by the western countries, including the United States. The United States, together with Muslim

3

countries, poured millions of dollars into the training and arming of the Arab mujahideen who fought in the jihad against the Soviet Union.

In the quote in ¶6, Azzam mentions the obligation of all Muslims to help fellow Muslims whose homelands are occupied.  This statement is consistent with the beliefs in the Muslim religion.  It is not a radical idea, nor is it anti-western.  Additionally, it is not indicative of the global Salafi-jihadist views described in the PSI.  Azzam opposed expanding jihad to other countries and was killed by those who disagreed with him.

Hassoun disagrees with the statement that Abdullah Azzam is the radical spiritual leader of such people as Osama Bin Ladin.  It is incorrect to say there is a linear connection between Abdullah Azzam and Osama Bin Ladin, as the views of Bin Ladin after Azzam's death were drastically different than Azzam's own views.  The views of Azzam  are not accurately portrayed in this PSI.

Some key points about Azzam that are omitted from these paragraphs – even though conceded by the government's so-called "expert," Rohan Gunaratna – are as follows:  Azzam's jihad "campaign" in Afghanistan received strong support from the U.S. government as well as many individuals in the United States (Tr.7/02/07:105); Al Qaeda was created behind Azzam's back, at a meeting in August 1987 at which Azzam was not only absent, but was criticized for the way in which he ran MAK (*id*. at 109-110); Azzam and Usama bin Ladin "argued" and "parted company" over what the mujahideen should do (*id*. at 134-135); "Azzam envisioned an organization that would channel the energies of the mujahideen into fighting on behalf of oppressed Muslims...." (*id*. at 115); "Azzam said [that] killing civilians was...<u>not</u> permissible [under] the Koran" (*id*. at 118 (emphasis added), *see* 134); "Azzam <u>vehemently opposed the use of terrorist tactics</u>"

4

(*id*. at 108 (emphasis added), *see* 133) and, in fact, "refused to give to Osama bin Laden a training camp that Osama bin Laden wanted to use for terrorist tactics training (*id*. at 137); during his life, Azzam "wanted to focus on Afghanistan,"(*id*. at 134, *see* 108), in contrast to bin Ladin who "wanted to focus on Egypt and other theaters of conflict at that time" (*id.* at 134); and, finally, "Azzam was <u>assassinated because he opposed Osama bin Laden's vision</u>" on these matters (*id.* at 135 (emphasis added)). Furthermore, defense witness Ra'ed Awad, who knew Azzam personally, testified that Azzam was a "sincere dev[out] righteous Muslim[ ] who loved his faith[,]...his community and...humanity in general[, who]...wanted nothing but goodness for people.....[and who] encouraged people to defend themselves." Tr.7/24/07:66-67.

**Objections to PSI ¶¶ 9, page 5**:

The statement that Sheik Omar Rahman assumed the role of spiritual leader of the global jihad with the death of Azzam is incorrect as there was no connection between Azzam and Rahman.   As stated above, Azzam was not the spiritual leader a global Salafi-jihad and there was no connection between Azzam and Rahman (who associated with the Egyptian Islamic Group.)   Azzam was not part of the Egyptian I.G. movement.   Azzam and Rahman were not part of an overall global conspiracy as described in the offense conduct, nor were Azzam and Bin Ladin connected in this overall global conspiracy.

Furthermore, the Federal case involving the Al-Kifah Refugee center and the planned bombing of New York City landmarks has nothing to do with this case.   The events and details of that case are not part of this indictment nor can these events be considered relevant conduct.   This paragraph should not be included in the PSI .

**Objections to PSI ¶10, page 6**:

The Defendant objects to this paragraph as it completely exaggerated the influence of Al Qeda in the Muslim communities.  In particular, the following statements that begin with "Al Qaeda successfully radicalized and mobilized the Islamic diaspora into small groups or cells… One such cell identified by the FBI…consisted of the defendants and others" is completely incorrect.  It is an inaccurate description about the effect of, or linkage between Al Qaeda and the Muslim diaspora as a whole.  It is also a misstatement about Hassoun.  There is no evidence that Hassoun was part of a cell that was "radicalized and mobilized" by Al Qaeda.  In fact, *The 911 Commission Report* did not mention the Hassoun or any of the co-defendants in this case as cell members under the influence of Al Qaeda.

**Objection to PSI ¶11, page 6**:

Hassoun objects to the assertions in ¶11 that he ever provided any "support" to anyone "for the purpose of establishing Islamic states governed by Islamic law," or that he ever provided any "support" to "mujahideen guerilla groups and [/or] terrorist groups" for any purpose, or that he ever provided any "support" to anyone for the purpose of "intimidating and coercing, through the use of physical force and violence (violent jihad), existing governments, individuals and institutions that did not share [his] view of Islam."

There was no evidence that any checks Hassoun wrote, or funds or other items he discussed in various calls, were ever transmitted to any location overseas for the purpose of "establishing Islamic states" or for the purpose of "intimidating [or] coercing" governments through "violent jihad" – or through any other means.  At all times when Hassoun sent or discussed sending money or other items to particular places, atrocities

were being committed against Muslims in those places and/or relief operations were under way to aid Muslim victims and refugees in those places.  A desire to aid Muslims who were under attack respond by "opposing" their attackers is <u>not</u> equivalent, legally or factually, to having a purpose of "intimidating [or] coercing" governments nor is it equivalent to "violent jihad."

**Objections to references throughout PSI** :

Hassoun objects to any reference or statement in this PSI that he supported "violent jihad" as a means to establish Islamic states governed by Sharia.  Hassoun may have expressed support for the mujahideen but it was in their effort to defend or aid Muslims who were victims of aggression.  Furthemore, when Hassoun used the word "jihad" it did not have the violent jihad connotation that the government has given to it.  Furthermore, Hassoun objects to any reference or statement in this PSI that he ever recruited anyone to participate in violent jihad.   He never exercised any influence or control over anyone to the extent that would be necessary to conclude that he "recruited" anyone to become a murderer, kidnapper or maimer.

**Objections to PSI ¶13, page 7**:

Hassoun objects to several assertions in ¶13 as inaccurate.  Hassoun did not distribute the Islam Report, although he did distribute other magazines.  He also did not go on "fund-raising tours to support Islamic fighters," although he did fund-raise to help Muslims who were victims of aggression in various parts of the world.  As stated elsewhere in these Objections, Hassoun never "recruited" anyone to participate in "violent jihad" and he had no knowledge or awareness that anyone to whom he gave

financial support, including Youssef and Padilla, ever engaged in "violent jihad."  (*See* Hassoun's, infra, at 25-27 for further discussion of this point).

Additionally, as stated elsewhere in these Objections, when Hassoun "professed" to being in MAK, he was puffing.  There is no evidence that he ever communicated with MAK, nor is there any corroborating evidence that he was a representative of MAK. Furthermore, Hassoun did not "publically profess" to being a "representative of al least six different mujahideen groups."  The actual statement that Hassoun made during his speaking engagement at Barry University on February 13, 1996 is quoted in PSI ¶74. In that statement, which Hassoun made in response to a hostile question from a member of the audience, Hassoun referred to being a representative of "six different organizations," not "six different mujahideen groups."  Moreover, Hassoun's references to "mujahideen" in that statement do not evidence any intent to support "violent jihad": the "mujahideen...in Bosnia" were a recognized part of the Bosnian government's armed forces and by 1996 Bosnia was at peace in any event; and Hekmatyar became Prime Minister of Afghanistan during that period and actively opposed the Taliban, which aligned with Al Qaeda.

**Objections to PSI ¶ 57, page 15**:

Hassoun objects to the description of Usbat Al Ansar as "a violent jihad group and affiliate group of Al Qaeda….during the 1990's."  During this period, Usbat was a small fringe Palestinian group that was concerned about intra-Palestinian affairs.  It had no global jihadist agenda during the period that is relevant to this case.  Its focus during the 1990's was in opposing the Lebanese authorities who, it believed, were oppressing

the Palestinian population.  It was also concerned with the intra-Palestinian politics involving the control of the Palestinian camp where it was based.

**Objections to PSI ¶60, pages 15 - 16**:

Hassoun objects to the implication in this paragraph that he was serious when he made these remarks about Abu mohjen and his group.  As his father-inllaw testified, Hassoun was joking when he said these things.

**Objection to PSI ¶71, page  17**:

Hassoun objects to several parts of this paragraph which attempts to summarize testimony of Herbert Atwell regarding speeches Hassoun gave at the mosque about mujahideen.  This paragraph mischaracterizes the testimony of Atwell as "consistent with other evidence introduced at trial, demonstrating Hassoun advocated the same global-Salafi jihad ideology as Sheik Azzam, Sheik Rahman and Usama bin Laden." This paragraph also incorrectly states that "Like these radical Islamists, Hassoun supported violent jihad as a means to establish Islamic states governed by Sharia."   In fact, Atwell specifically testified that he understood the mujahideen to be "freedom fighters" who during this time period (1997-2001) were helping to defend Muslims who were under attack in different parts of the world, and he further understood that becoming a mujahideen had nothing to do with becoming a terrorist. (Tr. 06/04/07:24-25).  Additionally, according to Atwell, Hassoun never talked to anyone about becoming a terrorist and never recruited anyone to become a terrorist; rather, Hassoun talked about helping Muslims who were suffering in various parts of the world. (Tr. 06/04/07:28).  Atwell testified that when Hassoun  talked about the atrocities that were occurring in Chechnya, Bosnia, and Kosovo, as well as other parts of the world, he

9

would speak about it with emotion. Atwell described how Hassoun showed video footage of atrocities that happened to Muslim women in Chechnya and Afghanistan who "were being raped and shot in the leg." Id.

The testimony by Atwell is not at all consistent with global-Salafi jihad ideology as advocating the use violence waged by mujahideen as a means of establishing Islamic states through violent jihad, or through murder, maiming and kidnapping. Atwell described Hassoun's talks as about helping Muslims and defending Muslims, not about using violence to establish Islamic states. To the extent violence is a part of any mujahideen activity, it was to defend Muslims communities under attack in areas such as Bosnia, Kosovo, Chechnya where the population was persecuted.

Furthermore, Hassoun objects to the claim in this paragraph that "evidence at trial, demonstrate[ed] [that] Hassoun advocated the same global-Salafi jihad ideology as…Azzam, …Rahman and …bin Laden….[and] supported violent jihad as a means to establish Islamic states governed by Sharia."   As stated above (objections to ¶¶ 5-7), Azzam did not advocate global jihad to establish states governed by Sharia. This is a major misinterpretation of the views of Azzam that has been repeated throughout this PSI. Also, there was no link between the views of Azzam and Rahman, and no link between the views of Azzam and Bin Ladin, particularly after 1991 when Bin Ladin begins to become more radical. Finally, as mentioned above, Hassoun's talks with others in the mosque were not about supporting global Salafi-violent jihad to establish Islamic states governed by Sharia. He spoke about aiding Muslims who were the victims of aggression and atrocities by foreign countries, such as Serbia and Russia.

**Objection to PSI ¶72, page 17**:

Information from Kamal Al Naji (incorrectly spelled in the PSI as "Alanaji") states that Hassoun was the leader of an informal prayer group, known as the Righteous Group, that occasionally met at the Mosque.  Hassoun objects to the statement that "Hassoun primarily preached about the individual's duty to participate in violent jihad (fighting) in such areas such as Afghanistan."  Al Naji defined "jihad" as he used that word to mean:

> Q: and when we talk jihad, particularly relating to Mr. Hassoun, was he referring to the military version of Jihad, the actual arm fighting?
>
> A: It's not always the way I understand it from him.  I mean, he was focusing a lot on the jihad, the fighting, but he told us that Jihad is to protect innocent people, either by going and help or give money or give, collect food, clothes or jus praying from the people.

(Grand Jury 09/16/04, at 9).

Hassoun objects to the statement that "Hassoun would most often refer to or quoted the teachings of Sheik Azzam on the subject of jihad" insofar as that is incorrectly intended to mean that Hassoun equated "jihad" with "violent jihad."  When Hassoun used the word "jihad," he did not use it in the sense of "terrorism" or "murder" but, rather, in the sense of protecting innocent Muslims who were victims of aggression. According to Al Naji, when he referred to the teachings of Azzam, he did not mean jihad to mean terrorism or murder. (Grand Jury, 05/23/03 at 24).  According to Al Naji, while Hassoun may have talked about defensive jihad in the military sense at these prayer meetings, Al Naji described his preaching as urging that they give help with non-military things.

11

> He continued, but not to push.  Again he always - - again, it's
> not with jihad, he always said pray for them, give clothes,
> whatever they need."

(Grand Jury, 05/08/03 at 24.)

Furthermore, Al Naji never said that Hassoun preached about a duty to participate in the "violent jihad in Afghanistan or Somalia."

**Objection to PSI ¶¶ 74, and 75, pages 7 and 18**:

Insofar as Hassoun "professed" being in MAK or representing other groups, he was doing nothing more than puffing.   There was no corroborating evidence that he was a representative of MAK.

**Objection to PSI ¶76, page 18**:

The radio address discussed in this paragraph was concerned with the occupation of Palestinian areas and Hassoun's comments were directed to the land dispute in that area.  With the exception of Chechnya, none of the countries mentioned in this radio address have anything to do with this case: Kashmir, Cyprus, Palestine, and Andalusia.  This radio address has been taken out of the context; it concerns a different issue that is not part of this case.    Hassoun objects to this paragraph.

**Objection to PSI ¶77, page 19:**

Hassoun objects to the description in this paragraph of the conflict in the Ogaden region as involving a "multinational terrorist group [that]…sought to establish an Islamic state in this region by attacking the Christian Orthodox Ethiopian forces."

First, this was a regional conflict between Ethiopia and Somalia.  Hassoun objects to the omission from this paragraph that Ethiopia had been engaged in long-term repression of Somalia Muslims and that Ethiopian forces had invaded Somalia.

The fighting was about territory and not about creating an Islamic state.  This conflict was not about Christians versus radical Muslims, as the PSI portrays it.

Second, Hassoun disputes the labeling of Al-Ittihad al-Islami as a multinational terrorist group, giving the impression it was under the influence of Al Qaeda.  The West Point Study shows that Al Qaeda failed to gain a foothold in Somalia in the 1990's, and by 1996 and 1997 the Al-Ittihad al-Islami was not controlled or even influenced by Al Qaeda.  This paragraph over simplifies and distorts the conflict in this region.

**Objection to PSI ¶78, page 19:**

Hassoun objects to the use of the term "directed" to describe Hassoun's communication to Youssef.  As is clear from the context of the call, Hassoun at most encouraged Youssef to go to Somalia; he did not "order" him to do so.

**Following PSI ¶80, the following information should appear on page 19:**

The December 31, 1996, call shows that Hassoun first learned of the group Al-Ittihad al-Islami just a few days earlier in a press release from Reuters.  There was no evidence that Hassoun ever had any contact with this group.  Furthermore, the call shows that he wanted Youssef to go there to gather the news, stating "I mean you would be a news correspondent…press is an important thing."

**Objection to PSI ¶87, page 20:**

Hassoun objects to the sentence beginning "Youssef put the brother on the phone with Hassoun…" in that Youssef did not use the words "spy or infiltrator."  He said the following:  "There is no penetration, no, he is one of us."   It is clear that Youssef meant that the Egyptian authorities or some opposing group had not penetrated his circle. Egypt was a very repressive country where there is very little

13

tolerance for political dissention and where the expression of religious or political views different from the Egyptian government is not allowed, in contrast to the United States, where diverse views are permitted.

**Objection to PSI ¶88, page 20**:

Hassoun objects to the implication this paragraph is trying to draw from Padilla's comment about "Youssef talk[ing] too much." This comment relates to the fact that the Egyptian authorities routinely listened to telephone calls and that Youssef could have problems with the Egyptian authorities, not because he was breaking any United States laws but because the Egyptian authorities would not like his activities.

**Objection to PSI ¶89, page 21**:

This paragraph mischaracterizes Hassoun's call with Youssef and the surrounding activities and gives the impression that Hassoun is part of the planning and acting as an advisor. When Hassoun asked Youssef "what the plan was," it is clear that Hassoun was resuming a conversation they had begun earlier in which Youssef had described what he was planning to do. The questions Hassoun asked were simply for the purpose of getting information. The statement "Hassoun and Youssef discussed Hassoun sending $5,000 for tickets" leaves out additional information. It appears that in this call, Yousseff asked Hassoun for help in raising the money for their transportation. Yousseff said that normally these expenses would be covered by Zakat (charity donations) but Youssef could not raise it. Youssef mentioned that he needed "capital" for the tickets and Adham said he would try to raise the money.

14

**Objection to PSI ¶93, page 21:**

The statement in this paragraph that "Hassoun instructed Youssef to call him as soon as he arrived there" is not accurate.  Hassoun actually said to Youssef, "but it is important that you (plural) call me when you arrive there god willing."  This term "instructed" mischaracterizes Hassoun as someone who was instructing or giving orders to Youssef.   This was not the case.

**Objection to PSI ¶94, page 22:**

In this paragraph, the sentence "Hassoun cautioned Youssef not to mention names" should be followed with Hassoun's further statement that "We have nothing to do with them" -- which Hassoun repeated two times to Youssef.

Additionally, the statement in this paragraph that "Hassoun advised Youssef that Abu Fayez may be able to assist in obtaining an iron (firearm)" gives the mistaken impression that Abu Fayez was in the business of dealing in arms.  Youssef asked "Yeah can I request from him (Abu Fayez) the cost of the iron and so on?"  Hassoun's reply was "You may take from him…tell him Abu Sayyaf will give you."  Hassoun had just mentioned Abu Fayez as someone who was helping the displaced and the refugees, and not as a military person.   Furthermore, if there was desire to help Youssef obtain a gun, it was for self-defense purposes because he was entering an area that was dangerous.

**Objection to PSI ¶95, page 22:**

The sentence in this paragraph that "Youssef told Hassoun to contact Abu Musab, the emir of jihad in Kosovo, or Abu Huzayfa, the emir in Tirana" is somewhat misleading.  Youssef did make a comment "you need to reach out to one or the other,"

but Youssef did not tell Hassoun how to reach either person; nor was there any evidence that Hassoun got in contact with either.   The reason Youssef made this call, besides asking Hassoun to send another $5,000, was to ask Hassoun to call Cairo to tell the families of the men with Youssef that the men were okay.

**Objection to PSI ¶96, page 22:**

This paragraph misrepresents the purpose of the described call.  In that call, in their discussion about Al Naji going to Kosovo, the purpose was understood to be to offer humanitarian aid.  Thus Hassoun explained, "Whoever goes there, whoever goes there, it's a good thing god willing because there are mosques that need to be fixed and opened, there are center to be organized and so on.  I mean there is administrative and non-administrative work."

**Objection to PSI ¶99, page 23:**

This statement in this paragraph that "Daher advised he had news from Peshawar (Pakistan) that the students (Taliban) gave 'our friend, the Saudi one' a school" gives the misleading impression that Daher got his news from some base or organization in Peshawar.  In context, it is clear that Daher was really referring to a news organization or a media source.

**Objection to PSI ¶100, page 23:**

Hassoun objects to the inclusion of this entire paragraph in the PSI.  The contents of the Bin Ladin interview were not offered for the truth of the matters asserted and the contents should not be included in the PSI.  The United States, which is the subject of this interview, was not part of this case.

**Objection to PSI ¶¶126-137, pages 28-30**:

Hassoun objects to the inclusion of these paragraphs in the PSI as they are not a part of the Indictment, nor are the relevant to the Sentencing Guidelines calculation. Furthermore, as these post-arrest statements were not recorded, and they are simply a reflection of an FBI agent's notes and recollection, they may be unreliable. Therefore, they should not be included in the PSI.

**Role Assessment**

**Objections to PSI ¶¶138-139, pages 30-31:**

As will be fully argued below under "Adjustment for Role in the Offense," ¶155, Hassoun objects to the assertions in ¶¶ 138-139 that he was a "manager" or "supervisor" in the "global Salafi-jihad movement" for which the PSI seeks to hold him accountable. On a more specific level, Hassoun objects to the assertion in ¶139 that he was a representative of any "mujahideen group": his statement at Barry University about "representing" various groups was, at most, puffing, and there was no evidence that AIG and AWR were "mujahideen groups," as ¶139 implies. Furthermore, insofar as ¶139 uses the phrase "mujahideen operations" to mean murder, kidnaping and maiming, Hassoun objects to the implication that he ever money raised for any such operations – through the named organizations or otherwise. Indeed, as indicated under Objections to PSI ¶11, there was no evidence that any funds from Hassoun were ever transmitted to any location overseas for the purpose of furthering "violent jihad" – as opposed to the purpose of aiding Muslims who were under attack and victims of atrocities. Additionally, insofar as ¶139 uses the term "mujahideen" to mean a person who murders, kidnaps or maims, Hassoun objects to the assertion in that paragraph

17

that he ever "recruit[ed]" anyone "to become mujahideen."  Indeed, he never "<u>recruited</u>" anyone to become anything.  As discussed below, while on a few occasions Hassoun talked about travel with Youseff and Padilla, he never exercised the degree of influence and control over either of these men that would be necessary to conclude that he "<u>recruited</u>" them to do anything, no less to be murderers, kidnapers and maimers.

**Offense Level Computation**

**Objection to PSI ¶149, pages 32-33:**

Hassoun objects to the use in ¶149 of the terms "terrorism" and "terrorists" to describe the charge in Count Two, as these terms were <u>redacted</u> from the Indictment, at the government's request, before the Indictment went to the jury and, therefore, were not part of the charges considered by the jury.

**Objections to PSI ¶154, page 33: <u>Victim-Related Adjustments</u>**

Hassoun objects to the recommendation in ¶154 that he be given an upward adjustment of 12 levels pursuant to §3A1.4(a) on the ground that "the offense is a felony that involved, or was intended to promote a federal crime of terrorism."  Pursuant to Application Note 1 of U.S.S.G. §3A1.4, "[f]ederal crime of terrorism" has the meaning given that term in 18 U.S.C. §2332b(g)(5), which contains two elements, as follows:

> (5) [T]he term "[f]ederal crime of terrorism" means an offense that -
>> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
>> (B) is a violation of [a long list of Title 18 statutory provisions, including §§956(a) and 2339A].[3]

_____

[3]Section 956(a) was not added to the litany of offenses listed in §2332b(g)(5) until October 26, 2001.  Pub.L 107-56, Title VIII, § 808, Oct. 26, 2001, 115 Stat.378. Therefore, if the Court determines that the jury's finding of post-October 26, 2001

As Hassoun was convicted of offenses under §§ 956(a) and 2339A, the second element of the §2332b(g)(5) definition is satisfied.  However, Hassoun submits that the first element – known in the case law as "the motivational element" – is not, and cannot be, established in this case.  In other words, Hassoun submits that the government cannot carry its burden of proving by <u>clear and convincing evidence</u>[4] that his <u>motivation</u> in committing any "offense" of which he was convicted[5] was "to influence or affect the conduct of government by <u>intimidation or coercion</u>, or to <u>retaliate</u> against government conduct" (emphasis added).

The PSI presumably bases its recommendation that §3A1.4 be applied on the sweeping assertion in PSI ¶11 that defendants "provided various forms of support to mujahideen guerilla and terrorist groups that were opposing, <u>intimidating and coercing</u>, through the use of physical force and violence (violent jihad), existing <u>governments</u>,

---

"participation" cannot be sustained, Count One will not support the "terrorism" enhancement, although the other two counts will.

[4]Hassoun adopts the argument set forth in the Objections filed on behalf of co-defendant Jose Padilla, demonstrating that the proper burden of proof to utilize in determining the applicability of the "terrorism" enhancement is at least "clear and convincing."  *See United States v. Thurston*, 2007 WL 1500176, *19 (D.Ore. May 21, 2007) (holding that "the <u>government must present clear and convincing evidence</u> that defendants' offenses of conviction involved or were intended to promote 'federal crimes of terrorism' as defined under §2332b(g)(5)(B)" (emphasis added)).  The dissenting opinion in *United States v. Graham,* 275 F.3d 490 (6th Cir. 2001) would go even further; it held that "the district court should at least be required...to make findings based on a detailed articulation of facts found <u>beyond a reasonable doubt</u> in justification" of imposition of the "terrorism" enhancement.  *Id.* at 540-541 (*dissent*)(emphasis added).

[5]Note that §3A1.4 specifically refers to "the offense" so that, unlike "role in the offense" which will be discussed below, the applicability of the "terrorism" enhancement depends exclusively upon the facts of the <u>offenses of conviction</u>, not upon facts included in "relevant conduct."

individuals and institutions that did not share [his] view of Islam" (emphasis added). However, as discussed above under Objections to PSI ¶11, there was <u>no evidence</u> that any checks Hassoun wrote or funds or other items he discussed in various calls were ever transmitted to any location overseas for the purpose of "establishing Islamic states" or for the purpose of "<u>intimidating [or] coercing" governments</u> through "violent jihad" – or through any other means.   Nor was there any evidence that Hassoun provided any support to anyone "to <u>retaliate</u> against government conduct."   Just as a desire to aid Muslims who were under attack respond by "opposing" their attackers is <u>not</u> equivalent, legally or factually, to having a purpose of "intimidating [or] coercing" governments, it is also not equivalent, legally or factually, to having a purpose of "retaliat[ing] against government conduct."   A desire to aid attacked Muslims by "opposing" their attackers is, at most, a desire to help Muslims <u>defend themselves</u> – and that is simply not the same as the very specific motivation required by the "terrorism" enhancement.[6]

Moreover, although Gunaratna opined about the activities of various mujahideen "groups," nothing he said linked Hassoun, or any other defendant, to any of those "groups" or established that Hassoun, or any other defendant, said or did anything with a purpose to intimidate, coerce or retaliate against any government – as opposed to a purpose of aiding Muslims who were under attack and victims of atrocities.[7]

---

[6]As at trial, by referencing the desire to help Muslims defend themselves, defense counsel does not raise the "affirmative defense of justification" but, rather, points out the mental state that must be considered.

[7]Gunaratna's testimony about the activities of Usbat al Ansar is particularly irrelevant as he did not even assert that those activities were directed "against the government."   *See* Tr. 6/26/07:92 ("Usbat al Ansar attacked...nightclubs, bars, restaurants, liquor stores, and...other organizations"); Tr. 6/28/07:88 (repeated same

The sweeping, unsupported assertion that appears in ¶11 is thus patently insufficient to support the application of §3A4.1. And this is particularly clear when other cases which have dealt with §3A4.1 are reviewed. *See United States v. Awan*, 2007 WL 2071748 (E.D.N.Y. July 17, 2007) (district court held that, even though evidence supported jury-finding that "defendant knowingly served as a conduit for funds being transferred from the United States to Pakistan in support of the Khalistan Commando Force ('KCF'), a separatist movement which seeks to establish an independent  Sikh state in Punjab, India, and that defendant was aware of KCF's use of violent means to further their cause," *id.* at *1n.1, it was "speculative to conclude that the defendant...was motivated by a desire to influence the policies of the Indian government or retaliate for some unspecified wrong," and, accordingly, "the motivational element of a 'federal crime of terrorism' [was] not demonstrated by a preponderance of the evidence," *id.* at *4 (emphasis added)); *United States v. Arnaout*, 282 F.Supp.2d 838 (N.D. Ill. 2003), *rev'd on other grnds*, 471 F.3d 994 (where defendant admitted to "provid[ing] aid to militia [*i.e.*, mujahideen] in Bosnia and Chechnya," *id.,* 282 F. Supp. 2d at 840, district court nonetheless refused to apply §3A4.1 because the government did "not establish[ ] that the Bosnian or Chechen recipients of [the] aid were engaged in the federal crime of terrorism, nor that [defendant] intended the donated boots, uniforms, blankets, tents x-ray machine, ambulances nylon and walkie-talkies to be used to promote a federal crime of terrorism," *id.* at 845 (emphasis added)).

*Cf. United States v. Aref*, 2007 WL 804814 (N.D.N.Y. March 14, 2007) (court found "terrorism" enhancement applicable – although it departed and varied downward

testimony); Tr. 7/10/07:153 (same again).

from the resultant guidelines sentence – where "the evidence established that [defendant] committed the crimes believing that Jaish-e-Mohammad..., the group that purportedly received the SAM, was intending to deploy it against the Pakistani Ambassador in order to teach the President of Pakistan a lesson"); *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (application of §3A4.1 not error where "there was substantial evidence....[that defendant's] goal was to bomb and disable public utilities in the hopes that power outages would lead to civil strife and upheaval on the streets of Miami"....[and] [h]e planned to demand the release of Muslim prisoners and changes in the government's foreign policy after the bombings...." – although the Eleventh Circuit "agree[d] with the district court...that the 12 level increase to [defendant's] offense level required by the terrorism enhancement prevent[ed] the penalty from fitting the crime...," and thus remanded the case for a determination as to whether factors existed "sufficient to remove [ this pre-*Booker*] case from the Guidelines 'heartland'").

As these precedents demonstrate, the "terrorism" enhancement should be applied <u>only</u> where detailed factual findings support the conclusion – clearly and convincingly – that the motivational element of that enhancement is established.  Here, no such detailed factual findings can be made because no evidence exists that Hassoun possessed the very specific motivation which that element requires.

### Objections to PSI ¶155, page 33: <u>Adjustment for Role in the Offense</u>:

Hassoun objects to the recommendation in ¶155 that he be given an "aggravating role" enhancement of three-levels pursuant to §3B1.1(b) on the ground that he "was a manager or supervisor (but not an organizer)...[in] the criminal activity...."

And he further objects to the PSI's failure to recommend that he be given a downward adjustment of two or four-levels for "mitigating role," pursuant to §3B1.2.   The Guidelines provide that a defendant's role in the offense – whether aggravating or mitigating – should be evaluated "on the basis of <u>all</u> conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.*, all conduct included under § 1B1.3(a)(1)-(4), and <u>not</u> solely on the basis of elements and acts cited in the count of conviction."  U.S.S.G. Ch. 3, Pt. B, intro. (emphasis added).[8]   As will be demonstrated below, when Hassoun's role is evaluated in the context of the "relevant conduct" attributed to him by the PSI, it becomes clear that he did not play the role of a "manager" or "supervisor" at all, but, rather, if anything, played a minor, if not minimal, role in the overarching "course of conduct or common scheme or plan" surrounding "the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).

### 1) Objection to upward adjustment for "manager/supervisor" role

The PSI seeks to hold Hassoun responsible for participating in a gargantuan, decade-long conspiracy, in which Usama Bin Laden led a "global Salafi-jihad movement" in which countless Islamic mujahideen-fighters supposedly sought to establish Islamic states around the world through the commission of murder, kidnaping and maiming.  *See* PSI ¶¶ 4-11.   Full consideration of this "relevant conduct"

---

[8] *See, e.g., United States v. Bennet*, 368 F.3d 1343, 1358 (11th Cir.2004) (in considering enhancement under §3B1.1(b) "the elements and acts in the counts of conviction are considered as well as all 'relevant conduct'"); *United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994) (in determining whether to apply an enhancement under §3B1.1, "the court's inquiry is not confined solely to the defendant's behavior comprising the actual offense charged[;] [r]ather,....the court must consider, in addition to the criminal act itself, the individuals' involvement in the events surrounding the criminal act").  *See also United States v. Rodriguez De Varon*, 175 F.3d 930, 940-941

demonstrates that the PSI misapplies the "manager/supervisor" label to Hassoun.

In determining whether the § 3B1.1(b) enhancement should apply,

> [f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. §3B1.1, *comment*. (n.4). Consideration of these factors, in the context of the nature and extent of this "global Salafi-jihad movement," show that Hassoun did <u>not</u> have the requisite duties, responsibilities and/or control to be considered a manager or supervisor.

Hassoun made <u>no decisions</u> as to where, when or how anything in the "global Salafi-jihad movement" occurred or was to occur. The PSI casts him as a "representative of AIG and AWR." PSI ¶139.[9] But all that he did in that capacity was try to spread the word about the plight of Muslims around the world and raise funds for that plight. The "nature of [Hassoun's] participation" in the "global Salafi-jihad movement" was thus, at most, as a talker – as someone who spoke out on behalf of his fellow Muslims who were under attack – and as a fund-raiser for Islamic charitable organizations. However, there was no evidence that any fund-raising done by Hassoun ever resulted in funds being transmitted to any location overseas for the purpose of

_____

(11th Cir.1999) (applying same method to consideration of minor role).

[9]The PSI ¶139 also asserts that Hassoun was a "representative" of "other "mujahideen groups." But, as discussed above under Objections to ¶139, Hassoun's statement at Barry University about "representing" various groups was, at most, puffing, and there was no evidence that AIG and AWR were "mujahideen groups."

furthering "violent jihad."   Furthermore, Hassoun played <u>no</u> role "in planning or organizing" any "violent jihad."   Nor did he exercise any "control and authority" over anyone.   Indeed, his suggestions to co-defendants that they go to particular places at particular times were not even heeded.   (For example, he asked Youssef to go to Somalia in the fall of 1996 but Youssef did not do so; and he asked Padilla to come back to the United States in the spring of 2000, but Padilla did not do so.)

The only other factor the PSI points to support its recommendation for a role enhancement is the assertion that Hassoun "recruit[ed]...others, including Youseff and Padilla, to become mujahideen [– by which the PSI means "murderer, kidnaper and maimer" – ] and supported them financially." *See* PSI ¶139.   But the actual evidence at trial tells a different story.

Although Hassoun asked Youssef to go to Somalia in the fall of 1996, his reason for doing so was to have Youssef <u>obtain information</u> about what was going on in that area with regard to the plight of Muslims who were being attacked by the Ethiopian army.   *See* call on 12/31/96 (GX 75TR).   Furthermore, nothing in the evidence provides a basis to conclude that Hassoun wanted Youssef to commit murder, kidnaping or maiming in Somalia.   Nor did Youssef, in fact, <u>go</u> to Somalia, thus undermining any claim that any recruitment actually occurred in connection with that location.

With respect to Kosovo, the record is clear that Youssef made the decision on his own to travel to that location.   Indeed, Youssef <u>told</u> Hassoun he was going and <u>asked</u> Hassoun for financial assistance to make the trip.   *See, e.g.,* calls on 6/17/98 (GX 94TR) and 6/25/98 (GX. 97TR).   That is not "recruitment."   Nor does the fact that Hassoun sent Youssef money for the trip change that conclusion: to assist is not to

"recruit."  And, in any event, there is no evidence that Hassoun ever intended that Youssef commit murder, kidnaping or maiming in Kosovo.  Assuming that "the iron" in the 6/35/98 call was a gun, Yousef would have needed a gun to protect himself in such a dangerous place.  Nor is there any evidence that Youssef engaged in any murder, kidnaping or maiming in Kosovo.  Indeed, his discussion of the fighting in Kosovo was merely a description of what he observed – not even a description of what he did.  *See* calls on 7/18/98 (GX 100TR) and 8/10/98 (GX 104TR).

Similarly, with respect to Youssef's travel to Chechnya, the calls make clear that the idea was all Youssef's and that Hassoun was merely told by Youssef of his plan to go to Chechnya after Youssef had made that plan on his own.  *See* two calls on 9/3/00 (GX 118TR and GX 119TR).  Furthermore, as described in ¶ 121, it was Youssef who told Hassoun what to do, who to call (Abu Hamza) and what to say to him. It was Youssef who was telling Hassoun what to do, not the other way around.  *See* call on 10/15/00 (GX 100TR).  Nor can the mere fact that Chechnya was a place where mujahideen were fighting render a plan to go there a plan to commit murder, kidnaping and maiming – for fighting is not the same as those other activities.

The evidence with respect to Hassoun's dealings with Padilla is even less susceptible to an interpretation of mujahideen-"recruitment."  While Hassoun may have encouraged Padilla to go to Egypt, the purpose in Padilla's doing so was to study Arabic and the Islamic religion.  This is not only clear from the calls (*see* calls on 8/17/98 (GX 105TR) and 8/29/98 (GX 107TR)); it is corroborated by classified statements from the brig.  Moreover, as the government and Court well know, the Uways statement establishes that it was not Hassoun but, rather, a "facilitator" whom Padilla met at the

Hajj in early 2000 who "<u>convinced</u> [Padilla] to come with him to Yemen...so that he could then travel to join the second jihad in Afghanistan" (*see* unclassified Uways statement [DE 914] (emphasis added)) – and that "faciliator" was someone with whom Hassoun had absolutely <u>no</u> connection.  Furthermore, when Padilla told Hassoun, in April 2000, that he was thinking about going to Yemen, Hassoun proposed to Padilla that he come to the United States instead.  *See* call on 4/10/00 (GX 117TR).  This was not "recruitment" for Padilla "to become [a] mujahideen"; if anything, it was a failure to "recruit" Padilla to return home.

In any event, even if the Court were to view Hassoun's conversations with Youssef and Padilla as evidence of "recruitment" of those <u>two</u> individuals,[10] that is simply not sufficient to qualify Hassoun as a "manager" or "supervisor" in the context of the "global Salafi-jihad movement" as a whole, which, as recounted in the PSI, must have involved a cast of <u>thousands</u> operating world-wide.  The enhancement under §3B1.1(b) requires that a defendant do far more than merely "recruit" an infinitesimal proportion of the members of the conspiracy; it requires that the defendant exercise control and authority over a <u>significant proportion</u> of the activity comprising the conspiracy.  *Cf., e.g., United States v. Adetona*, 2007 WL 3001826 (11th Cir. Oct.16,2007) (§3B1.1(b) enhancement upheld where defendant "was *in charge* of the [credit-card fraud] conspiracy for months at a time while [the head of the operation]

---

[10]The only other possible candidate for a claim of "recruitment" by Hassoun was Herbert Atwell.  But although Atwell, in response to a leading question, testified that Hassoun spoke about "the subject" of "brothers" becoming "mujahideen fighters," he did not testify that Hassoun "recruited" him.  To the contrary, he testified that "encourage[ment]" to become a "mujahideen fighter" came from "a lot of brothers in general."  Tr.6/04/07:16-17, 24-25.

traveled"; "discussed strategy," including selection of victim banks; "initiated" a particular credit card "deal"; "received a one-third share of the profit on deals he participated in"; and "supervised" three named co-conspirators and others (*italics* in original));   *United States v. Gallashaw*, 2007 WL 28328 (11th Cir. Jan. 4, 2007) ("district court did not clearly err [in] applying [three-level] upward adjustment under §3B1.1.(b)" where defendant "(1) was second in command in the [gang] hierarchy; (2) paid other members of the gang; (3) dictated the amount of drugs to be packaged for distribution; (4) stored drugs for the [gang members] at his home; and (5) recruited [gang] members" (emphasis added)); *United States v. Zuniga*, 228 Fed. Appx. 954 *1 (11th Cir. 2007) ("district court did not clearly err in applying three-level aggravating role enhancement" where defendant "'assert[ed] control or influence' over the distribution of cocaine once it was delivered from Colombia to Jamaica, using others to unload, transport, and sell cocaine in Jamaica, and over the drug-sale proceeds back to Colombia, using other to personally transport the money");   *United States v. Middlebrook,* 221 Fed. Appx. 888 (11th Cir. 2007) (§3B1.1(b) enhancement upheld in bank robbery case where defendant "recruited one of the robbery's participants, attended planning meetings for the robbery, and directed the activity within the bank itself" – in other words, where defendant played a role that was central to the crime at issue).   Compared to the roles played by the defendants who received §3B1.1.(b) enhancements for manger/supervisor in these reported cases, the role Hassoun played in the "relevant conduct" in this case was insignificant at best.

**2) Objection to failure of PSI to recommend reduction for minor role**

In determining whether a defendant qualifies for a downward adjustment in offense level for "mitigating role" under §3B1.2, the Guidelines direct that the district court determine whether the defendant was "substantially less culpable than most other participants in the relevant conduct." *Rodriguez De Varon*, 175 F.3d at 944 (emphasis added). Hassoun submits that even if the Court were to impose a §3B1.1(b) enhancement, he is still entitled to a reduction for minor or minimal role on the ground of his relatively low-level culpability in the "relevant conduct" as a whole. As the Eleventh Circuit recognized in *United States v. Perry*, 340 F.3d 1216, 1218 (11th Cir. 2003), at least two circuits have held that "aggravating and mitigating roles in the offense – as defined by the Guidelines – can 'coexist'" (emphasis added). Thus, the Third Circuit held in *United States v. Tsai*, 954 F.2d 155, 167 (3rd Cir. 1992), that an "assumption" that an upward adjustment for role foreclosed a "downward adjustment for less than average culpability" was "incorrect," stating "[n]othing in the Guidelines or in the enabling legislation...compels that conclusion." Similarly, the Seventh Circuit in *United States v. Jackson*, 207 F.3d 910, 922 (7th Cir. 2000), *rev'd in part on other grounds*, 531 U.S. 953 (2000), held that §3B1.2 "does not say that a manager or supervisor cannot be a minor participant; all that is required is that [defendant] be less culpable than most of the other participants."

Not reaching the merits of this "co-existence" issue as it had not been briefed, the Eleventh Circuit in *Perry* remanded the case to the district court to consider "both the legal and factual issues concerning the defendant's request for a minimal or minor role reduction." 340 F.3d at 1219. On remand, the District Court ruled that "it is not a legal

impossibility to have [a] minimal or minor adjustment even if you find an aggravating role in the case." *United States v. Perry*, CR 02-00109, S.D. Alabama, Jan. 13, 2004, Resentencing, Transcript at 3, excerpt attached as Ex A (emphasis added).

Hassoun objects to the failure of the PSI to recommend a two, if not four, level reduction in his offense level for "mitigating role" based on the relatively minor, if not minimal, role he played in the "global Salafi-jihad movement."  As noted above, the PSI seeks to hold Hassoun responsible for "relevant conduct" consisting of a gargantuan, decade-long conspiracy, in which Usama Bin Laden led a "global Salafi-jihad movement" involving countless Islamic mujahideen-fighters who supposedly sought to establish Islamic states around the world through the commission of murder, kidnaping and maiming.  For his part, Hassoun neither committed, ordered, oversaw or trained anyone to commit any acts of violence of any sort – including any acts of murder, kidnaping or maiming.  Nor did Hassoun ever seek or receive material or any kind of personal gain from the outcome of any such acts.  To the extent that Hassoun is viewed as having encouraged or financially supported any travels of Youssef and/or Padilla, there is no evidence that Hassoun understood such travels to be for the purpose of committing murder, kidnaping or maiming – or that any such acts were ever committed or intended by either of these co-defendants.  Furthermore, although Hassoun raised money for Islamic charities, there is no evidence that any of that money ever, in fact, funded any "violent jihad" activity anywhere.

Moreover, insofar as acts committed by others as part of the "global Salafi-jihad movement" are considered acts of murder, kidnaping and maiming, the commission of such acts occurred without Hassoun's participation, assistance or even his advance

knowledge.  Indeed, even if Hassoun is viewed as having expressed approval of such acts when he commented on news reports or first-hand accounts of fighting in various jihad theaters, such expressions were limited to review of <u>past</u> acts and did not constitute plans for, or even thoughts about, future acts.  In other words, Hassoun played <u>no role</u> whatsoever in the planning or commission of such acts.  Compared to the other participants in the "global Salafi-jihad movement" – including such participants as the overall leader, Usama bin Ladin; other leaders who presumably planned and coordinated strategies; commanders of "mujahideen groups"; and those who committed the acts of "murder, kidnaping and maiming," if any, ascribed to the "movement" – Hassoun contributed substantially less to the success of the "relevant conduct." Accordingly, Hassoun was substantially less culpable than the vast majority of these other participants and should receive a minor, if not a minimal, role reduction as allowed by the Sentencing Guidelines.

**Objection to PSI ¶157, page 34: <u>Adjusted Offense Level (subtotal)</u>:**

Hassoun objects to the recommendation in ¶157 that his Adjusted Offense Level be calculated as **43**.  If, as Hassoun urges, his Base Offense Level of **28** is not increased **12** levels for the "terrorism" enhancement, his Adjusted Offense Level will be **31**; if, in addition, his Base Offense Level is not increased **3** levels for aggravating role, and/or if he receives a **2** or **4** level reduction for mitigating role as well, his **Adjusted Offense Level** will be anywhere from **24 to 29**.

**Objection to PSI ¶160, page 34: <u>Total Offense Level</u>:**

Hassoun's objection to ¶160 is the same as his objection to ¶157.

**PART B:  THE DEFENDANT'S CRIMINAL HISTORY**

<u>**Criminal History Computation**</u>

**Objections to PSI ¶164, page 34:**

Hassoun objects to his assignment in ¶165 to a Criminal History Category of VI. While aware that application of the "terrorism" enhancement calls for such an assignment, Hassoun submits that even if that enhancement is applied to him – which, as discussed above, he vigorously opposes – he should receive a horizontal departure to Criminal History Category I under §4A1.3.  That Guidelines' provision expressly permits such a horizontal departure when a criminal history category substantially over-represents the seriousness of a defendant's criminal history, as Category VI does here.

In *United States v. Aref*, 2007 WL 804814 (N.D.N.Y. March 14, 2007), after applying the "terrorism" enhancement, the district court found that "a criminal history category of VI d[id] substantially over-represent the seriousness of [that defendant's] criminal history" as he had "received zero criminal history points[,]...ha[d] provided for his family until his arrest through lawful employment..., and there [was] no indication that he ha[d] engaged in any other criminal activity in this country...."  *Id.* at *3.  Accordingly, the court in *Aref* found that "[b]ased upon [defendant's] lack of prior criminal history, and his personal characteristics [regarding prior employment],....his circumstances [were] extraordinary and [therefore] a downward departure [was] warranted to a criminal history category of I."  *Id.*  The same analysis applies to Hassoun's situation and he urges the Court to reach the same result.

## PART C:  OFFENDER CHARACTERISTICS

### Objection to Revised PSI ¶176, page 36:

Hassoun objects to the implication in the way this paragraph is worded that his federal "custody" commenced on October 7, 2004, when he was "indicted for the instant federal offenses."  He was indicted on the federal firearm offense on January 12, 2004.  However, Hassoun has been, in reality, in continuous federal custody since June 12, 2002.  His initial arrest and detention on that date, although ostensibly conducted by the INS, were in fact initiated and instigated by the FBI, who interrogated him and searched his home on that date and, shortly thereafter, submitted charges alleging "terrorism" to the Immigration Court *via* a Declaration presented by FBI Agent Andrew Arena.[11]  Based on that Declaration, Hassoun was denied immigration bond and, hence, remained in custody on the very same allegations that eventually found their way into the Indictment in this case.

## PART E: FACTORS THAT MAY WARRANT A DEPARTURE

### Objection to PSI ¶215, page 42:

Hassoun objects to the assertion in ¶215 that no factors may warrant a departure.   Hassoun has separately filed a request that the Court sentence him below his advisory sentencing-guideline range based on the sentencing factors set forth in 18 U.S.C. §3553, as well as a request for a formal downward departure under §5K2.10.

---

[11] As the PSI explicitly recognizes, although he had "failed to maintain his student status," PSI ¶126, Hassoun was here in this country as "a legal resident," PSI ¶184.  At the time of his initial arrest, Hassoun had a pending application for permanent resident status which he had filed in 1996, based on a petition submitted by his mother who was a naturalized citizen.

**ADDENDUM TO THE PRESENCE REPORT**

Throughout the Addendum, the "Probation Officer's Responses" simply accept, adopt, and parrot the arguments and factual assertions that appear in the government's Sentencing Memorandum [DE 1280].  Not only does "the probation office" acknowledge that it has "[no]…independent and/or additional information concerning the offense" (Addendum at 2); it is clear from a comparison between the Addendum and the government's Sentencing Memorandum that "the probation office" has no independent view at all.[12]   The Addendum, therefore, provides the Court with no assistance.   It simply adds a partisan vote to the government's side of an adversarial argument. Hassoun therefore objects in general to all of the "Probation Officer's Responses" that appear in the Addendum and urges the Court to give them no weight whatsoever.

Because, for the most part, the Addendum simply copies the factual assertions and legal arguments made by the government, Hassoun's separately filed reply to the government's Sentencing Memorandum will suffice to document Hassoun's more specific objections to the Addendum. He must, however, point out several assertions in the Addendum – all cribbed from the government – that are so fundamentally fallacious that they cannot go unanswered.

---

[12] The Addendum literally copies large segments of DE 1280 (although in doing so it sometimes puts the paragraphs in a different order, uses paraphrases and omits record citations).   For example, the discussion of role at Addendum pages 5-6 copies DE1280: 25-26, 29-30; and the discussion of the "terrorism enhancement" at Addendum pages 8-11 copies  DE 1280:12-21.

- The Addendum at page 5 (paraphrasing the government at DE 1280:27[13]) states that "Although some of the violence connected to the wider global Salafi jihad movement was mentioned at trial, and in the Offense Conduct section of the presentence report, the global violence/conspiracy was not attributed as relevant conduct to any defendant in this case." This is nonsense. First, "the violence connected to the wider global Salafi jihad movement" was not just "mentioned" at trial; it was the central, repetitive drum-beat of Gunaratna's so-called "expert" testimony.  Second, if "the global violence/conspiracy" was "not attributed" to any defendant in this case, then what were they found guilty of?  What was the alleged conspiracy to murder, kidnap and maim if not precisely "the global violence/conspiracy" that the Addendum now wants to suggest can be ignored when considering the defendants' "role in the offense."  This is intellectual dishonesty at its worst.

- The Addendum at page 9 offers as support for application of the "federal crime of terrorism" enhancement the claim (paraphrasing the government at DE 1280:16[14]) that "[a]s specified in the Indictment, the defendants' activities were meant to displace or alter governments that did not adhere to Sharia law." (Emphasis added).   The Addendum then points to two passages in the Indictment (quoted by the government at DE 1280:17), which supposedly reflect that "specification," both of which speak of "*the*

---

[13] The government's exact sentence at DE 1280:27 is: "But the violence committed by these participants in the wider global Salafi jihad movement, while relevant as background to demonstrate the defendants' intent, has not been attributed to them as relevant conduct."

[14] The government's exact sentence at DE 1280:16 is "Overall, and in specific instances, the defendants' activities were meant to displace or alter governments that did not adhere to Sharia law."

*purpose of opposing existing governments*." (*Italics* in Addendum).  But not only is it logically incorrect to assert that seeking to "displace or alter" is the same as "opposing" governments; "displace or alter" does <u>not</u> appear in the Indictment in any event.

Moreover, a "purpose of opposing" government, which does appear in the Indictment, is <u>not</u> equivalent to the mental element of the "terrorism" enhancement. That element requires proof that defendants' actions were "<u>calculated to influence or affect conduct of government by intimidation or coercion or to retaliate against government conduct</u>" – *i.e.,* proof of a specific, multi-faceted mental element which entails both a goal of "influencing" or "affecting" the "conduct of government," and also the selection of a specific means to achieve that end.  Mere "opposition" does not satisfy that element. The Addendum's knee-jerk acceptance of the government's fallacious analysis should be rejected.

● In a related analytical error, the Addendum at page 11 (paraphrasing the government at DE 1280:21) states that although defendants "contend their actions were meant only to protect oppressed Muslims in conflicts overseas[,] [t]he motivational factors for the [defendants'] behavior does not change the fact that their actions were intended to retaliate or influence governmental conduct."  This statement – which <u>accepts</u> defendants' account of their "motivational factors" but then dismisses those factors as irrelevant to the defendants' "intent" – stands the mental element of the "terrorism" enhancement on its head.  That element, as defined in the law, is precisely a "motivational element," <u>not</u> an intent element. Indeed, the Conference Report on the legislation that directed the Sentencing Commission to enact the "federal crime of

terrorism" enhancement used that specific phrase, stating that the "new provision [will be] applicable only…upon conviction of [specifically listed crimes] *with the necessary motivational element to be established at the sentencing phase of the prosecution*." *Awan*, 2007 WL 2071748 at * 2, *quoting* 142 Cong. Rec. H3305-01, H3337 (April 15, 1996) (*italics* in *Awan*). *See also, e.g., United States v. Benkhala*, 501 F. Supp. 2d 748 752 (E.D. Va. 2007) (referring to "motivational element"). So, contrary to the Addendum's assertion, while defendants' "intent" is obviously relevant to whether they committed the crimes charged, "[t]he motivational factors for the[ir] behavior," not their intent, is precisely what matters when it comes to deciding whether the "terrorism" enhancement applies.[15]

● In arguing that the absence of "a specific identifiable victim" precludes a departure under §5K2.10 in this case, the Addendum at page 14 (paraphrasing the government at DE 1280:41) states that "the Court instructed the jury that these offenses did not require an identifiable victim[;] [i]nstead, the defendants' scheme included anyone [as contemplated victims] who opposed violent jihad."[16]  This is, of course, an absurd statement. The category of "anyone who opposed violent jihad" would encompass everyone in the world who thought "violent jihad" was a bad idea –

---

[15] While Hassoun urges the Court to follow *Thurston*, 2007 WL 1500176, at *19, and the dissent in *Graham,* 275 F.3d at 540-541, as well as the arguments made by Padilla, and apply the "clear and convincing" standard to the "terrorism enhancement" decision, *see supra* at 20, Hassoun submits that, even under a preponderance of evidence standard, the government cannot meet its burden of proof on this issue.

[16] The government's exact sentence at DE 1280:41 is that the Court's "instruction …dovetailed perfectly with the proof, which establish [*sic*] that the contemplated victims of the defendants' scheme included anyone who opposed violent jihad."

presumably the overwhelming majority of all people.  While the government was not required to prove the identify of specific individual "victims" to prove its charge of conspiracy to murder, kidnap and maim, it was required to prove that at least <u>some</u> identifiable "broad categories of alleged victims" were "contemplated."[17]  Indeed, if no categories of "victims" could be identified, there would be no conspiracy to murder, kidnap and maim as those offenses cannot occur – and hence cannot be planned – without victims. "[<u>A]nyone</u> who opposed violent jihad" simply does not qualify as an identifiable category of "victims."  However, as there <u>were</u> identifiable categories of "victims," first set forth in the Bill of Particulars, then described by Gunaratna, a departure under §5K2.10 is available if, as the defense submits, there is a preponderance of evidence that the "wrongful conduct" of those categories of victims "contributed significantly to provoking the offense behavior."

---

[17] *See* government's Bill of Particulars, which identified the "broad categories of alleged victims."

## CONCLUSION

For all the foregoing reasons, defendant Adham Amin Hassoun respectfully requests that this Court refuse to upwardly adjust his base offense level of **28** for either the "terrorism" enhancement or an aggravating-role enhancement but, instead, reduce that level by **2** or **4** points for mitigating role, thus setting his advisory guideline at level **24** or **26,** which, with a Criminal History Category of I, translates into a sentencing range of either of **51-63 months** or **63-78 months.**

Respectfully submitted,

**KENNETH M. SWARTZ**        **JEANNE BAKER**
SWARTZ & LENAMON        ATTORNEY AT LAW, P .A.
New World Tower, Suite 2100      Grove Forest Plaza, Suite 202
100 North Biscayne Boulevard     2937 Southwest 27th Avenue
Miami, Florida 33132           Miami, Florida 33133-3703
Tel:305-579-9090               Tel: 305-443-1600
Fax:786-425-2380              Fax: 305-445-9666
Florida Bar No. 331929         Florida Bar No.0880700

**COUNSEL for ADHAM AMIN HASSOUN**

By:_____/s/
Jeanne Baker

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 3, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and simultaneously served the foregoing document on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

_____/s/
Jeanne Baker

## SERVICE LIST: *UNITED STATES v. ADHAM HASSOUN*
## CASE NO  04-60001-CR-COOKE(s)(s)(s)(s)

**KENNETH M. SWARTZ**
ken@swartzlawyer.com
SWARTZ & LENAMON
New World Tower, Suite 2100
100 North Biscayne Boulevard
Miami, Florida 33132
Tel:    305-579-9090
Fax:    786-425-2380
Florida Bar No. 331929
Attorney for Defendant Hassoun

**RUSSELL KILLINGER**
russell.killinger@usdoj.gov
Assistant United States Attorney
Counter-Terrorism Section
99 N.E. Fourth Street, 8th Floor
Miami, FL   33132
Tel:    305-961-9437
Fax:    305-536-4675

**ANDREW PATEL**
agpatel@aol.com
111 Broadway, 13th Floor
New York, New York   10006
Tel:    212-349-0230
Fax:    212-346-4665
Attorney for Defendant Padilla

**MARSHALL DORE LOUIS**
mdl@sinclairlouis.com
Sinclair, Louis, Heath, et al.
Alfred I. DuPont Bldg.
169 East Flagler St., #1125
Miami, FL 33131
Tel: (305) 374-0544
Fax: (305) 381-6869
Attorney for Defendant Jayyousi

**JEANNE BAKER**
jbaker@fourdefenders.com
ATTORNEY AT LAW, P .A.
Grove Forest Plaza, Suite 202
2937 Southwest 27th Avenue
Miami, Florida 33133-3703
Tel:    305-443-1600
Fax:    305-445-9666
Florida Bar No.0880700
Attorney for Defendant Hassoun

**WILLIAM W. SWOR**
www.wwswor@wwnet.net
3060 Penobscot Building
645 Griswold St.
Detroit, Michigan 48226
313) 967-0200 x. 221
(313) 961-4926 (fax)
Attorney for Defendant Jayyousi

**MICHAEL CARUSO**
michael_caruso@fd.org
Assistant Federal Public Defender
150 West Flagler Street, Suite 1700
Miami, FL   33130
Tel:    305-530-7006
Fax:    305-536-4559
Attorney for Defendant Padilla