```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                      MIAMI DIVISION
 3                  CASE 04-60001-CR-COOKE
 4
     THE UNITED STATES OF AMERICA,
 5
                         Plaintiff,
 6
         vs.                              MIAMI, FLORIDA
 7                                        JUNE 25, 2007
                                          MONDAY - 9:30 A.M.
 8   ADHAM AMIN HASSOUN,
     KIFAH WAEL JAYYOUSI,
 9   JOSE PADILLA,
         a/k/a "Ibrahim,"
10       a/k/a "Abu Abdullah the Puerto Rican",
         a/k/a "Abu Abdullah Al Mujahir",
11
                         Defendants.
12
13               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
               BEFORE THE HONORABLE MARCIA G. COOKE,
14                  UNITED STATES DISTRICT JUDGE
15                             DAY 32
16   APPEARANCES:
17   FOR THE GOVERNMENT:
18                         RUSSELL KILLINGER, A.U.S.A.
                           BRIAN K. FRAZIER, A.U.S.A.
19                         JOHN SHIPLEY, A.U.S.A.
                           United States Attorney's Office
20                         99 N.E. 4th Street
                           Miami, FL  33132
21
                           STEPHANIE PELL, A.U.S.A.
22                         Counterterrorism Section
                           United States Department of Justice
23                         10th and Constitution Avenue, N.W.,
                           Room 2649
24                         Washington, D.C.  20530 - 202/353-2357
25
```

```
 1  FOR THE DEFENDANT HASSOUN:
 2                          KENNETH SWARTZ, ESQ.
                            Swartz and Lenamon
 3                          100 N. Biscayne Blvd.  21st Floor
                            Miami, FL  33132 - 305/579-9090
 4                          ken@swartzlawyer.com
 5                          JEANNE BAKER, ESQ.
                            2937 SW 27th Ave., Suite 202
 6                          Coconut Grove, FL 33133  305/443-1600
                            Jbaker@fourdefenders.com
 7
    FOR THE DEFENDANT PADILLA:
 8
                            MICHAEL CARUSO, A.F.P.D.
 9                          ANTHONY NATALE, A.F.P.D.
                            ORLANDO do CAMPO, A.F.P.D.
10                          Federal Public Defender's Office
                            150 W. Flagler Street
11                          Miami, FL  33131
12  FOR THE DEFENDANT JAYYOUSI:
13                          WILLIAM SWOR, ESQ.
                            3060 Penobscot Building
14                          645 Griswold Street
                            Detroit, MI  48226  313/967-0200
15
                            MARSHALL DORE LOUIS, ESQ
16                          Sinclair, Louis, Heath, Nussbaum &
                            Zavertnik, P.A.
17                          169 East Flagler Street, Suite 1125
                            Miami, FL  33131  305/374-0544
18                          mdl@sinclairlouis.com
19  REPORTED BY:
20                          ROBIN MARIE DISPENZIERI, RPR
                            Official Federal Court Reporter
21                          United States District Court
                            301 North Miami Ave.,  6th Floor
22                          Miami, FL  33128 - 305/523-5158
23
24
25
```

INDEX TO WITNESSES

Witnesses:                         PAGE

JOHN KAVANAUGH ................... 4

      Redirect Examination  ....... 4
By Mr. Frazier

      Recross-Examination  ....... 97
By Mr. Swor

ROHAN GUNARATNA ................ 114

      Direct Examination By  .... 114
Mr. Shipley

Reporter's Certificate ................................... 218

INDEX TO EXHIBITS

| Exhibits | Marked for Identification | | Received in Evidence | |
|---|---|---|---|---|
| Description | Page | Line | Page | Line |
| Government Exhibits 126T, 126TR | ....... 4 | 21 | 6 | 9 |
| Government Exhibits 215F, 215FT | ....... 6 | 14 | | |
| Government Exhibits 215F, 215FT | ................... 7 | | | 19 |
| Government Exhibits 600E through 600R | ....... 7 | 23 | 11 | 22 |

1                    MORNING SESSION

2          THE COURT:  Good morning, ladies and gentlemen.  You

3  may be seated.

4          Mr. Frazier, you are on redirect.  Agent Kavanaugh,

5  you are still under oath.

6                  REDIRECT EXAMINATION

7  BY MR. FRAZIER:

8  Q.  Good morning, Agent Kavanaugh.

9  A.  Good morning.

10  Q.  This may be your last day on the stand.  How do you feel

11  about that?

12  A.  Very, very excited.

13  Q.  Before we get into the substance of your testimony I want

14  to talk to you about a series of documents that I'd like to

15  authenticate and admit through you, though we're not going to

16  discuss these documents in front of the jury through you.  Is

17  that okay?

18  A.  Yes, sir.

19  Q.  Let me hand up to you what has first been premarked for

20  identification only as Government's Exhibit 126T, TR.

21  [Government Exhibits 126T, 126TR marked for identification].

22  Q.  And I'd ask you to take a look at it and tell me if you

23  recognize it.

24          MR. FRAZIER:  For the record, Your Honor, this is a

25  transcript of a call that occurred 5/14/97, at 21:43.

KAVANAUGH - Redirect

1          THE COURT:  Is this part of the series that has

2    already been authenticated and admitted?

3          MR. FRAZIER:  It is not.

4          THE COURT:  What is the exhibit number again?

5          THE WITNESS:  126TR.

6    BY MR. FRAZIER:

7    Q.  Do you recognize that document?

8    A.  Yes, sir.

9    Q.  Tell us generally what it is.

10   A.  It's an intercepted telephone call on 5/14/1997, from Kifah

11   Jayyousi's home telephone in Irvine, California, and the time

12   is 21:43.

13   Q.  You are looking at a physical paper transcript?

14   A.  Yes, sir.

15   Q.  Is this an official FBI transcript of that call?

16   A.  Yes, sir, it appears to be, yes, sir.

17   Q.  Is this the kind of transcript that you would rely upon in

18   your investigation, as well as in court to present the

19   government's case?

20   A.  Yes, sir, it is.

21   Q.  Does this physical transcript correspond to an audio

22   recording that has been kept by the FBI?

23   A.  Yes, sir, that is where it comes from.

24   Q.  You are aware that the FBI has the authentic audio

25   recording of this conversation?

1  A.  Yes, sir.

2         MR. FRAZIER:  Your Honor, move to admit Government

3  Exhibit 126T and TR.

4         THE COURT:  Any objection?

5         MR. SWARTZ:  No, objection.

6         MR. SWOR:  No, Your Honor.

7         MR. CARUSO:  No, Your Honor.

8         THE COURT:  Exhibit 126 is received.

9     [Government Exhibits 126T, 126TR received in evidence].

10 BY MR. FRAZIER:

11 Q.  Special Agent, I'm going to hand up to you another document

12 which has been premarked for identification only as Government

13 Exhibit 215F/FT.

14 [Government Exhibits 215F, 215FT marked for identification].

15 Q.  And I would like you to take a look at this document and

16 tell me if you recognize it.

17 A.  Yes, sir, I recognize this.

18 Q.  Generally, what is this document?

19 A.  An intercepted facsimile transmission dated 9/21/1994, at

20 14:12.  This is from the San Diego coverage of Kifah Jayyousi,

21 and it is from the residence telephone number.

22 Q.  In this document is there an Arabic original as well as a

23 translation of part of that Arabic?

24 A.  Yes, sir, this is a -- there is a shorthand written Arabic

25 portion and there is a translation for that.  There is also an

 1  English language facsimile, which obviously was not translated.

 2  Q.  That was part of the original transmission?

 3  A.  Yes, sir, exactly.

 4  Q.  And was this document intercepted as part of the wiretap

 5  coverage in this case?

 6  A.  Yes, sir, it was.

 7  Q.  And the translation is an official FBI translation of the

 8  type that you would rely upon in your investigation?

 9  A.  Yes, sir, it is.

10          MR. FRAZIER:  Your Honor, I move to admit Government

11  215F/FT into evidence.

12          MR. SWOR:  May I look at it, please?

13          No objection.

14          THE COURT:  Any objection from Mr. Hassoun?

15          MR. SWARTZ:  No objection, Your Honor.

16          THE COURT:  Any objection from Mr. Padilla?

17          MR. CARUSO:  No, Your Honor.

18          THE COURT:  Exhibit 215F/FT is received.

19     [Government Exhibits 215F, 215FT received in evidence].

20  BY MR. FRAZIER:

21  Q.  Finally, Agent Kavanaugh, I'd like to hand up to you what

22  has been marked as a collective exhibit, 600E through 600R.

23          [Government Exhibits 600E through 600R marked for

24                          identification].

25  Q.  I ask you to take a look at these documents and tell me if

1    you recognize them.

2              THE WITNESS:  Yes, sir, I recognize these.

3    BY MR. FRAZIER:

4    Q.  What, generally, are those documents?

5    A.  They are banking records, checks from Mr. Hassoun that were

6    obtained via subpoena during the investigation.

7    Q.  You recognize each of those documents as being in response

8    to that subpoena?

9    A.  Yes, sir, I recognize these.

10   Q.  On the cover page of that set of documents is there a

11   Federal Rule of Evidence 902 certification for those documents?

12   A.  Yes, sir, there is.

13             MR. FRAZIER:  Your Honor, I move to admit Government's

14   600E through R.

15             MR. SWARTZ:  Your Honor, I would like to ask for a

16   side bar at this time.

17             THE COURT:  Approach, please.

18                 [Proceedings at sidebar follow]:

19             MR. SWARTZ:  Judge, what I am looking at are checks

20   that really should have been, I guess, brought up in the direct

21   examination of this witness.

22             THE COURT:  Let me ask this question.  What about the

23   cross that makes these relevant, and why didn't they come up in

24   your examination in chief?

25             MR. FRAZIER:  Your Honor, some of these, in fact a lot

1   of these checks are checks to charities, American Worldwide

2   Relief, GRF, the Canadian Islamic Association, and, you know,

3   we did not anticipate the testimony through this agent would

4   evidence documents concerning the charities.

5           MR. KILLINGER:  The first time a check came up was in

6   the cross-examination of Mr. Swartz based on the search of his

7   house where some checks had been recovered, a whole series of

8   checks.  He specifically talked about one that had the word

9   "tourism" on the memo line.

10          MR. SWARTZ:  Your Honor, first of all, checks were

11  brought up on direct examination, two particular checks.

12  Number one, the Somalia check to Mr. Daher, I did cross on

13  that, which I am entitled to.  They also brought up a reference

14  to a phone call to a man named Ahman Hussein.  They brought

15  that up on direct.

16          THE COURT:  That was the check that ends up going back

17  into an account after it goes through Western Union?

18          MS. BAKER:  No, no, no, that was a different check.

19  They also brought up the $5,000.

20          MR. SWARTZ:  This is a $1,000 check when Mr. Padilla

21  called and said, hey, I got married, but I need my $450.

22          THE COURT:  This was the conversation with Marwa?

23          MR. SWARTZ:  No, Marwa wasn't involved in this one.

24  The conversation comes up in there with Marwa, but the check

25  is -- he called Heba.  Remember Heba?  He calls Heba's husband

1   and says he'll have Heba give him $1,000.  That's what this

2   check is.  What this is are a bunch of checks -- a lot of these

3   are checks from Mr. Jayyousi to American Worldwide Relief.  I

4   didn't ask questions about these checks.

5          MS. BAKER:  I would say there are one or two that

6   weren't brought up in direct that I don't think we would have

7   an objection to those specific checks.

8          MR. SWARTZ:  The government brought up this $2,500

9   check already.  This is the one that Mr. Kavanaugh read the

10  Koran quotation from.

11         THE COURT:  Yes.

12         MR. SWARTZ:  The rest of these checks were not

13  specifically discussed.

14         MR. FRAZIER:  Your Honor, I mean, all we are trying to

15  do is authenticate these checks through this witness.  There is

16  not going to be any new testimony about these checks.  I am

17  just trying to be efficient.  We can recall this witness for

18  the sole purpose of authenticating the checks.

19         THE COURT:  You're saying you are not intending to

20  publish them to the jury at this time?

21         MR. FRAZIER:  No.

22         MS. BAKER:  Then why would they become relevant?

23         MR. SWARTZ:  It's redirect.  I don't know why they got

24  the idea on redirect they can just decide they want to offer

25  these checks.  If they want to call somebody to offer these

1    checks, I don't know why they haven't done it yet, but they

2    chose to do it now.  I have got to be able to cross-examine

3    somebody on these.

4          THE COURT:  First of all, I am going to allow the

5    authentication process to begin.  I am not going to allow any

6    discussion of the checks at this time.  If it comes to a point

7    when they are not relevant, they will not be published to the

8    jury.

9          MS. BAKER:  We will just register our objection to

10   those that are beyond the scope.  There are a couple of checks

11   that are clearly within the scope.

12         THE COURT:  At the break, Ms. Baker and Mr. Swartz,

13   would you identify the specific ones that you say to me are

14   beyond the scope?

15         MS. BAKER:  Sure, I will give you a list of them.

16          [Proceedings in open court follow]:

17         THE COURT:  Mr. Frazier, you may proceed.

18         MR. FRAZIER:  Thank you, Your Honor.  We have a motion

19   to admit Government's 600E through R based on the 902

20   certification, business record certification.

21         THE COURT:  Received at this time.

22   [Government Exhibits 600E through 600R received in evidence].

23         MR. FRAZIER:  Thank you, Your Honor.  Finally, Your

24   Honor, I would request permission to publish to the jury a

25   document that is in evidence as Government Exhibit 64TR, which

1  corresponds to a telephone call of June 30, 1996, which will be

2  discussed through this witness, and it is in evidence.

3          THE COURT:  You may proceed.

4          MR. FRAZIER:  Thank you, Your Honor.

5  BY MR. FRAZIER:

6  Q.  Agent Kavanaugh, I want to turn our discussion to some

7  issues related to defendant Jose Padilla.  You were asked on

8  cross-examination about the frequency of contact between Adham

9  Hassoun and Jose Padilla.  Do you remember that?

10  A.  Yes, sir.

11  Q.  In fact, I believe you were asked concerning the number of

12  telephone calls in the binder between Adham Hassoun and Jose

13  Padilla?

14  A.  Yes, sir, that's correct.

15  Q.  How many calls are there in which Jose Padilla appears on

16  the phone, his voice is on the phone?

17  A.  It was a total of eight, seven of which were in the binder

18  and were played.

19  Q.  How many of these calls involve Adham Hassoun as well?

20  A.  I believe all eight of them do.

21  Q.  Now, based on your investigation, is telephone contact the

22  only type of contact that Adham Hassoun had with Jose Padilla?

23  A.  No, sir, it was not.

24  Q.  What other types of contact were there?

25  A.  Well, obviously, prior to Mr. Padilla's leaving South

 1  Florida they had person-to-person contact according to the

 2  telephone calls, they would see each other in person.  There

 3  was a reference in the call, I believe it was either the

 4  10/17/99 call or the 4/10/2000 call, about a letter that

 5  Mr. Padilla had sent back to Mr. Hassoun through Heba Hussein.

 6  Q.  Your testimony is that there was personal contact as well

 7  as some written contact?

 8          MR. SWARTZ:  Objection, Your Honor, leading.

 9          THE COURT:  Sustained.

10  BY MR. FRAZIER:

11  Q.  Let's take a look at 64TR, this document we've just passed

12  out.  Page 9 of this document is where we want to start.  First

13  of all, set the stage for us on this call.  What is the date of

14  this call?

15  A.  June 30, 1996.

16  Q.  The time of this call?

17  A.  11:36.

18  Q.  What is the target telephone?

19  A.  Adham Hassoun's residence in Sunrise, Florida.

20  Q.  Is this an incoming or an outgoing call?

21  A.  It's an outgoing telephone call.

22  Q.  Where is it going out to?

23  A.  Cairo, Egypt.

24  Q.  Who is on the call?

25  A.  It lists a total of five participants, AH, Adham Hassoun,

1  MY, Mohamed Youssef, KN for Kamal Al-Naji, UM is unidentified

2  male, and AO is an automated operator.

3  Q.  Let's go to page 9.  I am going to ask you some questions

4  about this issue of contact between the defendants.  At the top

5  of the page Mohamed Youssef is speaking.  In the large

6  paragraph he says, "There is no doubt that I am in a state of

7  expectation.  I mean, I am, of course, waiting for the trade to

8  take its natural course, and the deal, as long as there is a

9  state of preparation and in case of one who is ready."  Do you

10  see that?

11  A.  Yes, sir.

12  Q.  This is a discussion with Adham Hassoun?

13  A.  Yes, sir, in this portion of the call it's Mr. Hassoun and

14  Mr. Youssef.

15  Q.  Based on your investigation and understanding of how these

16  people communicated, the phrase "the trade to take its natural

17  course," do you have an opinion about what they are talking

18  about in this text?

19  A.  Yes, sir.

20  Q.  What is it?

21  A.  Talking about looking for an opportunity to participate in

22  a jihad.

23  Q.  Youssef continues, "At the same time, I have not heard from

24  Ibrahim, so -- the last time I spoke with, he told me, 'I am

25  selling the car and everything is all right.'"  The reference

1   to Ibrahim is Jose Padilla?

2   A.   Yes, sir, based upon this phone call it's Mr. Padilla.

3   Q.   Then he continues, "So, of course, the fact that there are

4   no correspondences at all coming from over there, from anybody

5   at all, on the contrary, I am the one who is sending letters."

6   Do you see that?

7   A.   Yes, sir.

8   Q.   Then Youssef continues on, "It is as if one's contacts are

9   being cut off and does not know what is going on out there in

10  the world.  This in itself is not comfortable, you see."

11  Hassoun says "yes."  Youssef continues on the subject of

12  communication.

13          MR. SWARTZ:  Your Honor, I am going to object unless

14  there is a question.

15          THE COURT:  Please proceed by question and answer.

16  BY MR. FRAZIER:

17  Q.   Explain what Youssef's concern is on the issue of

18  communication.

19          MR. SWARTZ:  Your Honor, I am going to object.  It

20  speaks for itself.  Beyond that, what it says on the paper

21  would be speculation and outside the scope of his personal

22  knowledge.

23          THE COURT:  Objection sustained.

24  BY MR. FRAZIER:

25  Q.   Next passage, Mohamed Youssef continues and he says to

1  Hassoun, "You, yourself, has always emphasized to me the

2  importance of communication, 'why didn't you call, let's keep

3  in touch,' and stuff."  Do you see that?

4  A.  Yes, sir.

5  Q.  Now, does this suggest anything about Hassoun's interest in

6  staying connected to Mohamed Youssef?

7        MR. SWARTZ:  Objection, Your Honor.  It calls for a

8  conclusion.

9        THE COURT:  Overruled.

10       THE WITNESS:  Yes, sir.

11 BY MR. FRAZIER:

12 Q.  What does it suggest?

13 A.  That he stresses the importance of staying in touch,

14 keeping communication open.

15 Q.  Then Hassoun talks about contacts with Jose Padilla in the

16 next line.  Hassoun says, "It's that, uh, I mean I see Ibrahim

17 almost every day at the mosque."  Do you see that?

18 A.  Yes, sir.

19 Q.  Is this evidence that there were different forms of

20 communication between Hassoun and Padilla other than the

21 telephone?

22       MR. CARUSO:  Objection, Your Honor.  That speaks for

23 itself.

24       THE COURT:  Sustained.

25 BY MR. FRAZIER:

1  Q.  Then down at the bottom of this page Hassoun says, "By God,

2  I tell you, I mean, something real quick, the warehouse will

3  open up very soon."  Then he continues, "All right.  And they

4  will request workers and they will request, I mean, people to

5  go, uh -- I mean to participate in the project."  Do you see

6  that?

7  A.  Yes, sir, I do.

8  Q.  Do you have an opinion about he is referring to there?

9  A.  Yes, sir.

10  Q.  What is that?

11  A.  Again, it's an opportunity to participate in some upcoming

12  jihad.

13  Q.  Also on the subject of contact and communication, let's

14  talk a look at 67TR, which is in the big binder.  Page 12 of

15  this binder involves a conversation between Hassoun and

16  Youssef?

17  A.  Yes, sir, that's correct.

18  Q.  Down at the bottom of the page Youssef says, "And does

19  Ibrahim have anything to do with?"  Hassoun answers, "He was

20  just with us now."  Do you see that?

21  A.  Yes, sir.

22  Q.  Is this additional evidence of other types of contact other

23  than the phone?

24  A.  Yes, sir, it's Mr. Padilla and Mr. Hassoun seeing each

25  other in person.

1  Q.   Then 112TR, the next call in the binder I want to talk

2  about in this connection, page 20, actually the bottom of 21.

3  Do you remember this passage between Youssef, Hassoun and Kamal

4  Al-Naji?

5  A.   Yes, sir, I do.

6  Q.   Just generally describe what they are talking about.

7  A.   Sending information over to Egypt through Khaled Youssef

8  who is in the U.S. at this point in time.

9  Q.   At the bottom of page 21 Youssef says, "It doesn't matter,

10 it's fine.  Whatever we can't talk about over the phone you may

11 send with him, not a problem."  Do you see that?

12 A.   Yes, sir.

13 Q.   The "him" is referring to whom?

14 A.   Khaled Youssef, Mohamed Youssef's brother.

15 Q.   Does this suggest another method of communication other

16 than the phone?

17 A.   Yes, sir.

18 Q.   What is that?

19 A.   Couriered messages, messages or letters sent through people

20 traveling over there.

21 Q.   116TR.

22         MR. SWARTZ:  Your Honor, I think I have an objection,

23 but maybe I don't.  I think I don't.  I withdraw it.

24         THE COURT:  Hearing no objection, Mr. Frazier, you may

25 proceed.

1          MR. SWARTZ:  Just wanted to make a note to myself.

2    BY MR. FRAZIER:

3    Q.  116TR, I think is where we are.  This is page 10 of this

4    transcript.  Who is talking?

5    A.  Adham Hassoun and Jose Padilla.

6    Q.  What, generally, are they discussing here?

7    A.  Individuals back in South Florida, just how everybody is

8    doing.

9    Q.  In the middle of the page Padilla says, "No, but I mean

10   when they -- when they heard about me" --  Then Hassoun breaks

11   in, "Of course I -- I told them the letter that you sent with

12   Heba, you know, and they are happy for you and everything."

13   Do you see that?

14   A.  Yes, sir.

15   Q.  Does this call suggest yet another method of communication?

16   A.  Yes, sir, it does.

17   Q.  What is that?

18   A.  Again a letter sent through a person traveling back and

19   forth, and people that are coming to South Florida.

20         MR. SWARTZ:  Objection, Your Honor.

21         THE COURT:  Basis?

22         MR. SWARTZ:  I will withdraw it, Your Honor.  Again, I

23   don't have an objection.

24   BY MR. FRAZIER:

25   Q.  117, let's talk about 117.  Who is talking on page 3 of

1  this transcript?  Page 3.

2  A.  At this point in the phone call it's Jose Padilla and Nahed

3  Hassoun, Mr. Hassoun's wife.

4  Q.  On the issue of communication, Nahed Hassoun says to Jose

5  Padilla, "Thank God, did you call your mother?  Your mother was

6  asking about you a couple of weeks ago."  Do you see that?

7  A.  Yes, sir, at the top of the page.

8  Q.  Does this passage suggest anything about who was most

9  current about Jose Padilla's activities down here in South

10  Florida?

11       MR. CARUSO:  Objection, speculation.

12       THE COURT:  Sustained.

13  BY MR. FRAZIER:

14  Q.  Based on your investigation, are you aware of whether Jose

15  Padilla was reluctant to speak about certain matters on the

16  phone?

17  A.  Yes, sir, he was.

18  Q.  Tell us what you base your conclusion on.

19  A.  Basically, when you state that exact opinion, that certain

20  things shouldn't be talked about on the phone, such as in the

21  July 28, 1997 call.

22  Q.  Based on these pieces of evidence, are the seven calls

23  involving Jose Padilla the only and exclusive contact between

24  Jose Padilla and people back in South Florida?

25       MR. CARUSO:  Objection, speculation, Your Honor.

 1          THE COURT:  Sustained.

 2   BY MR. FRAZIER:

 3   Q.  Are you aware of other contacts between Padilla and Adham

 4   Hassoun or Mohamed Youssef?

 5          MR. SWARTZ:  I am going to object, Your Honor, to the

 6   form of the question.  It calls for speculation.  It doesn't

 7   specify a specific --

 8          THE COURT:  Sustained.

 9   BY MR. FRAZIER:

10   Q.  Let me ask you about some calls in which you were asked

11   about Mohamed Youssef or Jose Padilla making their own plans

12   independent of Adham Hassoun.  Are you aware of that having

13   occurred in some of these calls?

14   A.  Yes, sir.

15   Q.  Even if Youssef, for example, acquired a piece of

16   information about jihad, would he then call Adham Hassoun?

17          MR. SWARTZ:  Objection, Your Honor.  That's a leading

18   question, speculation, calls for a conclusion.

19          THE COURT:  Objection sustained as to speculation.

20   BY MR. FRAZIER:

21   Q.  Let's talk about a concrete example, 81TR.  This is the

22   answering machine message.  Do you recognize that?

23   A.  Yes, sir, I do.

24   Q.  In it Youssef is calling Adham Hassoun's voice mail?

25   A.  Well, he is calling his home and he gets the voice mail,

1  yes, sir.

2  Q.  Then Youssef says, "My brother, Adham, I am calling you

3  from Cairo.  This is Mohamed Hisham, of course.  Please call me

4  at home after 9:30.  It is now 7:30 p.m.  It is very important,

5  of course, because most likely there is travel tomorrow or

6  after tomorrow.  I need to confirm with you a few issues, I

7  mean some final touches before we go on the picnic, God

8  willing."  Do you see that?

9  A.  Yes, sir.

10 Q.  Are you aware of whether Adham Hassoun informed Mohamed

11 Youssef about the travel opportunity?

12 A.  Yes, sir, there is a follow-up call where they discussed

13 that.

14 Q.  116TR, around page 11, 12, 13, this is a discussion between

15 Adham Hassoun and Jose Padilla.  Do you remember this?

16 A.  Yes, sir.

17 Q.  And is this an example of Jose Padilla soliciting advice

18 from Hassoun about travel to Yemen?

19        MR. SWARTZ:  I am going to object, Your Honor, to the

20 form of the question.  It calls for a conclusion, leading.

21        THE COURT:  Sustained.  Speaking objections,

22 Mr. Swartz, please.

23 BY MR. FRAZIER:

24 Q.  What is this passage about?

25 A.  I don't know that it was about Yemen specifically.  It was

1   about possible travel opportunities in the future.

2   Q.  The next call, 117TR, page 13, is this a similar example of

3   Padilla asking for advice about an opportunity he has found?

4           MR. SWARTZ:  Objection, same objection as stated

5   earlier to the one prior to this.

6           THE COURT:  Sustained.

7   BY MR. FRAZIER:

8   Q.  What is this passage about?

9   A.  They are discussing whether he should go to Yemen or not,

10  the pros and cons.

11  Q.  Agent Kavanaugh, you were asked questions on cross about

12  Hassoun telling Youssef or Padilla to return to the United

13  States.  Do you remember those questions?

14  A.  Yes, sir, I think I do.

15  Q.  You remember that there are instances in these transcripts

16  where Hassoun recommends coming back to the United States?

17  A.  Yes, sir, I remember several.

18  Q.  Now, based on your investigation, do you have an opinion as

19  to why Hassoun recommended return to the United States?

20          MR. SWARTZ:  Your Honor, I am going to object.

21          THE COURT:  Overruled.

22          MR. SWARTZ:  It's not that I don't have more to say,

23  it's just that I would like to address this objection.  Maybe

24  if we go side bar, Judge.  I'm sorry for the interruption.

25  Without giving a speaking objection, I cannot say more.

 1           THE COURT:  Okay.  I will be right there.

 2                [Proceedings at sidebar follow]:

 3           MR. SWARTZ:  The question is, does he have an opinion

 4  as to why Mr. Hassoun is recommending Jose Padilla come back to

 5  the United States.  Judge, that opens the door to anything.

 6           THE COURT:  What do you think the answer is going to

 7  be, Mr. Frazier?

 8           MR. FRAZIER:  That there is more information available

 9  about jihad opportunities here in the United States.  Once I

10  get this answer, I will follow up with specific examples in the

11  transcripts.

12           MR. SWARTZ:  How does he know he is going to say that?

13           THE COURT:  I am assuming that he probably has been

14  working with this witness for some time.

15           MR. SWARTZ:  Over the weekend?

16           MR. FRAZIER:  No.

17           MR. SWARTZ:  If this is a question that I did on cross

18  and he knows exactly what he is going to say --

19           THE COURT:  Can you just go directly to the

20  transcript, Mr. Frazier?

21           MR. FRAZIER:  Yes, Your Honor.

22                [Proceedings in open court follow]:

23           THE COURT:  Objection sustained.

24  BY MR. FRAZIER:

25  Q.  Let's go to 67TR in connection with this issue.  Page 5,

KAVANAUGH - Redirect

1   Hassoun and Youssef are discussing what?

2   A.  The possibility of travel down to Somalia or Ogaden, and

3   the possibility of returning back to the U.S. as well.

4   Q.  At the bottom of the page Youssef says, "What I mean is

5   that I will co -- I will co -- I will come for the purpose

6   of -- I will come and wait and for the purpose of external

7   trade."  Do you see that?

8   A.  Yes, sir.

9   Q.  The line before that Hassoun says, "Allah willing, he will

10  help you, just come here."  Do you see that?

11  A.  Yes, sir.

12  Q.  The "here" is where?

13  A.  South Florida.

14  Q.  Youssef at this time is where?

15  A.  In this call, I believe he is still in Cairo.  Yes, sir, he

16  is still in Cairo, Egypt.

17  Q.  Then Hassoun, at the bottom of the page, says, "Yes, I

18  mean, of course, moving around from here is much easier than it

19  is from where you are at, all right, because the picture is

20  clearer over here."  Do you see that?

21  A.  Yes, sir.

22  Q.  Is this an example or an instance of Hassoun encouraging

23  Youssef to come back to the United States?

24          MR. SWARTZ:  Objection, leading question.

25          THE COURT:  Sustained.

1  BY MR. FRAZIER:

2  Q.  Where is Hassoun wanting Youssef to go?

3  A.  To the United States.

4  Q.  For what purpose?

5  A.  It's easier to travel to and from and just more access to

6  information in the United States.

7  Q.  To and from where?

8  A.  Jihad areas.

9  Q.  Information about what?

10  A.  A jihad area.

11  Q.  Now, having reviewed these calls, have you formed an

12  opinion about the availability of information about jihad in

13  Egypt?

14  A.  Yes.

15  Q.  What is that opinion, generally?

16  A.  According to the calls, information was very limited over

17  there, tightly held.

18  Q.  75TR, let's take a look at that, page 3.  This is Hassoun

19  and Youssef speaking, middle of the page.  First of all,

20  Hassoun and Youssef are speaking about what subject?

21  A.  This is 12/31/96; is that correct?

22  Q.  12/31/96, page three.

23  A.  Yes, it's Mr. Youssef and Mr. Hassoun speaking at this

24  point.

25  Q.  What are they talking about?

1  A.  A letter Mr. Youssef sent to Mr. Hassoun.

2  Q.  In the middle of the page Hassoun says, "You didn't go

3  towards the brothers.  Why?"  Do you see that?

4  A.  Yes, sir.

5  Q.  What is he speaking about there?

6  A.  At this point, Ogaden.

7  Q.  Youssef says, "No, my brother, it didn't happen, by God."

8  Hassoun says, "By God, why?  There was a big thing over there.

9  Did you know?  Did you get news over there or" -- and Youssef

10  says, "No, there is a total blackout on this subject."  Do you

11  see that?

12  A.  Yes, sir.

13  Q.  What is the subject he is referring to?

14  A.  Ogaden, fighting with Ethiopians.

15  Q.  The phrase "total blackout" refers to what?

16  A.  Lack of any kind of information in Egypt.

17          MR. SWARTZ:  I am going to object, Your Honor.

18          THE COURT:  Basis?

19          MR. SWARTZ:  I will withdraw it.

20  BY MR. FRAZIER:

21  Q.  116TR.  On this issue of the news, is this a call between

22  Adham Hassoun and Jose Padilla?

23  A.  Yes, sir, it is.

24  Q.  Let's take a look at page 11.  What are Jose Padilla and

25  Hassoun discussing?

1  A.  Mr. Padilla is asking about the news, information.

2  Q.  And he says, "So how is -- what's the news?  How is the

3  news over there?"  And Hassoun says, "The news is" -- and

4  Padilla says, "Because we really don't get, you know, that much

5  information here."  Do you see that?

6  A.  Yes, sir.

7  Q.  The "here" is where?

8  A.  He's in Cairo, Egypt at this time.

9  Q.  Padilla is asking about the news over there, which refers

10 to what?

11 A.  He is asking about news about jihad in general, not any

12 specific place.  It's just general information.

13 Q.  Where is Adham Hassoun during this call?

14 A.  He is in Sunrise, Florida at this point.

15 Q.  Is this call consistent with what Youssef said about the

16 availability of jihad news?

17         MR. SWARTZ:  Objection, Your Honor.  It calls for a

18 conclusion.

19         MR. CARUSO:  Objection.

20         THE COURT:  Sustained.

21 BY MR. FRAZIER:

22 Q.  You were also asked questions on cross-examination about

23 periods in which either Youssef or Padilla were involved in

24 jihad activities.  Do you remember that?

25 A.  Yes, sir.

1  Q.  In fact, Mr. Caruso asked you a long series of questions

2  over a number of calls about periods of study, personal

3  activities, things of that nature?

4  A.  Yes, sir, I recall.

5  Q.  Now, based on your review of these calls, do you have an

6  opinion as to whether individuals would have to wait for

7  opportunities to come to them in order to travel for jihad?

8              MR. CARUSO:  Objection, speculation, Your Honor.

9              THE COURT:  Sustained.

10  BY MR. FRAZIER:

11  Q.  Let's talk about 88TR, page 8.  Who is speaking on this

12  call?

13              MR. CARUSO:  Your Honor, can we have a date for this

14  call?

15              MR. FRAZIER:  It is July 28, 1997, at 21:22.

16              THE WITNESS:  At this point it is Mr. Hassoun and

17  Mr. Padilla speaking.

18  BY MR. FRAZIER:

19  Q.  Top of the page Jose Padilla says, "You have to have a lot

20  of discipline, too, brother, you know, because you never know,

21  I mean, over there someone might be the Amir (commander) that

22  is younger than you.  You have to learn discipline and

23  obedience."  Do you see that?

24  A.  Yes, sir.

25  Q.  Here the subject-matter is what?  What are they talking

1   about?

2   A.   Jihad.

3   Q.   Then Hassoun says, "The most important is that you told me

4   that you -- you are ready, right?"  Do you see that?

5   A.   Yes, sir.

6   Q.   Padilla answers, "God willing, brother, we -- you know,

7   it's -- it's, you know, it's going to happen soon."  Then

8   Hassoun says, "Well, I tell you, I am not going to wait for the

9   bus to come."  Do you see that?

10  A.   Yes, sir.

11          MR. SWARTZ:   Objection, Your Honor, unless there is a

12  question pending.

13          THE COURT:   Rephrase, counsel, question and answer.

14  BY MR. FRAZIER:

15  Q.   The "it is going to happen soon," do you have an opinion as

16  to what that refers to?

17  A.   Yes, sir.

18  Q.   What does that refer to?

19  A.   An opportunity to go to a jihad.

20  Q.   Does this call show Padilla waiting for that opportunity?

21          MR. CARUSO:   Objection, leading, speculation.

22          THE COURT:   Sustained as to leading.

23  BY MR. FRAZIER:

24  Q.   A few lines down Padilla says, "Believe me, brother, it's

25  going to happen soon," he repeats that phrase.  Do you see

 1  that?

 2  A.  Yes, sir.

 3  Q.  Is that a reference to the same thing you testified to

 4  earlier?

 5  A.  Yes, sir.

 6  Q.  Now, based on your review of the calls, are Youssef and

 7  Padilla often frustrated by the lack of jihad opportunities?

 8          MR. SWARTZ:  Objection, calls for speculation.

 9          THE COURT:  Sustained.

10  BY MR. FRAZIER:

11  Q.  Let's take a look at 54TR.  This is a call involving

12  Mohamed Youssef?

13  A.  Yes, sir.

14  Q.  Take a look at page 4.  Youssef is talking to Hassoun.  The

15  middle of the page Youssef says, "I still have, uh, I mean,

16  less than two weeks, so I want to get the ticket, not to Rome

17  or to Bosnia because there is no work there."  Do you see that?

18  A.  Yes, sir.

19  Q.  Then Hassoun says, "What?"  Youssef follows up, "I intend

20  to look for work in, uh, an area that is a little active."  Do

21  you see that?

22  A.  Yes, sir.

23  Q.  The phrase "no work there" is in reference to what?

24  A.  The Bosnian jihad is ending at this point in time.

25  Q.  And then the phrase "looking for work in an area that is a

KAVANAUGH - Redirect

1  little active" refers to what?

2  A.  Going to a jihad area that is active.

3  Q.  Along the same lines of waiting for jihad to come, let's

4  look at --

5          MR. SWARTZ:  I am going to object to the comment by

6  counsel.

7          THE COURT:  Overruled.

8  BY MR. FRAZIER:

9  Q.  88TR, a third of the way down the page.

10 A.  I'm sorry, what page are we on?

11 Q.  Page 6.  I apologize.  Hassoun is speaking to Jose Padilla?

12 A.  Yes, sir.

13 Q.  And are they referencing Mohamed Youssef?

14 A.  Yes, sir, they do.

15 Q.  And in the large paragraph Hassoun says, "I told him to do

16 something.  He understood and then he sent me, uh, I don't

17 know, a letter, or he called me, he says, uh, uh, I can't go

18 where you told me because there is no way."  Do you see that?

19 A.  Yes, sir.

20 Q.  What is he referring to here?

21 A.  Mohamed Youssef's trip to Ogaden, which didn't take place.

22 Q.  That was based, at least in Youssef's opinion, on what

23 problem?

24 A.  Youssef had several problems with the lack of information

25 as well as just access to the area.

1  Q.  The next call is 89TR.  Along the same lines let's talk

2  about this discussion of jihad opportunities.  What is the date

3  of this call?

4  A.  November 12, 1997.

5  Q.  Who is speaking in this call?

6  A.  There are three listed participants, AH, Adham Hassoun, KD,

7  Kassam Daher, and UF, an unidentified female.

8  Q.  Let's take a look at page 3.  Daher and Hassoun are

9  speaking and Hassoun says, "So, what's up guy.  Daher responds,

10 "Nothing really."  Hassoun says, "What's new, tell me, here and

11 there."  Daher says, "There is nothing, there is nothing at

12 all, nothing at all."  Do you see that?

13 A.  Yes, sir.

14 Q.  Do you have an opinion as to what Daher is referring to

15 here?

16 A.  I can't say specifically what --

17         MR. SWARTZ:  Your Honor, I am going to object if he

18 can't say specifically.  It's speculation.

19         THE COURT:  Sustained.

20 BY MR. FRAZIER:

21 Q.  Let's go over a few pages later, page 6.  Regardless of

22 what the "nothing at all" refers to a few pages earlier, is

23 there a specific discussion about something on page 6 that you

24 do know about?

25 A.  Yes, sir.

1  Q.  So, what are they discussing here on page 6?

2  A.  They are looking for news regarding the first area, which

3  is Afghanistan.

4  Q.  There is a reference about two-thirds of the way down to

5  Hassoun saying, "Is there a school over there to teach

6  football?"  Do you see that?

7  A.  Yes, sir.

8  Q.  Do you have an opinion as to what that refers to?

9           MR. SWARTZ:  Your Honor, this is cumulative.  It was

10  covered in direct.  It was not covered in cross.  It's just

11  cumulative.

12           THE COURT:  Objection sustained.

13  BY MR. FRAZIER:

14  Q.  Does page 6 and the reference to the "school to teach

15  football" relate to the issue of jihad opportunity?

16           MR. SWARTZ:  Your Honor, it's the same attempt to --

17           THE COURT:  Sustained.

18  BY MR. FRAZIER:

19  Q.  114TR, page 3, bottom of the page, there is a reference to

20  the door opening somewhere.  Do you see that?

21  A.  Yes, sir, I do.

22  Q.  What does that refer to?

23  A.  An opportunity to go to a jihad.

24  Q.  Now, based on your review of all of these calls and the

25  evidence in this case, do you have an opinion as to what

1    Youssef, Padilla, Hassoun would be doing in the absence of a

2    door being opened somewhere?

3              MR. CARUSO:  Objection, speculation.

4              MR. SWARTZ:  Objection, Your Honor.

5              THE COURT:  Sustained.

6    BY MR. FRAZIER:

7    Q.  The school to teach football, is that an activity that

8    could be pursued in the absence of a door opening somewhere?

9              MR. SWARTZ:  Objection, leading, speculation.

10             THE COURT:  Sustained.

11   BY MR. FRAZIER:

12   Q.  Are there specific references in these calls to an interest

13   in training for jihad if no jihad is being fought?

14             MR. SWARTZ:  Objection, leading.

15             THE COURT:  Overruled.

16             THE WITNESS:  Yes, sir.

17   BY MR. FRAZIER:

18   Q.  You were asked questions on cross about Hassoun losing

19   contact with Padilla at times.  Do you remember that?

20   A.  Yes, sir.

21   Q.  At what point is it clear Hassoun has lost contact with

22   Padilla?

23   A.  Their last phone contact was April 10, 2000.  There is no

24   phone contact or any type of contact established after that.

25   Q.  Is there evidence in this case that Hassoun nonetheless

1    expressed an interest in what Padilla was doing?

2            MR. SWARTZ:  Objection, argumentative.  It calls for a

3    conclusion.

4            THE COURT:  Overruled.

5            THE WITNESS:  Yes, sir, through Mr. Youssef.

6    BY MR. FRAZIER:

7    Q.  Now, you were asked certain questions about the language

8    that Jose Padilla used in his discussions with Adham Hassoun.

9    Do you remember that?

10   A.  Yes, sir.

11   Q.  In fact, you were asked a series of questions by Mr. Caruso

12   about whether Padilla ever used code.  Do you remember that?

13   A.  Yes, sir, there were specific words we talked about, yes,

14   sir.

15   Q.  You talked about "tourism" and "football"?

16   A.  Yes, sir.

17   Q.  "Going on a picnic, smelling fresh air"?

18   A.  Yes, sir.

19   Q.  Now, in your opinion, is it possible to speak of jihad

20   without using these specific words?

21           MR. CARUSO:  Objection, speculation.

22           THE COURT:  Sustained.

23   BY MR. FRAZIER:

24   Q.  In these transcripts are there actual examples of people

25   speaking of jihad without using these words?

 1  A.  Yes, sir.

 2  Q.  There are specific examples of jihad being talked about

 3  when these words are not being used?

 4  A.  Yes, sir, that's correct.

 5  Q.  Now, based on your assessment of these calls, are you aware

 6  of whether Jose Padilla would speak freely about the issue of

 7  jihad?

 8         MR. CARUSO:  Objection, speculation.

 9         THE COURT:  Sustained.

10  BY MR. FRAZIER:

11  Q.  Are there specific examples in these recordings of Jose

12  Padilla saying people talk too much on the phone?

13  A.  Yes, sir.

14  Q.  Do you have an opinion as to what the subject-matter was

15  Padilla was discussing?

16         MR. CARUSO:  Objection.

17         THE COURT:  Sustained.

18  BY MR. FRAZIER:

19  Q.  Have you had an opportunity to compare Jose Padilla's

20  discussions on the phone with those of, say, Mohamed Youssef?

21  A.  Yes, sir.

22  Q.  How would you characterize how Padilla speaks on the phone

23  compared to Youssef?

24         MR. CARUSO:  Objection, relevance, Your Honor.

25         THE COURT:  Sustained.

1   BY MR. FRAZIER:

2   Q.  You were asked questions about Jose Padilla and how well he

3   learned.  Do you remember that?

4   A.  Yes, sir, I do.

5   Q.  In fact, I believe you were asked questions about whether

6   Padilla was a slow learner?

7   A.  Yes, sir.

8   Q.  Now, from your investigation, are you aware whether Padilla

9   had the capacity to speak multiple languages?

10  A.  Well, yes, sir, he spoke two and was learning a third, so

11  yes.

12  Q.  Padilla spoke English?

13  A.  Yes, sir.

14  Q.  Did he speak Spanish?

15  A.  Yes, sir.

16  Q.  Is there evidence that he could read Spanish?

17  A.  Yes, sir.

18  Q.  You said he was learning a third language?

19  A.  Yes, sir, he was studying the Arabic language.

20  Q.  In fact, on Exhibit 111TR, page 3, there is a specific

21  reference to his Arabic speaking ability?  Page 3.

22  A.  Yes, sir.

23  Q.  Adham Hassoun is speaking to Youssef's brother; is that

24  correct?

25  A.  Yes, sir, Khaled Youssef.

1  Q.  Hassoun says, "And when you speak with him, do you speak
2  Arabic or English?"  Khaled answers, "Well, 50/50, I mean."  Do
3  you see that?
4  A.  Yes, sir.
5  Q.  Is that a reference to how much Arabic he speaks with
6  Padilla?
7  A.  Yes, sir.
8  Q.  Are you aware of whether Jose Padilla worked as a language
9  teacher?
10  A.  Yes, sir.
11  Q.  Is there a reference to that in these calls?
12  A.  Yes, sir.
13  Q.  Did you learn whether or not Padilla was able to interact
14  with and communicate with people in foreign countries?
15  A.  Yes, sir.
16  Q.  Are there references to that in these calls?
17  A.  Yes, there are.
18  Q.  Are you aware of whether Jose Padilla expressed a
19  commitment to patience and discipline?
20  A.  Yes, sir.
21  Q.  Are there references to that in these calls?
22  A.  Yes, there are.
23  Q.  Are you aware of whether Padilla formed an opinion about
24  the proper way for Youssef to communicate with Hassoun?
25          MR. SWARTZ:  Objection.

1        MR. CARUSO:  Objection, leading.

2        THE COURT:  Sustained.

3   BY MR. FRAZIER:

4   Q.  Based on all of these things that you've testified about,

5   do you have an opinion as to whether Padilla showed a degree of

6   care about how to conduct himself?

7        MR. CARUSO:  Objection, speculation.

8        THE COURT:  Sustained as to speculation.

9   BY MR. FRAZIER:

10  Q.  Do you know of specific examples in the calls where Padilla

11  showed a degree of care of how he communicated and conducted

12  himself?

13  A.  Yes, sir.

14  Q.  Now, you were asked questions about specific telephone

15  calls in this binder and I want to talk with you about them.

16  Before we get into this binder, there was one call that was

17  passed out loose by Mr. Caruso, and that is 105TR.  Do you

18  remember being asked questions about that call, which was

19  August 17 of 1998?

20  A.  Yes, sir, I do.

21  Q.  Now, who is speaking on this one?

22  A.  It's Mr. Hassoun and Mr. Youssef.

23  Q.  I believe Mr. Caruso asked you specific questions on page

24  3.

25  A.  Actually, I don't have a copy of that.  It wasn't in the

1  binder.  I believe I gave my copy back after I was asked
2  questions about it.
3  Q.  I'll give you a copy.
4         Do you remember being shown this document by
5  Mr. Caruso?
6  A.  Yes, sir.
7  Q.  In fact, I think he characterized this call as one that
8  sets the stage for Padilla's trip to Egypt, I believe?
9  A.  Words to that effect, yes, sir.
10 Q.  On page 3, Mr. Caruso highlighted two passages, one at the
11 top and one at the bottom.  The one at the top, do you remember
12 being asked about it?  It has to do with Youssef welcoming
13 Padilla to Cairo.
14 A.  Yes, sir.
15 Q.  Then the one at the bottom had to do with Youssef and
16 Hassoun talking about Padilla's situation with his ex or soon
17 to be ex-wife?
18 A.  Yes, sir.
19 Q.  Do you remember there is a passage in the middle where
20 Hassoun is speaking about Yemen?  Do you see that?
21 A.  Yes, I do.
22 Q.  Mr. Caruso did not ask you about that passage, did he?
23 A.  I don't remember discussing it, no, sir.
24 Q.  Now, the date of this call is August 17, 1998?
25 A.  Yes, sir.

1    Q.  And where has Youssef been by this point in our narrative?

2    A.  He's been in Cairo for about the last two years.

3    Q.  Has he been anyplace else at this point in our narrative?

4    A.  Kosovo and Albania as well.

5    Q.  That was for jihad?

6    A.  Yes, sir.

7    Q.  The prior call, I believe, was August 10, 1998; is that

8    correct?

9    A.  Yes, sir.

10   Q.  And in that call they discuss the Kosovo conflict?

11   A.  That is correct.

12   Q.  Another prior call had to do with Hassoun saying he was

13   sending Ibrahim.  Do you remember that?

14   A.  Yes, sir, I do.

15   Q.  Was that call July 18, 1998?

16   A.  There were two in July, 1998, about that.

17   Q.  But you remember that discussion of sending Ibrahim?

18   A.  Yes, sir.

19   Q.  In the middle of page 3, what you didn't discuss on

20   cross-examination was this reference.  Youssef says, "He will

21   learn the Arabic language and get relaxed and attend good

22   lectures and I can get him married."  And he laughs.  Do you

23   remember discussing that?

24   A.  Yes, sir, I do.

25   Q.  But the next line says with Hassoun speaking, "Well,

1  perfect.  If there is any, could it, uh -- I mean a trip to

2  Yemen."  Then Youssef says, "It is possible.  No problem."  Do

3  you see that?

4  A.  Yes, sir.

5  Q.  Does Hassoun say exactly why he is talking about a trip to

6  Yemen?

7  A.  He says a little bit, but he doesn't go into great detail.

8  Q.  Does it appear that Youssef understands why Hassoun is

9  referring to Yemen?

10        MR. SWARTZ:  Objection, Your Honor, speculation.

11        THE COURT:  Sustained.

12  BY MR. FRAZIER:

13  Q.  Does Yemen appear in the facts of this narrative?

14  A.  It is mentioned, yes, sir.

15  Q.  Does it appear in this call as well as later in the

16  evidence?

17  A.  Yes, sir, in the calls in 2000.

18  Q.  Does Jose Padilla go to Yemen?

19  A.  Yes, sir.

20  Q.  Does Yemen appear on the mujahideen data form that is in

21  evidence?

22        MR. CARUSO:  Objection, leading.

23        THE COURT:  Overruled.

24        THE WITNESS:  Yes, sir, it does.

25  BY MR. FRAZIER:

KAVANAUGH - Redirect

1  Q.  Now, I want to explore with you a little bit on page 6 of

2  this call.  It's a large paragraph toward the bottom of the

3  page where Hassoun says, "Ah, well, God provide help."  Do you

4  see that?

5  A.  Yes, sir.

6  Q.  Then they continue on, Hassoun speaking, "Anyway, my

7  friend, fine, let me see.  Let me call the brother tomorrow and

8  see.  I can possibly send him to you for a month or two or

9  three.  All depends on what he thinks."  Do you see that?

10  A.  Yes, sir.

11  Q.  Who is the brother Hassoun is referring to?

12  A.  Mr. Padilla.

13  Q.  And the phrase "all depends on what he thinks," what does

14  that refer to?

15  A.  Obviously Mr. Padilla has a say in what is going to happen.

16  Q.  Page 8, along the same lines of Mr. Padilla having a say,

17  middle of the page.  Youssef says, middle of the page, "This is

18  the purpose.  I will find him a Sheikh to make him memorize the

19  Koran and so on."  Do you see that?

20  A.  Yes, sir.

21  Q.  Then Hassoun says, "He won't be made to, but he will get --

22  I do not think that he ever went to the areas, uh, uh, uh, the

23  areas.  He can get an idea, and if he likes it, he can stay.

24  If not, he can return here.  No problem.  He will have a round

25  trip ticket."  Do you see that?

1   A.   Yes, sir.

2   Q.   Who is the "he" Hassoun is referring to?

3   A.   Jose Padilla.

4   Q.   Along the same lines, does this passage show Padilla has a

5   say in what he does overseas?

6           MR. CARUSO:   Objection, speculation.

7           THE COURT:   Overruled.

8           THE WITNESS:   Yes, sir.

9   BY MR. FRAZIER:

10  Q.   Now, calls in the binder, let's take a look at certain

11  calls that you were asked about on cross-examination.   Let's

12  start a little later in the binder, around 114, 114TR.

13  A.   Yes, sir.

14  Q.   Do you remember being asked about some supplies that were

15  sent to Jose Padilla from the United States?

16  A.   Yes, sir, I do.

17  Q.   I believe these supplies included a book bag, a sleeping

18  bag, and an Army jacket.   Do you remember that?

19  A.   Yes, sir.

20  Q.   On the bottom of page 4, there is a discussion about these

21  very items.   Do you see that?

22  A.   Yes, sir.

23  Q.   On cross-examination, I think you were asked, well, a book

24  bag is just a book bag, a sleeping bag is just a sleeping bag,

25  something to that effect.   Do you remember that?

KAVANAUGH - Redirect

1   A.   Yes, sir, I do.

2   Q.   Does the bottom of page 3 suggest these items relate to a

3   particular thing Jose Padilla is planning to do?

4   A.   Yes, sir.

5   Q.   In fact, in the large paragraph at the bottom Jose Padilla

6   says, "Sister Heba was saying, uh, I was using her, and I told

7   her to get me some things because there were some brothers here

8   and there was, uh, there was -- there was a rumor here that the

9   door was opened somewhere.  Do you see that?

10  A.   Yes, sir.

11  Q.   I believe you just testified to what the phrase "the door

12  being open somewhere" refers to?

13  A.   Yes, sir.

14  Q.   And that is?

15  A.   An opportunity to go to a jihad.

16  Q.   And then he follows on, "So, I asked her to get me -- I

17  didn't ask her -- I asked her -- I wrote a letter telling her

18  to tell my mom to send me an Army jacket, a book bag and a

19  sleeping bag."  Do you see at that"?

20  A.   Yes, sir.

21  Q.   Does this passage relate those three items to the door

22  being open somewhere?

23  A.   Yes, sir.

24  Q.   You were also asked specific questions on this call as to

25  whether Jose Padilla had received any sort of jihad training.

KAVANAUGH - Redirect

47

1   Do you remember that?

2   A.   I remember the question, I don't remember which call it

3   directly pertained to.

4   Q.   I think the question on cross-examination was whether a

5   lack of training would prevent travel to a jihad area.  Do you

6   remember that?

7   A.   Yes, sir, I remember that question.

8   Q.   Is there a possibility, based on your review of the

9   evidence in this case, to receive jihad training in jihad areas

10  themselves?

11          MR. CARUSO:  Objection, speculation.

12          THE COURT:  Sustained.

13  BY MR. FRAZIER:

14  Q.   Are you aware of whether Mohamed Youssef received jihad

15  training?

16  A.   Yes, sir.

17  Q.   He did receive jihad training?

18          MR. SWARTZ:  Objection, Your Honor.

19          THE COURT:  Basis?

20          MR. SWARTZ:  Speculation.

21          THE COURT:  Overruled.

22  BY MR. FRAZIER:

23  Q.   You can answer.

24  A.   Yes, sir.

25  Q.   Are you speculating on that or is there evidence in this

1   case?

2   A.   No, sir, he talks about it in the August 10, 1998 telephone

3   call.

4   Q.   Where did he receive jihad training?

5   A.   In Kosovo.

6   Q.   Was that an active jihad area at the time?

7   A.   Yes, sir, it was.

8   Q.   Page 18 of this same intercept there is a further reference

9   to the book bag, the sleeping bag and the Army jacket; is that

10  correct?

11  A.   Yes, sir.

12  Q.   In the large paragraph in the middle of the page, Jose

13  Padilla is speaking?

14  A.   Yes, sir.

15  Q.   He says, "But it's very important, brother, that you leave,

16  uh -- some of that money has to go to, uh, Marwa for the things

17  that she brought me.  Now, she wrote me a letter because she

18  knows what I purchased them for.  She said that she doesn't

19  want, because she knows it's for, you know."  Do you see that?

20  A.   Yes, sir.

21  Q.   Then he follows on and says, "You know what an Army jacket

22  is for, you know what a sleeping bag is for, and you know what

23  a book bag is for."  And Hassoun says, "Yeah"?

24  A.   Yes, sir, I see that.

25  Q.   Does it appear from this passage that Hassoun and Padilla

1  have a specific purpose in mind for these items?

2  A.  Yes, sir.

3  Q.  Does it appear that Marwa, Padilla's ex or soon to be

4  ex-wife, also knows what they are for?

5  A.  He says that he told her, yes, sir.

6  Q.  Does this passage show that Marwa had a particular reaction

7  to Padilla's interest in getting these items?

8  A.  Yes, sir.

9  Q.  What is that?

10  A.  He doesn't go into great detail, but she appears to be

11  unhappy.

12  Q.  116TR.  You were also asked about this call on

13  cross-examination.  What was the date of this call?

14  A.  October 17, 1999.

15  Q.  Remind us who is speaking on this call and where they are

16  at the time.

17  A.  Mr. Hassoun is in Sunrise, Florida and Mr. Padilla is in

18  Cairo, Egypt.

19  Q.  You were asked some specific questions by Mr. Caruso about

20  references to study or studying.  Do you remember that?

21  A.  Yes, sir.

22  Q.  Let's take a look at page 3.  I think this is where he

23  asked you some questions.

24  A.  Yes, sir.

25  Q.  Middle of the page Hassoun is talking to Padilla and he

1    says, "You want to leave, too.  Do you want to leave or you --

2    do you want to stay?"  And then Padilla responds, "Uh."  He

3    chuckles.  "Yes, eventually, yes.  I want to study, yeah."  Do

4    you see that?

5    A.  Yes, sir.

6    Q.  You were asked a lot of questions on cross-examination

7    about study Padilla was actually going through or undertaking.

8    Do you remember that?

9    A.  Yes, sir.

10   Q.  In fact, at this time was he undertaking a course of study?

11   A.  Yes, sir, he was.

12   Q.  What was that study?

13   A.  He was studying the Arabic language and he was also

14   studying the Islamic religion.

15   Q.  Was Hassoun aware that he was studying the Arabic language

16   and the Islamic religion at this time?

17   A.  They discussed it in the telephone calls.

18   Q.  This is a reference to Hassoun asking Padilla if he wants

19   to leave to study.  Do you see that?

20   A.  Yes, sir.

21   Q.  Does that suggest to you that this is a reference to some

22   course of study that doesn't involve language or religion?

23             MR. CARUSO:  Objection, speculation.

24             MR. SWARTZ:  Objection.

25             THE COURT:  Sustained.

1  BY MR. FRAZIER:

2  Q.  Are you aware of any reason why Jose Padilla would need to

3  leave Egypt to study language or religion?

4         MR. CARUSO:  Objection, speculation.

5         THE COURT:  Sustained.

6  BY MR. FRAZIER:

7  Q.  There are references in the calls to the Al Hazar

8  University in Cairo.  Do you remember that?

9  A.  Yes, sir.

10  Q.  Are you aware of what this university is?

11  A.  Yes, sir.

12  Q.  Is it a prestigious university?

13  A.  Yes, sir, it is.

14  Q.  Is it a university that teaches language as well as

15  religion?

16  A.  Yes, sir.

17         MR. SWARTZ:  Objection, leading, Your Honor.

18         THE COURT:  Overruled.

19  BY MR. FRAZIER:

20  Q.  The answer is yes?

21  A.  Yes, sir.

22  Q.  Are you aware of whether this university has a curriculum

23  that would benefit someone wanting to study the Arabic language

24  and religion?

25         MR. SWARTZ:  Objection, Your Honor.  It suggests an

 1   answer.

 2              THE COURT:  Rephrase.

 3              MR. FRAZIER:  I will withdraw it, Your Honor.

 4   BY MR. FRAZIER:

 5   Q.  Page 13 of this same transcript.  I believe you were asked

 6   some questions about this passage where Padilla is being told

 7   by Hassoun to prepare himself financially.  Do you see that?

 8   A.  Yes, sir, I see it.

 9   Q.  That's near the bottom of page 13?

10   A.  Yes, sir.

11   Q.  On page 14, Hassoun says, "I mean, the worst that can

12   happen is that I will be, uh, forced to send the tickets from

13   here."  Do you see that?

14   A.  Yes, sir.

15   Q.  Is this a further reference to Padilla leaving Egypt to go

16   someplace else?

17   A.  Yes, sir.

18   Q.  Is this a reference to him leaving Egypt to go study

19   someplace else?

20   A.  Yes, sir, that's how they phrased it.

21   Q.  In fact, down at the bottom of page 14, you were asked by

22   Mr. Caruso some very specific questions about Hassoun's

23   reference to the class already starting.  Do you see that

24   reference?

25   A.  I see the reference, yes, sir.

1  Q.  In that paragraph, Hassoun says, "So, what you need to do

2  is now go ahead and start working on it and don't look behind,

3  man.  I mean, the -- the class has already started, you know,

4  and you don't want to miss any course."  Do you see that?

5  A.  Yes, sir.

6  Q.  Padilla cuts in, "ah-ha," do you see that?

7  A.  Yes, sir.

8  Q.  In fact, you were asked very pointedly be Mr. Caruso, is

9  this an example of Jose Padilla cutting off Adham Hassoun?

10  A.  Yes, sir, I remember that.

11  Q.  Now, in this comment about the class beginning, does Adham

12  Hassoun say the religion class is beginning?

13  A.  No, sir.

14  Q.  Does he say the Arabic class is beginning?

15         MR. SWARTZ:  Objection, leading.

16         THE COURT:  Sustained.

17  BY MR. FRAZIER:

18  Q.  Does he say anything about what type of class is beginning?

19  A.  No, sir.

20  Q.  117TR, what is the date of this?

21  A.  April 10, 2000.

22  Q.  Who is speaking here?

23  A.  There are several speakers throughout the telephone call.

24  Mr. Hassoun and Mr. Padilla are both participants in the call,

25  as well as Mr. Hassoun's wife.  There is an unidentified child,

1  an unknown male, and a receptionist or operator at MarCom named

2  Sophia.

3  Q.  You were asked about this call on cross-examination?

4  A.  Yes, sir.

5  Q.  In fact, is this a call that references the Hajj?

6  A.  Yes, sir, they discuss it in this call.

7  Q.  Let's go to page 13, bottom of the page.  Do you remember

8  being asked references to the Hajj in this case?

9  A.  Yes, sir.

10 Q.  Do you remember being asked about the religious importance

11 of the Hajj?

12 A.  Yes.

13 Q.  Now, in this call, Padilla says he went to the Hajj?

14 A.  That's correct.

15 Q.  And he says that "I met very good brothers, I mean, a lot

16 of brothers from Yemen."  Do you see that?

17 A.  Yes, sir.

18 Q.  Is this another reference to Yemen in this case?

19 A.  Yes, sir.

20 Q.  Now, based on his experience at the Hajj, does Padilla then

21 ask for some advice from Adham Hassoun?

22 A.  Yes, sir, he does.

23 Q.  Does Hassoun offer some advice?

24 A.  Yes, sir.

25         MR. SWARTZ:  Your Honor, I am going to object to the

 1  line of questioning.  It speaks for itself.

 2        THE COURT:  Sustained.

 3  BY MR. FRAZIER:

 4  Q.  Page 14, Padilla says he may need a recommendation.  Do you

 5  see that?

 6  A.  Yes, sir.

 7  Q.  Hassoun and Padilla discuss that issue?

 8  A.  Yes, sir.

 9        MR. SWARTZ:  Your Honor, same objection.  He is just

10  going through this to make certain points.  It is just

11  repetitive and it's not related to anything new.

12        THE COURT:  Repetitive.  Sustained.

13  BY MR. FRAZIER:

14  Q.  Let me ask this.  In this discussion, do Hassoun and

15  Padilla limit their conversation about the Hajj to its

16  religious significance?

17        MR. SWARTZ:  Objection, Your Honor.

18        THE COURT:  Sustained.

19  BY MR. FRAZIER:

20  Q.  You were asked about the religious significance of the

21  Hajj.  Do you remember that?

22  A.  Yes, I do.

23  Q.  Were you asked any questions about what other aspects of

24  the Hajj Hassoun and Padilla discuss?

25  A.  I don't believe I was, no, sir.

1   Q.   Including the issue of the recommendation?

2   A.   I don't remember discussing that on cross, no, sir.

3   Q.   What about the good brothers?

4   A.   I can't remember one way or the other.

5   Q.   What about the need for a recommendation because he is an

6   American?

7            MR. CARUSO:   Objection, leading.

8            THE COURT:   Sustained.

9   BY MR. FRAZIER:

10  Q.   Let's talk about 118TR.   What's the date of this call?

11  A.   September 4, 2000.

12  Q.   Who is on this call?

13  A.   It's Adham Hassoun, Mohamed Youssef, and an unidentified

14  female.

15  Q.   I want to focus us on page 4 of this call, because you were

16  asked questions on cross about something that appears here.

17  Middle of the page Youssef says, "Ibrahim is a little farther

18  south by -- he is supposed to be at Osama's and then he might

19  be able to go from Osama's to go to Ka -- to a little farther

20  north."  Do you see that?

21  A.   Yes, sir.

22  Q.   Mr. Caruso asked you questions about the phrase "supposed

23  to be at Osama's."  Do you remember that?

24  A.   Yes, I do.

25  Q.   In fact, you were asked questions about the "supposed to

1  be" aspect of that statement?

2  A.  Yes.

3  Q.  He said that means a little less than certain, or less than

4  certain?

5  A.  Yes, we discussed that.

6  Q.  You would agree with that as far as it goes with this

7  statement?

8  A.  Yes, the word supposed to, yes.

9  Q.  Now, based on your investigation and review of these calls,

10 are there other statements about Padilla's whereabouts at this

11 time?

12 A.  Yes, sir.

13 Q.  Are those statements more certain in the way they are

14 communicated?

15        MR. SWARTZ:  Leading, Your Honor, calls for a

16 conclusion.

17        THE COURT:  Overruled.

18        THE WITNESS:  Yes, sir, it's either later in this call

19 or the next call it's stated much more certainly.

20 BY MR. FRAZIER:

21 Q.  The area, or this location of Padilla at Osama's, do you

22 have an opinion of what that refers to?

23 A.  Yes, sir.

24 Q.  What is that?

25 A.  Afghanistan.

1  Q.  By the way, there is a reference to the name Khattab at the

2  top of this page.  Do you see that?

3  A.  Yes, sir.

4  Q.  In fact, Hassoun is asking Youssef, "You will be over

5  there, where?"  Youssef responds, "Over there at Osama's and

6  Khattab's company."  Do you see that?

7  A.  Yes, sir.

8  Q.  That reference to Osama refers to whom?

9  A.  Osama bin Ladin.

10  Q.  The reference to Khattab refers to whom?

11  A.  Ibn, I-B-N, al Khattab.

12  Q.  In fact, have we seen documents addressed from at least one

13  of the defendants to Ibn al Khattab in this case?

14        MR. SWARTZ:  Objection, Your Honor, outside the scope

15  of the cross.

16        THE COURT:  Overruled.

17        THE WITNESS:  I remember the name coming up.  I

18  couldn't tell you the exact document that it was on.

19  BY MR. FRAZIER:

20  Q.  Was there a reference to Ibn Khattab in certain intercepts

21  that we discussed last week involving Kifah Jayyousi?

22  A.  Yes, sir, and yesterday as well.

23        MR. SWOR:  Yesterday?

24        THE WITNESS:  I'm sorry, Friday.  The last time on --

25  yes.  Yes, it is the same Ibn al Khattab.

1    BY MR. FRAZIER:

2    Q.   You mentioned that there are references to the area of

3    Osama that were more certain than the last one we discussed?

4    A.   Yes, sir.

5    Q.   Let's take a look at 119TR.  Who is speaking here?

6    A.   Mr. Hassoun, Mr. Youssef, and an unidentified female.

7    Q.   Where is Youssef at this point?

8    A.   He's still in Cairo, Egypt.

9    Q.   Page 14, bottom of that page, are Hassoun and Youssef

10   discussing the whereabouts of Jose Padilla?

11   A.   Yes, sir.

12   Q.   And Youssef is speaking, next to the last paragraph, and

13   says, "He went, he went -- I mean he went to Al Muqbil for a

14   while, and from there, from there, I mean, he stayed -- he

15   stayed by Al Muqbil for about a month, and from there he

16   entered into the area of Osama."  Do you see that?

17   A.   Yes, sir.

18   Q.   Is this a more certain reference to Padilla's location?

19   A.   Yes, sir.

20   Q.   And the reference to Al Muqbil refers to where?

21   A.   It refers to the country of Yemen.

22   Q.   123TR, there is another reference to Padilla's location.

23   First of all, who is speaking on this call and where are they?

24   A.   Mr. Hassoun is in Sunrise, Florida.  Then there are two

25   unidentified males in the call who were both in the Republic of

1  Georgia.

2  Q.  Page 4 on this call, is there a discussion about the

3  whereabouts of Jose Padilla?

4  A.  Yes, sir, there is.

5  Q.  In the middle of the page Hassoun is asking UM 2, he says,

6  "Do you know what happened with Abu Abdallah, the Puerto

7  Rican?"  UM2 says, "Abu Abdallah who is Ibrahim is in

8  Afghanistan."  Do you see that?

9  A.  Yes, sir.

10 Q.  Hassoun says, "Yes, yes."  UM2 says, "Abu Abdallah,

11 Ibrahim, yes, he is currently in Afghanistan."  Do you see

12 that?

13 A.  Yes, sir.

14 Q.  Is this a more certain reference to the whereabouts of Jose

15 Padilla?

16         MR. CARUSO:  Objection, leading.

17         THE COURT:  Sustained.

18 BY MR. FRAZIER:

19 Q.  How would you characterize this reference in terms of

20 Padilla's location?

21         MR. CARUSO:  Objection, relevance

22         THE COURT:  Overruled.

23         THE WITNESS:  It states that he is currently in the

24 country of Afghanistan.

25 BY MR. FRAZIER:

 1  Q.  Does UM state any doubt or ambiguity as to Padilla's
 2  location?
 3          MR. CARUSO:  Objection, Your Honor, leading.
 4          THE COURT:  Overruled.
 5          THE WITNESS:  No, sir.
 6  BY MR. FRAZIER:
 7  Q.  I want to talk to you a little bit, Agent, about the final
 8  couple of references as to what Hassoun and Youssef were
 9  discussing at this stage in our narrative.
10          Youssef was traveling to different areas at this
11  point, was he not?
12  A.  Yes, sir.
13  Q.  Where was he going at this time?
14  A.  He was trying to go to Chechnya.
15  Q.  Were there references to Jose Padilla traveling at this
16  time?
17  A.  Yes, sir.
18  Q.  Where was he going at this time?
19  A.  He was also trying to go to Chechnya, according to the
20  September 3rd calls.
21  Q.  Let's take a look at that call just so we know where that
22  comes from, 118TR.  Actually, bottom of page 4, Youssef says,
23  "You see, he stayed for like two or three weeks or so, then he
24  took off, but the route -- I mean my route will be direct,
25  different from his."  Do you see that?

1  A.  Yes, sir.

2  Q.  Who are they referring to in this passage?

3  A.  Mr. Padilla.

4  Q.  Based on this discussion of the routes, what is Youssef

5  saying?

6  A.  They are going to the same place, just --

7           MR. CARUSO:  Objection, speculation.

8           THE COURT:  Sustained.

9  BY MR. FRAZIER:

10 Q.  Based on your knowledge of these calls and the

11 investigation, do you have an opinion as to where Jose Padilla

12 was headed at this time in the narrative?

13          MR. CARUSO:  Objection, speculation.

14          THE COURT:  Sustained.

15 BY MR. FRAZIER:

16 Q.  Are you aware, or have an opinion about what Youssef is

17 referring to in this particular passage?

18          MR. CARUSO:  Objection, speculation.

19          THE COURT:  Overruled.

20          THE WITNESS:  Yes, sir.

21 BY MR. FRAZIER:

22 Q.  What is that?

23 A.  They are going to the same place, Chechnya, but through

24 different routes.

25          MR. CARUSO:  Objection, move to strike, speculation.

63

KAVANAUGH - Redirect

1            THE COURT:  Overruled.

2   BY MR. FRAZIER:

3   Q.   You were asked, Agent Kavanaugh, a number of questions

4   about the mujahideen data form and the fingerprint analysis on

5   that data form.  Do you remember that?

6   A.   Yes, sir.

7   Q.   And for the record, that is Exhibit 403.

8   A.   I believe that is correct, yes, sir.

9   Q.   On the issue of fingerprint analysis, did you order a

10  fingerprint analysis of that document?

11  A.   Yes, sir.

12  Q.   Was that analysis conducted?

13  A.   Yes, sir.

14  Q.   And, again, are you aware of the results of that analysis?

15  A.   Yes, sir.

16  Q.   Explain what this analysis tells us about Padilla's contact

17  with the mujahideen data form?

18            MR. CARUSO:  Objection, beyond the scope of

19  cross-examination.

20            THE COURT:  Sustained.

21  BY MR. FRAZIER:

22  Q.   You were asked about the length of time between when the

23  blue binder and its contents were recovered in Afghanistan and

24  when the fingerprint analysis was done.  Do you remember that?

25  A.   I think so, yes, sir.

1  Q.  And just for clarification, the mujahideen data form,

2  Exhibit 403, was included in that blue binder when it was

3  recovered?

4  A.  Yes, sir, it was all one big thing.

5  Q.  So I want to talk to you about the length of time between

6  when the data form was recovered in the binder and when the

7  fingerprint analysis was done, okay?

8  A.  Okay.

9  Q.  First of all, when was Jose Padilla arrested on these

10  charges?

11  A.  It was January, I believe, January of 2005 -- 2006.  My

12  brain is mush this morning, as we can tell.  January of 2006.

13  Q.  When did you order the fingerprint analysis?

14  A.  It was done in the spring -- it was ordered in the spring

15  of 2006, and done at some point after that.

16  Q.  Did you order only a single test, or were there different

17  tests that you ordered be performed?

18  A.  There were other tests as well.

19  Q.  Do you remember when the data form was sent to the lab for

20  analysis?

21  A.  It was -- I believe it was in April of 2006.  I couldn't

22  give you an exact date without looking at the paperwork.

23  Q.  Are you aware of whether other tests were performed on the

24  data form before the fingerprint analysis?

25  A.  I don't know the order.  There were other tests done.  I

1    can't tell you the order they did stuff in.  Yes, there were

2    things done as well as the prints.

3    Q.  Do you know when the fingerprint analysis was actually

4    done?

5    A.  No, sir, I don't remember the exact date.

6    Q.  Let me ask you this.  Does fingerprint analysis have a

7    physical effect on the document being tested?

8    A.  It typically does, it depends on the method being used.  It

9    very typically affects the paper or the document being tested.

10   Q.  As an FBI case agent, does that fact affect when you order

11   fingerprint analysis done on a particular document?

12   A.  It certainly can.  It would depend on the item.  It

13   certainly can make that the last thing that you want to do.

14   Q.  Explain why.

15   A.  The items used to test very often alter the physical

16   characteristics and will change the color a little bit so it

17   won't look exactly like it did.  Ideally, you want to do

18   everything else you need to do with it before you fingerprint

19   it and change the way it looks.

20   Q.  Now, are you aware of any request from defense counsel to

21   physically inspect the mujahideen data form?

22   A.  Yes, sir.

23   Q.  Was such a request made?

24   A.  Yes, sir.

25   Q.  Did that request affect when you sent the form off for

1  fingerprint analysis?

2  A.  Yes, sir, I held off for about a month just so that

3  everybody could get a look at it first.

4  Q.  In its original condition?

5  A.  Yes, sir.

6  Q.  In your experience as an FBI agent, was there a lengthy

7  delay between this arrest and the fingerprint analysis in this

8  case?

9  A.  Not in my experience, no, sir.

10  Q.  Now, you also were asked about the issue of taking major

11  prints.  Do you remember that?

12  A.  Yes, sir.

13  Q.  Now, were Jose Padilla's prints taken upon his arrest?

14  A.  Yes, sir.

15  Q.  Were these the standards that were used during the

16  fingerprint analysis?

17  A.  Yes, they were.

18  Q.  Meaning they were examples against which prints of value

19  were compared?

20  A.  Yes.

21  Q.  And the comparison would be to the mujahideen data form?

22  A.  Yes, sir.

23  Q.  I believe you used the phrase, and I want to ask you about

24  it, you referred to the data form as a questioned document.  Do

25  you remember that?

1   A.  Yes, sir.

2   Q.  Does that mean that the authenticity of this document is in

3   doubt?

4          MR. CARUSO:  Objection, leading.

5   BY MR. FRAZIER:

6   Q.  What did you mean by that?

7   A.  The lab unit that does any kind of analysis of documents is

8   the questioned document unit.  Basically, if you have a

9   question about a document, you send it to them.

10  Q.  Now, the fingerprint analysis in this case, are you aware

11  of whether it established a match between the standards and any

12  prints from the mujahideen form?

13         MR. CARUSO:  Objection, Your Honor, beyond the scope

14  of cross-examination.

15         MR. FRAZIER:  Your Honor, it goes directly to the

16  issue of whether other prints needed to be taken, the major

17  case print issue.

18         THE COURT:  Objection overruled.

19         THE WITNESS:  Yes, sir, there was a match.

20  BY MR. FRAZIER:

21  Q.  Now, do major case prints involve taking impressions from

22  additional parts of the hand?

23  A.  Yes, sir, that is exactly what they are.

24  Q.  In other words, it gives an additional ground for

25  comparison?

1   A.  Yes, parts of the hand that aren't normally done on the

2   standard are taken with the major case standard.

3   Q.  Now, here the standard prints led to a match; is that

4   correct?

5          MR. CARUSO:  Objection, leading, asked and answered.

6          THE COURT:  Overruled.

7          THE WITNESS:  Yes, sir, they did.

8   BY MR. FRAZIER:

9   Q.  Based on that fact, was there a need to look for matches

10  between major case prints and other impressions on the

11  document?

12         MR. CARUSO:  Objection, relevance.

13         THE COURT:  Overruled.

14         THE WITNESS:  You can see an argument both ways, but

15  it doesn't give you anything you don't have already.

16  BY MR. FRAZIER:

17  Q.  Would the taking of major case prints alter the conclusion

18  that Jose Padilla's prints are on this document?

19         MR. CARUSO:  Objection, Your Honor.

20         THE COURT:  Overruled.

21         THE WITNESS:  No, sir.

22  BY MR. FRAZIER:

23  Q.  Do you consider the lack of major case prints to render the

24  comparison that was done unreliable?

25         MR. CARUSO:  Objection, Your Honor, relevance.

 1          THE COURT:  Sustained.

 2   BY MR. FRAZIER:

 3   Q.  Do you have any doubt that Jose Padilla handled the

 4   mujahideen data form?

 5          MR. CARUSO:  Objection, relevance.  Speculation.

 6          THE COURT:  Sustained.

 7   BY MR. FRAZIER:

 8   Q.  You were asked questions about the presence of a latent

 9   palm print on the mujahideen data form.  Do you remember that?

10   A.  Yes, sir.

11   Q.  This reference to the latent palm print was included in the

12   expert report that was produced in this case?

13   A.  Yes, sir.

14   Q.  The expert report meaning the fingerprint analysis report?

15   A.  Yes, sir, that's correct.

16   Q.  Now, was this report produced in discovery to the defense?

17   A.  I would assume so, but I don't give things directly to the

18   defense, so I certainly couldn't say one way or the other.

19   Q.  Certainly from the questioning, it appears the defense was

20   aware of the latent palm prints --

21          MR. CARUSO:  Objection.

22          THE COURT:  Sustained.

23          Ladies and gentlemen, it is 11:30.  This is a good

24   time for us to take our morning break.  We will come back in 15

25   minutes.

KAVANAUGH - Redirect

 1                    [The jury leaves the courtroom].

 2          THE COURT:  Counsel, I believe you established your

 3   point in this area.  What else are you moving toward?

 4          MR. FRAZIER:  Your Honor, only that the -- the thrust

 5   of the defense questioning was that the government had the

 6   exclusive rights to perform this latent palm print analysis and

 7   they did not do so.  I think it's a fair retort to their

 8   suggestion that they equally had the ability to perform any

 9   analysis that they wanted on this document, including of the

10   latent palm print.  It is not burden shifting.  It is a fair

11   rejoinder to the suggestion created by the defense.

12          If the Court doesn't want me to go there, I can move

13   on.  I have a few more questions.

14          THE COURT:  Move on.

15          MR. CARUSO:  Are those questions in the same area,

16   Your Honor?  If they are, I think we should address them now.

17          MR. FRAZIER:  They do go to the issue of the latent

18   palm print and whether the existence of an additional print

19   that was not tested for alters the conclusion or renders

20   unreliable the analysis that --

21          THE COURT:  Are you going to have the fingerprint

22   person come in?

23          MR. FRAZIER:  The fingerprint person has come in, but

24   they went into this on cross.  I think I am entitled to as

25   these questions to wrap this up.

1          MR. CARUSO:  Your Honor, my questions to Agent

2    Kavanaugh on this subject were fairly limited.  I asked them

3    whether they had done a test.  He said they did.  They got a

4    report from their expert.  He said that there was a palm print

5    on a certain page of the document and that they never submitted

6    a test for palm prints.  That was it.

7          I think Mr. Frazier has amply plowed this ground.  I

8    think the question that he proffered to the Court has already

9    been asked and answered.

10          MR. FRAZIER:  It's been asked with reference to the

11   major case prints.  They have two lines of attack on the

12   fingerprint analysis.  One was the lack of major case prints.

13   The other was a lack of the latent palm print test.  I think I

14   am entitled to ask the same question with regard to the second

15   issue as I did with the first.

16          MR. CARUSO:  The conclusion is not relevant, Your

17   Honor, regarding the presence of the fingerprints on the form.

18   They had a fingerprint examiner who testified.  He told the

19   jury what tests he did and what he discovered and rendered his

20   expert opinion.  Agent Kavanaugh's opinion as to what the

21   fingerprint test established is irrelevant, Your Honor.

22          THE COURT:  The objection is going to be sustained,

23   Mr. Frazier.

24          MR. SWARTZ:  Your Honor, could I discuss a situation?

25   I don't know how much longer they have, but I assume that they

1    are about near the end of the redirect.

2              MR. FRAZIER:  Not long.

3              MR. SWARTZ:  I would ask --

4              THE COURT:  I am going to allow recross.

5              MR. SWARTZ:  I may need some time to put it together.

6              THE COURT:  Let's see where we are in terms of time

7    frame.

8              MR. FRAZIER:  Your Honor, I think the government

9    deserves to be heard on this issue of recross.  My

10   understanding was that there was one new document that Mr. Swor

11   was going to be allowed to question on.  At 6:00 a.m. this

12   morning we received a list of about 29 documents he either

13   wants to put in through this witness or question this witness

14   on.  Maybe we are misinterpreting.

15             THE COURT:  Mr. Swor, are they misinterpreting?

16             MR. SWOR:  I do not intend on introducing any

17   exhibits.  What the letter said was that I may ask this witness

18   about or show to the witness.  That's all.

19             THE COURT:  I think, at this point, Mr. Swor, if you

20   want Agent Kavanaugh to come back, you can bring him back.  But

21   the issues are going to be drastically limited to the new areas

22   that Mr. Frazier brought up on redirect.

23                    [There was a short recess].

24             MR. NATALE:  Your Honor, there is an objection on

25   behalf of Mr. Padilla.  The government has had all weekend to

1    prepare their redirect on this area.  I think the government

2    has taken the opportunity to ask questions which they know are

3    improper to see if they can get away with them, or to goad the

4    defense into objecting in front of the jury.  It is a clear and

5    consistent pattern that has gone on throughout this trial.

6            We are all very experienced attorneys.  We know how

7    questions are to be phrased properly.  For them to be

8    intentionally -- and they cannot be off the top of the head.

9    For them to be intentionally drafted and then followed up by

10   being leading, giving the answer you want and doing it, goading

11   into objections, is, at best, unprofessional and is improper.

12   I think that it is something that needs to stop.  If not, we

13   end up risking the examination of the attorneys devolving into

14   closing arguments.

15           THE COURT:  Let's say I were to agree with you.  What

16   is the remedy?

17           MR. NATALE:  I think that everyone on all sides should

18   be admonished not to play cheap, stupid lawyer games.  We know

19   how to asks questions properly and artfully.  We know how to do

20   it without being leading when you don't have the right to be

21   leading.  We know how to do it so we don't goad on another into

22   objections.

23           If, on the other hand, we're going to say, oh, no,

24   this is a free for all, we can all stand up --

25           THE COURT:  First of all, Mr. Natale, I don't want to

1   say it is a free for all.  Maybe counsel thinks it is, but it

2   is not.

3              Second, I do think there were several areas of inquiry

4   that Mr. Frazier proceeded in a leading way that he should not

5   have.  But we have also had, Mr. Natale, as you can see by the

6   record, some hard fought evidentiary points in this trial where

7   I think both sides have had differing legal positions as to

8   what is proper and as to what is improper in this case.

9              But, for the record, I am going to caution everyone,

10  as I did with the speaking objections, as I am now going to do

11  with the leading questions.  I think you said it best, there

12  are no babes in the legal woods here.  Everybody here has tried

13  plenty of cases and knows what the rules of evidence are.  We

14  all occasionally slip, but --

15             MR. NATALE:  Thank you, Your Honor, because your

16  rulings have been clear as to what you are allowing in and not.

17             THE COURT:  At least I have tried to be, maybe not as

18  clear as I should be in terms of leading questions.

19             MR. FRAZIER:  Your Honor, just on a scheduling issue.

20             THE COURT:  12:30.

21             MR. FRAZIER:  We don't have any other questions on

22  redirect.  We are ready to hear the recross to the extent the

23  Court is going to allow it.  I just wanted to let counsel know

24  that.

25             THE COURT:  Are you going to close on Agent Kavanaugh?

 1          MR. FRAZIER:  On the record in front of the jury, yes.

 2          THE COURT:  Do you have any more questions you are

 3   going to ask him at all?

 4          MR. FRAZIER:  No.

 5          THE COURT:  What I will do is, I will have you rest --

 6   I will rephrase that.  I will have you say, no more questions

 7   for Agent Kavanaugh.  I will explain to the jury that we have

 8   some matters to take up out of their presence.  Their lunch

 9   will arrive in a few minutes.  We will come back at -- Mondays

10   is a bad day because one of our jurors has his class.  We

11   usually adjourn by 4:15.

12          MR. FRAZIER:  Your Honor, we would prefer just to go

13   right into the recross.

14          THE COURT:  I would prefer as well, but the defense

15   has asked me for some latitude.  I am inclined to give them

16   some, although I recognize that not a lot happened this

17   morning.

18          MS. BAKER:  Your Honor, I don't know if it's

19   appropriate now or later, but on behalf of Mr. Hassoun, we want

20   to ask for a particular instruction at some point with respect

21   to what has happened with Mr. Kavanaugh's testimony.  The

22   instruction we would request, which I have shown the government

23   and they don't agree to it -- I'll just quickly read it.

24          The exhibits introduced by Mr. Swor during his

25   cross-examination of Agent Kavanaugh were introduced on behalf

1    of defendant Kifah Jayyousi only.  Those exhibits and related

2    testimony may be considered by you only in connection with your

3    consideration of Mr. Jayyousi's case.

4           We would like that instruction and I don't know when

5    to --

6           THE COURT:  I understand your request, but this is not

7    a situation where we have -- what we will have, for example,

8    with the bin Ladin tape where there is no evidence about

9    Mr. Padilla having seen this, discussed it.  There are, as I

10   recall -- and I don't recall off the top of my head.  Some of

11   the conversation that Mr. Swor admitted had your client in the

12   transcript, I mean, so there was no issue related as to Bruton,

13   Crawford, or any of those.

14          It may not be a tape that you like, but I think that

15   instruction is inappropriate given what has happened with those

16   particular transcripts.  There might be some other transcripts,

17   Ms. Baker, where I will agree with you, but the ones that have

18   been admitted so far by Mr. Swor, I disagree with you legally

19   and I would not entertain an instruction like that.

20          MS. BAKER:  Just for the record, then, we certainly

21   would press the objection for the record with respect to any

22   transcripts that my client is not on or a party to.  You

23   certainly may be correct, Your Honor.  I am thinking of the

24   more globally --

25          THE COURT:  There may be a transcript where I will

1  consider a similar instruction, but the ones admitted so far, I

2  am not prepared to do that today.

3          Mr. Louis?

4          MR. LOUIS:  Your Honor, I have an edited version of

5  the UBL tape, and I don't know if it's going to come up today,

6  but we had shortened it a little bit and taken out some of the

7  things we wanted to.  I would like to present that as an

8  alternative to the Court's --

9          THE COURT:  You have another edited version?

10          MR. LOUIS:  No, no, they removed short segments from

11  the government's edited version which I thought were

12  inappropriate.

13          THE COURT:  I haven't seen your version, so I can't

14  make a comparison.

15          MR. SHIPLEY:  Neither have I, Judge.

16          MR. LOUIS:  I would like to present it to the Court

17  and the prosecutor.

18          THE COURT:  I don't think we are going to get to it

19  today, are we, Mr. Shipley?

20          MR. SHIPLEY:  Hope springs eternal.

21          THE COURT:  I would suggest, Mr. Louis, that if you

22  have that tape with you now, you give it to Mr. Shipley so he

23  can take an opportunity to look at it on the break.  If you

24  have another copy, I will take an opportunity to look at it on

25  the break.

1        MR. LOUIS:  I am unable to get it off of the computer,

2   but I can play it on all the screens.  So I will stay over

3   lunch if Mr. Shipley will meet with me for five minutes.

4        MR. SHIPLEY:  This is why -- the argument from the

5   defense side initially was, we don't want this.  We have given

6   them multiple versions.  We can't be at every term, Judge,

7   coming back to an issue on which you have ruled against the

8   defense.

9        THE COURT:  What is the section you found offensive?

10       MR. LOUIS:  I took out the video portions where they

11  show people firing guns and things.  I don't believe there was

12  any discussion from Osama bin Ladin on there.  It would only

13  have been commentary by CNN.  It's gone down to only what the

14  questions to bin Ladin were and his words.

15       I brought this up to Mr. Killinger on Friday.  I tried

16  to discuss it with him.  I couldn't put it on a CD and give it

17  to him.  I just need five minutes of their time to look at it

18  and we might agree.

19       MR. SHIPLEY:  Your Honor, if what he is talking about

20  is nothing but bin Ladin's comments and questions and answers,

21  that's what we did up front.  We spent hours and hours of

22  vehement objections --

23       THE COURT:  I remember that one.  The second version

24  of that, I don't know whether it was the technique,

25  Mr. Shipley, you are getting better with that machine, or

1    whatever, but the second edited one was just a far more -- the

2    second version of the edited version was just a lot more

3    smooth.  The other one appeared as if it had been edited.  I

4    was concerned the jury might think, the way it was delivered,

5    that they might not be getting an accurate version.

6         The second version of the edited version was a lot

7    smoother, flowed better, and I thought put in context what was

8    the interview, which is why, when I looked at that, I had you

9    take out what I thought was the objectionable part from the

10   defense standpoint, what I called the talking heads portion.

11   There were other people opining about what certain things

12   meant, not Mr. bin Ladin.

13        MR. SHIPLEY:  We stand on that, Judge, and the version

14   we provided corresponded with the Court's ruling.  All this

15   suggestion of going back and forth, cutting here and cutting

16   there in the video, not of that is founded in the calls.  There

17   is nothing in the calls that suggests we watch one --

18        MR. LOUIS:  I didn't mean to bring this whole issue

19   up, Judge.

20        THE COURT:  Bring the jury in.  I am going to have you

21   finish your questioning with Agent Kavanaugh.  I am going to

22   have the jury ready at 1:30.  We will come back at 1:20, 1:25,

23   I will take a look at it with everybody in here and we'll deal

24   with it.

25        MS. BAKER:  Your Honor, at that time we do have some

 1  further requests with respect to that interview that we haven't

 2  had a chance --

 3          THE COURT:  I am not arguing anything else about the

 4  interview.  We had two days of hearings.  I have the two

 5  versions of the instruction.  I have the one that I have kind

 6  of put together, and we will go from there.  We are not arguing

 7  anymore about the videotape.  If you have another version you

 8  want to submit, type it up, give it to Ivan.  No more hearings

 9  on that issue.  On the instruction.

10          Jury, please.

11              [The jury returns to the courtroom].

12          THE COURT:  Thank you very much, ladies and gentlemen.

13  You may be seated.

14          Mr. Frazier, do you have any further questions for

15  Agent Kavanaugh?

16          MR. FRAZIER:  No, Your Honor, no further questions of

17  this witness.  Thank you, Agent Kavanaugh.

18          THE COURT:  Ladies and gentlemen, normally at this

19  time we would conclude with Agent Kavanaugh.  As you know, we

20  proceed by direct and then cross-examination.  Because of the

21  circumstances of this case, the defense will be allowed what we

22  call a recross.

23          We are going to start our lunch a little earlier

24  today, 12:15.  You all are going to come back at 1:30.

25  Remember, no talking about the case.  Don't let anyone talk to

1    you about the case.  I will see everybody back at 1:30.

2                    [The jury exits the courtroom].

3              THE COURT:  For the record, counsel, Robin informed me

4    that on Friday afternoon she found some left over versions,

5    copies of the bin Ladin interview.  So they are in Robin's

6    custody.  She just didn't want to leave them around the

7    courtroom, the DVD.

8              I will see everyone back at 1:30.  1:25 for you all.

9              MR. SWARTZ:  I know the Court doesn't want to hear

10   anything more about the tape.

11             THE COURT:  Not only is the horse dead, Mr. Swartz,

12   the autopsy has been done.

13             MR. SWARTZ:  Could I just add, I don't want to turn

14   this into the Nicole Smith autopsy --

15             THE COURT:  Whatever.

16             MR. SWARTZ:  I just want to make one request so the

17   Court can -- so I say it.  Your Honor, there is a transcript of

18   this interview.  I would suggest that because of the prejudice

19   that is attached to the video, I mean the image of bin Ladin

20   himself, that an alternative could be to take the transcript,

21   you have the words, the questions and answers --

22             THE COURT:  We are going to show the edited version of

23   the interview.

24             [There was a recess for the noon hour].

25             MR. FRAZIER:  Judge, just one brief issue so we

1    understand the scope of the recross, Your Honor.

2           THE COURT:  I don't know if it's going to be brief.  I

3    am hoping it is brief.  It is definitely limited to the areas

4    of the redirect.  The areas of the redirect.

5           MR. FRAZIER:  My understanding, Your Honor, was that

6    it only came up in regard to that fax, that new fax that we put

7    in on redirect, which was 216F/FT.  That's what we would ask

8    the scope to be limited to.

9           THE COURT:  Mr. Swartz, is that your understanding?

10          MR. SWARTZ:  No.

11          THE COURT:  What are the areas that you are seeking to

12   go into?

13          MR. SWARTZ:  Number one, the witness was asked --

14          THE COURT:  And I am not just talking about you just

15   don't like the answer on the redirect.  I am talking about the

16   substantive new areas.

17          MR. SWARTZ:  He was asked about -- this particular

18   question, when Mr. Hassoun said in the call, this is T76, about

19   his understanding of what it means, that football has a

20   priority over the hungry that are dying, and he specifically

21   said are there hungry people in this area and that area and the

22   third area?  What is your understanding?

23          He gave an opinion that money for playing football

24   takes precedence over feeding.  I didn't ask him that question

25   at all.  So I think it's a new thing that was brought out.  I

1   would like to ask this question about this concept could mean

2   that where you have people that are dying --

3           THE COURT:  That's directly from one of the

4   conversations.  It's directly from the tapes.

5           MR. SWARTZ:  Right, but this is what the government

6   has done, Your Honor.  They have done this throughout their

7   redirect.  They went to areas in conversations -- these

8   conversations are the body of area.  I don't ask about this

9   area in cross.  They decide they are going to make another

10  point on redirect because they figure we can argue it's

11  recross.

12          THE COURT:  What I want to know are specific

13  substantive areas.  The fact that the government, in their

14  redirect, makes something appear in a manner on which you did

15  not get to make it appear the way you like it on cross, that's

16  not what I am talking about.  I am talking about a

17  substantively new area.

18          MR. SWARTZ:  Wouldn't that be a substantively new area

19  if I didn't talk about it on cross?  And I didn't ask him

20  anything about Mr. Hassoun's opinion about the priorities of

21  this dying --

22          THE COURT:  That's one.  What is two?

23          MR. FRAZIER:  Your Honor, before we get to two, we

24  would certainly object to one as not a new area.  The whole

25  thrust of the cross for Mr. Swartz was, well, isn't really what

1  Adham Hassoun doing all in the pursuit of humanitarian relief.

2  It is perfectly appropriate redirect for us to go to a call

3  that has been in evidence since direct and say, now, Agent, we

4  have heard about humanitarian relief.  The alternative theory

5  is jihad.  So, what does this call tell you about what Hassoun

6  is about.

7          THE COURT:  What is your second area, Mr. Swartz?

8          MR. SWARTZ:  I have it as check 1006, where Agent

9  Kavanaugh was asked about the words on the check.  There was a

10 Koran translation.  This translation, as he gave it, was not an

11 accurate translation.  I would like to ask him how he came up

12 with that translation, if he looked at the Koran, took it word

13 for word.

14         I may have asked him about a check where the word

15 "tourism" was on it.  I don't believe it is this check.  I

16 believe it was a different check.

17         MR. KILLINGER:  No, same check.

18         THE COURT:  Those are your two areas?

19         MR. SWARTZ:  I have an area I am going to put aside,

20 Your Honor, because I think you are going to say it was

21 covered.  This is an area of Yemen.  I do think that they went

22 all over the map with the Yemen, you know, on this one.

23         THE COURT:  What do you want to ask about Yemen?

24         MR. SWARTZ:  That when Mr. -- the only time that

25 Mr. Padilla and Mr. Hassoun, the only time that those two talk

1    about Yemen, that's where -- and this is the April 10th call --

2    that's where Mr. Hassoun says -- he doesn't encourage him to go

3    to Yemen.  He says, what are you going to Yemen for?  It's the

4    same thing in Egypt.

5         The government, on their redirect, went all over the

6    calls with Mr. Youssef and Mr. Hassoun trying to find Yemen

7    here, Yemen there, Yemen everywhere, to show that he wanted

8    Padilla to go to Yemen.

9         THE COURT:  Keep going.

10        MR. SWARTZ:  The reluctance to talk on the phone with

11   Mr. Youssef.  This time Mr. -- they brought this out.  When I

12   went into cross -- by the way, this brings up an area, I have

13   asked Mr. Killinger -- we talked about this summary that was

14   redacted, where it looks like the translator who was reviewing

15   the summaries thought that they didn't want to talk because

16   Egypt may be listening.  This is the, I want to say the

17   September 1, 1996 call.

18        MR. FRAZIER:  October 23, 1996.

19        MR. SWARTZ:  October 23rd.  Now, the government went

20   into the part about listening on the phone.  When I tried to go

21   into it on cross, I was shut down on that.  The government

22   objected and said I had no basis for it.  Now he comes up,

23   suddenly he has an opinion --

24        THE COURT:  Which area are you talking about?

25        MR. SWARTZ:  There were calls that were referenced,

1  three different calls that were referenced about not safe to

2  talk on the phone, you can't talk about this over the phone,

3  talks too much on the phone.  I have the three numbers if you

4  want.

5       Mr. Kavanaugh was implying that, you know, they

6  don't -- it's not safe to talk on the phone.  These were all

7  calls that involve Mr. Youssef, two of the calls --

8       THE COURT:  What do you want to ask, Mr. Swartz?

9       MR. SWARTZ:  I want to ask him if, in fact, he is

10  aware from his investigation that in Egypt they routinely, or

11  very normally -- it's very common that the Egyptians listen on

12  your phone call.

13       THE COURT:  I foreclosed that area because there would

14  be no way for this witness to know that.

15       MR. SWARTZ:  Well, he suggested it on the redirect.

16  They have a summary where a language specialist told them that

17  that's what was going on and that's why they were talking

18  secretively from Egypt.

19       THE COURT:  That's not what came out on the redirect.

20  There was no redirect about Egypt and not talking.

21       MR. SWARTZ:  I believe there is also an area that came

22  out, this is another area that I wanted to bring out, was about

23  the blackout on the news, you don't get much information.  He

24  pointed to those areas, which I didn't cover on cross.  They

25  did it because they wanted to make a point that Adham Hassoun

1    gets the information about jihad areas because in Egypt there

2    is a restriction on the freedom of press.

3           I want to go into that to say, yeah, you know that

4    there is a restriction on the freedom of press because you

5    actually said that that's why he isn't getting the information.

6    He made the opinion, I can't get the information about these

7    areas because there's blackout.  That was one of his words.  A

8    blackout on the news, we don't get much information over there.

9           THE COURT:  The government didn't go into that area on

10   their redirect.

11          MR. SWARTZ:  I think they did, Your Honor.

12          THE COURT:  He talked about blackout on the news?

13          MR. SWARTZ:  They talked about it regarding two

14   separate calls.

15          MR. FRAZIER:  Your Honor, this went to the issue of

16   Hassoun encouraging Youssef and Padilla to come back to the

17   United States, which was their cross.  The redirect on that is

18   it's not because Hassoun wants them to come back and be relief

19   workers or come back and go do jihad; it's because the

20   information flows more freely in the United States and Hassoun

21   has a better handle on developments in jihad areas.

22          That's what it has to do with, Judge, and it was a

23   direct response to what they argued in cross.

24          MR. SWARTZ:  They get their spin on it because they

25   get the redirect and that's exactly what they were doing.

1    THE COURT:  That's what happens in redirect.  I mean,

2  sometimes on redirect, Mr. Swartz, you have a redirect where

3  there are -- where I would say there is essentially a draw, for

4  lack of a better word.  But the government has the burden of

5  proof, which is why they are allowed procedurally to have the

6  redirect.

7    I was talking about specifically, and I said in my

8  side bar that I was talking about substantively new areas, if

9  the government went into a substantive new area.  Now, one that

10 I recall off the top of my head that does not pertain to you,

11 it pertains to a specific exhibit that applies to

12 Mr. Jayyousi -- and I am certain Mr. Swor will talk about it in

13 just a moment.

14    I do not recall, and I am not saying that I would

15 recall everything, but I do not recall a specific substantively

16 new issue.  Would there be areas that you would like to recross

17 on?  I am certain there would be.  But what I am talking about

18 is a substantively new area.  So far, the areas that you have

19 outlined, I do not see a substantively new area.

20    MR. SWARTZ:  Judge, one other area I think is new.

21 The government brought out number 105, it's a phone call which

22 was not in the book in fact.

23    MR. FRAZIER:  Padilla's counsel brought it up on

24 cross.

25    MR. SWARTZ:  All right.  But I didn't get a chance to

1    question him about this.  This is August 17, 1998.  The

2    government got a chance to question him about this on redirect

3    and I did not.  I think there are some very important points to

4    bring out.  I think I have the right one.  Excuse me, Your

5    Honor.  That's the trouble with having to condense everything.

6    As you know, there are so many calls here.  I thought it was

7    105.

8            64, June 30, 1996, this is a call between Adham,

9    Mohamed Youssef and Kamal Al-Naji.  There were three new calls

10   that you alerted us to for redirect.  This is one of the three.

11   In this call, I want to cover -- this is a call between Mohamed

12   Youssef and Adham Hassoun when Mr. Youssef is in Egypt.  I

13   believe the government had mentioned this call.

14           I wanted to bring out that Mr. Youssef had spoken to

15   Adham Hassoun about the things that he is doing.  He is

16   attending knowledge classes.  He is attending lectures.  He is

17   writing articles.  He is publishing articles.  He is studying.

18   I mean, the man is very involved in an academic pursuit.  I

19   think that this is an important call and I didn't question him

20   about this call.  The government had mentioned this call.

21           MR. FRAZIER:  Your Honor, the reason why we mentioned

22   this call is, again, the defense has highlighted a perceived

23   lack of communication between Hassoun and Padilla and there are

24   only seven telephone calls, and these calls are spaced over a

25   period of months sometimes.  So, the only thing we really

1    focused on in this call was the one line on page 9 which has to

2    do with Hassoun saying, "I see Ibrahim almost every day at the

3    mosque."  It clearly invited a discussion of this nature to

4    come out in this call.

5         The second point is, this call was in evidence,

6    obviously produced in discovery, but was in evidence.  This is

7    the call we didn't have to authenticate and we just passed out

8    to the jury early in the day.  Mr. Swartz could have crossed

9    the agent on this call on cross.  Now, here we are.

10        It's an extraordinary thing, as the Court is aware, to

11   give recross.  When it's just that, oh, there is another call

12   here and there is some good stuff, when the call has been

13   produced in discovery and it has been in evidence and could

14   have been fair game for cross, I just don't think it is a new

15   area, Your Honor.

16             THE COURT:  What was the next area?

17             MR. SWARTZ:  For me, Your Honor?

18             THE COURT:  Yes.

19             MR. SWARTZ:  The area, of course, was the summary that

20   we are waiting on the government to provide.  That issue is

21   still pending.

22             MR. FRAZIER:  Here it is.

23             MR. SWARTZ:  The unredacted portion on the summary of

24   10/23/96, we should probably mark this.  This is from the

25   language specialist, "I believe they are talking about

1   Mohamed" -- that would be Mohamed Youssef -- "going to Somalia.

2   Based on my knowledge of the Egyptian intelligence practices,

3   this person, if they are listening to this conversation, and

4   they may be doing that, he will not be allowed to leave Egypt

5   and he is even liable to get arrested."  That's the entire

6   paragraph.  I didn't have this when I was originally crossing

7   the agent.

8           It was redacted.  He is implying that there is a

9   reason that they are not talking directly.  Now, we know that

10  this, in fact, is a possible reason.  This agent has been

11  investigating this case, he saw this.  It is part of his

12  investigation.  It relates to a call that was offered in

13  evidence, that the government has talked about all the time

14  with regard to codes and not talking directly, and not being

15  able to talk --

16          THE COURT:  What else, other than the summary, which

17  you have identified as what?

18          MR. SWARTZ:  The summary to October 23, 1996.  We

19  didn't give it an identification number yet.

20          THE COURT:  Was that call in evidence?

21          MR. SWARTZ:  Yes, this call was October 23rd.  I don't

22  have the T number.

23          THE COURT:  What else, Mr. Swartz?

24          MR. FRAZIER:  Your Honor, while whether Swartz is

25  looking at his notes, just on this issue, we would object to

1    any questioning because this is a language specialist

2    speculating about what may or may not be going on with the

3    Egyptian intelligence service, what their practices may or may

4    not be, and saying from there, well, Youssef may be monitored,

5    he may not be.  He may be allowed to leave, he may not be.

6         I don't see why it is proper for defense counsel to

7    cross an agent over the speculation of a language specialist in

8    a note in a summary.

9         THE COURT:  Anything else other than this that you

10   want to go into?

11        MR. SWARTZ:  Your Honor, the agent had said in his

12   cross-examination, I believe on Friday, that -- he was asked

13   whether there was a criminal investigation from '95 through

14   2002.  He said no.  They went back to this point about there

15   being an intelligence investigation and the intelligence

16   investigation was not a criminal investigation.  He wasn't

17   involved in it, but he talked about what was going on in the

18   FBI in that period of '95 to 2002.

19        Judge, I just filed a motion last week, a motion to

20   produce evidence of documents showing that there was a criminal

21   investigation regarding defendants or co-defendants in this

22   case before 1995, before the wall that the government has

23   already testified about through Agent Hukill where they claim

24   that there was no sharing between the intelligence and the

25   criminal.

KAVANAUGH - Redirect

1    Before that wall went up, I think it was initially the

2  subject of a memo by Janet Reno in '95, this investigation was

3  going on since as early as '93.  The FBI reports, as we have

4  seen, are during the period preceding this wall when there was

5  no problem with sharing intelligence with criminal agents.  In

6  fact, they have a report where the agents were following

7  defendants and the report indicates a Neutrality Act

8  investigation.

9    Mr. Hassoun himself was photographed in Boston where

10  they were holding a fund raiser for Bosnia.  Mr. Zaky was in

11  the photographs.  This is in November of '94, before any

12  prohibition against sharing intelligence occurred.

13    I think the government is misleading this jury in this

14  area to suggest that this is all intelligence, therefore, it

15  couldn't have been the subject of any criminal investigation

16  and they couldn't have shared it with any criminal

17  investigation, because they want to foreclose any argument that

18  we could make, which is, this was all known by the FBI back

19  then.  It was all available to the FBI back then before the

20  wall and you could have looked at this stuff, but you didn't.

21  Now you are saying it's a crime.

22    THE COURT:  Anything else, Mr. Swartz?

23    MR. SWARTZ:  I think that's it.

24    THE COURT:  Mr. Swartz, I don't see any of the areas

25  that you've discussed with me on the record today as being

```
 1   substantive new areas.  Are there areas that you might like in
 2   a perfect universe to be able to recross on?  I think that that
 3   might be the case.  What I reserved and what I told counsel at
 4   side bar was substantively new areas, and none of those are
 5   substantively new.
 6          MR. SWARTZ:  Even, Your Honor, summary where -- the
 7   government didn't give it to us until --
 8          THE COURT:  The summary is about a call that is
 9   already in evidence.
10          MR. SWARTZ:  That's right.
11          THE COURT:  The area that you want to talk about is
12   the area that somehow, based upon what a language specialist
13   said in a note about something that the Egyptian government may
14   or may not be doing in this particular call, is not something
15   substantively new raised by the government.
16          MR. SWARTZ:  I understand, Your Honor.
17          THE COURT:  Thank you, counsel.
18          Mr. Swor, your areas?
19          MR. SWOR:  23, Exhibit 203, 215, 216, which were all
20   introduced during the government's redirect.
21          THE COURT:  Please refresh my recollection.
22          MR. SWOR:  203 is -- that's the letter about the
23   Bosnian commanders.  No, 203 is the letter from GRF to Fat'hi
24   Shishani.  216 is the fax to Bosnia.  215 is something they
25   just introduced this morning, a fax regarding the fatwah.
```

1   There is also a conversation that they introduced, January of

2   1996.  And I want to finish up with -- if you recall, on Friday

3   I was objecting because the government didn't introduce a

4   complete conversation, and I objected several times and I said

5   I would finish it myself.

6          THE COURT:  I will allow the 203, 215, 216, and merely

7   the area on that call where the government stopped.  As I

8   recall there were about seven or eight additional pages that

9   that call went on for.

10          MR. FRAZIER:  Your Honor, we would interpose an

11   objection to 215.  This was a document that was merely

12   authenticated through this witness.  We asked no questions

13   about this document of this witness, so there is nothing to

14   cross over.

15          As to the rule of completeness issue as to that last

16   call on Friday, we were exercising our rights to complete the

17   picture on that call.  Defense counsel put that call into

18   evidence on first cross and we came back after that.  There is

19   nothing for them to complete the record on.

20          MR. SWOR:  Actually, you had sustained my rule of

21   completeness.  Mr. Frazier asked three more questions.  I

22   objected again, said that he still had not completed the

23   conversation.  Rather than have a scrum about it, when the

24   jurors obviously wanted to leave, I said to the Court that I

25   would complete it and I think the Court said, thank you,

1   Mr. Swor.

2          As far as 215 is concerned, actually there is -- even

3   assuming that it hasn't been offered into evidence, there is

4   something to cross on it.  If the Court has not admitted it,

5   there is a one question cross on that.

6          THE COURT:  215 has not been published to the jury.

7          MR. FRAZIER:  Correct.

8          THE COURT:  So I'm going to allow 203 and 216.

9          MR. SWOR:  I'm sorry, Your Honor, there is an

10  identification matter related to this.

11         THE COURT:  What is the identification matter?

12         MR. SWOR:  The witness is sitting there.  The fact

13  is -- he is not going anywhere.  He said it was an outgoing

14  fax.  It's an incoming fax.

15         THE COURT:  I will allow that question.

16         Mr. Caruso, for Mr. Padilla anything?

17         MR. CARUSO:  No, Your Honor.

18         MR. LOUIS:  Your Honor, are we going to watch --

19         THE COURT:  I am going to bring the jury in and start

20  on this issue.  If we have to break, we will break later.

21              [The jury returns to the courtroom].

22         THE COURT:  Thank you, ladies and gentlemen.  You may

23  be seated.

24         Mr. Swartz, based upon my previous statements,

25  anything further for this witness?

1    MR. SWARTZ:  Nothing further, Your Honor.

2    THE COURT:  Mr. Swor, anything further for this

3  witness?

4    MR. SWOR:  Very briefly, Your Honor.

5                  RECROSS EXAMINATION

6  BY MR. SWOR:

7  Q.  Agent Kavanaugh, do you have in front of you Exhibit 215

8  that was submitted to you for identification?

9  A.  I do not.

10    MR. SWOR:  May I approach, Your Honor?

11    THE COURT:  You may.

12  BY MR. SWOR:

13  Q.  Agent Kavanaugh, just briefly, you testified -- when you

14  were asked to identify that fax, you testified that it was an

15  outgoing fax, correct?

16  A.  I honestly don't remember.  That's very possible.

17  Q.  In fact, it's an incoming fax?

18  A.  Yes, sir, it says on the cover sheet as well as the fax

19  itself that it is an incoming fax, that is correct.

20  Q.  Thank you.  216.  You don't have any of the exhibits in

21  front of you?

22  A.  No, sir, I'm afraid I don't, just the binder.

23  Q.  Do you know what 216 is?  It's the letter to Bosnia?

24  A.  Yes, sir, I remember that one.

25  Q.  You identified the recipients as individuals who were

1  commanders of the Bosnian mujahideen?

2  A.  Yes, sir, the addressees of the letter, yes, sir.

3  Q.  Abu Ma'ali and Abu Hareth were the names of the commanders,

4  correct?

5  A.  Yes, sir, that is correct.

6  Q.  And the mujahideen in Bosnia were, in fact, a unit --

7  actually there were several mujahideen units of the Bosnian

8  Army, correct?

9  A.  That's correct, yes, sir.

10 Q.  Also in the fax it refers to our brother, Abu Omar,

11 correct?

12 A.  Yes, sir, it did.

13 Q.  And it has a version of the cause of his death, correct?

14 A.  Well, I mean it explains --

15 Q.  It says what it says?

16 A.  Yes, sir, it talks about his dying over there, yes, sir.

17 Q.  This fax was sent out approximately a week after

18 Dr. Jayyousi learned about Zaky's death?

19        MR. FRAZIER:  Objection, speculation, lack of

20 foundation.

21        MR. SWOR:  No, it's not.

22        THE COURT:  Overruled.

23        THE WITNESS:  When he first learned about his death?

24 It was the end of May, so yes, sir, somewhere in that ballpark,

25 a week or two.

1  BY MR. SWOR:

2  Q.  This fax is the beginning of June?

3  A.  Yes, sir, June 6, 1995.

4  Q.  And you are aware that the source of the information about

5  that time were the people in Turkey, correct?

6  A.  Yes, sir, that's true.

7  Q.  And later on, Dr. Jayyousi learned from Aqeel Collins and

8  other sources from Chechnya that there was a different version

9  of the facts, correct?

10  A.  Yes, sir, it's fair to say that information kind of came in

11  over time.

12  Q.  And, in fact, after this fax, every other time that

13  Dr. Jayyousi published something about Zaky's death, he told

14  people that Zaky died performing relief work, correct?

15  A.  I can't say every time, but, I mean, I have seen examples

16  of that, yes, sir.

17  Q.  Every issue of Islam Report after this date that discusses

18  Zaky's death says he died performing relief work, correct?

19          MR. FRAZIER:  Objection, he testified that he doesn't

20  know.

21          MR. SWOR:  I am refreshing his recollection.

22          THE COURT:  I wouldn't say that was refreshing

23  recollection.  If the witness knows the answer.

24          THE WITNESS:  I do not know the answer.

25          MR. SWOR:  Coward.

1  BY MR. SWOR:

2  Q.  Exhibit 203 is the fax that was sent initially by Global

3  Relief?

4  A.  Yes, sir, I recall that one.

5  Q.  This was faxed from Global Relief to Dr. Jayyousi in

6  California?

7  A.  That is how I recall it, yes, sir.

8  Q.  And then Dr. Jayyousi put some personal notes on it,

9  correct?

10  A.  Yes, sir.

11  Q.  And then he sent it to Salwa Shishani, correct?

12  A.  Again, that's my recollection, yes, sir.

13  Q.  You don't know where it went after that?

14  A.  No, sir, I do not.

15  Q.  The Global Relief part of the letter -- do you want to read

16  it?

17  A.  I remember it.  If I can't remember, I will ask.

18  Q.  -- is directed specifically to Fat'hi Shishani, correct?

19  A.  Yes, sir, that's correct.

20  Q.  The part that Dr. Jayyousi writes is a very general

21  statement of support to all our mujahideen brothers, correct?

22  A.  May I see the document again?

23  Q.  Sure.

24  A.  Thank you.  May I also see the English translation?

25  Q.  What's the date?

1   A.   It's a fax from 8, June, 1995, at 8:33.

2          Yes, sir, to answer your question, it is a statement

3   to the general mujahideen brothers, it's a broad statement.

4   Q.   A broad statement of unity?

5   A.   Yes, it expresses unity with their cause.

6   Q.   And support?

7   A.   Yes, sir.

8   Q.   And to Dr. Jayyousi's -- his expressed position was that

9   Chechnya had been invaded by Russia and the Chechens were

10  invading -- or repelling the invaders, correct?

11         MR. FRAZIER:   Objection, lack of foundation,

12  speculation.

13         THE COURT:   Sustained on foundation.

14  BY MR. SWOR:

15  Q.   Based upon your review of all the documents, all of the

16  records, all of the transcripts and everything you know about

17  this case, Dr. Jayyousi had stated on numerous occasions that

18  the Chechens had been unlawfully invaded by the Russians and

19  that the mujahideen were merely repelling an invasion?

20         MR. FRAZIER:   Objection, hearsay.

21         THE COURT:   Overruled.

22         THE WITNESS:   Yes, I have seen where he stated that,

23  yes, sir.

24  BY MR. SWOR:

25  Q.   As we ended up Friday, you were being asked questions about

KAVANAUGH - Recross

1  Jayyousi Exhibit 128.

2  A.  Yes, sir, I remember.

3            MR. SWOR:  Your Honor, may I publish to the jury?

4            THE COURT:  You may.  Which exhibit is this?

5            MR. SWOR:  128.  These is are all the exhibits that

6  the Court admitted.  I asked the Court's permission last week

7  to publish them all to the jury.  I just had them put together.

8            THE COURT:  If you approach Mr. Tucker, he will be

9  happy to give you a hand.

10 BY MR. SWOR:

11 Q.  This is a phone call between Salwa Shishani and

12 Dr. Jayyousi, correct?

13 A.  128?

14 Q.  It's dated 6/17/95, at 12:14 p.m.  It is the second tab in

15 the binder.  I'm sorry, it is 118, not 128.  I apologize.

16 A.  Yes, that's correct.

17 Q.  JE 118.  You were asked about a conversation that went on

18 page 4, correct, about Salwa Shishani expressed some concern,

19 Dr. Jayyousi answered, attempting to assuage her concerns,

20 correct?

21 A.  Yes, sir.

22 Q.  Then she told history about Abu Omar, correct?

23 A.  Yes, sir.

24 Q.  And Zaky's work?

25 A.  That's correct.

1          MR. FRAZIER:  Your Honor, I will object.  Can we

2   approach?

3                [Proceedings at sidebar follow]:

4          MR. FRAZIER:  Your Honor, my understanding of the

5   Court's ruling as to the rule of completeness issue that was

6   being discussed was that it pertained to Jayyousi's Exhibit

7   128, specifically what appears on page 4, Al Khattab.  Remember

8   I said there were five more pages to this call and we moved on.

9          This is not the exhibit that we were talking about.  I

10  don't have a problem with him publishing exhibits to the jury.

11  I thought the recross was going to be limited to that.

12         MR. SWOR:  I will look back.  If that's what my notes

13  say, then we'll move on.  No problem.

14         THE COURT:  Thank you very much, counsel.

15              [Proceedings in open court follow]:

16         MR. SWOR:  Your Honor, I'm sorry.  This was not the

17  call that I intended to ask about.  If the Court will excuse

18  me.

19  BY MR. SWOR:

20  Q.  In the binder it's June 30, 1996, Jayyousi 128.  Turn to

21  page 4, please, where they are talking about Ibn Khattab.

22  A.  Yes, sir.

23  Q.  June 30, 1996, at 3:12, Jayyousi Exhibit 128, the fourth

24  from the back.  Now, you identified Ibn Al Khattab, correct?

25  A.  Yes, sir.  The tab does say 3:12 for the time, but the call

1  I have says 14:03.  I do believe this is the right call,

2  because I remember the call.  I think the tab has got the wrong

3  time, but I do remember this call.

4  Q.  I am so getting my money back from Kinkos.

5          You identified Ibn Al Khattab based upon what you

6  learned since you came on board this case, correct?

7  A.  Yes, sir.

8  Q.  And to say that this case has taken years of reading and

9  study and investigation would probably be an understatement,

10  correct?

11  A.  Correct, yes, sir.

12  Q.  And Khattab was a Chechen commander?

13  A.  He was not Chechen by birth.  He was a commander in

14  Chechnya, yes, sir.

15  Q.  Thank you.  But he had an organization that was larger than

16  just fighters, correct?

17          MR. FRAZIER:  Your Honor, I will object.

18          THE COURT:  Sustained.  Mr. Swor, please.

19          MR. SWOR:  Okay.

20  BY MR. SWOR:

21  Q.  Based upon your study and your knowledge of the records,

22  the transcripts, your other study, you know that Ibn Al Khattab

23  also had people who did other functions who were related to

24  him?

25          MR. FRAZIER:  Again, Your Honor, I will object.  This

1   goes to the 701, 703 scope of this witness's testimony.

2          THE COURT:  The witness may answer the question, but I

3   want to move through to the transcript, Mr. Swor.

4          MR. SWOR:  I'm just trying to --

5          THE COURT:  The objection is overruled.

6          THE WITNESS:  Yes, sir, his organization was broad and

7   encompassed more than just the fighting element, yes, sir.

8   BY MR. SWOR:

9   Q.  So, in the conversation Dr. Jayyousi talks about working

10  with Khattab's people, correct?

11  A.  Yes, sir.

12  Q.  In page 5, and I really don't want to read word for word

13  and page for page, Aqeel Collins is talking to Dr. Jayyousi

14  about relief work in Chechnya, correct?

15  A.  Yes, sir, they are talking about from Baku for the purpose

16  of Chechnya, that is what they have been talking about to this

17  point.

18  Q.  According to the quotes that you read on Friday, Aqeel

19  Collins was making statements about not being able to trust

20  people, correct?

21  A.  Yes, yes, he said that.

22  Q.  And according to the comments that you quoted from the

23  transcript on Friday, Dr. Jayyousi said that's why he is

24  working with Khattab's people and also with IHH, correct?

25  A.  That's exactly correct, yes.

1  Q.   On page 5, about the middle, Dr. Jayyousi says, "Same thing

2  with IHH, let me, uh -- that's why I said, okay, I am not going

3  to do any of this," correct?

4  A.   Yes, sir.

5  Q.   Dr. Jayyousi says, "I am out of it, I don't even want to

6  deal with it," correct?

7  A.   Yes, sir.

8  Q.   He says, "There's so much, uh, we are not there for this,"

9  correct?

10  A.   Yes.

11  Q.   He differentiates, he says, "Brother Mohamed Zaky went

12  there at a time when things were very different," correct?

13  A.   Correct.

14  Q.   Aqeel Collins is doing about the same thing that you are

15  doing?

16  A.   Yes, he is, yes.

17  Q.   Then Dr. Jayyousi says, "And truly, I don't want to -- I

18  don't want to -- there are more important things to be done

19  somewhere else in the world than go through this headache,"

20  correct?

21  A.   Yes.

22  Q.   "And that's why I decided I don't want to even deal with

23  it," correct?

24  A.   Yes, sir.

25  Q.   Then he says, "Unfortunately, as bad as it is, that's where

1  we are," correct?

2  A.  That's how he says it, yes, sir.

3  Q.  Then on the next page, there is more of that conversation

4  and then about the middle of the page Dr. Jayyousi says, "It's

5  not right, and, uh, you know, everybody is suffering because of

6  that," correct?

7  A.  Yes.

8  Q.  And Aqeel Collins says, "There are hundreds of people

9  sitting in Istanbul right now waiting to go," correct?

10  A.  Yes.

11  Q.  Dr. Jayyousi says, "Yeah.  So what we can do, dot, dot,

12  dot, I don't want to be part of any of this, that's not my

13  business," correct?

14  A.  Yes, sir.

15  Q.  Dr. Jayyousi, further down says, "My brother," and from the

16  underline we assume that that's in Arabic, right?

17  A.  That's correct, that's what that means.

18  Q.  "You have given me the option all the time and please

19  forgive me.  If I made the wrong decision, that's for myself,"

20  correct?

21  A.  Yes, sir.

22       MR. FRAZIER:  Your Honor, I will object.  I think this

23  goes beyond the scope of what was allowed for counsel.  It was

24  covered on cross.  He is just reading from the transcript.

25       THE COURT:  Overruled.

1    BY MR. SWOR:
2    Q.   The next page, page 7, Dr. Jayyousi says to Aqeel Collins,
3    "At the time I asked you to help us out" --  "Ah-ha," is the
4    reply.  -- "in finding out what the situation is."
5    A.   Yes, sir.
6    Q.   Then Aqeel Collins says, "Ah-ha."  Then Dr. Jayyousi says,
7    "You went back there and you found out all of that stuff,"
8    right?
9    A.   Yes, sir.
10   Q.   Dr. Jayyousi says, "And then we made the discussion we are
11   not going to go through this," correct?
12   A.   Correct.
13   Q.   Then Aqeel says something, and Dr. Jayyousi says, "We -- we
14   can't do that."  Aqeel says, "Oh come on."  Dr. Jayyousi says
15   again, "Aqeel, we can't do that."
16   A.   Correct.
17   Q.   Then there is back and forth for the rest of the page,
18   correct?
19   A.   Yes, sir.
20   Q.   On page 8, at the very top, Aqeel says they are the ones
21   that are part of the problem.  Dr. Jayyousi says, "Well, it --
22   true, they are the ones who started and, believe me, I don't
23   want to be part of it.  It's as simple as that."  Aqeel says,
24   "All right.  We -- we want to, uh, to stick to the same goal we
25   started with all of this, with relief.  If we are allowed to

1  carry out the relief work, fine.  If we are not, I don't want

2  us to spend any more effort on it.  If someone else wants to go

3  there on his own and do whatever he wants, that's fine, but not

4  through the organization.  I don't want to even indulge into

5  that problem.  That's -- that's the whole issue." Correct?

6  A.  Correct.

7  Q.  Then they have some personal conversation between the two

8  of them for the rest of the page?

9  A.  Yes, sir.

10 Q.  On page 9, which really is the last page, Dr. Jayyousi

11 talks about hypocrites.  He talks about how Mohamed Zaky dealt

12 with them?

13 A.  Correct.

14 Q.  He was always focused on the main thing, correct?

15 A.  Correct.

16 Q.  Essentially, that was the end of the conversation?

17 A.  Yes, sir.  They say their good-byes and that's it.

18         MR. SWOR:  Good-bye.

19         THE WITNESS:  Good-bye.

20         THE COURT:  Counsel for Mr. Padilla, any questions for

21 this witness?

22         MR. CARUSO:  No thank you, Your Honor.

23         THE COURT:  Thank you very much.  Agent Kavanaugh, you

24 are excused.

25                   The witness was excused].

1            THE COURT:  Counsel for the United States, are you

2    prepared with your next witness?

3            MR. SHIPLEY:  Yes, Your Honor, we are.  Can we go side

4    bar just for one moment?

5                 [Proceedings at sidebar follow]:

6            MR. SHIPLEY:  I may get to the video before we break.

7            THE COURT:  Let's see if we can get some testimony.

8            MS. BAKER:  Before we begin, Mr. Shipley and I

9    discussed this.  We objected to -- on expert witnesses, one of

10   the things I stated in writing is that our experts were

11   retained and enlisted to review and refute their, the

12   government's expert testimony.  Therefore, we understand that

13   we can share, in terms of, let's say, sharing of daily copy or

14   after the fact, the testimony of Dr. Gunaratna with our expert

15   for purposes of our expert to be able to refute that testimony.

16           MR. SHIPLEY:  We can do that at day's end.  She wants

17   to show daily copy to the expert.  There is case law --

18           MS. BAKER:  I have case law on my side.

19           THE COURT:  I have had situations where the expert is

20   sequestered, but allowed in the courtroom.

21           MR. SHIPLEY:  As Ms. Baker knows, there is a former

22   Fifth Circuit case --

23           MS. BAKER:  We disagree with the interpretation.

24           THE COURT:  Do you have another case?

25           MS. BAKER:  Yes, I do.  Your Honor, there are several

1   areas of the examination of this expert that we moved in limine

2   to exclude.

3           MR. SHIPLEY:  What issues are outstanding?

4           THE COURT:  Monday is the day that we have to let the

5   jury go at 4:30.  Are we going to reach that area that she

6   is --

7           MR. SHIPLEY:  No, I don't think we'll get there this

8   afternoon.  I think mostly we are going to talk about general

9   things related to Al-Qaeda.  We might get to the video today.

10  One point I did want to raise just so it's clear, obviously, on

11  some occasions in this case you have allowed voir dire with

12  regard to qualifications on experts where we have not had a

13  Daubert issue.  There is no dispute about this expert's

14  qualifications in light of the Court's ruling on the Daubert.

15  They can cross all they want on qualifications, but I don't

16  think it's appropriate to voir dire given --

17          MS. BAKER:  I don't have any problem with that.  We

18  may have a huge problem on the scope.  Mr. Shipley just said we

19  are going to talk about Al-Qaeda.  We have a major scope issue.

20  We think that only, you know, evidence relevant to what these

21  defendants --

22          THE COURT:  Let me say this.  Let's see if we can,

23  this afternoon, it's about 2:25, get through qualifications.

24  Maybe I have been taking this the wrong way, thinking about

25  this as a trial.  Maybe if I just think about each witness as

1    an individual exercise it might let us advance forward.

2              MR. LOUIS:  Judge, we don't know what he is going to

3    say.

4              THE COURT:  Let's see what happens.

5               [Proceedings in open court follow]:

6              THE COURT:  Ladies and gentlemen, our next witness is

7    on another floor and he'll be here shortly.

8              MR. SHIPLEY:  For the record, Your Honor, the United

9    States will call Dr. Rohan Gunaratna.

10             Your Honor, while we're waiting, one more issue at

11   side bar.

12              [Proceedings at sidebar follow]:

13             MR. SHIPLEY:  I'm sorry, Judge.  I did just want to

14   make clear on the record on the subject of 9/11, there may be

15   during the course of his qualifications some testimony that may

16   refer to his testifying before the 9/11 Commission, his work

17   was cited in that report.  He is going to testify about some of

18   the timings on other --

19             THE COURT:  First of all, I said this before,

20   Ms. Baker, and I am not changing my mind now, we know that 9/11

21   occurred.  For him to say as part of his qualifications, I did

22   X, I don't have a problem with that.

23             MS. BAKER:  I just want to bring up our responding

24   issue.  We have some impeachment of him that deals with his

25   testimony before the 9/11 Commission.  We decided we better not

1  go there least Your Honor will read it as an opening of the

2  door to 9/11.  If he is allowed to bring in his qualifications

3  with regard to the 9/11 Commission, there is serious

4  impeachment as to his testimony and --

5       THE COURT:  As I said before, Ms. Baker, and I said it

6  to you specifically, we have taken great pains to limit how

7  9/11 became an issue in this trial.  If we start down that

8  path -- if he says -- let's assume a doctor worked at Jackson

9  Hospital and he worked there for several years, but was fired

10 for sexual harassment.  If the fact that he was fired for

11 sexual harassment had nothing to do with what happened in the

12 case, that probably would not be impeachable if that were his

13 job.

14      What I need to know, Mr. Shipley, is he going to opine

15 on things that he opined on that were discredited?

16      MR. SHIPLEY:  No, absolutely not.

17      MS. BAKER:  We disagree.

18      THE COURT:  This is what is going to happen.  I think

19 all of you, meaning all of the defendants' counsel, need to

20 talk about this before we have a full issue on it.  When we get

21 there, I am going to allow him to get to that point to say that

22 he testified before the 9/11 Commission.  You all, Ms. Baker,

23 need to think long and hard before you decide to attack or go

24 down that road.

25      MS. BAKER:  That's why I tagged it.  Thank you.

```
 1                    [Proceedings in open court follow]:
 2               THE COURT:  Sir, please state your name for the ladies
 3     and gentlemen of the jury, and spell your last name.
 4               THE WITNESS:  Rohan Kumar Gunaratna,
 5     G-U-N-A-R-A-T-N-A.
 6               THE COURT:  Thank you.  Counsel, you may proceed.
 7               ROHAN GUNARATNA, GOVERNMENT'S WITNESS, SWORN
 8                         DIRECT EXAMINATION
 9     BY MR. SHIPLEY:
10     Q.  Good afternoon, Dr. Gunaratna.
11     A.  Good afternoon.
12     Q.  One suggestion before we go forward, it is very important
13     that you keep your voice up so the court reporter can take down
14     everything that you say and the jury can hear what you are
15     testifying to.
16               What do you do, Dr. Gunaratna?
17     A.  Currently, I am the head of the International Center for
18     Political Violence and Terrorism Research.
19     Q.  Where is that located?
20     A.  That is located in Singapore.
21     Q.  That is in Asia, correct?
22     A.  Yes, please.
23     Q.  Were you the founder of that center?
24     A.  Yes, I created that center.
25     Q.  When was that?
```

1   A.   It originally started as a program in mid 2002, and it was

2   upgraded to a status of a center in 2004.

3   Q.   How large is the center?

4   A.   It is perhaps the largest sitting research counter

5   terrorism center in the academic world outside Europe and North

6   America.  It has about 32 staff members working in Singapore.

7   We also have other field researchers from Afghanistan to

8   Pakistan to the Phillipines.

9   Q.   Do the staff of the center come from a variety of

10  countries?

11  A.   Yes, it's a multi-national center.  We have Americans,

12  Europeans, Middle Easterners and Asians.

13  Q.   Do they also come from a variety of religious faiths?

14  A.   Yes, they represent many of the major religions of the

15  world.  Fifty percent of the staff are Muslims.

16  Q.   Now, is this center affiliated with a university in

17  Singapore?

18  A.   Yes, the center is located within the premises of the

19  Nanyang Technological University in Singapore.

20  Q.   Are you a professor at that university?

21  A.   I am an associate professor at that university.

22  Q.   Is the center affiliated with any other universities in the

23  United States or elsewhere in the world?

24  A.   Yes, the center has many affiliations in Asia and in the

25  Middle East, but in the United States it works very closely

1    with the United States Military Academy at West Point.  It also

2    works with the Fletcher School for Law and Diplomacy at Tufts

3    University.  It also works with the Memorial Institute for the

4    Prevention of Terrorism in Oklahoma.

5    Q.   Now, how many years have you spent studying the fields of

6    terrorism and political religious violence?

7    A.   I worked in that field for about 24, 25 years.

8    Q.   Until recently, have you held any fellowships?

9    A.   Yes, until last year, I was a senior fellow at the United

10   States Military Academy at West Point known as the Army School,

11   at their Combating Terrorism Center, and currently I hold three

12   appointments in the United States.  One is, I am a senior

13   fellow at the Fletcher School for Law and Diplomacy at the

14   Egyptian Center for Counter Terrorism Studies.  I am also a

15   member of the steering committee of George Washington

16   University's Homeland Security Center.  I am also a senior

17   fellow at the National Memorial Institute for the Prevention of

18   Terrorism in Oklahoma.

19   Q.   You mentioned the Fletcher School.  Is that in

20   Massachusetts at Tufts University?

21   A.   Yes.

22   Q.   What was your title when you were at West Point, the U. S.

23   Military Academy, what was your title there?

24   A.   I was a senior fellow.

25   Q.   What did you do as a senior fellow at West Point?

GUNARATNA - Direct

1  A.   I used to teach the cadets at West Point, and I used to

2  work very closely with the faculty of the Combating Terrorism

3  Center at West Point.

4  Q.   Do you also have a relationship with George Washington

5  University here in the United States?

6  A.   Yes, at the George Washington University, at their Homeland

7  Security Center, I served on the steering committee of that

8  university center.

9  Q.   Could you tell the jury, have you also done work with the

10  North Atlantic Treaty Organization, or NATO, as it's known for

11  short?

12  A.   For three years I co-chaired the naval working group on

13  counter terrorism.  The other chair was General Rushower, who

14  founded the center.  Together we planned the strategy to

15  transfer some of the knowledge on counter terrorism to eastern

16  European countries.

17  Q.   Now, let me take you back to your home, Singapore, and your

18  center.  What does the International Center for Political

19  Violence and Terrorism Research do?

20  A.   We have three co-programs.  One is, we manage one of the

21  largest terrorism databases in the world.  It has terrorist

22  group profiles, terrorist personality profiles, terrorist

23  attack profiles.  It also has a large collection of primary and

24  secondary documents.

25          The second program is to build capacity to create

GUNARATNA - Direct

1    counter terrorism research centers in conflict zones.  We have

2    created one in Kabul in Afghanistan and also in Pakistan, and

3    we are creating other centers in Asia.

4           The third is a project on strategy counter terrorism,

5    how to create an environment which is difficult for terrorists

6    to generate support, and also an environment which is difficult

7    for terrorists to operate.

8    Q.   At the center, do you work with governments, with countries

9    around the world?

10   A.   Yes, we work with a number of governments.

11   Q.   Do you also consult with policy makers and policy groups in

12   different countries around the world?

13   A.   Yes, we do that.

14   Q.   You mentioned a document collection that you maintain at

15   the center.  When you were talking about that you referred to

16   primary sources.  Just so we are clear, what is a primary

17   source as opposed to a secondary source?

18   A.   Primary sources are mostly material collected from the

19   field from conflict zones.  Primary sources are also interviews

20   conducted with people who are participants in a conflict, as

21   opposed to secondary sources are material that is published.

22   It could be secondhand material.  One would always try to gain

23   access to the primary sources because they are invaluable.

24   Q.   Now, how extensive is this document collection that you

25   maintain?

GUNARATNA - Direct

1    A.  It is currently one of the largest collections in the

2    world, particularly on Al-Qaeda, it is considered one of the

3    best collections even by government agencies.

4    Q.  Where do these documents come from that you have in your

5    center?

6    A.  They come mostly from conflict zones.  For instance, from

7    Afghanistan, we have original Al-Qaeda collection which

8    consists of original papers and documents recovered from the

9    safe houses of Al-Qaeda and of the Arab mujahideen in

10   Afghanistan.

11   Q.  Are these materials at the center, are they available for

12   consultation by governments or policy makers or the

13   researchers?

14   A.  Yes, in fact, we will verify the identity of the

15   researcher, that the researcher is a bona fide researcher, and

16   we will provide access on a selective basis.

17   Q.  You mentioned your specialty in counter terrorism, or what

18   you call CT; is that right, for short?

19   A.  Yes.

20   Q.  What does that involve?

21   A.  There are three branches of combating terrorism.  One is

22   Operation Counter Terrorism, that is catch, kill, disruption.

23   Second is anti-terrorism, anti-terrorism is protection and

24   prevention.  Third, the strategy counter terrorism, that is,

25   you create an environment that is hostile to the terrorists and

1  unfriendly to its supporters.

2  Q.  Is your focus at the center on preventing terrorism?

3  A.  Mostly.

4  Q.  To do that, do you have to have a knowledge of past acts of

5  terrorism for political religious violence?

6  A.  Yes, because past acts provide deep insight into current

7  threat and how the threat may change over time.

8  Q.  Do you provide training yourself or through the center on

9  counter terrorism issues?

10  A.  Yes, we are one of the major training centers in the Asian

11  region, but I, myself, did a number of training programs in the

12  United States for a number of government agencies.

13  Q.  In your position, do you consult with policy makers within

14  government?

15  A.  Yes, we do that all the time.

16  Q.  Without going into some of the specifics, can you give a

17  few examples for the jury?

18  A.  I worked very closely with the New York Police Department

19  to create the intelligence division of NYPD soon after 2001.  I

20  also worked very closely with the Terrorism Research Center in

21  the United States to create a new course called the

22  [unintelligible] training program for U.S. military and for

23  Navy SEAL teams.

24  Q.  Now, is there a particular area of political or religious

25  violence that you focus on in your work and research?

GUNARATNA - Direct

1   A.  I work on political religious groups, but with a special

2   focus on the Islamic organizations.

3   Q.  Have you studied radical Islamist groups or organizations?

4   A.  Yes, I have.

5   Q.  Extensively?

6   A.  Yes.

7   Q.  Is that one of your specialties?

8   A.  Yes.

9   Q.  Let me step back before I go further into that subject.

10  Where did you grow up?

11  A.  I grew up in a small country called Sri Lanka, it's in

12  Asia.

13  Q.  Did your experience in Sri Lanka affect your interest today

14  in terrorism issues?

15  A.  Yes, very much, because in Sri Lanka we suffered a lot from

16  terrorism.

17  Q.  What was the nature of the conflict in Sri Lanka?

18  A.  In Sri Lanka it was a political conflict as opposed to a

19  political religious conflict.  There was a group called the

20  Tamil Tigers, and they were in constant conflict with the Sri

21  Lankan state.

22       MS. BAKER:  Objection, Your Honor.  I think this is

23  beyond the scope.

24       MR. SHIPLEY:  My next question is going to be about

25  how that fits in with his experience, the background study,

1   Judge.

2           THE COURT:  I will let you continue at this point,

3   Mr. Shipley.  For now the objection is overruled.

4   BY MR. SHIPLEY:

5   Q.  You were discussing that conflict in Sri Lanka.  Did you

6   actually study that conflict and work with the government in

7   Sri Lanka relating to that conflict?

8   A.  Yes, I did.

9   Q.  Subsequent to that work in Sri Lanka, did you obtain a

10  Master's degree in the United States?

11  A.  Yes, in 1994, I came to the United States on a fellowship,

12  and in 1995, I went to school in the United States and I got a

13  Master's degree at the University of Notre Dame.  I earned a

14  Master's degree in international peace studies.

15  Q.  International peace studies?

16  A.  Yes, please.

17  Q.  Did you subsequently obtain an additional degree?

18  A.  Yes, after I finished my Master's degree at the University

19  of Notre Dame, I traveled to the United Kingdom and I studied

20  at the University of St. Andrews in Scotland, where I obtained

21  a PhD in international relations.

22  Q.  Did you prepare a thesis or a large body of written work

23  while you were doing your PhD in Scotland?

24  A.  Yes, I prepared a Master's thesis, I prepared it on

25  Diaspora support for terrorist networks.

1   Q.  Can you just tell the jury, Diaspora support, what are you

2   referring to?

3   A.  Diaspora support means -- Diaspora means migrants beyond

4   the first generation, but a group of people who will preserve

5   their ethnic and religious identity and also will have those

6   linkages to their home countries.

7   Q.  By migrants, are you referring to people who have left

8   their home countries and gone to someplace else?

9   A.  Yes, certainly.

10  Q.  Did your thesis study how those groups were involved with

11  people still back in the country they came from and conflicts

12  there?

13          MS. BAKER:  Your Honor, objection, this is leading.

14          THE COURT:  For foundation purposes, I will allow it.

15  Mr. Shipley, you may continue.

16          THE WITNESS:  Yes, please.

17  BY MR. SHIPLEY:

18  Q.  In addition to what you have talked about already, have you

19  been awarded any fellowships by any organizations?

20  A.  Yes, I received a number of fellowships.  Because I came

21  from Sri Lanka, it was necessary for me to have these

22  fellowships to study.  I received the Hesburgh Scholarship to

23  do my Master's in the United States, and I received a British

24  Chevening Scholarship from the Foreign Office, or what you call

25  the State Department, the equivalent in the U.S.  I received

GUNARATNA - Direct

1  that from the UK, and that is called a British Chevening

2  Scholarship.

3  Q.  The first scholarship that you mentioned, that was at Notre

4  Dame, correct?

5  A.  Yes.

6  Q.  Have you been awarded any fellowships from the Ford

7  Foundation?

8  A.  Yes, when I was a visiting scholar at the University of

9  Illinois, at the Office of Arms Control, Disarmament and

10  National Security, I received a Ford Fellowship to work there

11  as a visiting scholar for a very short period of time.  I also

12  received a similar fellowship when I was at the University of

13  Maryland.  I received a foreign policy fellowship to work at

14  the security center there.

15  Q.  Have you received any grants for terrorism related research

16  over your career?

17  A.  Yes, I received a number of grants.  I received one grant

18  from the United States Institute of Peace in Washington, D.C.

19  to study suicide terrorism.  I also received a grant from the

20  Defense Evaluation Research Agency, which is the research wing

21  of the Ministry of Defense in the UK, to study terrorist

22  information operations.  I also received a grant from the

23  United Nations Terrorism Prevention Branch to study terrorist

24  escalation.  I received those three grants when I was doing my

25  PhD, and subsequently when I was at the University of St.

125

GUNARATNA - Direct

1  Andrews in Scotland.

2  Q.  Now, you also have done extensive work in building

3  databases of terrorism related information, correct?

4  A.  Yes.

5  Q.  We talked a little bit about the database at your center.

6  Have you helped create similar databases and worked with

7  similar sets of documents in other places?

8  A.  Yes, soon after September, 2001, I built -- I led the team

9  that built the database for the United Nations.  It was a data

10  base for the U.N. monitoring group into the mobility, weapons

11  and finance of Al-Qaeda, Taliban and their entities.  And the

12  team that built the database, I led that team.

13  Q.  Was that while you were in the UK?

14  A.  That was when I was in Singapore.

15  Q.  Now, Singapore is in Asia, correct?

16  A.  Yes, please.

17  Q.  How extensively, in the course of your professional work,

18  have you traveled through Asia and the Middle East?

19  A.  I've traveled extensively in Asia and the Middle East.

20  Since 1993, I have been traveling extensively in Pakistan.

21  Since 1989, I have been traveling in east Asia, the

22  Philippines, Indonesia, Malaysia, those countries.  Since the

23  late 1970s, I have been traveling in the Middle East, first as

24  a student in North Africa, and subsequently the Middle East.

25  Q.  Now, you mentioned Pakistan.  Have you had any academic

GUNARATNA - Direct

1  positions in that country?

2  A.  Yes, from 1993 through 1996, I was a visiting fellow at the

3  Institute of Strategic Studies in Islamabad in Pakistan.

4  Q.  Islamabad is the capital of Pakistan, correct?

5  A.  Yes, it is the capital.

6  Q.  What did you do there?

7  A.  As a visiting fellow at the Institute of Strategic Studies

8  in Pakistan, I mostly researched the jihad organizations that

9  were based in Pakistan.

10  Q.  Did you mean Islamist jihad organizations?

11  A.  Yes.

12  Q.  Have you traveled to Pakistan on subsequent occasions as

13  well?

14  A.  Yes, I visited Pakistan more than ten times, and I was

15  there just very recently, about two months ago.

16  Q.  What did you do with the information you gathered during

17  your stint as a visiting fellow in Islamabad?

18  A.  When I was a visiting fellow there I collected a large

19  amount of material on Kashmir, which I presented to the Peace

20  Studies Institute at the University of Notre Dame.

21  Subsequently, the material I gathered, we had them at the

22  University of St. Andrews at the Terrorism Research Center

23  there.  And the subsequent material that I gathered after I

24  moved to Singapore, the material that was collected in Pakistan

25  has now formed a part of the terrorism database in Singapore.

1  Q.  Now, are you a Muslim?

2  A.  I am not a Muslim.

3  Q.  Are you familiar with Islam as it relates to your work and

4  your research?

5  A.  Yes.  I am not a scholar on Islam, but I am a specialist on

6  terrorism.  But as it relates to terrorism, yes.

7  Q.  Is that so as it relates to radical Islamist groups and

8  Islamist terrorism?

9  A.  Yes.

10  Q.  Are you familiar with the history and the culture of Islam

11  as it relates to radical Islamic groups?

12  A.  Yes, please.

13  Q.  Are you aware of portions of the Koran or other Muslim

14  religious texts that are relevant to your work?

15  A.  Yes.

16  Q.  Now, do you speak Arabic or any other language from that

17  part of the world?

18  A.  I do not speak Arabic.

19  Q.  What languages do you speak?

20  A.  I speak a language called Sinhalese and I speak English.

21  Q.  Now, when you work with documents in Arabic, do you have

22  them translated?

23  A.  Yes, we have a separate section in our center called the

24  Middle East unit.  That unit is staffed by people who speak the

25  Middle Eastern languages, as well as some Asian languages like

1    Urdu.

2    Q.   Urdu is the language spoken in Pakistan, correct?

3    A.   Yes, that's correct.

4    Q.   Does your center employ any Muslims?

5    A.   Yes, fifty percent of the center staff are Muslims.  The

6    very reason the Muslim staff are employed is because it is

7    important to have an understanding of the language and the

8    religion.

9    Q.   And do you consult with those individuals at your center

10   and in your research around the world?

11   A.   Constantly.

12   Q.   Now, let me talk for a moment about your publications.

13   Have you published any books?

14   A.   Yes, I have published about ten books.

15   Q.   Do those books relate to terrorism?

16   A.   Most of those books.

17   Q.   Have you published a book called Inside Al-Qaeda?

18   A.   Yes, I have published a book titled Inside Al-Qaeda.

19   Q.   Has that book been published in a number of countries?

20   A.   Yes, it has been published in the UK and a number of

21   countries.  It has also been published by Columbia University

22   Press in the U.S., as well as by Berkeley Books, the soft pack.

23   Q.   Generally, what is the subject-matter of that book?

24   A.   It is a book on the Al-Qaeda organization and its network.

25   Q.   When was that book published?

1   A.   That book was published in 2002, the first edition.

2   Q.   When did you start writing that book?

3   A.   I started to write that book in 2000.

4   Q.   Even before that, had you done research into Al-Qaeda?

5   A.   Yes, I have.

6   Q.   Did you publish -- prior to the publication of your book,

7   had you published any articles on Al-Qaeda?

8   A.   Yes, in fact, one month before September, 2001, I published

9   a cover story article in the leading intelligence journal,

10  Intelligence Review, and that was on the Al-Qaeda organization.

11  Q.   Have you published other books aside from Inside Al-Qaeda?

12  A.   Yes, I have published a number of books.

13  Q.   Have you also edited books?

14  A.   Yes, I have edited a large number of books.

15  Q.   As an editor, what is your role in those publications?

16  A.   I would identify the most appropriate chapters, I would

17  edit them, and I would put them in a manner where the reader

18  will have a good idea of what is happening with regard to those

19  subjects or those organizations.

20  Q.   And you mentioned one a moment ago, but have you also

21  published studies or articles about these groups that you write

22  about?

23  A.   Yes, I have published a number of articles in reference

24  journals.   I also serve on the editorial boards of the two

25  leading counter terrorism journals in the world.

GUNARATNA - Direct

1  Q.  What are they?

2  A.  Terrorism and Political Violence and Conflict and Terrorism

3  Studies.

4  Q.  Have you also contributed chapters to books relating to

5  terrorism and these subjects?

6  A.  Yes, I have done that.

7  Q.  Have all of these books, articles, publications been

8  subject to review by your peers?

9  A.  Not all, but some of them.

10  Q.  Have you spoken about Al-Qaeda and the subjects of your

11  research?

12  A.  Yes, I have spoken about it.

13  Q.  Have you given lectures and presentations?

14  A.  Yes, at a number of universities, at a number of government

15  institutions in the U.S., in the UK and in Asia.

16  Q.  Have you also spoken in Africa?

17  A.  Yes, I have spoken in Africa.  I have spoken also in the

18  Middle East.

19  Q.  Have you been an expert witness before relating to

20  terrorism in a terrorism case?

21  A.  Yes, I have been an expert witness before.

22  Q.  In one particular country or in a number of countries?

23  A.  In a number of countries.

24  Q.  Have you ever been an expert witness in a United States

25  District Court?

1    A.  Yes, I have been an expert witness in the United States

2    District Court before.

3    Q.  Did you testify in that case?

4    A.  Yes, I did.

5    Q.  In addition to your testimony, have you also, on other

6    occasions, prepared reports as an expert?

7    A.  Yes, I have prepared numerous reports in the U.S., as well

8    as in Canada, as well as in the UK and elsewhere.

9    Q.  Have those reports always been for the prosecution?

10   A.  No, for the defense as well.

11   Q.  For both?

12   A.  Yes, for the prosecution and for the defense.

13   Q.  Did you actually prepare a report for the defense in a

14   terrorism prosecution here in the United States?

15   A.  Yes, I have.

16   Q.  And also outside the United States?

17   A.  Yes, I have.

18   Q.  Now, you have been retained by the United States Government

19   in this case, correct?

20   A.  Yes.

21   Q.  Are you being paid?

22   A.  Yes.

23   Q.  At your usual rate?

24   A.  Yes.

25   Q.  Is that subject to a contract with the government?

GUNARATNA - Direct

1  A.  Yes.

2  Q.  What effect, if any, does that have on your testimony?

3  A.  It has no effect.

4  Q.  I want to come back to something I started to address

5  earlier.  In your experience, have you devoted any specific

6  research and analysis to violence by radical Islamist groups?

7  A.  Yes, I have.

8  Q.  In fact, was that the focus of your research, articles and

9  writings about Al-Qaeda?

10  A.  Yes.

11  Q.  Can you tell the jury generally the types of research and

12  the types of experiences you had in this field regarding

13  radical Islamist groups?

14  A.  I have worked on Al-Qaeda and its associated groups.  I

15  have traveled to a number of conflict zones, a number of

16  countries, as a part of this research.  I have met some

17  significant individuals from those organizations.  I have also

18  debriefed a large number of such individuals while they are in

19  custody.  I have also reviewed their documents.  I have

20  interviewed some of them.  I have reviewed interviews of some

21  of those detainees.  I have also spoken to other specialists

22  working in this area.

23  Q.  Let me break that down a little bit.

24        Have you spoken to members of Islamist radical groups?

25  A.  Yes, I have.

1  Q.  About how many?

2  A.  Several hundred.

3  Q.  And these are interviews with actual participants in these

4  groups, correct?

5  A.  Yes.

6  Q.  Aside from speaking to those individuals, have you spoken

7  to people involved with governments and policy-makers about

8  these groups?

9  A.  Yes, I have.

10 Q.  Have you spoken to others in the academic world about

11 radical Islamist groups and radical Islamist violence?

12 A.  Yes, I have.

13 Q.  Have you also traveled in countries associated with such

14 acts?

15 A.  Yes, I have.

16 Q.  You mentioned Pakistan.  Have there been others?

17 A.  Yes, late last year I was in Iraq, I was in Baghdad.

18 Q.  You've traveled also extensively through the Middle East?

19 A.  Yes, I have.

20 Q.  When you travel in such places, do you obtain sources and

21 publications in those countries?

22 A.  Yes, it is a part of our trade and craft.

23 Q.  Those are materials that you review in your research,

24 correct?

25 A.  Yes.

1    Q.  Do you also interview people in those countries?

2    A.  Yes.

3    Q.  Are the methods that you use the same as those generally

4    accepted as reliable in the field in which you work?

5    A.  Yes.

6           MR. SHIPLEY:  Your Honor, at this time I would offer

7    Dr. Gunaratna as an expert in the areas of Al-Qaeda, its

8    associated groups and international terrorism.

9           THE COURT:  Any objection from Mr. Hassoun?

10          MS. BAKER:  Nothing other than what has been stated on

11   the record pretrial.

12          THE COURT:  Mr. Swor, any objection on behalf of

13   Mr. Jayyousi?  I see that you are standing.

14          MR. SWOR:  Yes, Your Honor.  May we --

15          THE COURT:  I'm sorry?

16          MR. SWOR:  No objection.

17          MR. do CAMPO:  Just our previous objections.

18          THE COURT:  The witness is accepted as an expert.

19   Would you repeat the areas again for the record, please,

20   Mr. Shipley.

21          MR. SHIPLEY:  Yes, Your Honor, Al-Qaeda, its

22   associated groups and international terrorism.

23          THE COURT:  So accepted.  You may proceed.

24   BY MR. SHIPLEY:

25   Q.  Dr. Gunaratna, let's start with the subject we mentioned in

GUNARATNA - Direct

1   discussing your qualifications and about which you have written

2   extensively, Al-Qaeda.  What is Al-Qaeda?

3   A.  Al-Qaeda is a multi-national organization --

4           MS. BAKER:  Your Honor, for the record, I would like a

5   standing objection.

6           THE COURT:  So noted.  You may proceed, please.

7   BY MR. SHIPLEY:

8   Q.  Why don't you start your answer again so it's clear.

9   A.  Al-Qaeda is a multi-national organization led by Osama bin

10  Ladin and the group -- group's principal theme is to create

11  Islamic states wherever Muslims live.

12  Q.  Let's take that in little pieces.  In what respect is it

13  multi-national?  What do you mean by using that word?

14  A.  Multi-national is, Al-Qaeda consists of members drawn from

15  different nationalities.  It is primarily an Arab organization,

16  but certainly it has members who are outside the Arab world.

17  Q.  By Arab world, you are referring to what part?

18  A.  Arab world is basically the Middle East.

19  Q.  Is it also multi-national in another respect?  You have

20  mentioned its membership.  Is it multi-national in other way?

21  A.  Yes, its membership is multi-national in terms of

22  geographic reach.  It has a global reach, so it is able to

23  operate outside of the Middle East.  It is able to operate in

24  Asia, in Africa, in the Middle East, in Europe and in North

25  America.

136

GUNARATNA - Direct

1  Q.  Was that a focus and has that been a focus of Al-Qaeda,
2  that global reach, would you say?
3  A.  Yes, Al-Qaeda has grown very significantly since its
4  foundation, and it has been able to recruit members and
5  supporters outside the Middle Eastern area.
6  Q.  Is that one of the unique features of Al-Qaeda, this
7  multi-national dimension that you have talked about?
8  A.  Certainly, because if you look at the groups that are
9  currently active globally, there are very few groups with that
10  level of multi-nationality.
11  Q.  You mentioned Osama bin Ladin.  Who is Osama bin Ladin?
12  A.  Osama bin Ladin is a Saudi -- he was a Saudi national and
13  he moved to Pakistan soon after the Soviet invasion of
14  Afghanistan.  In Pakistan, together with Abdullah Azzam, Osama
15  bin Ladin organized and created a structure to fight the
16  campaign against the Soviets.
17  Q.  Was Osama bin Ladin one of the founders of Al-Qaeda?
18  A.  Yes, Osama bin Ladin was a founding member of Al-Qaeda.
19  Q.  You mentioned in your answer a moment ago in defining
20  Al-Qaeda, it was committed to establishing Islamic states.
21  What do you mean by that?  Can you explain that to the jury?
22  A.  Al-Qaeda's principal's aim is to create Sharia based on
23  Islamic states.
24  Q.  And Sharia, as you used that term, means what?
25  A.  It means based on Islamic law.

1    Q.   Is that something distinct from what might be called

2    secular law or the politics as people know it in the west?

3    A.   Yes, in fact, it is historically opposed to the political

4    process and to democratic regimes.

5    Q.   Now, you mentioned a moment ago in discussing bin Ladin

6    another person, Abdullah Azzam.  I want to take the jury back

7    to the beginnings of Al-Qaeda.  Who is Abdullah Azzam?

8    A.   Abdullah Azzam was a key ideologue, if not the principal

9    ideologue of the jihad movement.  He was the main ideologue in

10   the fight against the Soviets in Afghanistan.

11   Q.   Now, where was Abdullah Azzam from originally?

12   A.   Abdullah Azzam is originally from Palestine and he lived in

13   Jordan.  He studied in Egypt, worked in Saudi Arabia, and

14   finally he lived in Pakistan.  He also traveled quite widely

15   spreading his message and ideology of jihad.

16   Q.   Was that primarily in the 1980s?

17   A.   Yes, in the 1970s and the 1980s, but he traveled

18   extensively in the 1980s.

19   Q.   Are you familiar with the speeches and writings and

20   publications of Abdullah Azzam?

21   A.   Yes, I am familiar with the writings and the work of

22   Abdullah Azzam.

23   Q.   Did Azzam have a view as to what kind of government was

24   appropriate?

25   A.   Abdullah Azzam consistently campaigned for the creation of

1   Sharia based Islamic states.

2   Q.  What was Azzam's view regarding the use of violence to

3   attain that?

4   A.  Azzam had no problems whatsoever of using force to achieve

5   his political aims or political objectives.

6   Q.  In fact, was that at the core of his philosophy?

7   A.  Yes, in fact, Abdullah Azzam, whenever he said "jihad," he

8   made it very clear that jihad meant the use of violence to

9   achieve those political goals.

10          MR. SHIPLEY:  Your Honor, at this time I want to

11  publish for the jury a picture, it's Government's Exhibit 450,

12  a picture of Abdullah Azzam as a demonstrative exhibit.

13          THE COURT:  You may proceed.

14          MR. SHIPLEY:  We don't have the screen up.  I will

15  come back to that.

16  BY MR. SHIPLEY:

17  Q.  Did Azzam publish any documents?

18  A.  Yes, Abdullah Azzam published a number of publication.  His

19  most renown, most famous publication was Join the Caravan,

20  which was a call for young Muslims to join in the fight against

21  the Soviets.  He also edited a journal call Al Jihad, which was

22  the principal journal of the Arab mujahideen published out of

23  Pakistan.

24  Q.  Is Azzam known for having published a significant article

25  in Al Jihad in connection with Al-Qaeda and the organization

1  that became known as Al-Qaeda?

2  A.   Yes, Abdullah Azzam published, in March or April of 1988,

3  an article titled Al-Qaeda al Suba, meaning the soil base.  It

4  was published out of the Al Jihad magazine that was produced at

5  that time out of Peshawar.

6  Q.   Has that article become known as the Al-Qaeda Charter, or

7  the founding document of Al-Qaeda?

8  A.   Yes, it is considered a very important document in the

9  foundation of Al-Qaeda.  In fact, it is considered a key

10  ideological narrative of what Al-Qaeda would become.

11  Q.   Now, you mentioned this a moment ago, but did Azzam use the

12  term "jihad"?

13  A.   Yes, Abdullah Azzam constantly used the word "jihad."

14  Q.   Are you familiar with the term, how it was used by Azzam

15  and by radical Islamist groups?

16  A.   Yes, certainly.

17          MS. BAKER:   Objection, compound question, Your Honor.

18          THE COURT:   On that basis, the objection is overruled.

19  BY MR. SHIPLEY:

20  Q.   Your answer was, you are familiar with that, how jihad is

21  used by those groups and by Azzam, correct?

22  A.   Yes.

23  Q.   To Azzam, what did jihad mean?

24  A.   To Abdullah Azzam jihad had a very special meaning, that

25  is, he said that it is to fight to create Islamic states

GUNARATNA - Direct

1  wherever the Muslims lived, the use of force, the use of armed

2  action.

3        MR. SHIPLEY:  Just one moment, Your Honor.  Your

4  Honor, at this time I would like to publish for the jury an

5  excerpt from a document that is already in evidence as

6  Government Exhibit 83.  That's in the John Kavanaugh materials

7  that the members of the jury have.  I want to put up one

8  particular page of it with the reference to Azzam.

9        This is number 83 in the binder, specifically on page

10  8.  Can you all see that?

11        THE WITNESS:  Mr. Shipley, would you be kind to read

12  that, because I, myself, can't see.

13        MR. SHIPLEY:  I will provide you with a copy of that.

14  You're the most important person here.

15        Your Honor, may I approach the witness?

16        THE COURT:  You may.

17        MR. SHIPLEY:  Do you see that, Dr. Gunaratna?

18        Members of the jury, do you have it in front of you or

19  can you see it on the screen?

20        ALL JURORS:  Yes.

21  BY MR. SHIPLEY:

22  Q.  This is a document that is already in evidence.  There is a

23  discussion by Adham Hassoun at the bottom of page 8.  Do you

24  see that, Dr. Gunaratna?

25  A.  Yes.

141

GUNARATNA - Direct

1  Q.  Do you see Adham Hassoun discussing the subject of tourism

2  and referring to a discussion where somebody told him tourism

3  can refer to many things?

4  A.  Yes.

5  Q.  Hassoun is saying, "I told him it cannot infer many

6  things."  Then we go to page 9, Hassoun continues, "cannot

7  infer many things.  I told him, when tourism was mentioned,

8  when jihad was mentioned, whenever jihad is mentioned in the

9  holy Koran, Sheikh Abdullah Azzam says whenever jihad is

10 mentioned in the Koran it can only mean that it is a battle for

11 the sake of Allah."

12        Are you familiar with that reference, Dr. Gunaratna?

13 A.  Yes, I am.

14 Q.  Is that statement attributed to Azzam consistent with what

15 Azzam's view was?

16 A.  Yes, absolutely.

17 Q.  To Azzam, was a battle a spiritual act or was it actual

18 violence that he had in mind?

19        MS. BAKER:  Object to the form of the question and to

20 the speculation about what Azzam had in mind.

21        THE COURT:  Objection overruled.

22 BY MR. SHIPLEY:

23 Q.  Let me ask a foundational question first.  Dr. Gunaratna,

24 you testified a moment ago, are you familiar with the speeches

25 and writings and views of Abdullah Azzam?

1    A.   Yes, I am.

2    Q.   In fact, that's at the core of your research into Al-Qaeda

3    and its origins?

4    A.   Yes.

5    Q.   When Abdullah Azzam referred to battle, was he referring to

6    violence?

7    A.   Yes, he referred to armed military action, and violence --

8    certainly the use of force is tantamount to violence.

9    Q.   Now, you are familiar with the term "jihad," correct?

10   A.   Yes.

11   Q.   Can that word have different meanings?

12   A.   Yes, the word jihad has many understandings, many

13   interpretations.

14   Q.   To Azzam, however, was it violence?

15   A.   To Azzam it meant armed action.

16   Q.   Not an internal struggle?

17   A.   Certainly not.

18   Q.   Dr. Gunaratna, another term that you mentioned in your

19   testimony, Sharia, are you familiar with how that term was used

20   by Azzam and by violent Islamist groups?

21   A.   Yes, the term of Sharia is Islamic law.  Abdullah Azzam was

22   determined that the Islamic states they would create would be

23   governed by Sharia law or by Islamic law.

24        MR. SHIPLEY:  Your Honor, the members of the jury can

25   put that excerpt down.  We are done for the moment with the

1   Agent Kavanaugh binder.

2   BY MR. SHIPLEY:

3   Q.   The establishment of Sharia, was that Azzam's goal?

4   A.   Yes, establishment of Islamic states and having Sharia law

5   in those states was Azzam's goal.

6   Q.   Now, at this time, at the time he published the Al-Qaeda

7   Charter and made these pronouncements, where was Azzam?

8   A.   Abdullah Azzam was living on the Afghanistan/Pakistan

9   border.  He was mostly living in Peshawar.

10  Q.   Peshawar is a city on the border of Afghanistan and

11  Pakistan, or close to it?

12  A.   Yes, it is on the Pakistan side of the border.

13  Q.   Now, what was happening in Afghanistan at this time, in the

14  middle to late 1980s?

15  A.   In the mid to late 1980s, there was the big fight.  It was

16  the anti-Soviet multi-national mujahideen campaign.

17  Q.   Just to break it down, had there been an invasion of

18  Afghanistan by the former Soviet Union?

19  A.   Yes, the Soviets invaded Afghanistan in December of 1979,

20  and the Soviets withdrew in February of 1989.  For ten years

21  the Soviets were in Afghanistan, and throughout the 1980s,

22  particularly in the second half of the 1980s, there was a big

23  fight by the Afghans and by the fighting mujahideen against the

24  Soviets.

25  Q.   As a result of the Soviet Union invasion, did people come

GUNARATNA - Direct

1   from outside Afghanistan to fight against the Soviet forces?

2   A.  Yes, it was a multi-national fight, so many people came

3   from the Middle East.  Some came from Asia, from the Muslim

4   countries.  A small number came from Europe and from North

5   America from the Muslim migrant communities.

6   Q.  Did they predominantly come from the Middle East, the Arab

7   world?

8   A.  Yes, most of them came from the Middle East.

9   Q.  Were those foreign fighters called mujahideen?

10  A.  Yes, they were called mujahideen, and mujahideen meant the

11  warriors of God, the fighters for God.

12  Q.  Did Abdullah Azzam, who we spoke about a moment ago, help

13  create an organization to recruit and assist fighters coming to

14  Afghanistan?

15  A.  Yes, Abdullah Azzam created an organization, together with

16  a man called Osama bin Ladin, called Maktab Al Khidmat.

17  Q.  And does it, in fact, have a longer name?

18  A.  Yes.

19  Q.  Can you identify the full name of the organization for the

20  jury?

21  A.  It was called the Maktab Al Khidmat for the Arab

22  Mujahideen.

23  Q.  Is that sometimes known by its abbreviation MAK?

24  A.  Yes, it is called M-A-K, Maktab Al Khidmat.

25  Q.  What does that -- Maktab Al Khidmat literally translate as

1  what?

2  A.  It means the Bureau of Services.  And the full name can be

3  translated the Bureau of Services for the Arab Mujahideen.

4  Q.  Now, when was MAK founded?

5  A.  MAK was founded in 1984.  It was founded in mid 1984.

6  Q.  At that point, and until the end of the fighting with the

7  Soviet Union, what did MAK do?

8  A.  Maktab Al Khidmat did four or five principal functions.

9  One is that it publicized the need for recruits from the Arab

10  world, from Europe, from the United States and from elsewhere.

11       Secondly, when they came to Pakistan, they were

12  received and they were housed in guest houses and they were

13  provided training.  Finally, they were dispatched to

14  Afghanistan to fight against the Soviets.  This was the main

15  function of MAK.

16  Q.  Which was the main function?

17  A.  To receive the foreign fighters, to house them, to train

18  them and to dispatch them to Afghanistan to fight against the

19  Soviets.

20  Q.  And did MAK provide military training to these individuals

21  coming to fight?

22  A.  Yes, because most of those people who came to Pakistan

23  didn't have prior military experience, so MAK did provide them

24  military training.

25  Q.  You mentioned Osama bin Ladin again.  When did -- strike

GUNARATNA - Direct

1   that.  Let me step back.

2          Did bin Ladin participate in the fighting against the

3   Soviets during the 1980s in Afghanistan?

4   A.  Yes, bin Ladin did participate in the fight against the

5   Soviets in Afghanistan.

6   Q.  And when did Osama bin Ladin actually go to Afghanistan, if

7   that is known?

8   A.  Bin Ladin traveled from Saudi Arabia to Pakistan in the

9   early 1980s, and he frequently visited Pakistan throughout the

10  1980s.  By the mid 1980s, he relocated to Pakistan and it was

11  at that point that he went to Afghanistan and he participated

12  in combat against the Soviets.

13  Q.  Did bin Ladin also provide substantial financing for the

14  fighting against the Soviet Union?

15  A.  Yes, bin Ladin was the principal financier of the

16  organization called MAK.

17  Q.  MAK is M-A-K, Maktab Al Khidmat, that we spoke about?

18  A.  Yes, the Service Bureau for the Arab Mujahideen.

19  Q.  Now, did Osama bin Ladin have a working relationship with

20  Abdullah Azzam?

21  A.  Yes, because they both belonged to the same organization.

22  Q.  Were they very close?

23  A.  They were very close.  In fact, bin Ladin regarded Abdullah

24  Azzam, at that time, as his mentor.  Abdullah Azzam regarded

25  bin Ladin as his protégé.

GUNARATNA - Direct

1   Q.   What did bin Ladin's role become in the fight against the

2   Soviet Union?

3   A.   Bin Ladin was totally committed to fighting the Soviets.

4   Q.   And did bin Ladin have a broader view about the appropriate

5   form of government to be established or laws to exist under?

6   A.   Yes, bin Ladin wanted an Islamic state created in

7   Afghanistan, and so did Abdullah Azzam.

8   Q.   Now, did there come a point when the Soviet Union left

9   Afghanistan?

10  A.   Yes, the Soviet Union withdrew from Afghanistan in February

11  of 1989.  The final withdrawal was in February, 1989, but they

12  started withdrawing forces in the late 1980s.

13  Q.   After that point, there were no Russian forces left in

14  Afghanistan, correct?

15  A.   After February, 1989, there were no Russian forces in

16  Afghanistan.

17  Q.   After the Soviet withdrawal, what happened in Afghanistan?

18  A.   After the Soviets withdrew from Afghanistan, the Afghan

19  factions, the Afghan various groups that were fighting against

20  the Soviets, they started to fight with each other.

21  Q.   Did any of these factions fighting in Afghanistan want to

22  establish Sharia law in Afghanistan?

23  A.   Yes, some of the factions were very committed towards

24  establishing an Islamic state based on Sharia law.

25  Q.   Was one of those factions or groups particularly radical in

148
GUNARATNA - Direct

1    its views?

2    A.   Yes, perhaps the most radical faction was a group titled

3    Hezb-i Islami, meaning the party of God, and it was led by

4    Gulbuddin Hekmatyar.

5    Q.   Hekmatyar was a military commander during the fighting,

6    correct?

7    A.   Gulbuddin Hekmatyar was the leader of Hezb-i Islami.  He

8    was certainly the commander of Hezb-i Islami.

9    Q.   Did Maktab Al Khidmat, MAK, continue after the Soviet

10   withdrawal in 1989?

11   A.   Yes, because the structures that were created to fight the

12   Soviets outside Afghanistan existed, and it existed as Maktab

13   Al Khidmat, or as the Services Bureau for the Arab Mujahideen.

14   Q.   That was even after 1989?

15   A.   Yes.

16   Q.   Now, was Abdullah Azzam still in charge of the organization

17   after 1989?

18   A.   Until November of 1989, Abdullah Azzam was in charge.  In

19   November, 1989, Abdullah Azzam was killed.  He was killed when

20   he was traveling in an explosion.

21   Q.   Who took over MAK at that point?

22   A.   Maktab Al Khidmat was taken over by Osama bin Ladin.

23   Q.   What -- did bin Ladin transform MAK in any way?

24   A.   Yes, because the principal reason Maktab Al Khidmat was

25   created, or MAK was created was to fight the Soviets.  After

1    the Soviet withdrawal in February of '89, Maktab Al Khidmat's

2    orientation changed to meet the new demands of Osama bin Ladin.

3    Q.   What were those new demands of Osama bin Ladin after 1989?

4    A.   Bin Ladin wanted to assist -- bin Ladin wanted to support

5    the different jihad groups that were fighting in Asia, in

6    Africa, in the Middle East and in the Caucasus.

7    Q.   Was that a broader goal than what MAK had originally been

8    founded to do?

9    A.   MAK was originally founded to assist the foreign fighters

10   who were coming to Pakistan, and when bin Ladin took over the

11   organization, MAK's orientation changed more to of a global

12   orientation in keeping with the vision and the mission of Osama

13   bin Ladin.

14   Q.   Now, at this point, did bin Ladin begin to create his own

15   organization to further those goals?

16   A.   Yes, in fact, even before the death -- even before the

17   death of Abdullah Azzam, bin Ladin established organization.

18   Q.   Was the name of that organization publically known at that

19   time?

20   A.   That organization was a secret organization.

21   Q.   What was it called?

22   A.   It was called Al-Qaeda.

23   Q.   Now, this organization that we referred to as MAK, did that

24   continue to exist alongside Al-Qaeda?

25   A.   Yes, MAK was the principal propaganda, recruitment, fund

1    raising organization basically that did all the support

2    activities for Al-Qaeda outside of Afghanistan.

3    Q.  Have you heard the term in your research a "front

4    organization"?

5    A.  Yes, there are front, cover and sympathetic organizations.

6    All terrorist groups have front, cover, sympathetic

7    organizations.  They operate through those front, cover,

8    sympathetic organizations because you cannot operate anywhere

9    using the name of a terrorist group.  So you would operate

10   through front, cover and sympathetic organizations.

11   Q.  By the early 1990s and after, was MAK a front organization

12   for Al-Qaeda?

13   A.  Yes, MAK was the best known front organization for

14   Al-Qaeda.

15   Q.  Now, why didn't bin Ladin just identify his organization

16   publically as Al-Qaeda?

17            MR. SWOR:  Objection, foundation.

18            THE COURT:  Sustained.

19   BY MR. SHIPLEY:

20   Q.  You testified a moment ago about the formation of Al-Qaeda,

21   correct?

22   A.  Yes.

23   Q.  Did you also testify about bin Ladin's concern for secrecy

24   in the formation of that organization?

25   A.  Yes.

GUNARATNA - Direct

1  Q.   Why didn't -- if you know from your research and studies,

2  why didn't bin Ladin just publicize this organization as

3  Al-Qaeda?

4  A.   Because if Osama bin Ladin publicized his organization as

5  Al-Qaeda, governments such as the United States would hunt and

6  dismantle those organizations.

7  Q.   Now, did MAK continue to maintain a presence outside

8  Afghanistan as it had during the Soviet invasion?

9  A.   Yes, MAK continued to maintain a presence outside of

10  Afghanistan.

11  Q.   Was that true through the early and mid 1990s?

12  A.   Yes, throughout the 1990s, they maintained a presence.

13  Q.   By this point, however, was there a difference between

14  Al-Qaeda and MAK?

15  A.   It was the same organization.

16  Q.   Did people outside of Afghanistan still identify themselves

17  as being with MAK in the early and mid 1990s?

18          MS. BAKER:   Objection, no foundation.

19          THE COURT:   Overruled.

20  BY MR. SHIPLEY:

21  Q.   You can answer.

22  A.   Can you repeat your question?

23  Q.   Did people outside Afghanistan identify themselves as being

24  with MAK during the early and mid 1990s?

25  A.   Certainly they did.

1  Q.  Did these people know of the connection between MAK and

2  Al-Qaeda?

3          MS. BAKER:  Objection.

4          MR. SWOR:  Objection.

5          MS. BAKER:  No foundation.

6          THE COURT:  One at a time.

7          MR. SHIPLEY:  I'll lay the foundation.

8          THE COURT:  For now, the objection is sustained.

9  BY MR. SHIPLEY:

10 Q.  Through your research, you are familiar with MAK and its

11 activities in the early and mid 1990s, correct?

12 A.  Yes.

13 Q.  You are also familiar with some of the public

14 pronouncements or the public appearance of MAK during that

15 period?

16 A.  Yes.

17 Q.  Are you familiar with individuals who were part of MAK

18 during that period?

19 A.  Yes.

20 Q.  Based on your experience and your research, do you have an

21 opinion as to whether people who were involved with MAK at this

22 time knew of the connection to Al-Qaeda?

23          MR. SWOR:  Still too broad of a question.

24          MS. BAKER:  Same objection.

25          THE COURT:  Objection overruled.

1           THE WITNESS:  Yes.

2    BY MR. SHIPLEY:

3    Q.  The answer is yes?

4    A.  Yes.

5    Q.  How long did MAK continue to exist as a front organization?

6    A.  MAK continued to exist into the 1990s.

7    Q.  In fact, did MAK publish any materials for Al-Qaeda in the

8    1990s?

9    A.  Yes, MAK published a very significant manual titled

10   Encyclopedia of the Afghan Jihad, which is a principal military

11   and terrorist fighting manual for Al-Qaeda.  It was published

12   by MAK.  The MAK office in Peshawar published a ten volume,

13   7,000 page manual.

14   Q.  Do you remember when that was published?

15   A.  It was published in -- the early versions came the mid

16   1990s, the earliest versions.

17   Q.  Now, the Arab fighters who were in Afghanistan to fight the

18   Soviets, what happened to them after the Soviets withdrew in

19   early 1989?

20   A.  After the Soviets left Afghanistan in February of 1989, the

21   Arab mujahideen that went to Pakistan and went to Afghanistan

22   to fight the Soviets were very disappointed.

23   Q.  Did they remain in Afghanistan or did they go to other

24   conflict zones?

25   A.  Some of them remained in Pakistan and others went to

1    different conflict zones.  The reason they left Pakistan and

2    they went to different conflict zones was because no Islamic

3    state was established in Afghanistan because of the infighting

4    between the different factions.

5    Q.  Was this the infighting that you mentioned earlier in your

6    testimony involving some of the groups, one of which was

7    Hekmatyar's group?

8    A.  Yes.

9    Q.  Did bin Ladin himself leave the Afghanistan/Pakistan border

10   at some point in the early 1990s?

11   A.  Yes, bin Ladin relocated himself and his organization from

12   Pakistan, from Peshawar, Pakistan to Khartoum, Sudan.

13   Q.  Where is Sudan?

14   A.  Sudan is in east Africa.

15   Q.  What kind of government existed in Sudan at that time?

16   A.  In Sudan General Omar Bashir had come into power.  The

17   spiritual leader of Sudan was Hassan al-Turabi.

18   Q.  Was that -- I'm sorry.  Finish your answer.

19   A.  It was an Islamic government.

20   Q.  What year did Osama bin Ladin go to the Sudan from

21   Afghanistan?

22   A.  Bin Ladin moved to Sudan in 1991.

23   Q.  Did bin Ladin take Al-Qaeda with him?

24   A.  Yes, Al-Qaeda headquarters moved from Peshawar, Pakistan to

25   Khartoum, Sudan in 1991.

1  Q.  After that move, did bin Ladin continue to operate Al-Qaeda

2  out of the Sudan?

3  A.  Yes, bin Ladin lived in Khartoum, Sudan from 1991 to May,

4  1996.

5  Q.  Did Al-Qaeda maintain any presence in Afghanistan during

6  these years when bin Ladin was back in Sudan?

7  A.  Yes, Al-Qaeda maintained a small, but significant presence

8  in Pakistan.

9  Q.  Again, is this a long the Pakistan/Afghan border?

10  A.  Yes, primarily in Peshawar.

11  Q.  Did Al-Qaeda maintain military training camps in that area?

12  A.  Yes, Al-Qaeda maintained a very small military training

13  presence on the Afghan/Pakistan border.

14  Q.  You testified a moment ago, but just so we are clear, what

15  years was bin Ladin operating Al-Qaeda out of the Sudan?

16  A.  Al-Qaeda headquarters shifted to Khartoum, Sudan in April,

17  1991, and they remained in Khartoum, Sudan until May, 1996.

18      MR. SHIPLEY:  Judge, we have some binders of exhibits

19  that we are going to be talking about with Dr. Gunaratna.  I

20  don't know whether this is a moment for the Court to take a

21  break and we can get those together, or we can pass them out

22  now.

23      THE COURT:  Why don't we pass them out now, put them

24  on the chairs, then we'll take our break.  When we come back

25  all the jurors will have the binders and we can proceed.

GUNARATNA - Direct

 1           MR. SHIPLEY:  Your Honor, we may need a moment, with
 2   the Court's indulgence.
 3           THE COURT:  Ladies and gentlemen, we will take our
 4   afternoon break.  Remember, no talking about the case.  Your
 5   new books will be on your chairs when you come back out.
 6                   [The jury exits the courtroom].
 7           THE COURT:  Dr. Gunaratna, you are not to discuss your
 8   testimony with anyone until you return after the afternoon
 9   recess.  Do you understand that?
10           THE WITNESS:  Yes, ma'am.
11           MR. SHIPLEY:  What time, Judge?
12           THE COURT:  4:00.
13           MR. SHIPLEY:  We may get to the portion of the bin
14   Ladin calls and the video.  We could stop at around 4:30.
15           THE COURT:  That would be a good time.  As you know,
16   we have our juror that attends school.  We will take up our
17   issues after that.
18                   [There was a short recess].
19                   [The jury enters the courtroom.]
20           THE COURT:  Thank you, ladies and gentlemen.  You may
21   be seated.
22           Mr. Shipley, you may proceed.
23           MR. SHIPLEY:  Does everybody have a binder of
24   materials in front of them?
25           ALL JURORS:  Yes.

1  BY MR. SHIPLEY:

2  Q.  Dr. Gunaratna, before we broke, we were talking about

3  Al-Qaeda and some of its figures in the late '80s and early

4  1990s.

5          MR. SHIPLEY:  First, Your Honor, I want to publish

6  what is Government's Exhibit 450, which is simply a

7  demonstrative exhibit, it's a picture of Abdullah Azzam.

8          THE COURT:  You may proceed.

9  BY MR. SHIPLEY:

10  Q.  Dr. Gunaratna, can you see that on your screen?

11  A.  Yes.

12  Q.  Is that the Abdullah Azzam who you testified about earlier

13  as one of the founders of Al-Qaeda and MAK?

14  A.  Yes, it is Abdullah Azzam.

15  Q.  Ms. Stafford, if you could pull up the next image, which I

16  believe is Exhibit 451.  It is an image of Osama bin Ladin.

17          Do you recognize that image as being Osama bin Ladin?

18  A.  Yes, that is an image of Osama bin Ladin.

19  Q.  He is the individual we have been speaking about and spoke

20  about before we took our break?

21  A.  Yes.

22  Q.  Now, you were discussing Al-Qaeda and bin Ladin in Sudan

23  during the period from 1991 to 1996.  Do you remember that?

24  A.  Yes.

25  Q.  During that time, did Al-Qaeda and bin Ladin engage in any

1  propaganda?

2  A.   Yes.

3  Q.   What was the purpose of that propaganda?

4         MS. BAKER:   I object.

5         THE COURT:   Just a moment, please, Mr. Shipley.

6  Objection sustained.   Rephrase.

7  BY MR. SHIPLEY:

8  Q.   Let me ask a different questions.

9         I'm using the word propaganda.   Is that a word that

10 you use in your research and study?

11 A.   Yes.

12 Q.   By propaganda what would you be referring to, examples?

13 A.   Propaganda is the dissemination of information that would

14 have an impact to politicize and radicalize the intended

15 audience.

16 Q.   During the early and mid 1990s, did bin Ladin and Al-Qaeda

17 engage in propaganda and distribute propaganda?

18 A.   Yes, Al-Qaeda did that.   In fact, Al-Qaeda has a special

19 committee for doing that.

20 Q.   What was that committee called?

21 A.   It is the Media and Public Relations Committee, Media and

22 PR Committee.

23 Q.   Are you also familiar at this time with something called

24 the Advice and Reformation Committee?

25 A.   Yes, the Advice and Reformation Committee is one of the

1   arms, or one of the organizations controlled, managed and

2   established by Al-Qaeda.

3          MR. SHIPLEY:  Your Honor, I would like to direct the

4   jury's attention to the first item in the binder, which is

5   Government's Exhibit 200F and 200FT.  This is a fax already in

6   evidence in this case.

7   BY MR. SHIPLEY:

8   Q.  Dr. Gunaratna, do you have those items in front of you?

9   A.  Yes.

10  Q.  Have you seen these items before coming to court?

11  A.  Yes, I have.

12  Q.  In fact, have you seen these items, or at least the

13  original of it, before your involvement in this case?

14  A.  Yes, I have.

15  Q.  Let me start looking at 200FT, which is the English

16  language translation.  On page one, do you see the target

17  telephone number?

18  A.  Yes, I do.

19  Q.  Is that (619) 268-8189?

20  A.  Yes, please.

21  Q.  Do you have an understanding as to whether that number is

22  associated with any of the defendants in this case?

23  A.  Yes, please.

24  Q.  Which defendant is that?

25  A.  Kifah Jayyousi's.

GUNARATNA - Direct

1  Q.  Let's turn to the second page, which is the translation of
2  the contents of the fax.  I want to ask you some questions
3  about this.  Do you see a reference in the upper left-hand side
4  to the Advice and Reformation Committee?  Is that the group you
5  were speaking about a moment ago?
6  A.  Yes.
7  Q.  Is this a facsimile from that committee?
8  A.  Yes.
9  Q.  This was sent to a fax number of defendant Jayyousi?
10  A.  Yes.
11          MR. SWOR:  Objection, assumes a fact not in evidence.
12          MR. SHIPLEY:  That is in evidence, Your Honor.
13          THE COURT:  That the number belonged to Dr. Jayyousi,
14  is that your objection, Mr. Swor?
15          MR. SWOR:  Actually, it's the foundation, Your Honor,
16  that it was sent to Dr. Jayyousi leaves out the middle
17  question, by whom.
18          MR. SHIPLEY:  That's not a legal objection, Judge.
19          THE COURT:  I think at this point in time the
20  objection is overruled.  You can talk about sending it to a
21  number to which Dr. Jayyousi subscribed.
22  BY MR. SHIPLEY:
23  Q.  Dr. Gunaratna, tell the jury again, what was the advice --
24  first of all, what is the date in this fax, what is the date
25  there?

1   A.   The date of transmission of the fax?

2   Q.   Why don't know we look at page 2 of 2 in the translation,

3   and is there a reference to a date in the second line under

4   decree?

5   A.   Yes.

6   Q.   What is that date?

7   A.   It is the 7th month, the 11th day, 1994.

8   Q.   July 11, 1994?

9   A.   Yes.

10   Q.   Tell the jury again, what was the Advice and Reformation

11   Committee?

12   A.   Advice and Reformation Committee is a front organization of

13   Al-Qaeda.

14   Q.   Have you seen this particular fax before your involvement

15   in this case?

16   A.   Yes, I have.

17   Q.   What was the relationship between the Advice and

18   Reformation Committee and Osama bin Ladin at this time, 1994?

19   A.   The Advice and Reformation Committee was an office created

20   by Osama bin Ladin in the United Kingdom.  It was located in

21   the Norsville Cricklewood area in the UK.  The head of that

22   office was Khalid Al Fawwaz.

23   Q.   Does this fax, in the second paragraph, make a specific

24   reference to Khalid Al Fawwaz?

25   A.   Yes, it is the individual that I just referred to.

GUNARATNA - Direct

1  Q.  Where was this committee of Osama bin Ladin based?

2  A.  The office of the Advice and Reformation Committee was

3  based in north London.

4  Q.  Were there other offices as well of this committee?

5  A.  That was the front office of Al-Qaeda located at that time

6  in the north of London.  In fact, it was the principal office

7  at that time operating in Europe.

8  Q.  Now, how, if at all, did the Advice and Reformation

9  Committee relate to MAK, the organization that we spoke about

10 earlier?

11 A.  It was another front organization of Al-Qaeda.

12 Q.  What was the purpose of the Advice and Reformation

13 Committee?

14 A.  Advice and Reformation Committee was to play a role in

15 support for Osama bin Ladin.

16 Q.  If we look at the original, which is 200F, the previous

17 tab, and the second page in that tab --

18 A.  You are referring to page 2?

19 Q.  Page 2 of 200F, which is the original facsimile.

20 A.  Yes.

21 Q.  Do you see a signature there?

22 A.  Yes.

23 Q.  Do you recognize that signature from your research and

24 study in the field?

25 A.  Yes.

1  Q.  Who is that?

2  A.  It is the signature of Osama bin Ladin.

3  Q.  If we look at 200FT, the translation, the name appears,

4  Osama Mohammed bin Ladin.  Is that the individual who we have

5  spoken of as Osama bin Ladin?

6  A.  Yes, it's the same individual.

7  Q.  Now, are you aware of what the specific purpose of this

8  facsimile was?

9  A.  This fax was to inform the support base and the sympathizer

10  base that Khaled Al Fawwaz has been appointed by Osama bin

11  Ladin as his representative to operate in that region.

12  Q.  As whose representative?

13  A.  As the representative of Osama bin Ladin.

14  Q.  Now, was this a mass mailing or a press release?

15  A.  It was not.

16  Q.  Was it a more targeted publication?

17        MS. BAKER:  Object, lack of foundation.

18        MR. SHIPLEY:  I'll ask a foundational question.

19        THE COURT:  The objection is sustained.

20  BY MR. SHIPLEY:

21  Q.  Prior to your involvement in this case, you have seen this

22  facsimile before, correct?

23  A.  Yes, I have seen it because the Advice and Reformation

24  Committee was raided and the documents were seized in the

25  United Kingdom.

1    Q.   Have you reviewed materials obtained from that raid?

2    A.   Yes, I have seen the material.

3    Q.   You are familiar with the purpose of the Advice and

4    Reformation Committee?

5    A.   Yes.

6    Q.   Are you familiar with its connection to Osama bin Ladin?

7    A.   Yes.

8    Q.   Based on your knowledge and your experience, do you have an

9    opinion as to whether this was a publication that was sent to a

10   specific group of people rather than a mass mailing?

11   A.   It was sent to a specific group of people.

12   Q.   What group was that?

13   A.   The people they believed were supporting the global jihad

14   movement.

15          MS. BAKER:   Object, move to strike, no foundation.

16          THE COURT:   Overruled.

17   BY MR. SHIPLEY:

18   Q.   Based on your knowledge and your experience, do you have an

19   opinion as to whether this would have come to somebody

20   randomly?

21   A.   Certainly not.

22   Q.   You can put that aside for a moment.

23          Now, let me return to the subject of Osama bin Ladin.

24   Did there come a time when he moved back to Afghanistan?

25   A.   Yes, bin Ladin left Khartoum, Sudan in May of 1996, and he

GUNARATNA - Direct

1   relocated to Afghanistan.

2   Q.   Now, was there a group that had taken charge of Afghanistan

3   at that time?

4   A.   Yes, there was a new group that had just emerged called

5   Islamic Moment of the Taliban, commonly known as the Taliban.

6   Q.   What was the Taliban?

7   A.   Taliban was an Islamist organization and it was very keen

8   to establish an Islamic state based on Sharia law in

9   Afghanistan.

10  Q.   Did the Taliban actually establish such a state under

11  Islamic law in Afghanistan?

12  A.   In the region it controlled, and at one point about eighty

13  to ninety percent of Afghanistan it managed to establish, at

14  least in most parts of Afghanistan, an Islamic state.

15  Q.   Are you familiar with the circumstances and the laws of

16  that Islamic state established in Afghanistan by the Taliban?

17  A.   Yes, I am.

18  Q.   Have we also spoken about what Sharia is?

19  A.   Yes.

20  Q.   Can you give an example of what Sharia is based on the

21  Taliban in Afghanistan?

22  A.   The Taliban established an Islamic state in Afghanistan, in

23  the regions it controlled, based on Sharia law.  It is the

24  imposition of strict Islamic laws.

25  Q.   Can you give an example of those kind of laws?

166

GUNARATNA - Direct

1  A.  That is, the people had to strictly adhere to the rules

2  according to Islamic rules, they had to govern Afghanistan by

3  those rules and regulations.  For example, there was a code of

4  dress for women, and there was a code where women could not go

5  to school.

6        MS. BAKER:  Object, move to strike, relevance.

7        THE COURT:  Overruled.

8  BY MR. SHIPLEY:

9  Q.  In terms of politics, or politics that we might know in the

10  United States, is that something that was part of Sharia?

11  A.  No, because, according to Sharia law, there cannot be such

12  political parties, and in Afghanistan the Taliban crushed

13  whatever movement was there against them.  They fought such

14  organizations if they were political organizations.

15  Q.  Are there elections under Sharia?

16  A.  Under the Sharia law imposed by Taliban, which was sticking

17  to those strict practices, there was no elections.

18  Q.  Now, that view, that view of Sharia held by the Taliban,

19  was that similar to the view of bin Ladin and his organization,

20  Al-Qaeda?

21  A.  Yes.

22  Q.  And was that, in fact, the common goal of radical Islamist

23  groups at the time?

24  A.  Yes.

25  Q.  What means did those groups try to create Islamic states

GUNARATNA - Direct

1   under Sharia; what means did they use?

2   A.  They would use any means to achieve an Islamic state,

3   including violence.

4   Q.  Did those groups believe in using the political process to

5   create those states?

6   A.  They didn't believe in the political process.

7   Q.  Now, how did it come about that bin Ladin went back to

8   Afghanistan once the Taliban took hold in 1996?

9   A.  Can you repeat your question, please.

10  Q.  How did it come about that Osama bin Ladin went back to

11  Afghanistan once the Taliban took power?

12  A.  Bin left for Afghanistan in May, 1996, because there was

13  significant pressure on the Khartoum government to get rid of

14  bin Ladin.  The pressure came from the United States and the UK

15  primarily and General Omar Bashir asked bin Ladin to leave.

16  Q.  Just so we are clear, was this pressure on the government

17  in Sudan to kick bin Ladin out?

18  A.  Yes, and bin Ladin relocated to Afghanistan and, of course,

19  he was welcomed by the Taliban organization.

20  Q.  What was the relationship between bin Ladin and the

21  leadership of the Taliban at this time?

22  A.  Between the Taliban organization led by Mullah Omar and bin

23  Ladin, there was a good relationship.

24  Q.  Did Al-Qaeda remain in Afghanistan after bin Ladin returned

25  there in 1996?

1   A.   Yes, Al-Qaeda headquarters was relocated to Afghanistan in

2   May, 1996, and since then Al-Qaeda remained in Afghanistan

3   until Al-Qaeda was dislodged in late 2001, by the U.S. led

4   coalition.

5   Q.   Was the Al-Qaeda, after 1996, any different in its goals

6   and its outlook and its thinking than before?

7   A.   Al-Qaeda's ideological disposition remained the same.

8   Q.   Consistent throughout its existence?

9   A.   Yes, because it was created as an ideological vanguard to

10  lead the fight against certain governments to create Islamic

11  states.

12  Q.   How about bin Ladin himself, did his views and his

13  commitment to achieving an Islamic state through violence ever

14  change?

15  A.   Bin Ladin's view of establishing Islamic states using

16  violence remained consistent.

17  Q.   Now, what was the structure of Al-Qaeda?  Let's talk about

18  it as an organization.  How was it set up and what were the

19  different roles in the organization?

20  A.   Al-Qaeda has a consultative council, what you call a

21  [unintelligible], and just below that there are was various

22  committees.  Al-Qaeda organization, the leader is called the

23  amir, and Osama bin Ladin is the amir.  Just below that there

24  is Dr. Ayman al Zawahiri, who is the deputy leader of Al-Qaeda.

25  He was also the leader of the Egyptian Islamic jihad.  Just

1    below that there was a man called Muhamed Atef who was the

2    military commander of Al-Qaeda.  Previously, he was one of the

3    leaders of the Egyptian Islamic jihad.

4    Q.  Let me stop you there.  As you described the organization,

5    is this one that basically went in a hierarchical way, from top

6    down?

7    A.  It was hierarchy when it comes to the leadership of the

8    organization.

9    Q.  So the leader of Al-Qaeda at this time -- and if there is

10   any difference in this time period then let me know, but I am

11   talking about the 1990s through early 2000.  Who was the leader

12   of Al-Qaeda?

13   A.  The leader of Al-Qaeda was Osama bin Ladin.

14   Q.  Did he have somebody immediately below him, second in

15   command?

16   A.  Yes, it was Dr. Ayman al Zawahiri, who was also the leader

17   of the Egyptian Islamic jihad.

18          MS. BAKER:  I am going to ask for a time frame, Your

19   Honor, and object without it.

20          MR. SHIPLEY:  I think I established the time frame.

21          THE COURT:  Overruled.

22   BY MR. SHIPLEY:

23   Q.  I'll ask the witness.  At what time --

24          MR. SHIPLEY:  With regard to who, with regard to

25   Zawahiri?  I don't know what the objection is, Judge.

1          THE COURT:  A time frame for what, Ms. Baker?

2          MS. BAKER:  When Zawahiri here allegedly took this

3    position or positions.

4    BY MR. SHIPLEY:

5    Q.  We are going to talk about Ayman Al Zawahiri in a minute,

6    but can you tell the jury, when was he in that position of

7    second in command to Osama bin Ladin?

8    A.  Zawahiri assumed the leadership of number two of Al-Qaeda

9    since the mid 1990s.

10   Q.  Did that continue through 2001?

11   A.  It continues to this date.

12   Q.  Now, below bin Ladin and Zawahiri, you mentioned another

13   person.  Who was that?

14   A.  It was a man called Abuhaf, but he was known as Muhamed

15   Atef.  He was Egyptian.  He was previously from the Egyptian

16   Islamic jihad, and he was killed in November, 2001.

17   Q.  Beneath these three people, were there other individuals or

18   was there a committee or a group?

19   A.  There was a number of committees.  For example, there was a

20   committee for security.  There was a committee for training led

21   by Abu Muhammad al Masri.  There was a committee for finance

22   led by Sheikh Salid.

23   Q.  There are a series of leaders and then there are different

24   committees that individuals led below that, correct?

25   A.  Yes.

1  Q.  Did Al-Qaeda have formal members the way you might be a

2  member of a club, for example?

3  A.  Yes, Al-Qaeda has a very small membership of people who

4  swear an oath of allegiance to Osama bin Ladin.  There are also

5  people who worked with Al-Qaeda who did not talk that oath.

6  Q.  Was that a much larger group of people?

7  A.  Yes.

8  Q.  Did Al-Qaeda have relationships with other radical Islamist

9  groups outside of Afghanistan?

10  A.  Yes, because Al-Qaeda was meant to be the pioneering

11  vanguard of the Islamic movement, and to do so it had to have

12  linkages with the different jihad organization.

13  Q.  Are these known as associate groups?

14  A.  Yes, you can call them associated groups.

15  Q.  What was the relationship between bin Ladin and the

16  Al-Qaeda leadership and these different associate groups in

17  other places around the world?

18  A.  Al-Qaeda and bin Ladin provided four things to those

19  associate groups.  It provided them finance, it provided them

20  training, it provided them deference, and most importantly, it

21  provided them ideology.

22  Q.  Did these groups share the same goal as Al-Qaeda with

23  regard to creating Islamic states through violence?

24          MR. SWOR:  Objection.

25          THE COURT:  Sustained.

1  BY MR. SHIPLEY:

2  Q.  I will ask it a different way.  You are familiar with these

3  associate groups through your study and your research, correct?

4  A.  Yes.

5  Q.  Are you familiar with their goals and their purposes?

6  A.  Yes.

7  Q.  With respect to the associate groups of Al-Qaeda, did those

8  groups have the same goals and same purposes as Al-Qaeda itself

9  and bin Ladin?

10 A.  Yes, the groups that received such assistance did have

11 compatible means, objectives and goals.

12 Q.  Was one of those compatible means, objectives and goals the

13 establishment of Islamic states through violence?

14 A.  I would say that many of the groups that Al-Qaeda provided

15 training, deference, finance, assistance did believe in

16 Al-Qaeda's methodology or Al-Qaeda's model of political

17 behavior.

18 Q.  By that are you referring to establishing Islamic states in

19 those places?

20 A.  Yes.

21 Q.  Now, tell the jury again, what did Al-Qaeda provide to

22 these associate groups?

23          MR. SWOR:  Objection, asked and answered.

24          THE COURT:  Overruled.

25          THE WITNESS:  Al-Qaeda provided them finance,

1    training, weapons and ideology.

2    BY MR. SHIPLEY:

3    Q.   Did these associate groups provide anything or any

4    resources to Al-Qaeda?

5    A.   Yes, those groups also had reciprocal arrangements with

6    Al-Qaeda.  For example, when Al-Qaeda members were being

7    hunted, some of those groups housed them and cared for them.

8    Q.   By reciprocal, you mean back and forth?

9    A.   Yes, sometimes when Al-Qaeda needed finance, those groups

10   assisted Al-Qaeda.

11   Q.   Have you heard the term "support cell" or "support network"

12   in your research?

13   A.   Yes.

14   Q.   What is a support cell with regard to these kind of groups?

15   A.   Militant or support cells, they have ten functions.  Those

16   ten functions are --

17   Q.   Before we identify the functions, can you give the jury a

18   general description?  Is that a term you use in the field, a

19   support cell?

20   A.   Yes.

21   Q.   Can you describe to the jury what you mean by that in a

22   sentence or two?

23   A.   Support cells are cells that provide support, that provide

24   assistance, that facilitate terrorist and militant

25   organizations.  Without support cells, a militant or terrorist

GUNARATNA - Direct

1    organization cannot exist because they need to replenish their

2    human losses and their material wastage and that support is

3    provided by support cells.

4    Q.   Have you studied such cells in your research?

5    A.   Yes, I have.

6    Q.   Can you identify, as you started to a moment ago, what are

7    the functions of a support cell?

8    A.   The support cell provides the following ten functions:

9    Propaganda, recruitment --

10   Q.   Go through these slowly enough for any of the jurors who

11   are taking notes.

12   A.   It will do fund raising.  It will do procurement.  It will

13   do transportation, safe houses, travel, communications,

14   training, forged identities.

15   Q.   By forged identities you mean what?

16   A.   Forged identities can mean three things in the context of a

17   passport, adapted identity, say a photo substitution of a

18   passport.  Another is a forgery that is a passport that has

19   been printed.  And third is a genuine I.D., but fraudulently

20   obtained.

21   Q.   The purpose of those items is to conceal somebody's

22   identity?

23   A.   Yes, they are all support functions.  Without support

24   functions, no militant or terrorist group can exist.

25   Q.   Those are some of the things that a support cell provides,

1    correct?

2    A.   Yes.

3    Q.   Now, these support cells, do they exist in conflict zones

4    themselves or do they exist outside of conflict zones?

5    A.   Support cells can exist in conflict zones.  Support cells

6    can exist outside conflict zones.  Support cells can also exist

7    in the migrant communities.

8    Q.   Again, migrant communities, you mean what?

9    A.   Migrant communities are people who leave zones in Asia,

10   Africa, Middle East, and migrate to Australia, Europe and North

11   America.

12   Q.   Do these support cells provide money to conflict zones, to

13   associate groups in conflict zones?

14   A.   Yes, because for those groups to exist, for those groups to

15   survive, for those groups to sustain their campaigns, they need

16   continuous support.

17   Q.   Do they provide and share information to groups in those

18   conflict zones?

19   A.   Yes, propaganda is critical.  Without propaganda there is

20   no recruitment, without propaganda there is no fund raising.

21   Q.   How about supplies and military equipment?

22   A.   Yes, there are two types of supplies, there are weapons and

23   there are dual user technologies.  Dual user technologies are

24   civilian goods commercially available, but in the hands of a

25   militant or terrorist group they enhance their performance.

1   That can range from boots, tents, uniforms, GPS, satellite

2   phones.

3   Q.   And do these support groups provide communications devices?

4   A.   Yes.

5   Q.   And how about personnel, how about recruits to go fight?

6   A.   Yes, recruitment.

7   Q.   How important is that to these support cells in their

8   relationship with the groups in the conflict zones?

9   A.   Without recruitment you cannot replenish the human losses,

10  people who are getting injured, people who are getting killed.

11  They have to be replaced, so recruitment is paramount.

12  Q.   Now, do members of these support cells necessarily have

13  direct contact with the leadership of the organizations they

14  are supporting?

15  A.   Not necessarily.

16  Q.   So, somebody may be part of a support cell without ever,

17  for example, meeting Osama bin Ladin?

18  A.   Yes, because it will be a risk to meet Osama bin Ladin.

19  Q.   Would these support groups and members of these support

20  groups necessarily travel to the conflict zones themselves?

21  A.   Some of them may, others may not, because it will be a risk

22  to travel to those conflict zones.

23  Q.   Would those groups recruit people to actually go fight in

24  those zones?

25  A.   Yes, those who are politicized, radicalized, they will

1    travel to those conflict zones.

2    Q.  Do these support cells ever operate through other

3    institutions?

4    A.  Yes, the support activities are performed through an

5    organization.  It cannot be performed without an organization.

6    Those organizations take the form of front, cover and

7    sympathetic organizations.  Those organizations usually have a

8    very human face, that means they operate as community

9    organizations, religious organizations, as human rights

10   organizations, as humanitarian organizations, as educational

11   organizations.

12   Q.  Do they operate as charities?

13   A.  They will operate also as charities.

14   Q.  Are these what you would call front organizations?

15   A.  Yes, they can be front, cover or sympathetic organizations.

16   Q.  What is the distinction you are making between front, cover

17   and sympathetic organizations?  Can you identify what you mean

18   by those three things for the jury?

19   A.  It is a very important distinction.  Front organization is

20   usually established by those members of the support cell, or

21   those people who are engaged in support activity.

22        Cover organization is an organization that people will

23   penetrate in order to advance the objectives.

24        Sympathetic organization is an organization that is

25   sympathetic to the actual group that is doing the fighting.

1  Q.  Would support cells use these institutions in order to

2  provide some of the things you mentioned earlier, recruits,

3  money and supplies?

4           MS. BAKER:  Object to the form.

5           THE COURT:  Overruled.

6  BY MR. SHIPLEY:

7  Q.  You can answer the question.

8  A.  Can you repeat the question.

9  Q.  Would these support cells use the kind of groups you are

10  talking about to provide money, relief, supplies, personnel to

11  people in the conflict zones?

12  A.  Yes.

13  Q.  Would these institutions sometimes perform legitimate

14  functions as well?

15  A.  Yes.

16  Q.  They would be used as front organizations for purposes of

17  assisting in the conflict zones?

18           MS. BAKER:  Objection.

19           THE COURT:  Sustained.

20  BY MR. SHIPLEY:

21  Q.  What would be the purpose of these support cells and these

22  front institutions in providing money and recruits to conflict

23  zones?

24  A.  Those front organizations will generate support in terms of

25  supplies, in terms of finance, in terms of recruits.  They will

1    send that assistance to those groups in those conflict zones.

2    Certainly they will carry out some activities in order to have

3    some legitimacy, but the function of the support cell is

4    basically to assist that group that is engaged in military

5    activity in the conflict zone.

6    Q.   Would these support groups and the participants in them

7    share the view of the associate groups they were supporting in

8    the conflict zones?

9             MS. BAKER:  Objection.

10            THE COURT:  Sustained.

11            MR. SHIPLEY:  May I try to rephrase, Judge?

12            THE COURT:  You may.

13   BY MR. SHIPLEY:

14   Q.   You have studied these support groups extensively, correct?

15   A.   Yes.

16   Q.   In fact, that was one of the focuses of your PhD research

17   some years ago, correct?

18   A.   Yes.

19   Q.   You are familiar with the operation of these support cells?

20   A.   Yes.

21   Q.   Have you spoken to individuals who have been part of these

22   support cells?

23   A.   Yes.

24   Q.   Have you also spoken to and researched members of Al-Qaeda

25   and its associate groups fighting in the conflict zones?

1   A.   Yes.

2   Q.   Are you familiar with the ideology and the views towards

3   Sharia of those associate groups and Al-Qaeda?

4   A.   Yes.

5   Q.   Based on your experience and your knowledge, do you have an

6   opinion as to whether members of a support cell who provide

7   resources and material and personnel to these associate groups

8   in conflict areas share the same ideology?

9   A.   They must have a comparative ideology, otherwise they would

10  not be driven by that belief system.  They share a common

11  belief system.

12  Q.   Now, are you familiar with how these groups communicate,

13  both the members of the support cells and with the associate

14  groups in conflict zones?

15  A.   Yes.

16  Q.   What are some of the methods they use to communicate?

17  A.   They can use numerous methods of communication, but I would

18  mention two or three methods.  One is that they can use a human

19  courier, that is an individual from the country where there is

20  a support cell, they would travel either with money or with

21  documents or with a message to the conflict zone.

22         Second is someone from the conflict zone can come to

23  the country where there is a support cell and meet those

24  supporters.

25         Third is they could communicate electronically by

1  phone or otherwise to an area around the conflict zone, or

2  sometimes, if available, communications are available, into a

3  communication platform in the conflict zone.

4  Q.  Okay.  Now, you are familiar with these different types of

5  communications, correct?

6  A.  Yes.

7  Q.  Over the course of your career you have reviewed many of

8  these conversations yourself, correct?

9  A.  Yes.

10  Q.  You have also spoken to people about their communications

11  with others in Al-Qaeda or in these associate groups, correct?

12  A.  Yes.

13  Q.  In that process, are you familiar with the term "code word"

14  or "double talk"?

15  A.  Yes, code words and double talk, they are two different

16  methods.

17  Q.  Can you explain to the jury what they mean in the context

18  of the communications between the kind of groups we are talking

19  about here?

20  A.  Code word is what is used between members and leaders of a

21  group, that is, they will have a set of words and they will

22  have corresponding words, and there will be a code sheet that

23  will be between two members or two leaders of the group, and

24  they will stick to that code sheet when they communicate.  That

25  is basically to conceal, to protect their message.  Even if

GUNARATNA - Direct

1    someone gets their message, it will be very difficult to decode

2    or decipher the message without the code sheet.

3    Q.   What is double talk?  Is that a word that you have

4    encountered in your research?

5    A.   Yes.  Double code is different from code.  Double talk is

6    usually used among the support cell, that is, members of a

7    support cell may not want to refer to procurement, may not want

8    to refer to finance, may not want to refer to an operation, to

9    an attack, and they will substitute those words with a term

10   only they can understand.

11   Q.   Now, in your years of experience are you familiar with some

12   of these words that have been used as code or double talk by

13   participants in violence associated with these groups?

14             THE COURT:  Mr. Shipley, I am going to interrupt you

15   here.  We need to stop for the afternoon recess at this time.

16             Ladies and gentlemen, you are going to hear my words.

17   You are not supposed to talk about this case.  You are not

18   supposed to discuss it with anyone else or have anyone discuss

19   it with you.  Tomorrow we are going to have a slight change in

20   schedule.  You will be starting at the regular time, but

21   leaving at approximately 3:00 or 3:30.  Tomorrow, leaving at

22   approximately 3:00 or 3:30.  Plan accordingly.  I will see you

23   all tomorrow morning.

24             All rise for the ladies and gentlemen of the jury.

25             [The jury leaves the courtroom at 4:34 p.m.]

1      THE COURT:  Dr. Gunaratna, you are free to go for the

2   day.  You are not to discuss your testimony with anyone.  You

3   are to return to the location that Mr. Shipley has told you to

4   tomorrow morning so we can begin at 9:30.  Do you understand

5   that, sir?

6      THE WITNESS:  Yes, Your Honor.

7            [The witness was excused].

8      THE COURT:  What prompted the change is, Ms. Zaki, who

9   I think is juror 14 or 15, her grandfather in-law passed away

10  over the weekend and she needs to travel out of town.  She has

11  a flight tomorrow evening.  She is talking advantage of our

12  Wednesday off to go to the funeral and be back here on

13  Thursday.

14     MS. BAKER:  Judge, I didn't hear.  You said there was

15  a change in --

16     THE COURT:  The reason we are stopping tomorrow at

17  3:00 is that Ms. Zaki's grandfather in-law passed away over the

18  weekend.  She is flying out tomorrow.  She asked the Court if

19  it would be okay to take a flight tomorrow at 7:00 p.m. out of

20  Fort Lauderdale.  I figured leaving at 3:30, that should give

21  her enough time, hopefully, with I-95 to get there and she'll

22  be back in time for Thursday's proceedings.

23     Would you read back Mr. Shipley's last question,

24  please?

25            [Text read back].

1          THE COURT:  Your objection?  Was it Mr. Swor who made

2     the objection?

3          MR. SWARTZ:  No, I was standing up to ask the Court --

4     I know we talked about the transcript of the Osama bin Ladin

5     tape.  I would like, Your Honor, whatever this version looks

6     like, that there be a written transcript, which can be easily

7     done by taking the transcript that is prepared and we will

8     agree on what is in the tape, whether what is in the tape is on

9     the piece of paper, but we need a record.

10          THE COURT:  If you would like to make the transcript

11     part of the record as the Court exhibit, whatever is the edited

12     version, I don't have a problem with that.  The reasons that we

13     normally have a transcript, the length, complicated language,

14     those things don't exist here.  There is, obviously,

15     translation because Mr. bin Ladin conducts his side of the

16     conversation in Arabic, but all the CNN reporters and language

17     is all in very understandable English.

18          MR. SWARTZ:  I am not talking about a translation

19     part.

20          THE COURT:  I will make it a Court Exhibit 3 or 4.

21          MR. SHIPLEY:  Just to be clear on what we are talking

22     about from Mr. Swartz.  You are proposing introducing a

23     transcript that corresponds to whatever is said on the portions

24     of the video we are going to be playing for the jury?

25          MR. SWARTZ:  No.

1           MR. SHIPLEY:  Okay.  Then I am confused.

2           THE COURT:  That's what I thought we were talking

3    about.  Now I am really confused.

4           MR. SHIPLEY:  What I am worried about, Judge, is there

5    is something else going on.  There is an effort to use this

6    transcript in some way, either to go beyond the contents of the

7    video that is going to be shown to the jurors, or in some way

8    to suggest there is a disparity or a conflict between the video

9    and the transcript, whether that is ascribed to the government

10   or whether that is ascribed to something else.

11          THE COURT:  If there is anything wrong with any of the

12   versions, by now someone should have brought it to my

13   attention.  We have watched it at length in open court.  We all

14   have watched it two or three times probably in our own offices.

15   What do you need the transcript for?

16          MR. SWARTZ:  We need it for the record, not for the

17   jury, but for the record, because once it's played, and I

18   assume Robin isn't going to be taking down everything in the

19   tape, we need to have in writing what words were said to the --

20   what they heard at least.

21          THE COURT:  That is why I said, Mr. Swartz, I have no

22   objection to making whatever is the edited version transcript a

23   Court exhibit, so in case there has to be some appellate review

24   later it's there for the Court.

25          MR. SHIPLEY:  Not for the jury?

GUNARATNA - Direct

1          THE COURT:  Not for the jury.  I'll make it a Court

2    exhibit.

3          MR. SWARTZ:  We just need to have the final disk.

4          THE COURT:  We are trying to work on that, Mr. Swartz.

5          Mr. Louis, you were standing?

6          MR. LOUIS:  Yes, ma'am.

7          THE COURT:  Let's do one issue at a time.  One, we

8    have your issue with the tape.  We have Ms. Baker's issue with

9    the Lebanon bombings.  Those are the issues that we need to

10   take up so we can progress with Dr. Gunaratna tomorrow.

11         MS. BAKER:  We also have the issue of the expert and

12   whether our defense expert, whom we identified and noticed as

13   someone who would review and refute the government's expert,

14   can review the transcript of the government's expert's

15   testimony.

16         THE COURT:  Let's start first -- I see Ms. Stafford is

17   in position.  Or are you going to use your version first,

18   Mr. Louis?

19         MR. LOUIS:  No, Judge, I haven't even seen their final

20   version.

21         THE COURT:  Wasn't it the one we had on Friday?

22         MR. SHIPLEY:  Yes.

23         MR. LOUIS:  My understanding is there were edits made

24   to that.

25         THE COURT:  The final I saw started with that

GUNARATNA - Direct

1   introduction war on terror stuff and I didn't want that.  I

2   wanted it actually to start with Peter Arnett in the jeep

3   driving up the mountain road.

4          MR. KILLINGER:  Judge, just for the record, I want to

5   make it clear, that morning I came over, we -- that afternoon

6   we viewed the eight minute edition.  The next morning I came

7   over and I handed defense counsel all a copy and I gave one to

8   Avi.  You looked at it before you came out for court.  Avi came

9   back out with a note on it saying, the Judge wants it to start

10  at 48 seconds into the edition that I did.

11         When I went back across the street the actual 48

12  second part still had the words "holy terror."  I didn't think

13  you wanted that in there, so I started it at 49 or 50

14         THE COURT:  I think Avi told me it came out to 51.

15         MR. KILLINGER:  That's exactly what we did.

16  Everything else has remained the same from the copy that I gave

17  them on Friday morning.

18         THE COURT:  That's because it had that big "war on

19  terror" like logo right up front.  I think the communication

20  came by because there are actually two places where I said

21  something about X, and Peter Arnett actually says it.  So

22  Mr. Killinger had -- where I say it was slightly different from

23  where Arnett said it, and that's how we got to the place where

24  the tape should have been cut.

25         MR. LOUIS:  May I suggest that we see the government's

 1  version?  I have seven changes.

 2          THE COURT:  Seven?

 3          MR. LOUIS:  They are very small.  I am specific on

 4  them.

 5          MR. CARUSO:  Really, the bottom line is, we really

 6  haven't seen the government's version that is going to be

 7  played for the jury tomorrow.

 8          THE COURT:  Okay.  Ms. Stafford, would you play it,

 9  please.

10                    [Video played].

11          THE COURT:  Thank you, Ms. Stafford.  Mr. Swartz?

12          MR. SWARTZ:  Your Honor, I marked off on the

13  transcript, there is an introduction that is the voice of

14  Arnett where it starts, "Our quest to meet bin Ladin begins in

15  Peshawar, Afghanistan."  He describes the trip.  He talks about

16  how there were assassination attempts, why they had to bring

17  their own cameras and other things.

18          This part, I think "one of the worlds most wanted men"

19  may have been in that portion.  Up to the point where there is

20  a question which begins, Mr. bin Ladin, you have declared a

21  jihad against the United States, can you tell us why?  Then he

22  answers.  Everything up to that point need not be there.  The

23  question is what I just read.

24          THE COURT:  Mr. Swartz, I have to have disagree with

25  you.  The reason why I do is, I believe that it is necessary at

 1    some point to put the interview in context for the jurors.  We

 2    could just start playing it in the middle, but it gives the

 3    jurors some idea of how this interview came to be, why it

 4    happened, he is responding, why he is responding to specific

 5    questions and answers, as opposed to what I'm afraid would

 6    happen if we started at the point where you are, which I happen

 7    to think is more prejudicial to the defense, is it appears as

 8    if Mr. bin Ladin somehow begins speaking about these subjects

 9    on his own, as opposed to replying in an interview context of

10    questions and answers.

11            MR. SWARTZ:  We can cure that, Judge, by simply giving

12    some information, a stipulation, Peter Arnett works for CNN, he

13    traveled to interview this man and he interviewed the man.

14    That's all they need to know.

15            THE COURT:  Is there some circumstance where that

16    would not be readily available to the jury?  There is nothing

17    inflammatory or overly prejudicial about what Mr. Arnett is

18    doing.  He is traveling in a van, he is proceeding down a

19    highway, speaking in a calm, cool, rational tone of voice in

20    English, in a dispassionate way.

21            MR. LOUIS:  Judge, can I play my clip that has been

22    edited so that we can see the changes?

23            THE COURT:  How long did we spend on this the other

24    day, Mr. Louis?  Like the better part of a morning.

25            MR. LOUIS:  I understand, Judge.  I think my five

1   minute clip will be longer than 30 minutes of oral argument.

2           THE COURT:  I am not about to hear anymore argument.

3           MR. LOUIS:  I know, I can see.  I think the clip

4   captures everything the Court is looking for and it just

5   filters out a few things that were objectionable to the defense

6   that we have not addressed previously.

7           THE COURT:  Play it, Mr. Louis.

8           MR. SWARTZ:  Judge, we want to make the point, as

9   Ms. Baker pointed out, the opening statement by Mr. Arnett is,

10  amid these mountains of Afghanistan is the hiding place of the

11  world's most wanted man, Osama bin Ladin.  For the jury to hear

12  that --

13          THE COURT:  I could take judicial notice of that fact.

14  I mean, that is such a fact -- I'm saying that is the kind of

15  thing that is so readily available and known to any of our

16  jurors who are news watchers, those that are not -- he is --

17          MR. SWARTZ:  Part of the problem is -- and if we do

18  this through a stipulation -- the date of this interview is not

19  given.  For all they know it happened a month ago.

20          MR. SHIPLEY:  The transcripts make clear, Your Honor,

21  by the defendants -- Jayyousi is saying that the interview

22  occurred a couple of months before.

23          MR. SWARTZ:  You're right.  It was in '97.  The

24  world's most wanted man, and they are talking about him, is

25  exactly what the government wants the jury to reflect on.

1       THE COURT:  Exactly, because it puts in context the

2   call, your client's reaction to the call, the state of mind of

3   your client at the time, and he is making this reaction to an

4   interview where, on U.S. television, it said the person he is

5   reacting to is one of the most wanted men in the world.  So

6   that exactly goes to your client's state of mind.

7       MR. SWARTZ:  And that state of mind, Your Honor, is

8   not the state of mind that this case is about.  The state of

9   mind of this case, Your Honor, is whether people who are

10  supporting these various mujahideen in these various areas

11  intended to commit murder.  This man is interviewed about

12  everything but the areas that this case is about.

13      He is wanted by the United States because he has a

14  jihad against U.S. troops.  Those are not the victims.  Those

15  are not the subject of this case.  You look at each and every

16  one of those answers, every single one of them had to do with

17  U.S. troops, U.S. policy in certain areas.  That is where this

18  becomes so prejudicial.

19      THE COURT:  Mr. Louis, are you ready?

20      MR. LOUIS:  Just about, Your Honor.

21                     [Video played].

22      THE COURT:  I am going to use so far what I am going

23  to call the government's edited version.  I don't believe it is

24  overly inflammatory or overly prejudicial.  I believe the first

25  part of the interview places it in context and does not say

1    anything which would overly inflame the jury on this particular

2    individual.

3          I recognize, and I think I have said this before, that

4    just by virtue of the nature of the individual there is bound

5    to be some dispute as to how he might be received by the ladies

6    and gentlemen of the jury.  As I said before, we worked hard to

7    select people who could think, reason, not be inflamed merely

8    by the presence of an individual on a videotape.

9          MR. LOUIS:  If I may make two precise objections so

10   it's in the record, Your Honor.  There are two portions of this

11   tape that don't relate to our case.  These gentlemen are not

12   accused of conspiring to murder Americans, and I think that

13   that is the predicate to these two points that I wanted to

14   raise.

15         The first portion deals with the bombings of the two

16   American military barracks in Saudi Arabia.  There is limited

17   commentary by bin Ladin about that saying that he was not

18   there.  But the previous portion that shows the statistics of

19   the dead American soldiers is unduly inflammatory and has

20   nothing to do with the charges that are brought against these

21   men.  That portion, at a minimum, should be stricken.

22         The other portion is where bin Ladin claims credit for

23   killing many American soldiers in Somalia.  We know today,

24   based Anthony Zinney's own statements, that's Major General

25   Zinney who was in charge of the troops over there, that, in

1   fact, Al-Qaeda had nothing to do with that.  That was Adid's

2   men.  So it is factually incorrect.  They don't talk about it

3   on the tapes.  It just serves to inflame the jury against bin

4   Ladin and these men more so than they already are.

5          THE COURT:  Your objection is noted for the record.  I

6   am going to leave the tape.  Ms. Stafford, the one that you

7   played this afternoon is the one that, if and when the time

8   comes before the jury, that's the one that we should have

9   played.  That is the issue, I think, number two and a half.

10          We are now to issue number three, which is the issue

11   of the realtime transcript being provided to the defense

12   expert.

13          MR. SWARTZ:  Judge, the issue of the instruction to be

14   read before this is played, we have offered an instruction and

15   we have also asked that the instruction be played -- the

16   instruction be read after it's played.

17          THE COURT:  I left it on my desk.

18          MR. SHIPLEY:  Judge, while we are waiting, on the

19   issue of the daily copy, my argument rests on one case.

20          THE COURT:  Do you have a copy?

21          MR. SHIPLEY:  If the Court wants to take a look at it

22   before tomorrow, it may short circuit the argument.

23          THE COURT:  I appreciate that, Mr. Shipley.

24          MS. BAKER:  Your Honor, I would like you to also look

25   at the case, the Miller cite, which I don't have an extra copy

 1   of.

 2           MR. SHIPLEY:  It's a case called Marvin.  It actually

 3   cited the Miller case.

 4           MS. BAKER:  I did provide an additional citation to

 5   Mr. Shipley.  Believe it or not, it's a case from the Court of

 6   Military Appeals because this issue has not been in the

 7   reported decisions.  I think because there is so much

 8   discretion allowed the Judge it has not come up on appeal.

 9           THE COURT:  Just e-mail Avi any additional citations

10   if you don't have them written for right now.

11           MS. BAKER:  I will just give him the citation right

12   now.

13           THE COURT:  Mr. Shipley, have you had an opportunity

14   to review Mr. Hassoun's request for the instruction?

15           MR. SHIPLEY:  Yes, I have, Your Honor.

16           THE COURT:  I have your mark up from the previous one.

17           MR. SHIPLEY:  Okay.  I do disagree with it in two

18   respects.  First of all, the first sentence is flatly wrong.

19   It is not offered for no purpose other than the fact that the

20   statements were made.  That is completely untrue.  It is

21   offered, by the Court's own words and under the rules,

22   regarding state of mind and intent of the defendants.

23           The idea of offered only for the fact it was made is a

24   different concept and a different exception to the hearsay

25   rule.  That is not the same thing as state of mind and intent,

1   and I am happy to refer back the Court to the transcript.  I

2   think that is an inaccurate statement of what it is offered for

3   and certainly not what we have offered it for to this Court.

4         The second sentence, word to that effect, if they want

5   them, regarding not offered for the truth, that's fine.  That

6   has never been an issue I have quarreled with.

7         As to the third sentence, I have two concerns.  One is

8   the broader one and I defer to the Court because I am sure Your

9   Honor as thought about this.  I actually don't know whether it

10  is better or not from anyone's standpoint to make the

11  connection between this video and 9/11.  It may be in people's

12  minds, but it may not.

13        The statement "it has no relevance to this case" is

14  way too broad.  That's not incorrect because, as you know,

15  there are areas in which 9/11, in terms of the investigation

16  and different steps -- so that is too broad.  My suggestion is

17  to take that out.  As I said, to the extent there are jurors

18  who do not draw the connection between bin Ladin and 9/11, that

19  is something that is only beneficial.  If you give them this

20  instruction, the third sentence of this, you are making clear

21  that every juror who looks at it will associate it with 9/11.

22        I defer to that on the Court as to mentioning it, but

23  certainly you can't say, respectfully, that it has no relevance

24  to this case because that is inconsistent with the testimony.

25        THE COURT:  Mr. Swartz?

GUNARATNA - Direct

1      MR. SWARTZ:  Your Honor, what I would propose is, if

2  the first sentence is a problem, just deleting the first

3  sentence and beginning with, it is not offered to prove the

4  truth of any statements made in the interview.  Then the final

5  sentence, I am also instructing you that the events of

6  September 11, 2001, have no relevance in this case and should

7  not be considered by you in any way in connection with this

8  case.

9      The reason for this last sentence, Judge, is because

10 that is a fact.  The jury was told this in various portions of

11 the voir dire.  They were told that this was not about 9/11.

12 It isn't about 9/11.  If the government solely wants to move it

13 about 9/11, then that's a strategy move they are trying to

14 make, but that's certainly not what this case is about.

15     They should be told this.  If there are some jurors

16 that haven't made a connection, we -- we are worried about the

17 one that already have made a connection with Osama bin Ladin.

18 So when they go back in the jury room, that can be -- it's

19 coming from the Court that it has no connection to 9/11.  This

20 interview has nothing to do with 9/11.

21     There is a reference to the World Trade Center

22 bombing.  We know that is the 1993 bombing.  The jurors may not

23 understand that.  That's why we need to clear this confusion

24 up, that this case has nothing to do with the World Trade

25 Center bombing.  We are asking that the Court read it not just

1    before, but after, because this is such a potentially

2    prejudicial piece of evidence.

3         THE COURT:  Here is my proposal.  Ladies and gentlemen

4    of the jury, you are about to view a videotape.  The videotape

5    is not offered to prove the truth of any of the statements in

6    the interview.  You may consider the video as it bears on the

7    state of mind on defendants Hassoun and Jayyousi only.  There

8    is no evidence that Mr. Padilla viewed, heard or commented on

9    the videotape.

10        I'm also instructing you that the events of September

11   11, 2001, should not be considered by you in reaching a

12   decision in this case.

13        MR. CARUSO:  Your Honor, on behalf of Mr. Padilla, we

14   would like the instruction to also contain the concrete line

15   that the videotape is not to be considered against Mr. Padilla.

16   I know in that instruction you instruct the jury that it is

17   only being introduced against Mr. Hassoun and Mr. Jayyousi.  I

18   would ask that you flatly tell the jury that the videotape is

19   not to be considered against Mr. Padilla because, as Your Honor

20   knows, this tape is being introduced for a very discrete

21   reason, per the Court's ruling, to reflect on the state of mind

22   of Mr. Jayyousi and Mr. Hassoun.

23        If Mr. Padilla was being tried alone, a request we've

24   made to this Court numerous times, this videotape would be

25   inadmissible.  Therefore, if the tape would be inadmissible

1    against Mr. Padilla if he were tried alone, the jury cannot

2    consider this videotape against him in this trial for any

3    reason.  So we would ask the Court that you flatly instruct the

4    jury in that regard.

5         MR. SHIPLEY:  Your Honor, I objected to that because

6    it's -- I understand what Mr. Caruso is trying to do, but it is

7    not an accurate statement of the law.  The state of mind of

8    Jayyousi and Hassoun bears directly on the conspiracy of which

9    Mr. Padilla is alleged to be part of.  To say that it has no

10   relevance whatsoever --

11        THE COURT:  Do you disagree with Mr. Caruso's

12   assertion, Mr. Shipley, that if Mr. Padilla had been tried

13   alone, that it is likely that this tape might have been

14   inadmissible given the fact that it is used, at least so far

15   according to what the government has said, that it bears on a

16   conversation that has occurred between defendants Hassoun and

17   Jayyousi with each other, and defendants Hassoun and Jayyousi

18   with other individuals?

19        MR. SHIPLEY:  Respectfully, Judge, I don't agree.  If

20   we had the same charge in this case and the same conspiracy and

21   I was trying to prove up the same facts and the same state of

22   mind and common objective of the conspiracy, it wouldn't

23   matter.  There may be an atmospheric issue that affects the

24   Court's analysis if he were the only one there.

25             But as a matter of law and as a matter of the

1   relevance of this videotape and state of mind, that does go to

2   Padilla in that sense, which is why Mr. Caruso's suggestion

3   that you may not consider this videotape in any way during the

4   entirety of your deliberations regarding Mr. Padilla is too

5   broad.  The only basis in the law for making a statement like

6   that would be to return to the issue the defense has proposed

7   at various points, which is that evidence relevant to the

8   conspiracy is only selectively admissible.  That's not the law.

9           THE COURT:  Mr. Caruso, I think there might be some

10  additional limiting instruction that would go towards your

11  client.  This evening would you give it another shot, one not

12  quite as broad in language, please?

13          MR. CARUSO:  Sure.  Just so I can get to that point

14  sooner rather than later, does the Court have any inclination

15  as to --

16          THE COURT:  I guess to say "in any way," because there

17  may be -- as we know, you are going to argue, and the

18  government is free to argue, that they may reach a decision

19  based upon inferences that could be made in reason and common

20  sense.

21          MR. CARUSO:  What about, this videotape could not be

22  considered against Mr. Padilla to show his state of mind?

23          MS. BAKER:  Your Honor, I have a --

24          THE COURT:  Let me hear from Mr. Shipley on this

25  point, Ms. Baker.  Then I will get to you.

 1          MR. SHIPLEY:  If I may suggest this, Your Honor.  Let

 2    me talk to Mr. Caruso.  My concern is the same because

 3    Padilla's state of mind goes to whether he has the framework

 4    and the same objective of the conspiracy.  I am not sure that

 5    does it.  Let me take a crack at this with Mr. Caruso.

 6          THE COURT:  Will we be getting to the tape pretty near

 7    in the morning for Dr. Gunaratna's testimony?

 8          MR. SHIPLEY:  Yes, it will be tomorrow morning.

 9          THE COURT:  Just drop off your language at chambers in

10    the morning and we will work it out.

11          Ms. Baker, your issue?

12          MS. BAKER:  Thank you, Your Honor.  This is directly

13    responsive to the language that Your Honor has proposed to

14    give.  I think that the sentence that you have proposed will

15    read like a direction to the jury that you have decided that

16    this video bears upon my client's state of mind and you are

17    telling them it does, and that is wrong, prejudicial and

18    unfair.

19          Let me clarify something.  What my client says in the

20    phone conversations, and there are several of them, one after

21    the fact, obviously can be considered by the jury as to his

22    state of mind, as it can in any phone conversation.  All of the

23    phone conversations have come in, I believe -- the only proper

24    reason they have all come in is to determine his state of mind

25    at different times.  That's what this case is all about.

1           I would not object to an instruction that said the

2    jury may consider what he says in any phone call with respect

3    to this interview as bearing on his state of mind, but the

4    interview itself does not bear on his state of mind.  The

5    interview in the abstract is just an interview.  It bears on

6    Osama bin Ladin's state of mind.

7           THE COURT:  It is not in the abstract, Ms. Baker.  The

8    interview is in context to the fact that your client discussed

9    it on, if I recall, at least two, possibly three telephone

10   conversations.

11          MS. BAKER:  I don't disagree, Your Honor.  Afterwards

12   he did discuss it.

13          THE COURT:  He discusses it before and he discusses it

14   after.

15          MS. BAKER:  And to give an instruction to say that

16   what he says bears on his state of mind would not be error.

17   But to say that the interview in the abstract bears on his

18   state of mind is in error.  You certainly could say to the jury

19   that insofar as he hears it and comments on it, his comments

20   are introduced for his state of mind, but it is not correct.

21          This video looked at just -- let's just say the

22   government, in a hypothetical situation, just introduced the

23   interview which, by the way, they did in 2001, the Embassy

24   bombing case.  This very same video was introduced against four

25   people, the first of whom was Osama bin Ladin himself, and the

1    others of whom who were alleged to be in a conspiracy.  This

2    was the Embassy bombing, wherever the other Embassy was,

3    forgive me for not knowing.  Tanzania.

4          Four of them were on trial.  It was United States

5    versus Osama bin Ladin and three others.  They were all alleged

6    to be in a conspiracy to commit those specifically

7    anti-American attacks.  The interview came in.  I don't know

8    what their instructions were, but certainly it was relevant to

9    the intent of Osama bin Ladin in that case and, I guess, to his

10   co-conspirators in that case.

11         THE COURT:  First of all, Ms. Baker, I am going to

12   give the jury at the conclusion of the trial, however many

13   years it might be from this moment in time, that they are to

14   consider the instructions as a whole.  So they will get that

15   instruction.

16         This, I believe, is -- we parse it out in the manner

17   in which you have suggested, I don't believe -- it may make

18   sense to a lawyer, but I don't believe it will make sense to

19   those without legal training.  I believe the instruction as it

20   stands now correctly frames the issue for the jury as to how

21   they should consider the tape when they are viewing it.

22         MS. BAKER:  Your Honor, could we respectfully request,

23   since you are permitting some extra time overnight for a

24   portion of the proposed instruction to be considered, to give

25   you some more modified language?

 1          THE COURT:  You can slide anything under the door

 2    tomorrow you want, but we are moving on from this videotape.

 3    We are moving on.

 4          Mr. Swor, is there anything else?

 5          MR. SWOR:  I just think Ms. Baker has correctly stated

 6    what the Court's consideration should be.

 7          THE COURT:  Thank you very much, Mr. Swor.

 8          We are now to the issue, which I understand,

 9    Mr. Shipley, you think will come up tomorrow, and that's the

10    motion to exclude the Usbat al Ansar evidence.

11          MR. SHIPLEY:  I suspect that it will come up tomorrow,

12    Your Honor.

13          THE COURT:  Will it come up such that we should argue

14    it now?  I am anticipating that Mr. Gunaratna is probably going

15    to be on the stand for the remainder of the week.  Am I wrong?

16          MR. SHIPLEY:  I think that is actually probably wrong.

17    I am trying my best to keep things moving.  I don't know what

18    the Court's preference is on the issue.

19          THE COURT:  If it means that we are going to have

20    significant time away from the jury tomorrow, I would rather do

21    it now.

22          MR. SHIPLEY:  I would just as soon do it now.  I can

23    rest comfortably on what my papers are.  I think it boils down

24    to, in its current version anyway, and issue that the Court

25    previously ruled on.  Basically, as Your Honor, if you have

1    read what I had attached --

2         THE COURT:  Basically, if I understand, what Ms. Baker

3    is arguing is the fact this was mentioned by the government in

4    their opening and that she did not object to exclude it or to

5    strike it.  But that on further review, she has gone back over

6    the Bill of Particulars and this was not mentioned.

7         Your contrasting argument is the Bill of Particulars

8    places the defense on notice.  It is not exclusive.  It does

9    not mean that the only evidence, within reason -- if the

10   government were to somehow bring in something from maybe South

11   America, that might be outside, but that basically what you

12   outline in your Bill of Particulars places the defense on

13   sufficient notice as to how they can prepare and defend this

14   case.

15        MR. SHIPLEY:  If I can have the floor for two minutes,

16   Your Honor, I can sit down and then you can take up whatever

17   you need with Ms. Baker.

18        MS. BAKER:  It is my motion.

19        THE COURT:  Continue, please, Mr. Shipley.

20        MR. SHIPLEY:  That's exactly right as to the Bill of

21   Particulars.  Again, the focus of this issue appears to be

22   about testimony from Dr. Gunaratna regarding comments in a

23   phone call of these defendants.  It is a phone call involving

24   defendant Jayyousi, later referenced by Hassoun, referring

25   specifically to the bombings of nightclubs and liquor stores in

1    Lebanon.

2           The testimony will be that this was by this group

3    Usbat al Ansar, this was characteristic of what they did.  That

4    is in the call they had contemporaneous with or before the Bill

5    of Particulars.  That's a call.

6           THE COURT:  Was this a call that the defense was

7    placed on notice with the calls that would be presented at

8    trial?

9           MR. SHIPLEY:  Yes, always been among those, Judge.

10   There has never been any ambiguity about that.  That's all I

11   intend to do.  I intend to have him on the stand, when I'm

12   talking about this call -- another portion of that call talks

13   about an assassination of a moderate Islamic leader by Usbat al

14   Ansar.

15          I'm going to ask him, do you see the incidents

16   referenced in this call?  Are you familiar with them?  Yes, I

17   am.  Are you familiar with what Usbat al Ansar did?  Yes, I am.

18   This is the group that Hassoun actually stands up and says on

19   the phone, this is my group.  This is the Abu Muhjin group.

20   I'm with the Abu Muhjin group.  That is Usbat al Ansar.  That's

21   my argument.

22          THE COURT:  Thank you, Mr. Shipley.  Ms. Baker.

23          MS. BAKER:  I am almost tempted not to share what I am

24   about to share because it is going to help the government, but

25   I am going to share it because I think that it's time we tried

 1   to speak the truth in this courtroom.

 2          The statement on page -- let me back up.  We do not

 3   take the position that Usbat al Ansar could not be referenced

 4   by the witness.  We do not take the position that we had no

 5   notice that that name would come up.  We take the position that

 6   we have no notice in the Bill of Particulars, by which they are

 7   bound unless they go through a procedure that doesn't prejudice

 8   us to modify it, which they did not go through, and they are

 9   bound by the indictment.  I include the FISA intercepts.

10          In all of those documents, Your Honor, we had

11   absolutely no notice that Usbat al Ansar would be claimed to

12   have engaged in bombings of civilian targets during the period

13   of this indictment.

14          The line that Mr. Shipley is referring to -- and I do

15   want to get it out of the transcript -- happens not to be

16   dealing with Usbat al Ansar.  I guess if Mr. Gunaratna thinks

17   it is and he is going to testify to that, we will be able to

18   show that he doesn't know what he is talking about.  The line

19   is on page 7 of the January 4, '96 transcript, which is 35T.

20          Now, on the pages before that, Usbat al Ansar is

21   discussed.  What is discussed about Usbat al Ansar is --

22          THE COURT:  What page again?

23          MS. BAKER:  Through page 6 there are a couple of

24   references.  I think they probably are all on pages 5 and 6.

25   Usbat al Ansar is discussed.  This is a call between Kifah

1   Jayyousi and somebody named Abu Mustafa.  They are discussing

2   the assassination of Halibi for which several members of Usbat

3   al Ansar were captured, arrested and ultimately executed.  I

4   can't remember at the moment if the execution in this was about

5   to happen or had already happened.

6        We do not have a claim that we were not on notice

7   about a discussion of the assassination.  The next page of this

8   transcript, page 7, brings up a totally different episode.  AM,

9   Abu Mustafa, says his brother, Dr. Hassan Shalal's son --

10   which, by the way, is phonetic and is completely incorrect.

11        THE COURT:  It says it is phonetic in the transcript.

12        MS. BAKER:  I know, and it is not Dr. Shalal's son.

13   It's another organization altogether.  I am looking for the

14   name of it so I can pronounce it correctly.  In any event, it

15   is another organization.  The other organization operated out

16   of Tripoli, which is northern Lebanon.  I don't see Tripoli on

17   this page, but it talks about during Christmas bombing liquor

18   stores.

19        That was another organization, Your Honor.  It was not

20   Usbat al Ansar, which operated out of a particular Palestinian

21   refugee camp in the south.  Tripoli is mentioned on the next

22   page.  Yes.  If you would look, Your Honor, on page 8.

23        THE COURT:  I am on page 8.

24        MS. BAKER:  It is a totally different organization

25   from Tripoli that did engage in the Christmas period liquor

GUNARATNA - Direct

1   store bombing.  It is not Usbat al Ansar.  I realize

2   Mr. Shipley is going to -- apparently he's going to have

3   Mr. Gunaratna testify to that.  That is going to then be his

4   problem when we have a definitive work that was very recently

5   published --

6            MR. SHIPLEY:  Judge, what is the issue, then?  This is

7   a factual dispute.  If Ms. Baker wants to impeach my witness --

8   she is standing up here arguing how I am factually wrong.

9            MS. BAKER:  I think this is unfair.  This is my time.

10           THE COURT:  First of all -- wait, wait, wait.  Both of

11   you be quiet.  Ms. Baker.

12           MS. BAKER:  Thank you, Your Honor.  Your Honor, the

13   government cannot claim we are on notice of something that is

14   outside the Bill of Particulars and outside the indictment and

15   outside any proper factual foundation.  They cannot claim that

16   we are on notice that Usbat al Ansar engaged in bombings when

17   it was a different organization that engaged in bombings.  They

18   cannot say we can just impeach their expert.  That is not a

19   good enough answer when it is factually inaccurate.

20           THE COURT:  If the government thinks, based upon their

21   review of the record, that it is factually accurate, they are

22   entitled to put forth what they think, based upon their review

23   of the evidence, is factually accurate.

24           It would be very different, Ms. Baker, if you were

25   coming in saying, Mr. Shipley and Dr. Gunaratna know what they

 1   are telling the jury is false or inaccurate.

 2        MS. BAKER:  I won't go further down that path.  I will

 3   rest upon what I think is an absolutely clear legal position.

 4   There is no question it is outside the Bill of Particulars.

 5   Your Honor, I stood here a year and a half ago, it was February

 6   of '06, and I said, we need to know how to defend, we need to

 7   know were there suicide bombings that they are planning to

 8   throw at our clients.  We need to have the same kind of

 9   discovery that they had in al-Arien where they were told that

10   there were 16 episodes of buses being blown up and markets

11   being blown up, and that we needed to know the victims of the

12   alleged conspiracy to commit murder.

13        Your Honor directed the government to tell us the

14   categories of alleged victims.  Those categories are uniformly

15   categories of governmental forces or other forces in a civil

16   war.  There was not a whisper, not a suggestion of a suicide

17   bombing or a bombing of a civilian target anywhere.  One day

18   not that long ago, Mr. Frazier made a comment, and I stood

19   up -- this was pretrial, but I don't remember exactly what

20   hearing it was, or maybe it was during an argument in the midst

21   of trial.

22        I stood up and said, we are not on notice of any

23   suicide bombings.  Mr. Frazier made this comment about, well,

24   you must not be reading your transcripts.  Your Honor, we have

25   studied our transcripts.  If there was any evidence of a

1    suicide bombing committed by any of the groups that my client

2    is alleged to have supported I assure you we would have been in

3    here opposing the introduction of such evidence on the grounds

4    that it is outside the indictment and it's outside the Bill of

5    Particulars.

6          We have a right under the law of the Eleventh Circuit

7    to stand on the Bill of Particulars.  The Bill of Particulars

8    told us that there were jihad conflicts, areas of jihad

9    conflict in different parts of the world, and that my client

10   and others were alleged to have given support, to have joined

11   with co-conspirators for the purpose of furthering the jihad

12   conflict or furthering the alleged violent jihad.  I hate to

13   use that word because I think it is a made up word.  It has no

14   legal significance.  But it is the government's case, so I will

15   use it for these purposes.

16         My client is accused of having participated in a

17   conspiracy to commit murder in Bosnia, Kosovo, Chechnya, where

18   there was a jihad conflict.  He is accused of giving material

19   support to a jihad conflict where mujahideen were fighting to,

20   according to Dr. Gunaratna, establish an Islamic state.  They

21   were fighting in armed confrontation.

22         That's what the entire Bill of Particulars is about,

23   armed confrontations, armed conflicts.  That's what the

24   indictment is about.  Nowhere is there an assertion that my

25   client participated in a conspiracy to blow up a civilian

1    entity, a civilian facility.

2            Not only were we not on notice because Usbat al Ansar

3    did not do that, but aside from that, if we had been on notice

4    I would have been in here moving to exclude it on the grounds

5    that it was beyond the Bill of Particulars.  I would have done

6    that pretrial, Your Honor.  If Your Honor would have permitted

7    an amendation to the Bill of Particulars, which I would have

8    vigorously fought, but you might have permitted it, then we

9    would have had time to prepare differently for trial.

10           I assure you I would have moved for that because that

11   was exactly what was in my mind, exactly what was in my mind

12   when I stood here and argued for a Bill of Particulars and said

13   we don't know what we are defending against.  We were told that

14   we were defending against opposition to apostate regimes, which

15   are Muslim regimes that have lost their way Islamically, civil

16   war in Afghanistan.  That's where we're accused of supporting

17   one side, and I am not even sure which side.  I never knew

18   that.  And jihad conflicts where the victims where the Russian

19   forces, I am quoting, Your Honor, Russian forces in Chechnya

20   and Tajikistan, Serbian Croatian forces in Bosnia and Kosovo,

21   that's what we were told about, not a whisper of an attack on a

22   civilian entity.

23           There is not even a suggestion in what the government

24   is now asserting with respect to Usbat al Ansar that this

25   bombing was anything other than just a random bombing during

1    Christmas of a liquor store.  They are not even suggesting to

2    his intent because it would be factually completely baseless.

3    It was not -- during the time of this indictment it was totally

4    confined to fighting other factions within one Palestinian

5    refugee camp in southern Lebanon.

6         This Christmas time bombing took place in Tripoli, a

7    different part of the country, a different group.  Usbat al

8    Ansar never engaged in the kind of contact that fits within the

9    Bill of Particulars.

10        THE COURT:  I understand.  Mr. Swor, anything before I

11   allow Mr. Shipley to reply?

12        MR. SWOR:  Your Honor, I would adopt Ms. Baker's

13   argument.

14        THE COURT:  Mr. Swor -- Mr. Shipley -- too many people

15   who have names that begin with S are involved in these

16   proceedings.

17        You reference on page 5 of your response several

18   cases.  One of them you discuss, Johnson, the Court said, when

19   a conspiracy is alleged, the government is not limited to

20   proving at trial only those acts as stated either in an

21   indictment or in the Bill of Particulars.  It is not

22   prejudicial for the government to show other acts of the

23   conspirators occurring during the life of the conspiracy.

24        Now, how does that affect what Ms. Baker says is the

25   fact that you are required to procedurally amend a Bill of

1   Particulars?

2          MR. SHIPLEY:  Well, in two respects, Your Honor,

3   Johnson goes on -- if you see my parenthetical in the following

4   paragraph, Johnson discusses the Bill of Particulars

5   specifically and regarding the ability of the government or

6   otherwise to amend it at any point in time.  That's what the

7   Johnson case is about.

8          Judge, I don't think there is an issue regarding the

9   Bill of Particulars.  I think Your Honor's initial ruling was

10  correct.  Ms. Baker doesn't call your attention, holding aside

11  the factual dispute, to the expressed reference to Lebanon in

12  the Bill of Particulars.  Your Honor is aware of that.  We have

13  been over that.  Your Honor is aware that Lebanon is referenced

14  specifically in the indictment.  This specific call was

15  provided to the defense long ago.

16         The whole nub of a Bill of Particulars is to provide

17  notice.  There is no statement in the Bill of Particulars

18  saying this bombing incident discussed in this call of which

19  you have notice is not one that is going to be linked to the

20  group that this defendant, your client, is part of it.  In

21  fact, it makes clear that the Bill of Particulars is not

22  exclusive, it is not the only source of the evidence or the

23  allegations, and refers specifically to acts of murder, maiming

24  and kidnapping against leaders, members and supporters of what

25  they viewed as apostate regimes, including other Muslims.

1          The incidents that are being referenced in that phone

2     call that they certainly have notice of involve efforts by this

3     group in Lebanon to attack civil institutions that were

4     perceived as being unIslamic.  Those are liquor stores and

5     nightclubs.  My testimony through Dr. Gunaratna is going to be

6     rooted in the phone call itself.  They have had ample notice of

7     that.

8          Again, merely by the discussion that we are having

9     here there is no issue of surprise.  This is, respectfully,

10    Judge, a gotcha.  Ms. Baker didn't object during the

11    discussion.  Lebanon is a problem for the defendants because it

12    doesn't fit into this humanitarian model that they want to put

13    in front of the jury.  That's not our theory of the case and

14    that's not the evidence.

15         The Bill of Particulars has ample disclosure in it.

16    To the extent there is an issue, then I would ask the Court for

17    permission to amend it because there clearly is no prejudice.

18    But I don't think the government needs to amend a Bill of

19    Particulars to say, defense counsel, you have had a call for a

20    year that refers to an act of violence and refers to the group

21    your client is part of and claims to be part of.  So you are

22    clear, defense counsel, I am going to tell you now in bright

23    lights we are going to say that the group your client claimed

24    to be part of participated in these acts.

25         That is not what a Bill of Particulars is for.  That

1    is not the purpose of a Bill of Particulars.  So, to be clear,

2    Judge, our argument is the Bill of Particulars provides ample

3    notice regarding Lebanon, regarding supporters of people who

4    oppose these nonIslamic regimes or insufficiently Islamic

5    regimes, that much is clear from the record and from the calls.

6         To the extent there is any issue, we would ask

7    permission to amend.  But again, think about what an amendment

8    would be and what it would say.  Defense counsel, in this call

9    that you had, this particular bombing of your client's group

10   involved this particular act.  That's not the case.

11        I won't delve further in the factual issues.  Needless

12   to say, I disagree completely with Ms. Baker.  Usbat al Ansar

13   repeatedly engaged in these kind of acts against

14   nonsufficiently Islamic organizations in Lebanon.  If she

15   disagrees, she argues it with the jury.

16        THE COURT:  For purposes of this record, I should say,

17   and I think I said it at the time, the indictment starts out in

18   paragraph one, "There existed a radical Islamic fundamentalist

19   movement dedicated to the establishment of a pure Islamic state

20   governed by strict Islamic law.  Followers in support of this

21   movement adhere to a radical Salafist philosophy and ideology

22   that encouraged and promoted violent jihad to be waged by

23   mujahideen using physical force and violence to oppose

24   governments, institutions and individuals that did not share

25   their view of Islam.

1           "Groups espousing this radical Salafist ideology

2    included the Islamic Group of Egypt, the Egyptian Islamic jihad

3    and violent Al-Qaeda and violent jihad groups in other

4    countries, including Afghanistan, Algeria, Bosnia, Chechnya,

5    Lebanon, Libya and Somalia.  These groups engaged in acts of

6    physical violence, including murder, maiming, kidnapping and

7    hostage taking in waging violent jihad."

8           I believe that the government's comments concerning

9    this issue is appropriate given the Bill of Particulars.  If

10   the defense has a factual disagreement, absent coming to me

11   saying that the government is somehow putting forth testimony

12   that they know is false, which has not been the case, the

13   defense has a different factual viewpoint that they say they

14   can prove.  I am going to allow the references to those areas.

15          So defendant's motion to exclude Usbat al Ansar

16   bombing evidence, docket entry 1065, is denied.

17          MS. BAKER:  Your Honor, may I ask for this

18   clarification?  Is the government going to be, as they were

19   during Mr. Kavanaugh's questioning, limited to what is in the

20   calls and any bombing, any alleged bombing --

21          THE COURT:  This is a different witness.  This is a

22   702 witness.  He has way more latitude to testify as an expert.

23   Agent Kavanaugh was hamstrung, to what extent you can say that

24   is, because the government, for whatever reason, did not offer

25   him as an expert.  He was offered as a lay witness and was

1  bound by the facts in the record.  To the extent appropriate,

2  this witness is testifying as an expert witness.  Your

3  objection is noted for the record.

4         Mr. Swor, I have your draft that you handed up to Avi

5  on the instruction.  I will look it over and I will have one to

6  read on the record tomorrow morning.

7         MR. SHIPLEY:  I haven't seen it, Judge.

8         THE COURT:  It is written in longhand.  To the extent

9  I can, Mr. Swor, this is what his draft is:  You are about to

10 view a videotape.  The government claims that Mr. Hassoun and

11 Dr. Jayyousi viewed this videotape.  You are to decide whether

12 you believe Mr. Hassoun and Dr. Jayyousi viewed the videotape.

13 If you believe that they viewed the videotape, you may consider

14 it in conjunction with any statement that they have made to

15 determine the state of mind of defendants Hassoun and Jayyousi.

16        There is no claim by the government that Jose Padilla

17 viewed or knew about this video.

18        That's his draft.  I am going with the other three

19 that I have and I will have one for everyone tomorrow morning.

20        MR. SHIPLEY:  Obviously, we don't agree with that.

21        THE COURT:  I will have one that I can pass out to

22 everyone tomorrow morning.  Thank you, everyone.

23                    [Court recessed].

24

25

1                    C E R T I F I C A T E

2          I hereby certify that the foregoing is an accurate

3     transcription of proceedings in the above-entitled matter.

4

                            /S/  ROBIN M. DISPENZIERI

5     _____     _____
          DATE FILED           ROBIN M. DISPENZIERI, RPR-CP

6                              Official Federal Court Reporter
                               United States District Court

7                              301 North Miami Avenue, 6TH Floor
                               Miami, FL  33128 - 305/523-5158

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

abbreviation 144:23
Abdallah 60:6,7,10
Abdullah 1:10,10 136:14 137:6,7,8
137:11,12,20,22,25 138:7,12,18
139:2,13,24 141:9,25 142:5,21
143:8 144:12,15 146:20,23,24
147:7 148:16,18,19 149:17
157:7,12,14
ability 38:21 70:8 213:5
able 11:2 39:13 56:19 91:15 94:2
105:19 110:15 135:22,23 136:4
206:17
above-entitled 218:3
absence 35:1,8
absent 216:10
absolutely 113:16 141:16 206:11
209:3
abstract 201:5,7,17
Abu 1:10,10 60:6,7,10 98:3,3,10
102:22 170:21 205:19,20 207:1
207:9
Abuhaf 170:14
academic 89:18 115:5 125:25
133:10
Academy 116:1,10,23
accepted 134:4,18,23
access 26:5 32:25 118:23 119:16
account 9:17
accurate 79:5 84:11 198:7 208:21
208:23 218:2
accused 192:12 210:16,18 211:16
achieve 138:4,9 167:2
achieving 168:13
acquired 21:15
act 93:7 141:17 214:20 215:10
action 140:2 142:7,15
active 31:20 32:1,2 48:6 136:9
activities 20:9 28:24 29:3 150:2
152:11 177:4 179:2
activity 35:7 177:21 179:5
acts 120:4,6 133:14 212:20,22
213:23 214:24 215:13 216:5
actual 36:24 133:3 141:17 177:25
187:11
adapted 174:17
add 81:13
addition 123:18 131:5
additional 17:22 67:22,24 70:18
95:8 122:17 194:4,9 199:10
address 23:20 70:16 132:4
addressed 58:12 190:6
addressees 98:2
Adham 1:8 12:8,12,19,22 13:19,25
14:12 19:5 21:3,12,16,24 22:2
22:10,15 27:22 28:13 33:6 36:8
38:23 53:9,11 54:21 56:13 84:1
86:25 89:8,12,15 140:23 141:1
adhere 166:1 215:21
Adid's 193:1
adjourn 75:11
admissible 199:8
admit 4:15 6:2 7:10 8:13 11:19
admitted 5:2 76:11,18 77:1 96:4
102:6
admonished 73:18
adopt 212:12
advance 112:1 177:23
advantage 183:11
advice 22:17 23:3 54:21,23 158:24
158:25 160:4,23 161:10,12,17
161:19 162:2,8,12,14 163:23
164:3
affect 65:10,25 121:13 212:24
affiliated 115:16,22
affiliations 115:24
Afghan 147:18,19 153:10
Afghanistan 34:3 57:25 60:8,11,24
63:23 115:7 118:2 119:7,10
136:14 137:10 143:10,13,18,19
143:14 144:1,14 145:14,18
146:3,5,6,11 147:7,9,10,14,16
147:17,18,21,22 148:12 150:2
151:8,10,16,23 153:17,20,21,23
154:3,21 155:5 164:24 165:1,2,9
165:11,13,14,16,21,22 166:2,12
167:8,11,12,18,24 168:3 171:9
188:15 190:10 211:16 216:4
Afghanistan/Pakistan 143:8 154:9

Afghans 143:23
Afghan/Pakistan 155:13
afraid 97:22 189:5
Africa 125:24 130:16,17 135:24
149:6 154:14 175:10
afternoon 81:4 111:8,23 114:10,11
156:4,8 182:15 187:5 193:7
agencies 119:3 120:12
Agency 124:20
agent 4:4,8 6:11 7:21 9:3 12:6
23:11 61:7 63:3 65:10 66:6 71:1
71:20 72:20 74:25 75:7,25 79:21
80:15,17,19 84:3,8 90:9 91:7,10
92:7,11,23 97:7,13 109:23 143:1
216:23
agents 93:5,6
ago 20:6 126:15 129:20 136:19
137:5 139:11 141:24 144:12
150:20 155:14 160:5 174:6
179:17 190:19 209:5,18 213:15
agree 67:6 73:15 75:23 76:17
78:18 184:8 198:19 217:20
Ah 13:25 33:6 44:3
ahead 53:2
Ahman 9:14
ah-ha 53:6 108:3,6
aim 136:22
aims 143:15
air 36:17
al 1:10 51:7 58:11,13,25 59:13,15
59:20 103:7,24 104:5,22 138:21
138:25 139:3,4 144:16,21,24,25
145:8 146:17 148:9,13,22,24
149:1 161:22,24 163:10 168:24
169:16 170:5,21 203:10 205:3
205:13,17,20 206:3,11,16,20,21
206:25 207:3,20 208:1,16 211:2
211:24 212:7 215:12 216:15
Albania 42:4
alerted 89:10
Algeria 216:4
Allah 25:9 141:11
allegations 213:23
alleged 198:9 202:1,5 209:12,14
210:2,10,12 212:19 216:20
allegedly 170:2
allegiance 171:4
allow 11:4,5 72:4 74:23 95:6 96:8
96:15 113:21 123:14 211:21
216:14
allowed 72:11 80:21 88:5 91:4 92:5
107:23 108:25 110:20 111:11
113:2 194:8
allowing 74:16
alongside 149:24
alter 65:15 68:17
alternative 77:8 81:20 84:4
alters 70:19
altogether 207:13
al-Arien 209:9
al-Naji 14:1 18:4 89:9
Al-Qaeda's 136:22 168:7 172:16
172:16
al-Turabi 154:17
ambiguity 61:1 205:10
amend 212:25 213:6 214:17,18
215:7
amendation 211:7
amendment 215:7
America 1:4 115:6 135:25 144:5
175:11 204:11
American 9:1 10:3 56:6 192:16,19
192:23
Americans 115:11 192:12
amid 190:10
AMIN 1:3
amir 29:21 168:23,23
amount 126:19
ample 214:6,15 215:2
amply 71:7
analysis 63:4,9,10,12,14,16,24
64:7,13,20,24 65:3,6,11 66:1,7
66:16 67:7,10 69:14 70:6,9,20
71:12 132:6 198:24
Andrews 122:20 125:1 126:22
Ansar 203:10 205:3,14,17,20 206:3
206:11,16,21,25 207:3,22 208:20
208:1,16 211:2,24 212:8 215:12
216:15
answer 15:15 24:6,10 30:13 47:23

51:20 52:1 73:10 82:15 99:23,24
101:2 105:2 135:8 136:19
139:20 151:21 153:3 154:18
178:7 208:19
answered 68:5 71:9 102:19 172:23
answering 21:22
answers 17:19 30:6 39:2 78:20
81:21 188:22 189:5,10 191:16
Anthony 2:9 192:24
anticipate 9:3
anticipating 203:14
anti-American 202:7
anti-Soviet 143:16
anti-terrorism 119:23,23
anybody 15:4
anymore 80:7 190:2
anyone's 195:10
anyplace 42:3
anyway 44:6 203:24
AO 14:2
apologize 32:11 102:15
apostate 211:14 213:25
apparently 208:2
appeal 194:8
Appeals 194:6
appear 43:8,13,15,20 48:25 49:3
83:14,15
appearance 152:14
APPEARANCES 1:16
appeared 79:3
appears 5:16 12:15 49:10 56:16
69:19 103:7 163:3 189:7 204:21
appellate 185:23
applies 88:11
appointed 163:10
appointments 116:12
appreciate 193:23
approach 8:17 97:10 102:8 103:2
140:15
appropriate 75:19 84:2 111:16
129:16 137:24 147:4 216:9
217:1
approximately 98:17 182:21,22
April 35:23 53:21 64:21 85:1 139:2
155:16
Aqeel 99:7 105:13,18 106:14 107:8
108:2,6,13,14,15,20,23
Arab 119:9 135:15,16,17,18 138:22
144:6,21 145:3,9 146:18 148:13
153:17,21
Arabia 137:13 146:8 192:16
Arabic 6:22,23,24 38:19,21 39:2,5
42:22 50:13,15 51:23 53:14
107:16 127:16,18,21 184:16
area 26:10 31:20,25 32:2,25 34:2
47:5 48:6 57:20 59:2,16 70:3,15
73:1 82:21,21,22 83:8,9,17,18
83:24 84:7,19,21 85:12,24 86:13
86:21,22 87:9 88:9,18,19,20
90:15,16,19 93:14 94:11,12 95:7
111:5 120:24 132:22 136:5
155:11 161:21 181:1
areas 26:8 44:22,23 47:9 61:10
72:21 74:3 82:3,4,11,16 83:7,13
84:18 86:24 87:1,7,21 88:8,16
88:18 93:24 94:1,1,4,18 111:1
134:7,19 180:8 191:10,12,17
195:15 210:8 216:14
aren't 68:1
argued 83:10 199:17,18 203:13
argued 87:23 211:12
argues 215:15
arguing 80:3,6 204:3 208:8
argument 68:14 78:4 93:17 190:1
190:2 193:19,22 204:7 205:21
209:20 212:13 215:21
argumentative 36:2
arguments 73:14
armed 140:1 142:7,15 210:21,23
210:23
arms 124:9 159:11
Army 45:18 46:18 48:9,21 98:8
116:10
Arnett 187:2,21,23 188:14 189:12
189:17 190:9
arrangements 173:5
arrest 66:7,13
arrested 64:9 91:5 207:3
arrive 75:9
artfully 73:19

article 129:9 138:24 139:3,6
130:7 132:8
articles 89:17,17 129:7,21,23
ascribed 185:9,10
Asia 114:21 115:24 118:3 121:12
125:15,18,19,21 130:15 135:24
144:3 149:5 175:9
Asian 120:10 127:25
Asians 115:12
aside 84:19 129:11 133:6 164:22
211:3 213:10
asked 12:7,11 21:10 23:11 28:22
29:1 35:18 36:7,11 38:2,5 40:14
40:18,23 41:1,12 45:11,14,23
46:16,17,24 49:12,19,23 50:6
52:5,21 53:8 54:3,8,10 55:20,23
56:16,22,25 63:3,22 66:10 68:5
69:8 71:2,9,10 75:15 82:13,17
84:9,14 85:13 92:12 95:12,21
97:14 101:25 102:6,17 108:3
167:15 172:23 183:18 193:15
asking 20:6 23:3 28:1,9,11 50:18
58:4 60:5 196:25
asks 73:19
aspect 57:1
aspects 55:23
assassination 188:16 205:13
207:2,7
asserting 211:24
assertion 198:12 210:24
assessment 37:5
assist 144:13 149:4,9 179:4
assistance 172:10,15 173:24
179:1
assisted 173:10
assisting 178:17
associate 115:21 171:13,16,19
172:3,7,22 173:3 175:13 179:7
179:25 180:3,7,13 181:11
195:21
associated 132:14 133:13 134:8
134:22 159:22 171:14 182:13
Association 9:2
assuage 102:19
assume 69:17 71:25 107:16 113:8
185:18
assumed 170:8
assumes 160:11
assuming 24:13 96:3
assure 210:2 211:10
Atef 169:1 170:15
Atlantic 117:10
atmospheric 198:23
attached 81:19 204:1
attack 71:11 113:23 117:23 182:9
211:21 214:3
attacks 202:7
attain 138:3
attempt 34:16
attempting 102:19
attempts 188:16
attend 42:21
attending 89:16,16
attends 156:16
attention 154:9 185:13 213:10
attorneys 73:6,13
Attorney's 119:2
attributed 141:14
audience 158:15
audio 5:21,24
August 40:19 41:24 42:7 48:2 89:1
Australia 175:10
authentic 5:24
authenticate 4:15 10:15 90:7
authenticated 5:2 95:12
authenticating 10:18
authentication 11:5
authenticity 67:2
automated 14:2
autopsy 81:12,14
availability 216:24
available 24:8 93:19 119:11 175:24
181:2,2 189:16 190:15
Ave 2:5,21
Avenue 1:23 218:7
Avi 187:8,8,14 194:9 217:4
awarded 123:19 124:6
aware 5:24 20:14 21:3,12 22:10
37:5 38:8 39:8,18,23 47:14
50:15 51:2,10,22 62:16 63:14

64:23 65:20 67:10 69:20 86:10
90:10 99:4 127:13 163:7 213:12
213:13
**Ayman** 168:24 169:16 170:5
**Azzam** 136:14 137:6,7,8,11,12,20
137:22,23,25 138:4,7,12,17,18
138:24 139:2,11,13,14,21,23,24
140:8 141:9,14,17,20,25 142:5
142:14,15,20,21 143:7,8 144:12
144:15 146:20,24,24 147:7
148:16,18,19 149:17 157:7,12
157:14
**Azzam's** 138:2 141:15 143:3,5
**A.F.P.D** 2:8,9,9
**a.m** 1:7 72:11
**A.U.S.A** 1:18,18,19,21
**a/k/a** 1:9,10,10

**B**

**babes** 74:12
**back** 9:16 13:5 19:7,18 20:24 23:16
24:4 25:3,23 41:1 69:24 72:20
72:20 75:9 78:7 79:15,22 80:24
81:1,8 87:16,18,19 92:14 93:18
93:19 95:18 103:12,24 104:4
108:7,17 117:17 121:9 123:11
132:4 137:6 138:15 146:1 155:6
155:24 156:5 164:24 167:7,10
173:8 183:12,22,23,25 187:9,11
195:1 196:18 204:5 206:2
**background** 121:25
**bad** 75:10 106:25
**bag** 45:17,18,24,24,24,24 46:18,19
48:9,9,22,23
**Baghdad** 133:17
**Baker** 2:5 9:18 10:5,22 11:9,12,15
75:18 76:17,20 79:25 110:8,18
110:21,23,25 111:17 112:20,23
113:5,17,22,25 121:22 123:13
134:10 135:4 139:17 141:19
151:18 152:3,5,24 158:4 163:17
164:15 166:6 169:18 170:1,2
178:4,18 179:9 183:14 186:11
190:9 193:24 194:4,11 199:23
199:25 200:11,12 201:7,11,15
202:11,22 203:5 204:2,17,18
205:22,23 206:23 207:12,24
208:7,9,11,12,24 209:2,12,24
213:10 214:10 215:12 216:17
**Baker's** 186:8 212:12
**Baku** 105:15
**ballpark** 98:24
**banking** 8:5
**bar** 8:16 23:24 88:8 94:4 110:4
112:11
**barracks** 192:16
**base** 20:18 125:10 139:3 163:9,10
**based** 9:6 11:19 12:21 14:15 15:2
20:14,22 23:18 29:5 31:6 32:22
34:24 37:5 40:4 47:8 54:20 57:9
62:4,10 68:9 91:2 94:12 96:24
101:15 104:5,21 126:9 136:22
136:25 138:1 147:24 152:20
162:1,3 164:8,18 165:8,20,23
180:5 192:24 199:19 208:20,22
**baseless** 212:2
**Bashir** 154:16 167:15
**basically** 20:19 67:8 135:18 150:1
169:5 179:4 181:25 203:25
204:2,11
**basis** 19:21 27:18 47:19 85:22
119:16 139:18 199:5
**battle** 141:10,17 142:5
**bear** 201:4
**bearing** 201:3
**bears** 197:6 198:8,15 200:16 201:5
201:16,17
**beginning** 53:11,12,14,18 99:2
196:3
**beginnings** 137:7
**begins** 188:14,20 189:8
**behalf** 72:25 75:19,25 134:12
197:13
**behavior** 172:17
**belief** 180:10,11
**believe** 12:11,20 13:3 25:15 30:24
38:5 40:23 41:1,8 42:7 45:17
46:11 52:5 55:25 63:8 64:11,21
66:23 70:2 78:11 84:15,16 86:21

89:13 90:25 92:12 104:1 108:22
157:16 167:4,6 172:15 188:25
191:23,24 194:5 200:23 202:16
202:17,18,19 216:8 217:12,13
**believed** 164:13
**belonged** 146:21 160:13
**Beneath** 170:17
**beneficial** 195:19
**benefit** 51:23
**Berkeley** 128:12
**best** 73:11 74:11 119:3 150:13
203:17
**better** 78:25 79:7 87:21 88:4
112:25 189:24 195:10
**beyond** 11:10,14 15:20 63:18
67:13 107:23 121:23 123:3
185:6 211:5
**big** 17:14 27:8 64:4 143:15,22
187:18
**Bill** 204:6,7,12,20 205:4 206:6
208:14 209:4 210:4,7,7,22 211:5
211:7,12 212:9,21,25 213:4,9,12
213:16,17,21 214:15,18,25
215:1,2 216:9
**binder** 12:12,17 17:14,15 18:1
40:15,16 41:1 45:10,12 63:23
64:2,6 97:22 102:15 103:20
140:9 143:1 156:23 159:4
**binders** 155:18,25
**birth** 104:13
**Biscayne** 2:3
**bit** 43:7 44:1 61:7 65:16 77:6 125:5
132:23
**blackout** 27:10,15 86:23 87:7,8,12
**blow** 210:25
**blown** 209:10,11
**blue** 63:23 64:2
**Blvd** 2:3
**board** 104:6
**boards** 129:24
**body** 83:8 122:22
**boils** 203:23
**bombing** 196:22,22,25 201:24
202:2 207:17 208:1 209:17,17
210:1 211:25,25 212:6 213:18
215:9 216:16,20,20
**bombings** 186:9 192:15 204:25
206:12 208:16,17 209:7,23
**bona** 119:15
**book** 45:17,23,24 46:18 48:9,23
88:22 128:17,18,19,23,24,25
129:1,2,3,6
**books** 128:13,14,15,16,22 129:11
129:12,13,14 130:4,7 156:5
**boots** 176:1
**border** 143:9,10,12 154:9 155:9,13
**Bosnia** 31:17 93:10 94:24 97:23
98:6 210:17 211:20 216:4
**Bosnian** 31:24 94:23 98:1,7
**Boston** 93:9
**bottom** 17:1,18 18:2,9 25:4,17
34:19 41:11,15 44:2 45:20 46:2
46:5 52:9,21 54:7 59:9 61:22
140:23 188:5
**bound** 192:4 206:7,9 217:1
**brain** 64:12
**Branch** 124:23
**branches** 119:21
**break** 11:12 69:24 77:23,25 96:20
96:20 110:6 132:23 143:17
155:21,24 156:4 157:20
**breaks** 19:10
**BRIAN** 1:18
**brief** 81:25 82:2,3
**briefly** 97:4,13
**bright** 214:22
**bring** 72:20 79:18,20 86:22 89:4,14
96:19 112:23 113:2 188:16
204:10
**brings** 85:12 207:8
**British** 123:23 124:1
**broad** 101:3,4 105:6 152:23 195:14
195:16 199:5,12
**broader** 147:4 149:7 195:8
**broke** 157:2
**brother** 18:14 22:2 27:7 29:20 30:6
30:24 38:23 44:7,11 48:15 98:10
106:11 107:15 207:9
**brothers** 27:3 46:7 54:15,16 56:3
100:21 101:3

**brought** 8:20 9:11,13,14,19 10:6,8
48:17 72:22 78:15 82:25 85:11
85:18 112:15 192:20
**Bruton** 76:12
**build** 117:25
**building** 2:13 125:2
**built** 125:8,9,12
**bunch** 10:2
**burden** 70:10 88:4
**Bureau** 145:2,3 146:18 148:13
**bus** 30:9
**buses** 209:10
**business** 11:20 107:13

**C**

**C** 218:1,1
**cadets** 71:17
**Cairo** 13:23 22:3 25:15,16 28:8
41:13 42:2 49:18 51:8 59:8
**California** 5:11 100:6
**called** 9:21,25 32:17 79:10 120:21
121:11,19 124:1 127:20,23
128:17 137:1 144:9,10,16,16,21
144:24 146:16 149:21,22 158:20
158:23 165:4 168:22 169:1
170:14 194:2
**calling** 21:24,25 22:2
**calls** 9:25 12:12,15,19 13:2 16:7
20:22 21:6,10,13,18 22:20 26:11
26:16 28:17 29:2,5 31:6,8 34:24
35:12 36:2 37:5 39:11,16,21
40:10,15 43:17 45:10,11 50:17
51:7 57:9,16 61:20 62:10 79:16
79:17 85:6,25 86:1,7,7 87:14
89:6,9,24,24 156:14 205:7 215:5
216:20
**calm** 189:19
**cameras** 188:17
**camp** 207:21 212:5
**campaign** 136:16 143:16
**campaigned** 137:25
**campaigns** 175:15
**CAMPO** 2:9 134:17
**camps** 155:11
**Canada** 131:8
**Canadian** 9:7
**can't** 18:10 32:17 33:16,18 56:4
65:1 77:13 78:6 86:2 87:6 99:15
100:17 108:14,15 140:12 195:23
207:4
**capacity** 38:9 117:25
**capital** 126:4,5
**captured** 207:3
**captures** 190:4
**car** 14:25
**Caravan** 138:19
**cared** 40:6,11
**cared** 173:7
**career** 124:16 181:7
**carry** 109:1 173:8
**Caruso** 2:8 6:7 7:17 16:22 20:11
20:25 28:19 29:1,8,13 30:21
35:3 36:11,21 37:8,16,24 40:1,7
40:17,23 41:5,10,22 43:22 45:6
47:11 49:19 50:23 51:4 52:22
53:8 56:7,22 60:16,21 61:3 62:7
62:13,18,25 63:18 67:4,13 68:5
68:12,19,25 69:5,21 70:15 71:1
71:16 96:16,17 109:22 188:15
197:13 198:6 199:9,13,21 200:2
200:5
**Caruso's** 198:11 199:2
**case** 1:3 5:19 7:5 14:9 34:25 35:25
47:9 48:1 54:8,18 58:13 65:10
66:8 67:10,17,21 68:2,10,17,23
69:12 71:11,12 74:8 76:3 80:21
80:25 81:1 91:1 92:22 94:3
101:17 104:6,8 110:17,18,22,24
111:11 113:12 130:20 131:3,19
156:4 159:6,13,22 161:15
163:21 182:17 185:23 191:8,9
191:12,15 192:11 193:19,25
194:2,3,5 195:13,24 196:6,8,14
196:24 197:12 198:20 200:25
201:24 202:9,10 204:14 210:14
213:7 214:13 215:10 216:12
**cases** 74:13 212:18
**catch** 119:22
**categories** 209:14,14,15

**Caucasus** 149:6
**cause** 98:13 101:5
**caution** 74:9
**CD** 78:18
**cell** 173:11,14,19 174:7,8,25
176:16 177:20 179:3 180:6,20
180:23 182:6,7
**cells** 173:15,23,23,25 174:3,4
175:3,5,5,6,12 176:7,12 177:2
178:1,9,21 179:19,22 180:13
**center** 114:17,23,24 115:2,3,5,9,11
115:16,18,22,24 116:11,14,16
117:3,7,8,14,18 118:8,15
119:5,11 120:2,8,20 124:14
125:5 126:22 127:23 128:4,5,9
196:21,25
**centers** 118:1,3 120:10
**certain** 20:15,19 36:7 45:10 55:10
57:3,4,13 58:20 59:3,18 60:14
71:5 79:11 88:12,17 168:10
191:17
**certainly** 57:19 65:12,13 69:18,19
76:20,23 83:24 123:9 135:16
136:8 139:16 142:8,17 148:8
151:25 164:21 179:2 195:3,23
196:14 201:18 202:8 214:2
**Certificate** 3:9
**certification** 8:11 11:20,20
**certify** 218:2
**chair** 117:13
**chairs** 155:24 156:5
**chambers** 80:2 88:25 89:2
**chance** 80:2 88:25 89:2
**change** 65:16,19 120:7 168:14
182:19 183:8,15
**changed** 149:2,11
**changes** 188:1 189:22
**changing** 112:20
**chapters** 129:16 130:4
**characteristic** 205:3
**characteristics** 65:16
**characterize** 37:22 60:19
**characterized** 41:7
**charge** 148:16,18 165:2 192:25
198:20
**charges** 64:10 192:20
**charities** 9:1,4 177:12,13
**Charter** 139:6 143:7
**cheap** 73:18
**Chechen** 104:12,13
**Chechens** 101:9,18
**Chechnya** 61:14,19 62:23 99:8
101:9 104:14 105:14,16 210:17
211:19 216:4
**check** 9:5,12,16,18,20,24 10:2,9
84:8,9,14,15,16,17
**Chevening** 123:24 124:1
**chief** 8:24
**child** 53:25
**chose** 11:2
**Christmas** 207:17,25 212:1,6
**chuckles** 50:3
**circuit** 110:22 193:22 210:6
**circumstance** 189:15
**circumstances** 80:21 165:15
**citation** 194:4,11
**citations** 194:9
**cite** 193:25
**cited** 112:17 194:3
**civil** 209:15 211:15 214:3
**civilian** 175:24 206:12 209:17
210:25 211:1,22
**claim** 92:23 207:6 208:13,15
217:16
**claimed** 206:11 214:23
**claims** 192:22 214:21 217:10
**clarification** 64:1 216:18
**clarify** 200:19
**class** 52:23 53:3,11,12,14,18 75:10
**classes** 89:16
**clear** 35:21 73:4 74:16,18 111:10
112:14 118:16 135:8 138:8
155:14 167:16 184:21 187:5
190:20 195:20 196:23 209:3
213:21 214:22 215:1,5
**clearer** 25:20

clearly 11:11 90:3 214:17
client 76:11,22 191:3 199:11
200:19 201:8 210:1,9,16,25
213:20 214:21,23
clients 209:8
client's 191:2,6 200:16 215:9
clip 189:21 190:1,3
close 74:25 143:11 146:22,23
closely 115:25 117:2 120:18,20
closing 73:14
club 171:2
CNN 78:13 184:16 189:12
coalition 168:4
Coconut 2:6
code 36:12 166:3,4 181:13,15,20
181:22,24 182:2,5,5,12
codes 91:14
collected 118:18 126:18,24
collection 117:23 118:14,24 119:7
collections 119:1,3
collective 7:22
Collins 99:7 105:13,19 106:14
107:8 108:2,6
color 65:16
Columbia 128:21
combat 146:12
combating 116:11 117:2 119:21
come 8:23 24:4 25:5,6,10,23 29:7
30:9 32:3 69:24 70:22,23 72:20
75:9 77:5 79:22 80:24 87:16,18
87:19 90:4 108:14 115:9,13
119:4,6 132:4 138:15 143:25
144:6 147:8 154:16 155:24
156:5 164:19,24 167:7,10
180:22 194:8 200:23,24 203:9
203:11,13 206:5
comes 5:23 9:24 11:6 61:22 85:22
169:7 193:8
comfortable 15:10
comfortably 203:23
coming 15:4 19:19 23:16 58:17
78:7 144:13 145:21 149:10
159:10 196:19 208:25 216:10
command 169:15 170:7
commander 29:21 104:12,13
148:5,8 169:2
commanders 94:23 98:1,3
comment 32:5 53:11 209:18,23
commentary 78:13 192:17
commented 197:8
comments 78:20 105:22 201:19,19
204:22 216:8
commercially 175:24
Commission 112:16,25 113:3,22
210:17
commit 191:11 202:6 209:12
210:17
commitment 39:19 168:13
committed 136:20 147:3,23 210:11
committee 116:15 117:7 158:19,20
158:21,22,24,25 160:4,7 161:11
161:12,18,19 162:1,2,4,9,13,14
163:24 164:4 170:18,20,20,21
committees 168:22 170:19,24
common 86:11 166:22 180:10
198:22 199:19
commonly 165:5
communicate 39:14,24 180:12,16
180:25 181:24
communicated 14:16 40:11 57:14
communication 15:12,18 16:2,14
16:20 17:13 18:15 19:15 20:4
89:23 180:17 181:3 187:19
communications 174:13 176:3
181:2,5,10,18
communities 144:5 175:7,8,9
community 177:8
company 58:6
comparative 180:9
compare 37:19
compared 37:23 66:19
comparison 66:21 67:25 68:24
77:14
compatible 122:7,11,12
complete 95:4,16,19,25
completed 95:22
completely 194:20 207:10 212:2
215:12
completeness 95:15,21 103:5
complicated 184:13
compound 139:17

computer 78:1
conceal 174:21 181:25
concept 83:1 194:24
concern 15:17 102:18 150:23
200:2
concerned 79:4 96:2
concerning 9:4 12:11 216:8
concerns 102:19 195:7
conclude 80:19
conclusion 16:8 20:18 21:18 22:20
28:18 36:3 57:16 68:17 70:19
71:16 202:12
concrete 21:21 197:14
condense 89:5
condition 66:4
conduct 40:6
conducted 40:11 63:12 118:20
conducts 184:15
confined 212:4
confirm 22:6
conflict 42:10 118:1,19,20 119:6
121:17,18,19,20 122:5,6,7 130:2
132:15 153:24 154:1,2 175:3,4,5
175:6,12,13,18 176:8,20,22
177:1 178:11,17,22 179:1,5,8,25
180:8,14,21,22 181:1,3 185:8
210:9,12,18,19
conflicts 123:11 210:8,23 211:18
confrontation 210:21
confrontations 210:23
confused 185:1,3
confusion 196:23
conjunction 217:14
connected 16:6
connection 18:2 24:25 76:2
138:25 152:1,22 164:6 195:11
195:18 196:7,16,17,19
cons 23:10
consider 68:23 77:1 197:6 198:2
199:3 201:2 202:14,21 217:13
consideration 76:3 203:6
considered 76:2 119:2 139:8,9
196:7 197:11,15,19 199:22
200:21 202:24
consistent 28:15 73:5 141:14
168:8,16
consistently 137:25
consists 119:8 135:14
conspiracy 198:8,20,22 199:8
200:4 202:1,6 209:12 210:17,25
212:19,23
conspirators 212:23
conspiring 192:12
constant 121:20
constantly 128:11 139:13
Constitution 1:23
consult 118:11 120:13 128:9
consultation 119:12
consultative 168:20
contact 12:8,21,22,24 13:1,6,7
14:4 17:13,22 20:23 35:19,21,23
35:24,24 63:16 176:13 212:8
contents 16:8 16:15 21:3
contain 197:14
contemporaneous 205:4
contents 63:23 160:2 185:6
context 79:7 174:16 181:17 189:1
189:9 191:1,25 201:8
continue 44:6 122:13 123:15 148:9
149:24 151:7 153:5 155:1
170:10 204:19
continued 151:9 153:6
continues 14:23 15:3,8,11,25 17:3
141:6 170:11
continuous 175:16
contract 131:25
contrary 15:5
contrasting 204:7
contributed 130:4
Control 124:9
controlled 159:1 165:12,23
conversation 5:25 9:22,24 17:15
55:15 76:11 91:3,4,15,23
102:17 105:9 107:3 109:7,16
184:16 198:16 200:22
conversations 83:4,7,8 181:8
200:20,23 201:10
COOKE 1:13
cool 189:19
copies 81:5

copy 40:25 41:1,3 77:24 110:17,17
140:13 187:7,16 193:19,20,25
core 138:6 142:2
correct 12:14 17:17 26:21 37:4
38:24 42:8,11 48:10 54:14 63:8
68:4 69:15 76:23 96:7 97:15,19
98:4,5,8,9,11,13 99:5,9,14,18
100:9,11,18,19,21 101:10
102:12,16,18,20,22,25 103:24
104:6,10,11,16 105:10,14,20,24
105:25 106:3,6,9,12,13,20,23
107:1,6,9,13,17,20 108:11,12,16
108:18 109:5,6,13,14,15 114:21
124:4 125:3,15 126:4 128:2,3
131:19 133:4,24 139:21 142:9
147:14 148:6 150:21 152:11
163:22 170:24 172:3 175:1
179:14,17 181:5,8,11 201:20
213:10
correctly 202:20 203:5 207:14
correspond 5:21
corresponded 79:14
correspondences 15:4
corresponding 181:22
corresponds 12:1 184:23
couldn't 58:18 64:21 69:18 78:16
93:15,16
council 168:20
counsel 30:13 32:6 65:20 70:2
74:1,23 81:3 88:23 92:6 94:3,17
95:17 103:14 107:23 109:20
110:1 113:19 114:6 187:7
214:19,22 215:8
counter 115:4 116:14 117:13,15
118:1,4 119:17,22,24 120:9
129:25
Counterterrorism 1:22
countries 39:14 115:10 117:16
118:8,12 123:6,8 125:22 128:19
128:21 130:22,23 132:16 133:13
133:21 134:1 144:4 216:4
country 59:21 60:24 121:11 123:11
126:1 130:22 180:19,23 212:7
couple 11:10 20:6 61:8 190:22
courier 180:19
Couriered 18:19
course 14:7,8,17 15:3 19:11 22:3,5
25:18 50:10,22 53:4 90:19
112:15 120:21 125:17 167:18
170:7
courtroom 70:1 80:11 81:2,7 96:21
110:20 156:6,19 182:25 206:1
Court's 77:8 79:14 102:6 103:5
111:14 156:2 194:21 197:21
198:24 203:6,18
cover 8:10 86:24 89:11 97:18
129:9 150:5,6,7,10 177:6,15,16
177:22
coverage 6:20 7:5
covered 34:10,10 84:21 107:24
Coward 99:25
co-chaired 117:12
co-conspirators 202:10 210:11
co-defendants 92:21
co-programs 117:20
crack 200:5
craft 133:22
Crawford 76:13
create 117:25 118:5 119:25 120:19
120:21 125:6 135:10 136:22
139:25 142:22 144:13 149:14
166:25 167:5 168:10
created 70:11 114:24 118:2 136:15
144:15 147:6 148:11,25,25
161:19 168:9
creating 118:3 171:23
creation 137:25
credit 192:22
Cricklewood 161:21
crime 93:21
criminal 92:13,16,20,25 93:5,15,16
critical 175:19
Croatian 211:20
cross 8:23 9:12 23:11 24:17 34:10
35:18 56:2,16 58:15 70:24 83:9
83:15,19,25 85:12,21 86:24
87:17,23 88:24 90:9,14 92:7
95:14,18 96:4,5 107:24 111:15
crossed 90:8

crossing 91:6
cross-examination 9:6 12:8 28:22
42:20 45:11,23 47:4 49:13 50:6
54:3 63:19 67:14 75:25 80:20
92:12
cross-examine 11:2
crushed 166:12
CT 119:18
culture 127:10
cumulative 34:9,11
current 20:9 120:6 203:24
currently 60:11,23 114:17 116:11
119:1 136:9
curriculum 51:22
custody 81:6 132:19
cut 15:9 187:24
cuts 53:6
cutting 53:9 79:15,15

D

Daher 9:12 33:7,8,9,11,14
daily 110:13,17 193:19
Dame 122:13,19 124:4 126:20
data 43:20 63:4,5,17 64:1,6,19,24
65:21 66:21,24 69:4,9 125:9
database 125:5,9,12 126:25
databases 117:21 125:3,6
date 13:13 29:13 33:2 41:24 49:13
53:20 56:10 64:22 65:5 99:17
100:25 160:24,24 161:1,3,6
170:11 190:18 218:5
dated 6:19 102:14
Daubert 111:13,14
day 1:15 4:10 16:17 75:10 90:2,8
111:4 161:7 183:2 189:24
209:17
days 80:4
day's 110:16
dead 81:11 192:19
deal 14:8 79:23 106:6,22
dealing 206:16
deals 112:24 192:15
dealt 109:11
dealt 98:13,18,23 99:13,18 149:16
149:17
debriefed 132:18
December 143:19
decide 10:24 83:9 113:23 217:11
decided 106:22 112:25 200:15
decipher 182:2
decision 107:19 197:12 199:18
decisions 194:7
declared 188:20
decode 182:1
decree 161:4
dedicated 215:19
deep 120:6
defend 204:13 209:6
defendant 2:1,7,12 12:7 76:1
159:24 160:9 204:24 213:20
defendants 1:11 14:4 58:13 92:21
93:7 111:21 113:19 159:22
190:21 194:22 197:12 198:16,17
204:23 214:11 217:15
defendant's 216:15
Defender's 2:1
defending 211:13,14
defense 65:20 69:16,18,19 70:5,11
73:4 75:14 78:5,8 79:10 80:21
89:22 92:6 95:17 124:22,23
131:10,12,13 186:12 187:7
189:7 190:5 193:11 199:6 204:8
204:12 205:6 213:15 214:19,22
215:8 216:10,13
defer 195:8,22
deference 171:20 172:15
defining 136:19
definitely 82:3
definitive 208:4
degree 40:5,11 122:10,13,14,17,18
delay 66:7
deleting 196:2
deliberations 199:4
delivered 79:4
delve 215:11
demands 149:2,3
democratic 137:4
demonstrative 138:12 157:7

denied 216:16
Department 1:22 120:18 123:25
depend 65:12
depends 44:9,13 65:8
deputy 168:24
describe 18:6 173:21
described 169:4
describes 188:15
description 3:13 173:18
deserves 72:9
desk 193:17
detail 43:7 49:10
detainees 132:21
determine 200:24 217:15
determined 142:22
Detroit 2:14
developments 87:21
devices 176:3
devolving 73:13
devoted 132:5
Diaspora 122:25 123:1,3,3
didn't 8:23 10:4 16:2 27:2,7 32:21
42:19 46:17 79:18 81:6 82:24
83:19,19 85:15 86:24 87:9 88:25
89:19 90:7 91:6,19 93:20 94:7
95:3 145:23 150:15 151:1,2
167:6 183:14 187:1,12 214:10
died 99:14,18
Diego 6:20
difference 151:13 169:10
different 9:18 16:19 61:10,25
62:24 64:16 84:16 86:1 99:8
106:12 118:12 135:15 142:11
149:5 154:1,2,4 158:8 168:5,19
170:23 171:12,16 172:2 181:4
181:15 182:5 187:22 194:24,24
195:16 200:25 207:8,24 208:17
208:24 210:9 212:7,7 216:13,21
differentiates 106:11
differently 211:9
differing 74:7
difficult 118:5,6 182:1
dimension 136:7
Diplomacy 116:2,13
dire 111:11,16 196:11
direct 3:8 8:20 9:11,15 10:6 34:10
61:24 80:20 84:3 87:23 114:8
159:3 176:13
directed 100:18 209:13
direction 200:15
directly 24:19 47:3 67:15 69:17
83:3,4 91:9,14 198:8 200:12
disagree 76:18 110:23 113:17
188:24 194:17 198:11 201:11
215:12
disagreement 216:10
disagrees 215:15
disappointed 153:22
Disarmament 124:9
discipline 29:20,22 39:19
disclosure 214:15
discovered 71:19
discovery 69:16 90:6,13 209:9
discredited 113:15
discrete 197:20
discretion 194:8
discuss 4:16 42:10,19 54:6 55:7
55:24 71:24 78:16 156:7 182:18
182:18 183:2 201:12 212:18
discussed 10:13 12:2 22:12 50:17
57:5 58:21 59:3 76:9 93:25
103:6 110:9 201:8 206:21,21,25
213:18
discusses 99:17 201:13,13 213:4
discussing 19:6 23:9 25:1 27:25
34:1 37:15 41:23 42:23 56:2
59:10 61:9 122:5 135:1 137:5
141:1 157:22 207:1
discussion 11:6 12:6 14:12 24:14
33:2,23 42:17 45:20 55:14 60:2
62:4 78:12 90:3 108:10 140:23
141:2 207:7 214:8,11
discussions 36:8 37:20
disk 186:3
dislodged 168:3
dismantle 151:6
disparity 185:8
dispassionate 189:20
dispatch 145:18
dispatched 145:13

DISPENZIERI 2:20 218:4,5
disposition 168:7
dispute 111:13 192:5 208:7 213:11
disruption 119:22
dissemination 158:13
distinct 137:1
distinction 177:16,19
distribute 158:17
District 1:1,1,14 2:21 130:25 131:2
218:6
division 1:2 120:19
docket 216:16
doctor 113:8
document 5:7 6:11,15,18,22 7:4
11:25 13:11,12 41:4 58:18 63:10
65:7,9,11 66:24 67:2,8,9 68:11
68:18 70:9 71:5 72:10 95:11,13
100:22 118:14,24 139:7,8 140:5
140:22
documents 4:14,16 7:25 8:4,7,10
8:11 9:4 58:12 67:7 72:12 92:20
101:15 117:24 119:4,8 125:7
127:21 132:19 138:17 163:24
180:21 206:10
doesn't 9:19 21:6 43:7 48:18 49:10
50:22 68:15 70:12 81:9 85:2
99:19 206:7,18 213:10 214:12
doing 19:8 35:1 36:1 73:10 84:1
87:25 89:15 91:4 94:14 106:14
106:15 122:23 124:24 158:19
177:25 189:18
don't 10:6,23 11:1 18:23,23 19:23
22:25 23:22 28:4 32:16 40:25
41:23 47:2 53:2,4 55:25 56:2
64:25 65:5 68:15 70:1 73:22 76:4
73:20,21,25 74:21 75:18,23 76:4
76:10 77:5,18 78:5,11,24 80:25
81:13 82:2,15 83:8 84:15 86:6
86:23 87:8 90:14 91:21 92:6
93:24 97:16,20,22 100:13
103:10 105:12 106:5,17,18,22
107:12 108:22 109:1,4 111:7,15
111:17 112:2,22 135:8 138:14
155:20,23 161:2 169:25 184:12
184:14 191:23 192:11 193:2,25
194:10 195:9 198:19 201:11
202:7,17,18 203:17 207:16
209:19 211:13 213:8 214:18
217:20
door 24:5 34:20 35:2,8 46:9,11,21
113:2 203:1
DORE 2:15
dot 107:11,11,12
double 18:1,14,15 182:3,5,5,12
doubt 14:6 61:1 67:3 69:3
Dr 98:18 99:7,13 100:5,8,20 101:8
101:17 102:12,19 105:9,13,23
106:1,5,17 107:4,11,15 108:2,6
108:10,13,14,21 109:10 110:14
112:9 114:10,16 134:7,25
140:17,24 141:12,23 142:18
155:19 156:7 157:2,10 159:8
160:13,16,21,23 168:24 169:16
183:1 186:10 200:7 204:22
207:9,12 208:25 210:20 214:5
217:11,12
draft 217:4,9,18
drafted 73:9
drastically 72:21
draw 88:3 195:18
drawn 135:14
dress 166:4
driven 180:10
driving 187:3
drop 200:9
dual 175:23,24
DVD 81:7
dying 82:20 83:2,21 98:16
D.C 1:24 124:18

E

E 218:1,1
earlier 23:5 31:4 33:22 80:23 132:5
154:5 157:12 162:10 178:2
earliest 153:16
early 90:8 93:3 146:9 150:11
151:11,17,24 152:11 153:15,19
154:10 157:3 158:16 169:11
earned 122:13

DISPENZIERI

easier 25:18 26:5
easily 184:6
east 2:17 115:25 125:18,19,21,23
125:24 127:24 130:18 133:18
135:18,23,24 144:3,6,8 149:6
154:14 175:10
eastern 117:15 127:25 136:5
Easterners 115:12
edit 129:17
edited 77:4,9,11 79:1,2,3,6 81:22
129:13,14 138:21 184:11 185:22
189:22 191:23
edition 129:1 187:6,10
editor 129:15
editorial 129:24
edits 186:23
educational 177:10
effect 41:9 45:25 65:7 132:2,3
195:4
efficient 10:17
effort 109:2 185:5
efforts 214:2
Egypt 13:23 18:7 25:16 26:13
27:16 28:8 41:8 49:18 51:3
52:15,18 59:8 85:4,16 86:10,18
86:20 87:1 89:12 91:4 137:13
216:2
Egyptian 91:2 92:3 94:13 116:14
168:25 169:3,17 170:15,15
216:2
Egyptians 86:11
eight 12:17,20 95:8 187:6
eighty 165:12
either 13:3 28:23 57:18 72:12
168:20 216:20
elections 166:15,17
electronically 180:25
element 105:7
Eleventh 210:6
Embassy 201:23 202:2,2
emerged 165:4
emphasized 16:1
employ 128:4
employed 128:6
encompassed 105:7
encountered 182:4
encourage 85:2
encouraged 215:22
encouraging 25:22 87:16
Encyclopedia 153:10
ended 101:25
ends 9:16
engage 157:25 158:17 207:25
engaged 177:21 179:4 206:12
208:16,17 212:8 215:13 216:5
English 7:1 38:12 39:2 100:24
127:20 159:15 184:17 189:20
enhance 175:25
enlisted 110:11
entered 59:16
enters 156:19
entertain 76:19
entire 91:5 210:22
entirety 199:4
entities 125:11
entitled 9:13 70:24 71:14 208:22
entity 211:1,22
entry 216:16
environment 118:5,6 119:25
episode 207:8
episodes 209:10
equally 70:8
equipment 175:21
equivalent 123:25
error 201:16,18
escalation 124:24
espousing 216:1
ESQ 2:2,5,13,15
essentially 88:3 109:16
establish 147:22 165:8,10,13
210:20
established 35:24 67:11 70:2
71:21 147:5 149:17 154:3 159:2
165:16,22 169:20 177:20
establishing 136:20 147:24 168:15
172:18
establishment 143:3,4 172:13
215:19
eternal 77:20
Ethiopians 27:14

ethnic 123:5
Europe 115:5 135:24 144:4 145:10
162:7 175:10
European 117:16
Europeans 115:12
Evaluation 124:20
evening 183:11 199:11
event 207:14
events 196:5 197:10
eventually 50:3
everybody 19:7 66:3 74:12 79:23
81:1 107:5 156:23
evidence 3:12 6:9 7:11,19 8:11 9:4
11:22,25 12:2 16:19 17:22 20:22
34:25 35:25 38:16 43:16,21 47:9
47:25 74:13 76:8 84:3 90:5,6,13
91:13,20 92:20 94:9 95:18 96:3
111:20 140:5,22 159:6 160:11
160:12 197:2,8 199:7 203:10
204:9 208:23 209:25 210:3
213:22 214:14 216:16
evidentiary 74:6
ex 41:16 49:3
exact 20:19 58:18 64:22 65:5
exactly 7:3 24:18 43:5 65:17 67:23
87:25 105:25 187:15 190:25
191:1,6 204:20 209:19 211:11
211:11
examination 3:4,8 4:6 8:21,24 9:11
73:13 97:5 111:1 114:8
examiner 71:18
example 21:15,21 22:17 23:2
25:22 53:9 76:7 165:20,25 166:3
170:19 171:2 173:6 176:17
examples 24:10 36:24 37:2,11
40:10 66:18 99:15 120:17
158:12
exception 194:24
excerpt 140:5 142:25
excited 4:12
exclude 111:2 203:10 204:4 211:4
216:15
exclusive 20:23 70:6 204:8 213:22
excuse 89:4 103:17
excused 109:24,25 183:7
executed 207:3
execution 207:4
exercise 112:1
exercising 95:16
exhibit 4:20 5:4 6:3,8,13 7:18,22
11:25 38:20 63:7 64:2 88:11
94:19 97:7 100:2 102:1,4 103:6
103:9,23 138:11,12 140:6 157:6
157:7,16 159:5 184:11,20
185:23 186:2
exhibits 3:11,12,14,16,17,18 4:21
6:9,14 7:19,23 11:22 72:17
75:24 76:1 97:20 102:5 103:10
155:18
exist 147:5 149:24 153:5,6 174:1
174:24 175:3,4,5,6,6,14 184:14
existed 148:12,12 154:15 215:18
existence 70:18 168:8
exits 81:2 156:6
expectation 14:7
experience 54:20 66:6,9 121:13,25
132:5 145:23 152:20 164:8,18
180:5 182:11
experienced 73:6
experiences 132:12
expert 69:12,14 71:4,20 110:9,12
110:14,15,17,19 111:1 130:19
130:21,24 131:1,6 134:7,18
186:11,12,13 193:12 208:18
216:22,25 217:2
experts 110:10 111:12
expert's 111:13 186:14
explain 15:17 63:16 65:14 75:7
136:21 181:17
explains 98:14
explore 44:1
explosion 148:20
expressed 36:1 39:18 101:8
102:18 213:11
expresses 101:5
extensive 118:24 125:2
extensively 121:5 125:17,19,20
133:18 135:2 137:18 179:14
extent 74:22 195:17 214:16 215:6
216:23 217:1,8

external 25:6
extra 193:25 202:23
extraordinary 90:10
ex-wife 41:17 49:4
e-mail 194:9

**F**

F 218:1
face 177:8
facilitate 173:24
facility 211:1
facsimile 6:19 7:1 160:7 162:19 163:8,22
fact 8:25 12:11 15:3 29:1 36:11 38:5,20 41:7 46:5 50:10 52:21 53:8 54:5 56:25 58:4,12 65:10 68:9 83:13 86:9 88:22 91:10 93:6 96:12 97:17 98:6 99:12 110:14 113:10 119:14 129:8 132:8 137:3 138:6,7 139:9 142:2 144:17 146:23 149:16 153:7 158:18 159:12 160:11 162:6 166:22 179:16 190:13,14 193:1 194:19,23 196:10 198:14 200:21 201:8 204:3 212:25 213:21
faction 148:2
factions 147:19,21,23,25 154:4 212:4
facts 43:13 99:9 198:21 217:1
factual 208:7,15 213:11 215:11 216:10,13
factually 193:2 208:8,19,21,23 212:2
faculty 117:2
fair 70:7,10 90:14 99:10
fairly 71:2
faiths 115:13
false 209:1 216:12
familiar 127:3,10 137:19,21 139:14 139:20 141:12,24 142:9,19 152:10,13,17 158:23 164:3,6 165:15 172:2,5 179:19 180:2,12 181:4,13 182:11 205:16,17
famous 138:19
far 57:6 76:18 77:1 79:1 88:18 96:2 191:22 198:14
farther 56:17,19
fatwah 94:25
Fat'hi 94:23 100:18
Fawwaz 161:22,24 163:10
fax 82:6,6 94:24,25 96:14,14 97:14 97:15,17,18,19 98:10,17 99:2,12 100:2 101:1 159:5 160:2,9,24 161:1,14,23 163:9
faxed 100:5
FBI 5:15,22,24 7:7 65:10 66:6 92:18 93:3,18,19
features 136:6
February 143:20 147:10,11,15 149:1 153:20 209:5
Federal 2:10,20 8:11 218:6
feeding 82:24
feel 4:10
fellow 116:9,13,17,24,25 126:2,7 126:17,18
fellowship 122:11 124:10,12,13
fellowships 116:8 123:19,20,22 124:6
female 33:7 56:14 59:6
fide 119:15
field 115:7 116:7 118:19 132:12 134:4 162:24 173:18
fields 116:1
Fifth 110:22
fifty 115:15 128:5
fight 136:15 137:10 138:20 139:25 143:15,23 144:1,2 145:14,18,21 146:4 147:1,20 148:11,25 153:17,22 168:10 176:5,23
fighters 104:16 144:9,11,13 145:17 149:9 153:17
fighting 27:14 105:7 143:23 145:6 146:2,14 147:3,19,21 148:5 149:5 153:11 177:25 179:25 210:19,21 212:4
figure 83:10
figured 183:20
figures 157:3
filed 92:19 218:5
filters 190:5
final 22:7 61:7 147:11 186:3,19,25 196:4
finally 7:21 11:23 137:14 145:13
finance 125:11 170:21 171:19 172:15,25 173:9 178:25 182:8
financially 52:7
financier 146:15
financing 146:13
find 44:18 85:6
finding 108:4
fine 18:10 44:7 109:1,3 195:5
fingerprint 63:4,9,10,24 64:7,13,24 65:3,6,11,18 66:1,7,16 67:10 69:14 70:21,23 71:12,18,21
fingerprints 71:17
finish 79:21 95:2,5 154:18
finished 122:18
fired 113:9,10
first 4:19 9:5,10 11:4 13:12 26:19 34:2 59:23 64:9 66:3 71:15 73:25 95:18 98:23 112:19 123:4 124:3 125:23 129:1 141:23 157:5 159:4 160:24 186:16,17 191:24 192:15 194:18,18 196:2 196:2 201:25 202:11 208:10
FISA 206:9
fit 214:12
fits 121:25 212:8
five 13:25 78:3,17 103:8 145:8 189:25
FL 1:20 2:3,6,11,17,22 218:7
Flagler 2:10,17
flatly 194:18 197:18 198:3
Fletcher 116:2,13,19
flight 183:11,19
floor 2:3,21 112:7 204:15 218:7
Florida 1:1,6 13:1,19 19:7,19 20:10 20:24 25:13 28:14 49:17 59:24
flowed 79:7
flows 87:20
flying 183:18
focus 56:15 120:2,25 121:2 132:8 136:1,1 204:22
focused 90:1 109:14
focuses 179:16
follow 8:18 11:16 24:2,10,22 103:3 103:15 110:5 112:5,12 114:1
followed 73:9
Followers 215:20
following 93:6 174:8 213:3
follows 31:19 46:16 48:21
follow-up 22:12
football 34:6,15 35:7 36:15 82:19 82:23
force 138:4 140:1 142:8 215:23
forced 52:12
forces 144:1 147:12,13,15 209:15 209:15 211:19,19,20
Ford 124:6,10
foreclose 93:17
foreclosed 86:13
foregoing 218:2
foreign 39:14 123:24 124:13 144:9 145:17 149:9
forged 174:14,15,16
forgery 174:18
forgive 107:19 202:3
form 21:6 22:20 43:20 63:4,5,17 64:1,6,19,24 65:21,25 66:21,24 67:12 69:4,9 71:17 141:19 147:5 177:6 178:4
formal 171:1
formation 150:20,24
formed 26:11 39:23 126:25
former 110:21 143:18
forms 16:19
Fort 183:20
forth 19:19 79:15 108:17 173:8 208:22 216:11
forward 112:1 114:12
fought 35:13 74:6 166:13 211:8
found 23:3 78:9 81:4 108:7
foundation 98:20 101:11,13 123:14 124:7 136:4 139:9 150:17 151:18 152:5,7 160:15 163:17 164:15 208:15
foundational 141:23 163:18
founded 79:16 117:14 145:4,5,5
149:8,9
founder 114:23
founders 136:17 157:13
founding 136:18 139:7
four 145:8 171:18 201:24 202:4
fourth 103:23
frame 72:7 169:18,20 170:1
frames 202:20
framework 200:3
fraudulently 174:19
free 73:24 74:1 183:1 199:18
freedom 87:2,4
freely 37:6 87:20
frequency 12:8
frequently 146:9
fresh 36:17
Friday 58:24 78:15 81:4 92:12 95:2 95:16 101:25 105:18,23 186:21 187:17
friend 44:7
front 4:16 73:4 75:1 78:21 97:7,21 140:18 150:3,5,6,7,10,11,13 153:5 156:24 159:8 161:12 162:5,11 177:6,14,15,16,19 178:16,22,24 187:19 214:13
frustrated 31:7
full 113:20 144:19 145:2
function 145:15,16 179:3
functions 104:23 145:8 173:15,16 173:17 174:7,8,23,24 178:14
fund 93:10 149:25 174:12 175:20
fundamentalist 215:18
funeral 183:12
further 48:8 52:15 80:1,14,16 96:25 97:1,2 107:15 121:9 149:15 204:5 209:2 215:11
furthering 210:11,12
future 23:1

**G**

G 1:13
gain 118:22
game 90:14
games 73:18
gathered 126:16,21,23
general 28:11,12 100:20 101:3 111:8 117:13 154:16 167:15 173:18 192:24
generally 5:9 6:18 8:4 18:6 19:6 26:15 128:23 132:11 134:3
generate 118:6 178:24
generation 123:4
gentlemen 4:2 69:23 80:12,18 96:22 112:6 114:3 156:3,20 182:16,24 192:6,11 197:3
genuine 174:19
geographic 135:22
George 116:15 117:4,6
Georgia 60:1
getting 49:7 78:25 79:5 87:5 104:4 176:10,10 200:6
give 50:1 11:15 41:3 64:22 68:15 69:17 75:15 77:22 78:16 80:8 90:11 91:19 94:7 102:9 120:16 165:20,25 173:17 183:20 194:11 195:19 199:11 200:14 201:15 202:12,24
given 76:15 78:5 107:18 111:16 130:13 190:19 198:14 210:10 216:9
gives 67:24 189:2
giving 23:25 73:10 189:11 210:18
global 100:2,5 15 135:22 136:2 149:11 164:13
globally 76:24 136:9
go 14:3 17:5 22:7 23:9,24 24:19,25 26:2 27:2 30:19 32:17 33:21 34:23 43:7,18 46:15 48:16 49:10 52:15,18 53:2 54:7 56:19,19 61:14,19 70:12,17 75:12 80:6 82:12 84:2 85:2,8,20 87:3,9,19 92:10 106:19 107:8 108:11 109:2 110:3 111:5 113:1,23 114:12 121:9 141:6 146:6 153:23 154:20 166:4 174:10 176:5,23 183:1,12 185:6 196:18 199:1,10 206:7,8 209:2
goad 73:3,21
goading 73:10
149:8,9
goal 108:24 143:3,5 149:7 166:22 171:22
goals 138:9 149:15 168:5 172:5,8
God 17:1 20:5 22:7 27:7,8 30:6 44:3 144:11,11 148:3
goes 9:17 57:6 67:15 105:1 107:23 191:6 200:3 213:3
good 4:2,8,9 42:21 54:15 56:3 69:23 90:12 114:10,11 129:18 156:15 167:23 208:19
goods 175:24
Good-bye 109:18,19
good-byes 109:17
gotcha 214:10
govern 166:2
governed 142:23 215:20
government 1:17 3:14,16,17,18 4:21 6:2,9,12,14 7:10,19,23 10:8 11:22,25 70:5 72:8,25 73:1 75:22 83:5,13 85:5,19,21 87:9 88:4,9,21 89:2,13,20 90:20 91:13 92:22 93:13 94:7,13,15 95:3,7 119:3 120:12,14 122:6 130:14 131:18,25 137:23 140:6 147:5 154:15,19 167:13,16 185:9 190:25 196:12 198:15 199:18 201:22 204:3,10 205:24 208:13,20 209:13 211:23 212:19 212:22 213:5 214:18 216:11,18 216:24 217:10,16
governmental 209:15
governments 118:8,10 119:12 133:7 151:5 168:10 215:24
government's 4:20 5:19 8:13 11:19 77:11 94:20 110:12 114:7 138:11 157:6 159:5 186:13,14 187:25 188:6 191:23 210:14 216:8
GPS 176:1
grandfather 183:9,17
grant 124:17,19,22
grants 124:15,17,24
great 43:7 49:10 113:6
grew 121:11
GRF 9:2 94:23
Griswold 2:14
ground 67:24 71:7
grounds 210:3 211:4
group 117:12,22 121:19 123:4 125:10 135:10 148:2 150:9 154:7 160:4 164:10,11,12 165:2 165:4 170:18 171:6 174:24 175:25 177:25 179:4 181:21,23 205:2,18,19,19,20 212:7 213:20 214:3,20,23 215:9 216:2
groups 118:11 121:1,3 123:10 127:7,11 129:21 132:6,13,14,24 133:4,8,11 134:8,22 136:8,9 139:15,21 142:20 147:19,25 149:5 150:6 154:6 166:23,25 167:4 171:9,13,14,16,19,22 172:3,7,8,10,14,22 173:9 179:1,6 173:14 175:13,14,14,15,17 176:3,8,19,20,23 178:9 179:1,6 179:7,14,25 180:3,7,12,14 181:11,18 182:13 210:1 216:1,3 216:5
group's 135:10
Grove 2:6
grow 121:10
grown 136:3
guess 8:20 199:16 202:9 206:16
guest 145:12
Gulbuddin 148:4,7
Gunaratna 3:7 110:14 112:9 114:4 114:7,10,16 134:7,25 140:17,24 141:12,23 142:18 155:19 156:7 157:2,10 159:8 160:23 183:1 186:10 203:14 204:22 206:16 208:3,25 210:20 214:5
Gunaratna's 200:7
guns 78:11
guy 33:9
G-U-N-A-R-A-T-N-A 114:5

**H**

Hajj 54:5,8,11,13,20 55:15,21,24
half 143:22 193:9 209:5

**Halibi** 207:2
**hamstrung** 216:23
**hand** 4:19 6:11 7:21 67:22 68:1
   73:23 102:9
**handed** 187:7 217:4
**handle** 87:21
**handled** 69:3
**hands** 175:24
**happen** 27:7 30:7,15,25 44:15
   52:12 113:18 189:6,6 207:5
**happened** 60:6 75:16,21 76:15
   113:11 147:17 153:18 189:4
   190:19 207:5
**happening** 129:18 143:13
**happens** 88:1 112:4 206:15
**happy** 19:12 102:9 195:1
**harassment** 113:10,11
**hard** 74:6 113:23 192:6
**Hareth** 98:3
**hasn't** 96:3
**Hassan** 154:17 207:9
**Hassoun's** 13:19 16:5 20:3 21:24
   52:22 53:25 83:20 194:14
**hate** 210:12
**haven't** 11:1 77:13 80:1 186:19
   188:6 196:16 217:7
**Hazar** 51:7
**head** 73:8 76:10 88:10 114:17
   161:21
**headache** 106:19
**headed** 62:12
**headquarters** 154:24 155:16 168:1
**heads** 79:10
**hear** 74:22 81:9 114:14 182:16
   183:14 190:2,11 199:24
**heard** 14:23 19:10 72:9 84:4 150:3
   173:11 185:20 197:8
**hearing** 18:24 209:20
**hearings** 80:4,8
**hears** 201:19
**hearsay** 101:20 194:24
**Heath** 2:16
**Heba** 9:25,25 10:1 13:5 19:12 46:6
**Heba's** 9:25
**Hekmatyar** 148:4,5,7
**Hekmatyar's** 154:7
**held** 26:17 66:2 116:8 166:18
**help** 25:10 44:3 108:3 144:12
   205:24
**helped** 125:6
**Hesburgh** 123:22
**hey** 9:21
**Hezb-i** 148:3,7,8
**he'll** 10:1 112:7
**he's** 28:8 42:2 59:8 208:2
**hiding** 190:10
**hierarchical** 169:5
**hierarchy** 169:7
**highlighted** 41:10 89:22
**highway** 189:19
**Hisham** 22:3
**historically** 137:3
**history** 102:22 127:10
**hold** 116:11 167:8
**holding** 93:10 213:10
**holy** 141:9 187:12
**home** 5:11 21:25 22:4 117:17
   123:6,8
**Homeland** 116:16 117:6
**honestly** 97:16
**HONORABLE** 1:13
**Honor's** 213:9
**Hope** 77:20
**hopefully** 183:21
**hoping** 82:3
**horse** 81:11
**Hospital** 113:9
**hostage** 216:7
**hostile** 119:25
**hour** 81:24
**hours** 78:21,21
**house** 9:7 145:17
**housed** 145:12 173:7
**houses** 119:9 145:12 174:13
**huge** 111:18
**Hukill** 92:23
**human** 174:2 176:9 177:8,9 180:18
   214:12
**humanitarian** 84:1,4 177:10
   214:12
**hundred** 133:2

**hundreds** 107:8
**hungry** 82:20,21
**hunt** 151:5
**hunted** 173:7
**husband** 9:25
**Hussein** 9:14 13:5
**hypocrites** 109:11
**hypothetical** 201:22

---

## I

**Ibn** 58:11,13,20,25 103:21,24
   104:5,22
**Ibrahim** 1:9 14:24 15:1 16:16 17:19
   42:13,17 56:17 60:7,11 90:2
**idea** 10:24 44:23 129:18 189:3
   194:23
**Ideally** 65:17
**identification** 3:12 4:20,21 6:12,14
   7:24 91:19 96:10,11 97:8
**identified** 91:17 97:25 103:24
   104:5 186:12
**identify** 11:13 97:14 129:16 144:19
   150:15 151:16,23 173:17 174:6
   177:17
**identities** 174:14,15,16
**identity** 119:14 123:5 174:17,22
**ideological** 139:10 168:7,9
**ideologue** 137:8,9,9
**ideology** 137:15 171:21 173:1
   180:2,8,9 215:21 216:1
**IHH** 105:24 106:2
**Illinois** 124:9
**image** 81:19 157:15,16,17,18
**immediately** 169:14
**impact** 158:14
**impeach** 208:7,18
**impeachable** 113:12
**impeachment** 112:24 113:4
**implying** 86:5 91:8
**importance** 16:2,13 54:10
**important** 22:4 30:3 48:15 89:3,19
   106:18 114:12 128:7 139:8
   140:14 176:7 177:19
**importantly** 171:20
**imposed** 166:16
**imposition** 165:24
**impressions** 67:21 68:10
**improper** 73:3,11 74:8
**inaccurate** 195:2 208:19 209:1
**inadmissible** 197:25,25 198:14
**inappropriate** 76:15 77:12
**incident** 213:18
**incidents** 205:15 214:1
**inclination** 199:14
**inclined** 75:15
**include** 206:9
**included** 45:17 64:2 69:11 216:2
**including** 56:1 70:9 167:3 213:25
   216:4,6
**incoming** 13:20 96:14 97:17,19
**inconsistent** 195:24
**incorrect** 193:2 195:14 207:10
**independent** 3:11,12
**INDEX** 3:1,1
**indicates** 93:7
**indictment** 206:9,13 208:14 210:4
   210:24 212:3,21 213:14 215:17
**individual** 112:1 157:19 161:25
   163:4,6 180:19 192:2,4,8
**individuals** 19:7 29:6 97:25 128:9
   132:17,18 133:6 145:20 152:17
   170:17,24 179:21 198:18 215:24
**Indonesia** 125:22
**indulge** 109:4
**indulgence** 156:2
**infer** 141:5,7
**inferences** 199:19
**infighting** 154:3,5
**inflame** 192:1 193:3
**inflamed** 192:7
**inflammatory** 189:17 191:24
   192:19
**inform** 163:9
**information** 18:7 21:16 24:8 26:6,9
   26:12,16 27:16 28:1,5,12 32:24
   86:23 87:1,5,6,8,20 99:4,10
   124:22 125:3 126:16 158:13
   175:17 189:12
**informed** 22:10 81:3

**initial** 213:9
**initially** 78:5 93:1 100:2
**injured** 176:10
**inquiry** 74:3
**Inside** 128:17,18 129:11
**insight** 120:6
**insofar** 201:19
**inspect** 65:21
**instance** 25:22 119:6
**instances** 23:15
**Institute** 116:3,17 124:18 126:3,7
   126:20
**institutions** 130:15 177:3 178:1,13
   178:22 214:3 215:24
**instruct** 197:16 198:3
**instructing** 196:5 197:10
**instruction** 75:20,22 76:4,15,19
   77:1 80:5,9 193:13,14,15,16
   194:14 195:20 197:14,16 199:10
   201:1,15 202:15,19,24 217:5
**instructions** 202:8,14
**insufficiently** 215:4
**intelligence** 91:2 92:3,15,15,24
   93:5,12,14 120:19 129:14,20
**intend** 31:19 72:16 205:11,11
**intended** 103:17 158:14 191:11
**intending** 10:19
**intent** 194:22,25 202:9 212:2
**intentionally** 73:8,9
**interact** 39:13
**intercept** 48:8
**intercepted** 5:10 6:19 7:4
**intercepts** 58:20 206:9
**interest** 16:5 35:12 36:1 49:7
   121:13
**internal** 142:16
**international** 114:17 117:18
   122:14,15,21 134:8,22
**interpose** 95:10
**interpretation** 110:23
**interpretations** 142:13
**interrupt** 182:14
**interruption** 23:24
**interview** 79:8 80:1,4 81:5,18,23
   134:1 189:1,3,9,13 190:18,21
   191:4,25 196:4,20 197:6 201:3,4
   201:5,5,8,17,23 202:7
**interviewed** 132:20 189:13 191:11
**interviews** 118:19 132:20 133:3
**introduce** 95:3
**introduced** 75:24,25 94:20,25 95:1
   197:17,20 201:20,22,24
**introducing** 72:16 184:22
**introduction** 187:1 188:13 210:3
**invaded** 101:9,18 143:19
**invaders** 101:10
**invading** 101:10
**invaluable** 118:23
**invasion** 101:19 136:13 143:17,25
   151:8
**investigating** 91:11
**investigation** 5:18 7:8 8:6 12:21
   14:15 20:14 23:18 38:8 57:9
   62:11 86:10 91:12 92:13,15,16
   92:16,21 93:2,8,15,17 104:9
   195:15
**invited** 90:3
**involve** 12:19 50:22 67:21 86:7
   119:20 214:2
**involved** 9:23 28:23 89:18 92:17
   123:10 133:7 152:21 212:15
   215:10
**involvement** 159:13 161:14
   163:21
**involves** 17:15
**involving** 20:23 31:11 58:21 154:6
   204:23
**in-law** 183:9,17
**Iraq** 133:17
**irrelevant** 71:21
**Irvine** 5:11
**Islam** 99:17 127:3,5,10 215:25
**Islamabad** 126:3,4,17
**Islami** 148:3,7,8
**Islamic** 9:22 50:14,16 121:2 127:11
   135:11 136:20,23,25 138:1
   139:25 142:21,22,23 143:4
   147:6,24 154:2,19 165:5,8,11,14
   165:16,22,24 166:2,25 167:2
   168:10,13,15,25 169:3,17

**170:16 171:11,23 172:13,18**
   205:13 210:20 215:4,14,18,19
   215:20 216:2,2
**Islamically** 211:15
**Islamist** 121:3 126:10 127:7,8
   132:6,13,24 133:11,11 139:15
   142:20 165:7 166:22 171:8
**isn't** 83:25 87:5 185:18 196:12
**issue** 14:4 15:17 20:4 24:25 27:21
   34:15 37:6 55:7 56:1 63:9 66:10
   67:16,17 70:17 71:15 72:9 74:19
   76:12 78:7 79:18 80:9 81:25
   87:15 88:16 90:20 91:25 95:15
   96:20 99:17 103:5 109:5 111:13
   111:19 112:10,24 113:7,20
   186:7,8,8,11 193:9,10,10,13,19
   194:6 195:6 198:23 199:6
   200:11 202:20 203:8,18,24
   204:21 208:6 213:8 214:9,16
   215:6 216:9
**issues** 12:7 22:6 72:21 111:3 120:9
   121:14 156:17 186:9 215:11
**Istanbul** 107:9
**item** 65:12 159:4
**items** 45:21 46:2,21 49:1,7 65:15
   159:8,10,12 174:21
**it's** 5:10 10:23 13:21 14:13 15:2
   16:16 17:11,24 18:10 20:2 23:22
   23:23 26:5,23 28:12 30:7,7,7,24
   33:18 34:10,16 40:22 44:2 48:15
   48:19 55:11 56:13 57:18,19 70:7
   71:10 75:18 77:5 78:13 82:2,25
   83:4,10 85:3 86:6,11 87:18,19
   88:21 90:10,11 93:21 96:14
   97:17,23 98:21 99:10 101:1,3
   102:14 103:20 107:4 108:23
   111:10,16,23 115:11 117:10
   121:11 135:8 138:11 157:7
   160:15 163:6 185:17,24 192:10
   193:16 194:2,5 196:18 198:6
   205:25 207:13 210:4
**Ivan** 80:8
**I'd** 4:14,22 7:21
**I'll** 41:3 75:23 152:7 163:18 169:23
   188:1
**I'm** 6:11 23:24 32:10 58:24 96:8,9
   97:22 102:15 103:16 105:4
   112:13 134:15 154:18 158:9
   189:5 190:14 197:10 205:11,15
   205:20
**I've** 125:19
**I-B-N** 58:11
**I-95** 183:21
**I.D** 174:19

---

## J

**jacket** 45:18 46:18 48:9,21
**Jackson** 113:8
**Janet** 93:2
**January** 64:11,11,12 95:1 206:19
**Jayyousi** 1:8 2:12 6:20 10:3 58:21
   76:1 88:12 98:18 99:7,13 100:5
   100:8,20 101:17 102:1,12,19
   103:20,23 105:9,13,23 106:1,5
   106:17 107:4,11,15 108:2,6,10
   108:13,14,21 109:10 134:13
   160:9,13,16,21 190:21 197:7,17
   197:22 198:8,17,17 204:24
   207:1 217:11,12,15
**Jayyousi's** 5:11 76:3 101:8 103:6
   159:25
**JBaker@fourdefenders.com** 2:6
**JE** 102:17
**JEANNE** 2:5
**jeep** 187:2
**jihad** 14:22 17:12 21:16 24:9 26:8
   26:10,12 28:11,16,24 29:7 30:2
   30:19 31:7,24 32:2,3 33:2 34:15
   34:23 35:13,13 36:19,25 37:2,7
   42:5 46:15,25 47:5,9,9,14,17
   48:4,6 84:5 87:1,19,21 126:8,10
   137:9,15 138:7,8,21,25 139:4,12
   139:13,20,23,24 141:8,8,9 142:9
   142:12 149:5 153:10 164:13
   168:25 169:3,17 170:16 171:12
   188:21 191:14 210:8,8,11,12,18
   210:19 211:18 215:22 216:2,3,7
**job** 113:13
**John** 1:19 3:3 140:6

Johnson 212:18 213:3,4,7
join 138:19,20
joined 210:10
Jordan 137:13
Jose 1:9 12:7,9,12,15,22 15:1
16:15 19:5 20:2,4,9,14,23,24
21:11 22:15,17 24:4 27:22,24
29:19 32:11 36:8 37:6,11,19
38:2 39:8,18 43:18 45:3,15 46:3
46:5,25 48:12 51:2 53:9 59:10
60:3,14 61:15 62:11 64:9 66:13
68:18 69:3 217:16
journal 129:9 138:21,22
journals 129:24,25
Judge 1:14 8:19 23:24 24:5 77:15
78:6 79:13,19 81:25 87:22 88:20
92:19 112:2,13 122:1 155:18
156:11 160:18 169:25 179:11
183:14 185:4 186:19 187:4,9
189:11,21,25 190:8 193:13,18
194:8 196:9 198:19 205:9 208:6
213:8 214:10 215:2 217:7
judicial 190:13
July 20:21 29:15 42:15,16 161:8
June 1:7 12:1 13:15 89:8 99:2,3
101:1 103:20,23
juror 156:16 183:9 195:21
jurors 75:10 95:24 140:20 155:25
156:25 174:10 185:7 189:1,3
190:16 195:17 196:15,22
jury 1:13 4:16 10:20 11:8,24 70:1
71:19 73:4 75:1,7 79:4,20,22
80:10,11 81:2 90:8 93:13 96:6
96:19,21 102:3,7 103:10 111:5
114:3,14 117:9 120:17 123:1
132:11 136:21 137:6 138:11
140:4,7,18 142:24 144:20 156:6
156:19 160:23 161:10 170:6
172:21 173:17,21 177:18 181:17
182:24,25 184:24 185:17,25
186:1 188:7 189:16 190:11,25
192:1,6 193:3,8 196:10,18 197:4
197:16,18 198:1,4 200:15,21
201:2,18 202:12,20 203:20
209:1 214:13 215:15
jury's 159:4
Justice 1:22

K
K 1:18
Ka 56:19
Kabul 118:2
Kamal 14:1 18:3 89:9
Kashmir 126:19
Kassam 33:7
Kavanaugh 3:3 4:4,8 7:21 10:9
12:6 23:11 63:3 71:2 72:20
74:25 75:7,25 79:21 80:15,17,19
84:9 86:5 97:7,13 109:23 140:6
143:1 216:23
Kavanaugh's 71:20 75:21 216:19
KD 33:6
keen 165:7
keep 16:2 85:9 114:13 203:17
keeping 16:14 149:12
KENNETH 2:2
ken@swartzlawyer.com 2:4
kept 5:22
key 137:8 139:9
Khaled 18:7,14 38:25 39:2 163:10
Khalid 161:22,24
Khartoum 154:12,25 155:3,16,17
164:25 167:13
Khattab 58:1,10,11,13,20,25 103:7
103:21,24 104:5,12,22
Khattab's 58:6 105:10,24
Khidmat 144:16,21,24,25 145:8
146:17 148:9,13,22,24
Khidmat's 149:1
kick 167:17
kidnapping 213:24 216:6
Kifah 1:8 5:10 6:20 58:21 76:1
159:25 206:25
kill 119:22
killed 148:19,19 170:16 176:10
killing 192:23
Killinger 1:9 9:5 78:15 84:17
85:13 187:4,15,22
kind 5:17 27:16 67:7 80:5 99:10

137:23 140:11 154:15 165:25
173:14 178:9 181:18 190:14
209:8 212:8 215:13
Kingdom 122:19 161:20 163:25
Kinkos 104:4
KN 14:1
knew 152:22 211:17 217:17
know 9:2 10:23 11:1 15:9 19:12
22:25 24:12 27:9 28:4 29:20,20
30:6,7 32:17 33:24 40:10 48:19
48:21,22,22 53:3 60:6 61:21
64:25 65:3 71:25 73:2,6 76:4 77:5
73:21 74:23 75:18 76:4 77:5
78:24 80:19 81:9 82:2 83:12
84:22 86:5,14 87:3 89:6 91:9
97:23 99:20,24 100:13 101:16
104:22 107:5 111:20 112:2,20
113:14 137:2 151:1 152:1
155:20 156:15 161:2 166:9
169:10,25 184:4 189:14 190:3
190:19 192:23 195:9,14 196:22
197:16 199:17 202:7 203:17
206:18 207:12 208:25 209:6,7
209:11 211:13 216:12
knowing 202:3
knowledge 15:22 62:10 89:16 91:2
104:21 117:15 120:4 164:8,18
167:8
known 93:18 116:10 117:10
138:24 139:1,6 144:23 146:7
149:18 150:13 165:5 170:14
171:13 190:15
knows 24:18 48:18,19 49:4 74:13
99:23 110:21 197:20
Koran 10:10 44:19 84:10,12
127:13 141:9,10
Kosovo 42:4,10 48:5 210:17
211:20
Kumar 114:4

L
lab 64:19 67:7
lack 27:16 31:7 32:24 47:5 68:23
71:12,13 88:4 89:23 98:19
101:11 163:17
ladies 4:2 69:23 80:12,18 96:22
112:6 114:2 156:3,20 182:16,24
192:5 197:3
Ladin's 78:20 147:1 150:23 168:15
201:6
language 7:1 36:7 38:18,19 39:8
42:21 50:13,15,22 51:3,14,23
86:16 90:25 92:1,7 94:12 127:16
127:20 128:2,7 159:16 184:13
184:16 199:12 200:9,13 202:25
languages 38:9 127:19,25,25
Lanka 121:11,13,15,17,18 122:5,7
122:9 123:21
Lankan 121:21
large 14:5 32:15 44:2 46:5 48:12
115:3 117:23 122:22 126:18
129:14 132:18
larger 104:15 171:6
largest 115:4 117:21 119:1
late 125:23 133:17 143:14,15
147:12 157:3 168:3
latent 69:8,11,20 70:6,10,17 71:13
latitude 75:15 216:22
Lauderdale 183:20
laughs 42:22
law 110:17,18 116:2,13 136:25
137:2 142:21,23,23 143:4
147:22,24 165:8,11,23 166:11
166:16 198:7,25 199:5,8 210:6
215:20
laws 147:5 165:15,24,25
lawyer 73:18 202:18
lay 152:7 216:25
lead 168:10
leader 148:7 154:17 168:22,24,25
169:9,11,13,16 205:13
leaders 169:3 170:23 181:20,23
213:24
leadership 167:21 169:7 170:8
171:16 176:13
leading 13:8 21:17 22:20 25:24
30:21,22 35:9,14 40:1 43:22
51:17 53:15 56:7 57:15 60:16
61:3 67:4 68:5 73:10,20,21 74:4

74:11,18 123:13 129:9,25
learn 29:22 39:13 42:21
learned 38:3 98:18,23 99:7 104:6
learner 38:6
learning 38:10,18
leave 48:15 50:1,1,19 51:3 81:6
91:4 92:5 95:24 154:9 167:15
175:9 193:6
leaves 70:1 160:16 182:25
leaving 12:25 52:15,18 182:21,21
183:20
Lebanon 186:9 205:1 207:16 212:5
213:11,13 214:3,11 215:3,14
216:5
lectures 42:22 89:16 130:13
led 68:3 125:8,12 135:9 148:3
167:22 168:3 170:20,22,24
left 81:4 123:7 147:8,13 153:20
154:1 164:25 167:12 193:17
left-hand 160:3
legal 74:7,12 160:18 202:19 209:3
210:14
legally 76:18
legitimacy 179:3
legitimate 178:13
Lemanon 2:2
length 63:22 64:5 184:13 185:13
lengthy 66:6
letter 13:4 19:11,18 27:1 32:17
46:17 48:17 72:17 94:22,23
97:23 98:2 100:15
letters 15:5 18:19
let's 13:11 14:3 16:2 17:13 19:25
21:21 24:25 26:18 27:24 29:11
31:11 32:3 33:1,8,21 45:10,11
49:22 54:7 56:10 59:5 61:21
72:6 73:15 110:7,13 111:22
112:4 113:8 134:25 135:12
160:1 168:17 186:7,16 201:21
level 136:10
liable 91:5
Libya 216:5
life 212:23
light 111:14
lights 214:23
likes 44:23
limine 111:1
limit 55:15 113:6
limited 26:16 71:2 72:21 82:3,8
103:11 192:16 212:19 216:19
limiting 199:10
line 3:13,13 9:9 16:16 25:9 42:25
55:1 90:1 161:3 188:5 197:14
206:14,18
lines 30:24 32:3 33:1 44:16 45:4
71:11
linkages 123:6 171:12
linked 213:19
liquor 204:25 207:17,25 212:1
214:4
list 11:15 72:12
listed 33:6
listen 86:11
listening 85:16,20 91:3
lists 13:25
literally 144:25
little 31:20 32:1 43:7 44:1 45:12
56:17,19 57:3 61:7 65:16 77:6
80:23 125:5 132:23 136:1
live 135:11
lived 137:12,14 140:1 155:3
living 143:8,9
located 114:19,20 115:18 161:20
162:5
location 57:21 59:18,22 60:20 61:2
183:3
logo 187:19
London 162:3,6
long 14:6 29:1 72:2 113:23 153:5
155:9 189:23 209:18 213:15
longer 71:25 144:17 190:1
longhand 217:8
look 4:22 6:15 7:12,25 13:11 17:14
26:18 27:24 31:11,14,20 32:4
33:8 45:10 49:22 53:2 59:5
61:21 65:17 66:3 68:9 77:23,24
78:17 79:23 103:12 136:8 161:2
162:16 163:3 191:15 193:21,24
207:22 217:5
looked 79:8 84:12 93:20 187:8

201:21
looking 5:13 8:19 14:21 31:25 34:2
64:22 91:25 159:15 190:4
207:13
looks 65:19 85:14 184:5 195:21
loose 40:17
losing 35:18
losses 174:2 176:9
lost 35:21 211:15
lot 8:25 10:2 29:19 50:6 54:15
75:16 72:6,2 121:15
Louis 2:15,16 77:3,4,10,16,21 78:1
78:10 79:18 96:18 112:2 186:5,6
186:18,19,23 187:25 188:3
189:21,24,25 190:3,7 191:19,20
192:9
lunch 75:8 78:3 80:23

M
M 218:4,5
machine 21:22 78:25
magazine 139:4
mail 21:24,25
mailing 163:14 164:10
maiming 213:23 216:6
main 109:14 137:9 145:14,16
maintain 118:14,25 151:7,9 155:5
155:11
maintained 151:12 155:7,12
major 66:10 67:16,21 68:2,10,17
68:23 71:11,12 111:19 115:14
120:10 192:24
MAK 144:23 145:4,5,7,15,20,23
146:16,17 148:9,21,23,25 149:7
149:9,23,25 150:11,13 151:7,9
151:14,17,24 152:1,10,14,17,21
153:5,6,7,9,12,12 157:13 162:9
makers 118:11 119:12 120:13
making 21:11 105:19 177:16
185:22 191:3 195:20 199:5
Maktab 144:16,21,24,25 145:8
146:17 148:9,12,22,24 149:1
MAK's 149:11
Malaysia 125:22
male 14:2 54:1
males 59:25
man 9:14 53:3 89:18 144:16 169:1
170:14 189:13,13 190:11,24
191:11
manage 117:20
managed 159:1 165:13
manner 83:14 129:17 202:16
manual 153:9,11,13
map 84:22
March 139:2
MARCIA 1:13
MarCom 54:1
MARIE 2:20
mark 90:24 194:16
marked 3:12 4:21 6:14 7:22,23
188:12
markets 209:10
married 9:21 42:22
MARSHALL 2:15
Marvin 194:2
Marwa 9:22,23,24 48:16 49:3,6
Maryland 124:13
Masri 170:21
mass 163:14 164:10
Massachusetts 116:20
Master's 122:10,13,14,18,24
123:23
match 67:11,19 68:3
matches 68:9
material 118:18,21,22 126:19,21
126:23,24 164:2 174:2 180:7
210:18
materials 119:11 133:23 140:6
153:7 156:24 164:1
matter 18:9 96:10,11 198:23,25,25
218:3
matters 20:15 75:8
Ma'ali 98:3
ma'am 156:10 186:6
mdl@sinclairlouis.com 2:18
mean 10:14 16:7 16:16 17:2,4,5
19:9 22:7 25:4,18 29:21 31:15
39:2 43:1 52:11 53:3 54:15
59:13,14 61:24 67:2,6 76:12

79:18 81:19 83:1 88:1 89:18
98:14 99:15 126:10 135:13
136:21 139:23 141:10 173:8,21
174:15,16 175:8 177:17 181:17
190:14 204:9
meaning 66:18 69:14 113:19 139:3
139:24 148:3
meanings 142:11
means 57:3 82:19 107:17 123:3,3
136:24,25 145:2 166:25 167:1,2
172:11,12 177:8 203:19
meant 79:12 138:8 142:15 144:10
171:10
Media 158:21,21
meet 78:3 149:2 176:18 180:23
188:14
meeting 176:17
member 116:15 136:18 171:2
members 115:6 132:24 135:14,16
136:4 140:7,18 142:24 171:1
173:6 176:12,19 177:20 179:24
180:6,13 181:20,23 182:6 207:2
213:24
membership 135:20,21 171:3
memo 9:9 93:2
Memorial 116:3,17
memorize 44:18
men 188:18 191:5 192:21 193:2,4
mention 180:18
mentioned 43:14 59:2 89:13,20,21
116:19 118:14 119:17 124:3
125:25 129:20 133:16 134:25
135:20 136:11,19 137:5 139:11
141:7,8,8,10 142:18 145:25
154:5 170:12 178:2 204:3,6
207:21
mentioning 195:22
mentor 146:24
merely 95:6,11 101:19 192:7 214:8
message 21:22 137:15 180:21
181:25 182:1,2
messages 18:19,19
met 54:15 132:16
method 18:15 19:15 65:8
methodology 172:16
methods 134:3 180:16,17,18
181:16
MI 2:14
Miami 1:2,6,20 2:3,11,17,21,22
218:7,7
MICHAEL 2:8
mid 115:1 143:15 145:5 146:10
151:11,17,24 152:11 153:15
158:16 170:9
middle 19:9 26:19 27:2 31:15
41:19 42:19 44:17,17 48:12
49:25 56:17 60:5 106:1 107:4
115:12,25 125:18,19,23,24
127:24,25 130:18 133:18 135:18
135:23,24 136:5 143:14 144:3,6
144:8 149:6 160:16 175:10
189:2
midst 209:20
migrant 144:5 175:7,8,9
migrants 123:3,7
migrate 175:10
militant 173:15,24,25 174:24
175:25
military 116:1,10,23 120:22 142:7
145:20,23,24 148:5 153:10
155:11,12 169:2 175:21 179:4
192:16 194:6
Miller 193:25 194:3
mind 49:1 112:20 141:18,20 191:2
191:6,7,8,9 194:22,25 197:7,21
198:7,22 199:1,22 200:3,16,22
200:24 201:3,4,6,16,18,20
211:11,11 217:15
minds 195:12
minimum 192:21
Ministry 124:21
minute 170:5 187:6 190:1
minutes 69:25 75:9 78:3,17 190:1
204:15
misinterpreting 72:14,15
misleading 93:13
mission 149:12
mobility 125:10
model 172:16 214:12
moderate 205:13

modified 202:25
modify 206:8
Mohamed 14:1,5 15:25 16:6 18:14
21:4,11 22:3,10 31:12 32:13,21
37:20 47:14 56:13 89:9,11 91:1
91:11 106:11 109:11
Mohammed 163:4
mom 46:18
moment 88:13 110:4 128:12
129:20 136:19 137:5 139:11
140:3 141:24 142:25 144:12
150:20 155:14,20 156:1 158:5
160:5 164:22 165:5 174:6
202:13 207:4
Monday 1:7 111:4
Mondays 75:9
money 48:16 82:23 104:4 175:12
178:3,10,22 180:20
monitored 92:4
monitoring 125:10
month 44:8 59:15 66:2 129:8 161:7
190:19
months 89:25 126:15 190:22
morning 4:1,2,8,9 64:12 69:24
72:12 75:17 94:25 182:23 183:4
187:5,6,17 189:24 200:7,8,10
217:6,19,22
mosque 16:17 90:3
mother 20:5,5
motion 11:18 92:19,19 203:10
204:18 216:15
mountain 187:3
mountains 190:10
move 6:2 7:10 8:13 62:25 70:12,14
103:13 105:3 155:1 164:15
166:6 196:12,13
moved 103:8 111:1 126:24 136:13
154:22,24 164:24 211:10
movement 137:9 164:14 166:13
171:11 215:19,21
moving 25:18 70:3 203:2,3,17
211:4
Muhamed 169:1 170:14
Muhammad 170:21
Mujin 205:19,20
mujahideen 43:20 63:4,17 64:1
65:21 66:21 67:12 69:4,9 98:1,6
98:7 100:21 101:3,19 119:9
138:22 143:16,23 144:9,10,10
144:22 145:3 146:18 148:13
153:21 191:10 210:19 215:23
Mujahir 1:10
Mulah 167:12
multiple 38:9 78:6
multi-national 115:11 135:3,9,13
135:14,19,20,21 136:7 143:16
144:2
multi-nationality 136:10
Muqbil 59:13,15,20
murder 191:11 192:12 209:12
210:17 213:23 216:6
mush 64:12
Muslim 127:1,2,13 128:6 144:3,5
211:15
Muslims 115:15 128:4,5 135:11
138:20 140:1 213:25
Mustafa 207:1,9
M-A-K 144:24 146:17

N
N 2:3
Nahed 20:2,4
named 58:1,17 114:2,3 144:17,19
145:2 149:18 150:9 163:3 206:5
207:14
named 9:14 54:1 207:1
names 98:3 212:15
Nanyang 115:19
narrative 42:1,3 43:13 61:9 62:12
139:19
Natale 2:9 72:24 73:17,25 74:5,15
national 116:17 124:10 136:12
nationalities 135:15
Nations 124:23 125:9
NATO 117:10
natural 14:8,16
nature 29:3 90:3 121:17 192:4
naval 117:12
Navy 120:23

near 52:9 72:1 200:6
necessarily 176:12,15,20
necessary 123:21 188:25
need 9:21 22:6 51:2 53:1 55:4 56:5
56:18 68:9 72:5 78:17 113:14,19
113:23 145:9 156:1 174:1
175:15 182:15 184:9 185:15,16
185:19 186:3,9 188:22 189:14
196:23 204:17 209:6,6,8
needed 67:16 173:9 209:11
Needles 215:11
Neither 77:15
network 128:24 173:11
networks 122:25
Neutrality 93:7
never 29:20 71:5 195:6 205:10
211:17 212:8
new 10:16,13 50:15:11 72:10,21
82:6,16,25 83:17,18,24 88:8,9
88:16,18,19,20 89:9 90:14 94:11
94:4,5,15 120:18,21 149:2,3
156:5 165:4
news 27:9,21 28:1,2,3,3,9,11,16
34:2 86:23 87:8,12 190:16
Nicole 81:14
nightclubs 204:25 214:5
Niki 165:13
nonIslamic 215:4
nonsufficiently 215:14
noon 81:24
normally 68:1 80:18 86:11 184:13
Norsville 161:21
north 2:21 56:20 115:5 117:10
125:24 135:24 144:4 162:3,6
172:13
northern 207:16
note 19:1 92:8 94:13 187:9
noted 135:6 193:5 217:3
notes 91:25 100:8 103:12 174:11
notice 190:13 204:8,13 205:7
206:5,6,11 207:6 208:13,16
209:22 211:2,3 213:17,19 214:2
214:5,6,17
noticed 186:12
Notre 122:13,19 124:3 126:20
November 33:4 93:11 148:18,19
170:16
nub 213:16
number 5:4 6:21 9:12 12:11 29:2
63:3 82:13 88:21 91:19,22
118:10 120:11,12 123:20 124:17
128:19,20 129:12,14,23 130:14
130:14,22,23 132:15,15,18
138:18 140:9 144:4 159:17,21
160:9,13,21 170:8,19 193:9,10
numbers 86:3
numerous 101:17 131:7 180:17
197:24
Nussbaum 2:16
NYPD 120:19
N.E 1:20
N.W 1:23

O
oath 4:5 171:4,5
obedience 29:23
object 15:13,19 21:5 22:19 23:20
27:17 32:5 33:17 54:25 83:24
91:25 103:1 104:17,25 107:22
141:19 158:4 163:17 164:15
166:6 169:19 178:4 201:1 204:4
214:10
objected 85:22 95:4,22 110:9
198:5
objecting 73:4 95:3
objectionable 79:9 190:5
objections 22:21 73:11,22 74:10
78:22 134:17 192:9
objective 198:22 200:4
objectives 138:5 172:11,12 177:23
obtain 122:9,17 133:20
obtained 8:6 122:20 144:1 174:20
obviously 7:1 12:25 44:15 90:6
95:24 111:10 184:14 200:21
217:20
occasionally 74:14
occasions 101:17 111:11 126:12
131:6

occurred 4:25 21:13 93:12 112:21
190:22 198:16
occurring 212:23
October 49:14 85:18,19 91:18,21
offensive 78:9
offer 10:24,25 54:23 134:6 216:24
offered 91:12 96:3 193:14 194:19
194:21,23 195:2,3,5 196:3 197:5
216:25
office 1:19 2:10 123:24 124:9
153:12 161:19,22 162:2,5,6
offices 162:4 185:14
official 2:20 5:15 7:7 218:6
Ogaden 25:2 27:6,14 32:21
oh 73:23 90:11 108:14
okay 4:17 24:1 64:7,8 104:19 106:2
181:4 183:19 185:1 188:8
194:17
Oklahoma 116:4,18
Omar 98:10 102:22 154:16 167:15
167:22
once 24:9 167:8,11 185:17
ones 11:13 76:17 77:1 108:20,22
one's 15:8
open 1:16 16:14 17:3 24:22 46:12
46:22 103:15 112:5 114:1
185:13
opened 35:2 46:9
opening 34:20 35:8 113:1 190:9
204:4
opens 24:5
operate 118:7 135:23,23 150:7,8,9
155:1 163:11 177:2,8,12,13
operated 207:15,20
operating 155:15 162:7
operation 119:22 179:19 182:8
operations 124:22
operator 54:21 54:1
opine 113:14
opined 113:15
opining 79:11
opinion 14:17 17:8 20:19 23:18
24:3 26:12,15 29:6 30:15 32:22
33:14 34:8,25 36:19 37:14 39:3
40:5 57:22 62:11:16 71:20,20
82:23 83:20 85:23 87:6 152:21
164:9,19 180:6
opportunities 23:1 24:9 29:7 31:7
33:2
opportunity 14:21 17:11 22:11
23:3 30:19,20 34:15,23 37:19
46:15 73:2 77:23,24 194:13
oppose 215:4,23
opposed 118:17,21 121:18 137:3
189:5,9
opposing 210:3
opposition 211:14
oral 190:1
order 29:7 63:9 64:13,16,25 65:1
65:10 177:23 178:1 179:2
ordered 64:14,17
organization 104:15 105:6 109:4
117:10 128:24 129:10 135:3,9
135:15 138:25 144:13,15,19
146:16,21 148:16 149:11,15,17
149:18,20,20,23 150:1,4,11,13
150:15,24 151:2,4,15 153:5
154:11 161:12 162:9,11 165:7
166:19 167:19,22 168:18,19,22
169:4,8 171:12 174:1 177:5,5,19
177:22,22,24,24 207:13,15,15
207:19,24 208:17
organizations 121:2,3 123:19
126:8,10 129:19 132:17 150:5,7
150:8,10 151:6 159:1 166:14,14
173:25 176:13 177:6,7,7,9,9,10
177:10,11,14,15,17 178:16,24
215:14
organized 136:15
orientation 149:2,11,12
original 6:22 7:2 66:4 119:7,8
159:13 162:16,19
originally 91:6 115:1 137:11,12
149:7,9
origins 142:3
ORLANDO 2:9
Osama 58:8,9 59:3,16 78:12 135:9
136:11,11,12,14,17,18 144:16
145:25 146:6,19 148:22 149:2,3

149:12 151:4 154:20 157:16,17
157:18 161:18,20 162:1,15
163:2,4,5,10,13 164:6,23 167:10
168:23 169:13 170:7 171:4
176:17,18 184:4 190:11 196:17
201:6,25 202:5,9
**Osama's** 56:18,19,23 57:21 58:5
**outgoing** 13:20,21 96:13 97:15
**outline** 204:12
**outlined** 88:19
**outlook** 168:6
**outside** 15:21 58:14 115:5 131:16
135:16,23 136:5 144:1 148:12
150:2 151:7,9,16,23 171:9 175:4
175:6 204:11 208:14,14,15
209:4 210:4,4
**outstanding** 111:3
**overly** 189:17 191:24,24 192:1
**overnight** 202:23
**overruled** 16:9 23:21 32:7 35:15
38:4 43:23 45:7 47:21 51:18
57:17 58:16 60:22 61:4 62:19
63:1 67:18 68:6,13,20 98:22
101:21 105:5 107:25 122:3
139:18 141:21 151:19 152:25
160:20 164:16 166:7 169:21
172:24 178:5
**overseas** 45:5

**P**

**pack** 128:22
**Padilla's** 12:25 20:9 37:19 41:8,16
49:3,7 57:10 59:18,22 60:20
61:1 63:16 66:13 68:18 88:23
200:3
**pages** 33:21,22 95:8 103:8 206:20
206:24
**paid** 131:21
**pains** 113:6
**Pakistan** 115:8 118:2 125:20,25
126:3,4,8,9,12,14,24 128:2
133:16 136:13,14 137:14 138:23
143:11,12 145:11,22 146:8,9,10
149:10 153:21,25 154:1,12,12
154:24 155:8
**Pakistan/Afghan** 155:9
**Palestine** 137:12
**Palestinian** 207:20 212:4
**palm** 69:9,11,20 70:6,10,18 71:4,6
71:13
**paper** 5:13 15:20 65:9 184:9
**papers** 119:8 203:23
**paperwork** 64:22
**paragraph** 14:6 32:15 44:2 46:5
48:12 53:1 59:12 91:6 161:23
213:4 215:18
**paramount** 176:11
**parenthetical** 213:3
**parse** 202:16
**part** 5:1 6:23 7:2,4 79:9 85:20
91:11 100:15,20 107:12 108:21
108:23 112:21 126:25 127:17
132:16 133:22 135:17 152:17
166:10 176:16 179:21 184:11,19
187:12 188:18 189:24 190:17
191:25 198:9 212:7 213:20
214:21,21,24
**participants** 13:25 33:6 53:24
118:20 133:3 179:6 182:13
**participate** 14:21 17:5,11 146:2,4
**participated** 146:11 210:16,25
214:24
**particular** 9:11 46:3 49:6 62:17
65:11 75:20 76:16 82:17 94:14
120:24 130:22 140:8 161:14
192:1 207:20 215:9,10
**particularly** 119:2 143:22 147:25
**Particulars** 204:6,7,12,21 205:5
206:6 208:14 209:4 210:5,7,7,22
211:5,7,12 212:9,21 213:1,4,9
213:12,16,17,21 214:15,19,25
215:1,2 216:9
**parties** 166:12
**parts** 67:22 68:1 165:14 210:9
**party** 76:22 148:3
**pass** 155:21,23 217:21
**passage** 15:25 18:3 20:8 22:24
23:8 41:19,22 45:4 46:21 48:25
49:6 52:6 62:2,17

**passages** 41:10
**passed** 13:11 40:17 90:7 183:9,17
**passport** 174:17,18,18
**path** 113:8 209:2
**patience** 39:19
**pattern** 73:5
**peace** 122:14,15 124:18 126:19
**peers** 130:8
**PELL** 1:21
**pending** 30:12 90:21
**penetrate** 177:23
**Penobscot** 2:13
**people** 14:16 17:4 18:19 19:19
20:24 36:24 37:12 39:14 78:11
79:11 82:21 83:2 99:5,14 104:23
105:10,20,24 107:8 118:20
123:4,7,11 127:24 133:7 134:1
137:2 143:25 144:2 145:22
151:16,23 152:1,11 161:10,11
164:13 166:1 170:17 171:3,5,6
175:9 176:10,10,23 177:21,22
178:11 181:10 191:9 192:7
201:25 212:14 215:3
**people's** 195:11
**perceived** 89:22 214:4
**percent** 115:15 128:5 165:13
**perfect** 43:1 94:2
**perfectly** 84:2
**perform** 70:6,8 178:13
**performance** 175:25
**performed** 64:17,23 177:4,5
**performing** 99:14,18
**period** 89:25 92:18 93:4 124:11
152:15,18 157:23 169:10 206:12
207:25
**periods** 28:23 29:2
**permission** 11:24 102:6 214:17
214:18
**permitted** 211:6,8
**permitting** 202:23
**person** 13:2 17:25 19:18 70:22,23
91:3 137:6 140:14 170:13 191:4
**personal** 13:6 15:21 29:2 100:8
199:7
**personality** 117:22
**personnel** 176:5 178:10 180:7
**person-to-person** 13:1
**pertain** 88:10
**pertained** 47:3 103:6
**pertains** 88:11
**Peshawar** 139:5 143:9,10 153:12
154:12,24 155:10 188:15
**Power** 187:2,21 189:12
**PhD** 122:21,23 124:25 179:16
**Philippines** 125:22
**Phillipines** 115:8
**philosophy** 138:6 215:21
**phone** 9:14 12:16,16 15:12 17:23
18:10,16 20:2,16,20 35:23,24
37:12,20,22 85:10,20 86:2,2,3,6
86:12 88:21 102:11 181:1
200:20,22,23 201:2 204:23,23
205:19 214:1,6
**phones** 176:2
**phonetic** 207:10,11
**photo** 174:17
**photographed** 93:9
**photographs** 93:11
**phrase** 14:16 27:15 30:25 31:23,25
44:13 46:11 56:22 66:23
**phrased** 52:20 73:7
**physical** 5:13,21 65:7,15 215:23
216:6
**physically** 65:21
**picnic** 22:7 36:17
**picture** 25:19 95:17 138:11,12
157:7
**piece** 21:15 184:9 197:2
**pieces** 20:22 135:12
**pioneering** 171:10
**place** 28:12 32:21 62:6,23 187:23
190:10 212:6
**placed** 205:7
**places** 125:7 133:20 171:17 172:19
187:20 191:25 204:8,12
**Plaintiff** 1:5
**Plan** 182:22
**planned** 117:14
**planning** 46:3 209:7
**plans** 21:11

**platform** 181:3
**play** 73:18 78:2 162:14 188:8
189:21 190:7
**played** 12:18 185:17 188:7,10
191:21 193:7,9,14,15,16
**playing** 82:23 184:24 189:2
**please** 7:12 8:17 15:15 22:3,22
80:10 94:21 103:21 104:18
107:18 114:2,22 122:16 123:16
125:16 127:12 134:19 135:6
158:5 159:20,23 167:9 183:24
188:9 199:12 204:19
**plenty** 74:13
**plowed** 71:7
**point** 11:6 18:8 20:2 26:24 27:6
28:14 29:16 31:24 35:21 42:1,3
59:7 61:11 64:15 70:3 72:19
75:20 83:10 86:25 90:5 92:14
105:17 111:10 113:21 116:1,10
116:22,25 117:1,3 122:2 145:6
146:11 147:8,13 148:21 149:14
151:13 154:10 160:19 165:12
188:19,22 189:1,6 190:8 199:13
199:25 213:6
**pointed** 86:24 190:9
**pointedly** 53:8
**points** 55:10 74:6 89:3 192:13
199:7
**Police** 120:18
**policy** 118:11,11 119:12 120:13
124:13 191:17
**policy-makers** 133:7
**political** 114:18 116:6 117:18
120:5,24 121:1,18,19 130:2
137:3 138:5,5,9 166:12,14 167:4
167:6 172:16
**politicize** 158:14
**politicized** 176:25
**politics** 137:2 166:9,9
**portion** 6:25 14:13 79:10 90:23
156:13 188:19 192:15,18,21,22
202:24 205:12
**portions** 78:10 127:13 184:23
192:10 196:10
**position** 101:8 120:13 170:3,6
186:17 206:3,4,5 209:3
**positions** 74:7 126:1 170:3
**possibility** 25:2,3 47:8
**possible** 23:1 36:19 43:2 91:10
97:16
**possibly** 44:8 201:9
**potentially** 197:1
**power** 154:16 167:11
**PR** 158:22
**practices** 91:2 92:3 166:17
**precedence** 82:24
**preceding** 93:4
**precise** 192:9
**predicate** 192:13
**predominantly** 144:6
**prefer** 75:12,14
**preference** 203:18
**prejudice** 81:18 206:7 214:17
**prejudicial** 189:7,17 191:18,24
197:2 200:17 212:22
**premarked** 4:19 6:12
**premises** 115:18
**preparation** 14:9
**prepare** 52:7 73:1 122:22 131:13
204:13 211:9
**prepared** 77:2 110:2 122:24,24
131:6,7 184:7
**presence** 69:8 71:17 75:8 151:7,9
151:12 155:5,7,13 192:8
**present** 5:18 77:7,16
**presentations** 130:13
**presented** 126:19 205:7
**preserve** 123:4
**press** 76:21 87:2,4 128:22 163:14
**pressure** 167:13,14,16
**prestigious** 51:12
**pretrial** 134:11 209:19 211:6
**pretty** 200:6
**prevent** 47:5
**preventing** 120:2
**prevention** 116:4,17 119:24
124:23
**previous** 96:24 134:17 162:16
192:18 194:16
**previously** 169:2 170:15 190:6

**platform** 203:25
**primarily** 135:15 137:16 155:10
167:15
**primary** 117:23 118:16,16,18,19,23
**principal** 135:10 137:8 138:22
145:8 146:15 148:24 149:25
153:10 162:6
**principal's** 136:22
**print** 67:17 69:9,11 70:6,10,18,18
71:4,13
**printed** 174:19
**prints** 65:2 66:11,13,18 67:12,16
67:21 68:3,10,17,18,23 69:20
71:6,11,12
**prior** 12:25 23:5 42:7,12 129:6
145:23 163:21
**priorities** 83:20
**priority** 82:20
**probably** 24:13 90:24 104:9 113:12
185:14 203:14,16 208:16
**problem** 18:11 32:23 43:2 44:24
93:5 103:10,13 108:21 109:5
111:17,18 112:22 184:12 190:17
196:2 208:4 214:11
**problems** 32:24 138:4
**procedurally** 88:5 212:25
**procedure** 206:7
**proceed** 11:17 12:3 15:15 18:25
80:20 114:6 134:23 135:6
138:13 155:25 156:22 157:8
**proceeded** 74:4
**proceeding** 189:18
**proceedings** 1:13 8:18 11:16 24:2
24:22 103:3,15 110:5 112:5,12
114:1 183:22 212:16 218:3
**process** 11:5 137:4 167:4,6 181:13
**procurement** 174:12 182:7
**produce** 92:20
**produced** 69:12,16 90:6,13 139:4
**professional** 125:17
**professor** 115:20,21
**proffered** 71:8
**profiles** 117:22,22,23
**program** 115:1 117:25 120:22
**programs** 120:11
**progress** 186:10
**prohibition** 93:12
**project** 17:5 118:4
**promoted** 215:22
**prompted** 183:8
**pronounce** 207:14
**pronouncements** 143:7 152:14
**proof** 88:5
**propaganda** 149:25 158:1,3,9,12
158:13,17,17 159:3,17 159:19,19
175:20
**proper** 39:24 74:8 92:6 200:23
208:15
**properly** 73:7,19
**proposal** 197:3
**propose** 196:1
**proposed** 199:6 200:13,14 202:24
**proposing** 184:22
**pros** 23:10
**prosecution** 131:9,12,14
**prosecutor** 77:17
**protect** 181:25
**protection** 119:23
**protégé** 146:25
**prove** 196:3 197:5 198:21 216:14
**provide** 44:3 90:20 119:16 120:6,8
140:13 145:20,23 146:13 172:21
173:3,23,23 175:12,17 176:3
178:2,10 180:6 194:4 213:16
**provided** 79:14 145:13 171:18,19
171:19,20,21 172:14,25 174:3
193:11 213:15
**provides** 174:8,25 215:2
**providing** 178:22
**proving** 212:20
**public** 2:10 152:13,14 158:21
**publically** 149:18 150:16
**publication** 129:6 138:18,19
163:16 164:9
**publications** 128:12 129:15 130:7
133:21 137:20
**publicize** 151:2
**publicized** 145:9 151:4
**publish** 10:20 11:24 102:3,7 129:6
138:11,17 140:4 153:7 157:5

**published** 11:7 96:6 99:13 118:21 128:13,14,17,18,19,20,21,25 129:1,7,8,11,12,21,23 138:18,22 138:24 139:2,4 143:6 153:9,11 153:12,14,15 208:5
**publishing** 89:17 103:10
**Puerto** 1:10 60:6
**pull** 157:15
**purchased** 48:18
**pure** 215:19
**purpose** 10:18 25:5,6 26:4 44:18 49:1 105:15 158:3 162:12 163:7 164:3 174:21 178:21 194:19 210:11 215:1
**purposes** 110:15 123:14 172:5,8 178:16 210:15 215:16
**pursued** 35:8
**pursuit** 84:1 89:18
**put** 72:5,13 78:16 79:7 80:6 82:6 84:19 95:17 100:8 102:7 129:17 140:7 142:25 155:23 164:22 189:1 208:22 214:12
**puts** 191:1
**putting** 216:11
**P.A** 2:16
**p.m** 22:4 102:14 182:25 183:19

---

**Q**

**qualifications** 111:12,14,15,23 112:15,21 113:2 135:1
**quarreled** 195:6
**quest** 188:14
**question** 8:22 15:14,15 21:6,18 22:20 24:3,17 25:24 30:12,13 47:2,4,7 67:9 71:8,14 72:11,13 82:18,24 83:1 89:1,2,19 96:5,15 101:2 105:2 121:24 139:17 141:19,23 151:22 152:23 160:17 163:18 167:9 178:7,8 183:23 188:20,23 209:4
**questioned** 66:24 67:8
**questioning** 55:1 69:19 70:5 79:21 92:1 216:19
**questions** 10:4 14:3 23:11,13 28:22 29:1 35:18 36:7,11 38:2,5 40:14,18,23 41:2 46:24 49:19,23 50:6 52:6,22 55:23 56:16,22,25 63:3 69:8 70:13,15,25 71:1 73:2 73:7,19 74:11,18,21 75:2,6 78:14,20 80:14,16 81:21 95:12 95:21 101:25 109:20 158:8 160:2 189:5,10
**quick** 17:2
**quickly** 75:23
**quiet** 208:11
**quite** 137:14 199:12
**quotation** 10:10
**quoted** 105:22
**quotes** 105:18
**quoting** 211:19

---

**R**

**R** 8:14 11:19 218:1
**radical** 121:3 127:7,11 132:6,13,24 133:11,11 139:15 147:25 148:2 166:22 171:8 215:18,21 216:1
**radicalize** 158:14
**radicalized** 176:25
**raid** 164:1
**raided** 163:24
**raise** 111:10 192:14
**raised** 94:15
**raiser** 93:10
**raising** 150:1 174:12 175:20
**random** 211:25
**randomly** 164:20
**range** 176:1
**rate** 131:23
**rational** 189:19
**reach** 111:5 135:22,22 136:2 199:18
**reaching** 197:11
**reacting** 191:5
**reaction** 49:6 191:2,3
**read** 10:9 38:16 75:23 100:15 105:12,18 113:1 140:11 183:23 183:25 188:23 193:14,16 196:25 200:15 204:1 217:6
**reader** 129:17

**readily** 189:16 190:15
**reading** 104:8 107:24 209:24
**ready** 14:9 30:4 74:22 79:22 191:19
**real** 17:2
**realize** 208:1
**really** 8:20 28:4 33:10 83:25 89:25 105:12 109:10 185:3 188:5,5
**realtime** 193:11
**reason** 51:2 89:21 91:9,10 128:6 148:24 154:1 183:16 188:25 192:7 196:9 197:21 198:3 199:19 200:24 204:9 216:24
**reasons** 184:12
**recall** 10:17 29:4 76:10,10 88:10,14 88:15,15 95:2,8 100:4,7 201:9
**receive** 47:9,17 48:4 145:17
**received** 3:12 6:8,9 7:18,19 11:21 11:22 46:25 47:14 72:12 123:20 123:22,23,25 124:10,12,13,15 124:17,17,19,22,24 145:12 172:10 192:5
**receptionist** 54:1
**recess** 72:23 81:24 156:9,18 182:15
**recessed** 217:23
**recipients** 97:25
**reciprocal** 173:5,8
**recognize** 4:23 5:7 6:16,17 8:1,2,7 8:9 21:22 75:16 157:17 162:23 192:3
**recollection** 94:21 99:21,23 100:12
**recommendation** 55:4 56:1,5
**recommended** 23:19
**recommending** 24:4
**recommends** 23:16
**record** 4:24 11:20 63:7 74:6,9 75:1 76:20,21 81:3 93:25 95:11 112:14 134:11,19 135:4 184:9 184:11 185:16,17 187:4 192:10 193:5 208:21 215:5,16 217:1,3,6
**recording** 5:22,25
**recordings** 37:11
**records** 8:5 101:16 104:21
**recovered** 9:7 63:23 64:3,6 119:8
**recross** 72:4,9 74:22 75:13 80:22 82:1 83:11 88:16 90:11 94:2 97:5 103:11
**Recross-Examination** 3:5
**recruit** 136:4 144:13 176:23
**recruitment** 149:25 174:9 175:20 176:6,9,11
**recruits** 145:9 176:5 178:2,22,25
**redacted** 85:14 91:8
**redirect** 3:4 4:4,6 10:23,24 72:1,22 73:1 74:22 82:4,4,7,15 83:7,10 83:14 84:2 85:5 86:15,19,20 87:10,17,25 88:1,2,2,6 89:2,10 94:20
**refer** 30:18 34:22 44:14 112:16 141:3 182:7,8,8 195:1
**reference** 9:13 13:3 14:25 31:3,23 34:4,14,19 38:21 39:5,11 42:20 48:8 50:18,21 52:15,18,23,24,25 60:14,19 69:11 71:10 129:23 140:8 141:12 160:3 161:3,24 196:21 212:17 213:11
**referenced** 85:25 86:1 204:24 205:16 206:3 213:13 214:1
**references** 35:12 39:16,21 49:20 51:7 54:5,8 59:2 61:8,15 206:24 216:14
**referencing** 32:13
**referred** 66:24 118:15 142:5,7 149:23 161:25
**referring** 17:8 18:13 27:13 32:20 33:14 43:9 44:11 45:2 62:2,17 123:2,7 135:17 141:2 142:5 158:12 162:18 172:18 204:24 206:14
**refers** 27:15 28:9 30:16 32:1 33:22 34:8 46:12 57:22 58:8,10 59:20 59:21 98:10 213:23 214:20,20
**reflect** 190:25 197:21
**Reformation** 158:24,25 160:4 161:10,12,18,19 162:2,8,12,14 183:23 164:4
**refresh** 94:21
**refreshing** 99:21,22

**refugee** 207:21 212:5
**refute** 110:11,15 186:13
**regard** 71:14 82:6 91:14 111:12 113:9,18 169:24,24 171:23 173:14 198:4
**regarded** 146:23,24
**regarding** 34:2 71:17 87:13 92:21 94:25 132:12 138:2 194:22 195:5 199:4 204:22 213:5,8 215:3,3
**Regardless** 33:21
**regimes** 137:4 211:14,15 213:25 215:4,5
**region** 120:11 163:11 165:12
**regions** 165:23
**register** 11:9
**regular** 182:20
**regulations** 166:3
**rejoinder** 70:11
**relate** 34:15 46:2,21 128:15 162:9 192:11
**related** 12:7 55:11 76:1,12 96:10 104:23 111:9 124:15 125:3
**relates** 91:12 127:3,6,7,11
**relating** 122:7 130:4,19
**relations** 122:21 158:21
**relationship** 117:4 146:19 161:17 167:20,23 171:15 176:8
**relationships** 171:8
**relaxed** 42:21
**release** 163:14
**relevance** 37:24 60:21 68:12,25 69:5 166:6 195:13,23 196:6 198:10 199:1
**relevant** 8:23 10:22 11:7 71:16 111:20 127:14 199:7 202:8
**reliable** 134:4
**relief** 9:2 10:3 84:1,4 87:18 99:14 99:18 100:3,5,15 105:14 108:25 109:1 178:10
**religion** 50:14,16,22 51:3,15,24 53:12 128:8
**religions** 115:14
**religious** 54:10 55:16,20 115:13 116:6 120:5,24 121:1,19 123:5 127:14 177:9
**relocated** 146:10 154:11 165:1 167:18 168:1
**reluctance** 85:10
**reluctant** 20:15
**rely** 5:17 7:8
**remain** 153:23 167:24
**remainder** 203:15
**remained** 153:25 155:17 168:2,7 168:16 187:16
**remedy** 73:16
**remember** 9:25 12:9 18:3 22:15 23:13,15,17 28:24 35:19 36:9,12 38:3 40:18 41:4,11,19,23 42:13 42:17,23 45:14,18,25 47:1,2,2,6 47:7 49:20 50:8 51:8 53:10 54:7 54:10 55:21 56:2,4,23 58:17 63:5,24 64:19 65:5 66:11,25 69:9 78:23 80:25 97:16,24 100:17,17 102:2 103:7 104:2,3 153:14 156:4 157:23 207:4 209:19
**Remind** 49:15
**removed** 77:10
**render** 68:23
**rendered** 71:19
**renders** 70:19
**Reno** 93:2
**renown** 149:7
**repeat** 134:19 151:22 167:9 178:8
**repeatedly** 215:13
**repeats** 30:25
**repelling** 110:10,19
**repetitive** 55:11,12
**rephrase** 30:13 52:2 75:6 158:6 179:11
**replaced** 176:11
**replenish** 174:1 176:9
**reply** 108:4 212:11
**replying** 189:9
**Report** 69:12,14,14,16 71:4 93:6,7 99:17 112:17 131:13
**reported** 2:19 194:7
**reporter** 2:20 114:13 218:6
**reporters** 184:16

**Reporter's** 3:9
**reports** 93:3 131:6,7,9
**represent** 115:14
**representative** 163:11,12,13
**Republic** 59:25
**request** 11:24 17:4,4 65:20,23,25 75:22 76:6 81:16 194:14 197:23 202:22
**requests** 80:1
**required** 212:25
**research** 114:18 115:4 117:19 118:1 120:20,25 124:15,20,20 126:22 127:4 128:10 129:4 130:11 132:6,8,11,16 133:23 142:2 150:3 151:1 152:10,20 158:10 162:23 172:3 173:12 174:4 179:16 182:4
**researched** 126:8 179:24
**researcher** 119:15,15,15
**researchers** 115:7 119:13
**reserved** 94:3
**residence** 6:21 13:19
**resources** 173:4 180:7
**respect** 75:20 76:21 80:1 135:12 135:19 172:7 201:2 211:24
**respectfully** 195:23 198:19 202:22 214:9
**respects** 194:18 213:2
**responding** 112:23 189:4,4
**responds** 33:9 50:2 58:5
**response** 8:7 87:23 212:17
**responsive** 200:13
**rest** 10:12 75:5 108:17 109:8 203:23 209:3
**restriction** 87:2,4
**rests** 193:19
**result** 143:25
**results** 63:14
**retained** 110:11 131:18
**retort** 70:7
**return** 23:12,19 44:24 156:8 164:23 183:3 199:6
**returned** 167:24
**returning** 25:3
**returns** 80:11 96:21
**review** 29:5 31:6 34:24 47:8 57:9 101:15 110:11 129:10 130:8 133:23 185:23 186:13,14 194:14 204:5 208:21,22
**reviewed** 26:11 132:19,20 164:1 181:7
**reviewing** 85:14
**Rican** 1:10 60:7
**rid** 167:13
**right** 14:25 17:3 24:1 25:19 30:4 73:20 75:13 83:5 88:25 89:4 94:10 104:1 107:5,9,16 108:8,24 119:18 187:19 190:23 194:10,11 204:20 210:6
**rights** 70:6 95:16 177:9
**rise** 182:24
**risk** 176:18,21
**risking** 73:13
**road** 113:24 187:3
**Robin** 2:20 81:3 185:18 218:4,5
**Robin's** 81:5
**Rohan** 3:7 112:9 114:4,7
**role** 129:15 147:1 162:14
**roles** 168:19
**Rome** 31:16
**room** 1:23 196:18
**rooted** 214:6
**round** 44:24
**route** 61:24,24
**routes** 62:4,24
**routinely** 86:10
**RPR** 2:20
**RPR-CP** 218:5
**rule** 8:11 95:15,20 103:5 194:25
**ruled** 78:7 203:25
**rules** 74:13 166:1,2,3 194:21
**ruling** 79:14 103:5 111:14 197:21 213:9
**rulings** 74:16
**rumor** 46:8
**Rushower** 117:13
**RUSSELL** 1:18
**Russia** 101:9
**Russian** 147:13,15 211:18,19
**Russians** 101:18

**S**

S 116:22 212:15 218:4
safe 86:1,6 119:9 174:13
sake 141:11
Salafist 215:21 216:1
Salid 170:22
Salwa 100:11 102:11,18
San 6:20
satellite 176:1
Saudi 136:12,12 137:13 146:8
192:16
saw 91:11 186:25
saying 10:19 34:5 37:12 42:12
46:6 62:5 88:14 90:2 92:4 93:21
141:5 187:9 190:14,21 192:17
208:25 213:18 216:11
says 10:1 14:6 15:11,20,25 16:16
17:1,18 18:9 19:9 20:4 22:2 25:4
25:9,17 27:2,7,8,10 28:2,3,4
29:19 30:3,8,24 31:15,19 32:15
32:17 33:9,10,11 39:1 42:20,25
43:2,7 44:3,17,21 46:6 48:15,21
48:23 49:5 50:1 52:11 53:1
54:13,15 55:4 56:17 59:13 60:5
60:7,10,10 61:22 85:2,3 97:18
98:15,15,19 98 104:1 106:1,5,8
106:11,17,25 107:2,4,8,11,15
108:2,6,6,10,13,13,14,14,20,21
108:23 113:8 141:9 187:21
200:19 201:2,16 205:18 207:9
207:11 212:24
schedule 182:20
scheduling 74:19
scholar 124:8,11 127:5
scholarship 123:22,24 124:2,3
school 34:5,14 35:7 116:2,10,13
116:19 122:12 156:16 166:5
scope 11:10,11,14 15:21 58:14
63:18 67:13 82:1,8 105:1 107:23
111:18,19 121:23
Scotland 122:20,23 125:1
screen 138:14 140:19 157:10
screens 78:2
scrum 95:23
SEAL 120:23
search 9:6
seated 4:3 80:13 96:23 156:21
second 71:14 74:3 78:23 79:1,2,6
84:7 90:5 102:14 117:25 119:23
143:22 160:1 161:3,23 162:17
169:14 170:7 180:22 187:12
195:4
secondary 117:24 118:17,21
secondhand 118:22
Secondly 145:11
seconds 187:10
secrecy 150:23
secret 149:20
secretively 86:18
section 1:22 78:9 127:23
secular 137:2
security 116:16 117:7 124:10,14
170:20
see 13:2 14:10 15:6,10 16:3,16,17
17:5,20 18:11 19:13 20:6 22:8
25:7,10,20 27:3,11 28:5 29:23
30:4,9,25 31:17,21 32:18 33:12
34:6,20 39:3 41:20 43:3 44:4,7,8
44:9,19,25 45:21 46:9,19 48:19
48:24 50:4,19 52:7,8,13,23,25
53:4,6 54:16 55:5 56:20 58:2,6
59:16 60:8,11 61:23,25 68:14
72:6 73:3 74:5 81:1,8 88:19 90:2
92:6 93:24 100:22,24 110:7
111:22 112:4 134:13 140:10,12
140:17,19,24 141:1 157:10
159:16 160:3 162:21 182:22
186:16 187:25 189:22 190:3
205:15 207:16 213:3
seeing 17:24
seeking 82:11
seen 58:12 76:9 77:13 93:4 99:15
101:22 159:10,12 161:14 163:21
163:23 164:2 186:19 188:6
217:7
segments 77:10
seized 163:24
select 192:7
selective 119:16

selectively 199:8
selling 14:25
send 18:11 44:8 46:18 52:12 67:9
179:1
sending 15:5 18:7 42:13,17 160:20
senior 16:9,12,16,24,25
sense 199:2,20 202:18,18
sent 13:5 18:19 19:11,18 27:1
32:16 45:15 64:19 65:25 98:17
100:2,11 160:9,16 164:9,11
sentence 173:22 194:18 195:4,7
195:20 196:2,3,5,9 200:1
separate 87:14 127:23
September 56:11 61:20 85:17
125:8 129:8 196:6 197:10
sequestered 110:20
Serbian 211:20
series 4:14 5:1 9:7 29:1 36:11
170:23
serious 113:3
serve 129:24
served 117:7
serves 193:3
service 92:3 146:18
Services 145:2,3 148:13
SESSION 4:1
set 8:10 13:13 168:18 181:21
sets 41:8 125:7
seven 12:17 20:22 89:24 95:8
188:1,2
sexual 113:10,11
Shalal's 207:9,12
share 110:13 171:22 175:17 179:7
180:8,10 205:23,24,25 215:24
shared 93:16
Sharia 138:22,24 138:1 142:19,21
142:23 143:3,4 147:22,24 165:8
165:18,20,23 166:10,11,15,16
166:18 167:1 180:3
sharing 92:24 93:5,12 110:13
sheet 97:18 181:22,24 182:2
Sheikh 44:18 141:9 170:22
she'll 183:21
shifted 155:16
shifting 70:10
Shipley's 183:23
Shishani 94:24 100:11,18 102:11
102:18
short 72:23 77:10 117:11 119:18
124:11 156:18 193:22
shortened 77:6
shorthand 6:24
shortly 112:7
shot 199:11
shouldn't 10:20
show 30:20 45:4 49:6 72:18 78:11
81:22 85:7 110:17 199:22
206:18 212:22
showed 40:5,11
showing 92:20
shown 41:4 75:22 185:7
shows 192:18
shut 85:21
side 8:16 23:24 78:5 88:8 94:4
110:3,18 112:11 143:12 160:3
184:15 211:17,17
sidebar 8:18 24:2 103:3 110:5
112:12
sides 73:17 74:7
signature 162:21,23 163:2
significance 55:16,20 210:14
significant 132:17 138:24 153:9
155:7 167:13 203:20
significantly 136:3
similar 23:2 77:1 124:12 125:6,7
166:19
simple 108:23
simply 157:6 189:11
Sinclair 2:16
Singapore 114:20 115:6,17,19
117:17 125:14,15 126:24,25
single 64:16 191:16
Sinhalese 127:20
Sister 46:6
sit 204:16
sitting 96:12 107:9 115:4
situation 41:16 71:24 76:7 108:4
201:22
situations 110:19
sleeping 45:17,24,24 46:19 48:9

48:22
slide 203:1
slight 182:19
slightly 187:22
slip 74:14
slow 38:6
slowly 174:10
small 121:11 144:4 155:7,12 171:3
188:3
smelling 36:17
Smith 81:14
smooth 79:3
smoother 79:7
soft 128:22
soil 139:3
soldiers 192:19,23
sole 10:18
solely 196:12
soliciting 22:17
Somalia 9:12 25:2 91:1 192:23
216:5
somebody 10:25 11:3 141:2
164:19 169:14 176:16 207:1
somebody's 174:21
someplace 52:16,19 123:8
son 207:9,12
soon 17:3 30:7,15,25 41:16 49:3
120:19 165:8 136:13 203:22
sooner 199:14
Sophia 54:2
sorry 23:24 32:10 58:24 96:9
102:15 103:16 112:13 134:15
154:18
sort 46:25
source 99:4 118:17,17 213:22
sources 99:8 118:16,18,19,21,23
133:20
south 12:25 19:7,19 20:9,24 25:13
56:18 204:10 207:21
southern 1:1 212:5
Soviet 136:13 143:18,25 144:1
145:7 146:14 147:2,8,10,17
148:9 149:1 151:8
Soviets 136:10 137:10 138:21
143:19,20,21,24 145:14,19
146:3,5,12 147:3,18,20 148:12
148:25 153:18,18,20,22
spaced 89:24
Spanish 38:14,16
speak 20:15 36:19 37:6 38:9,14
39:1,1 127:16,18,19,20,20,24
206:1
speakers 53:23
speaking 14:5 22:21 23:25 26:19
26:20,23 27:5 29:11,17 32:11
33:5,9 36:25 38:21,23 40:21
41:20 42:25 44:6 48:13 49:15
53:22 59:5,12,23 74:10 133:6
157:19 160:5 189:8,19
speaks 15:20 16:22 37:22 39:5
55:1
special 6:11 121:1 139:24 158:18
specialist 86:16 90:25 92:1,7
94:12 127:5
specialists 132:21
specialties 121:7
specialty 119:17
specific 10:7 11:13 21:7 24:10
28:12 33:23 35:12 36:13,20 37:2
37:11 38:20 40:10,14,23 46:24
49:1,19 52:22 83:12 88:11,15
132:5 161:23 163:7 164:10,11
188:3 189:4 213:14
specifically 9:8 10:13 22:25 33:16
33:18 82:20 88:7 100:18 103:7
113:6 140:9 202:6 204:25 213:5
213:14,23
specifics 120:16
specify 21:7
speculating 47:25 92:2
speculation 15:21 20:11,25 21:6
21:18,19 29:8 30:21 31:8 33:18
35:3,9 36:21 37:8 40:7,8 43:10
45:6 47:11,20 50:23 51:4 62:7
62:13,18,25 69:5 92:7 98:19
101:12 141:20
speeches 37:19 141:24
spell 114:3
spend 109:2 189:23
spent 78:21 116:5

spin 87:24
spiritual 141:17 154:17
spoke 14:24 38:10,12 144:12
146:17 157:19 162:9
spoken 89:14 128:2 130:10,12,16
130:17,17 132:21,24 133:6,10
163:5 165:18 179:21,24 181:10
spreading 137:15
spring 64:14,14
springs 77:20
Sri 121:11,13,15,17,18,20 122:5,7
122:9 123:21
St 122:20 124:25 126:22
staff 115:6,9,15 128:5,6
staffed 127:24
Stafford 157:15 186:16 188:8,11
193:6
stage 13:13 41:8 61:9
stand 4:10 73:24 79:13 203:15
205:11 210:7
standard 68:2,2,3
standards 66:15 67:11
standing 134:13 135:5 184:3 186:5
208:8
standpoint 79:10 195:10
stands 202:20 205:18
start 13:12 45:12 53:2 80:23 96:19
113:7 129:2 134:25 135:8
159:15 186:16 187:2,9 189:2
started 53:3 108:22,25 115:1 129:3
132:4 147:12,20 174:6 186:25
187:13 189:6
starting 52:23 182:20
starts 188:14 215:17
state 14:6,9 20:19 61:1 114:2
121:21 123:25 147:6,24 154:3
165:8,10,14,16,22 167:2 168:13
191:2,6,7,8,8 194:22,25 197:7
197:21 198:7,21 199:1,22 200:3
200:16,22,24 201:3,4,6,16,18,20
210:20 215:19 217:15
stated 23:4 57:19 101:17,22
110:10 134:10 203:5 212:20
statement 57:1,7 100:21 101:2,3,4
141:14 190:9 195:2,13 198:7
199:5 206:2 213:17 217:14
statements 57:10,13 96:24 105:19
192:24 194:20 196:4 197:5
states 1:1,4,14,19,22 22:7 23:13
23:16,19 24:5,9 25:23 26:3,6
45:15 60:23 87:17,20 110:1
112:9 115:23,25 116:1,10,12
117:5 120:12,21 122:10,11,12
123:23 124:18 130:24 131:1,14
131:16,18 135:11 136:20,23
138:1 139:25 142:22 143:4,5
145:10 151:5 166:10,25 167:5
167:14 168:11,15 171:23 172:13
172:18 188:21 191:13 202:4
218:6
statistics 192:18
status 115:2
stay 44:23 50:2 78:7
stayed 59:14,15 61:23
staying 16:6,13
steering 116:15 117:7
step 121:9 146:1
STEPHANIE 1:21
steps 195:16
stick 108:24 181:24
sticking 166:16
stint 126:17
stipulation 189:12 190:18
stood 209:5,18,22 211:12
stop 73:12 156:14 169:4 182:15
stopped 95:7
stopping 183:16
store 208:1 212:1
stores 204:25 207:18 214:4
story 129:9
Strategic 126:3,7
strategy 117:14 118:4 119:24
196:13
street 1:20 2:10,14,17 187:11
stresses 16:13
stricken 192:21
strict 165:24 166:17 215:20
strictly 166:1
strike 62:25 145:25 164:15 166:6
204:5

structure 136:15 168:17
structures 148:11
struggle 142:16
student 125:24
studied 121:3 122:19 137:13 174:4
179:14 209:25
studies 116:14 122:14,15 126:3,7
126:20 129:21 130:3 151:1
study 29:2 49:20 50:3,7,10,12,19
50:22 51:3,23 52:18 104:9,21,22
121:25 122:6 123:10,22 124:19
124:21,23 158:10 162:24 172:3
studying 38:19 49:20 50:13,14,15
89:17 116:5
stuff 16:3 65:1 90:12 93:20 108:7
187:1
stupid 73:18
Suba 139:3
subject 15:11 17:13 26:20 27:10
27:13 71:2 93:2,15 112:14 121:9
130:8 131:25 134:25 141:1
164:23 191:15
subjects 129:19 130:5,10 189:8
subject-matter 29:25 37:14 128:23
submit 80:8
submitted 71:5 97:8
subpoena 8:6,8
subscribed 160:21
subsequent 122:9 126:12,23
subsequently 122:17 124:25
125:24 126:21
substance 4:13
substantial 146:13
substantive 82:16 83:13 88:9 94:1
substantively 83:17,18 88:8,15,18
88:19 94:4,5,15
substitute 182:9
substitution 174:17
Sudan 154:12,13,14,15,16,17,20
154:22,25 155:2,3,6,15,16,17
157:22 164:25 167:17
suddenly 85:23
suffered 121:15
suffering 107:5
sufficient 204:13
suggest 16:5,12 18:15 19:15 20:8
46:2 50:21 77:21 81:18 93:14
185:8 187:25 200:1
suggested 86:15 202:17
suggesting 212:1
suggestion 70:8,11 79:15 114:12
195:16 199:2 209:16 211:23
suggests 51:25 79:17
suicide 124:19 209:7,16,23 210:1
Suite 2:5,17
summaries 85:15
summary 85:13 86:16 90:19,23
91:16,18 92:8 94:6,8
Sunrise 13:19 28:14 49:17 59:24
supplies 45:14,17 175:21,22 178:3
178:10,25
support 100:21 101:6 118:6
122:25 123:1,3 149:4 150:1
162:15 163:9 173:11,11,14,15
173:19,23,23,25 174:2,3,7,8,23
174:23,25 175:3,5,5,6,12,16
176:3,7,12,16,19,19 177:2,4,20
177:21 178:1,9,21,24 179:3,6,14
179:19,22 180:6,13,20,23 182:6
182:7 210:10,19 215:20
supported 210:2
supporters 120:1 136:5 180:24
213:24 215:3
supporting 164:13 176:14 179:7
191:10 211:16
supposed 56:18,22,25 57:8 182:17
182:18
sure 11:15 100:23 195:8 199:13
200:4 211:17
surprise 214:9
survive 175:15
suspect 203:11
sustain 175:15
sustained 13:9 15:23 16:24 20:12
21:1,8,19 22:21 23:6 24:23
25:25 28:20 29:9 32:23 33:9
33:19 34:12,17 35:1,10 36:22
37:9,17,25 40:2,8 43:11 47:12
50:25 51:1 53:16 55:2,12,18
56:8 60:17 62:8,14 63:20 69:1,6

69:22 71:22 95:20 101:13
104:18 150:18 152:8 158:6
163:19 171:25 178:19 179:10
SW 2:5
swear 171:4
Swor 2:13 3:6 6:6 7:12 58:23 72:10
72:15,16,19 75:24 76:11,18
88:12 94:18,19,22 95:20 96:1,9
96:12 97:2,4,6,10,12 98:21 99:1
99:21,25 100:1 101:14,24 102:3
102:5,10 103:12,16,19 104:18
104:25 105:3,4,8 108:1
109:18 134:12,14,16 150:17
152:4,23 160:11,14,15 171:24
172:23 184:1 203:4,5,7 212:10
212:12,14 217:4,9
SWORN 114:7
sympathetic 150:5,6,8,10 177:7,15
177:17,24,25
sympathizer 163:9
system 180:10,11

                    T

T 91:22 218:1,1
tab 102:14 103:25 104:2 162:17,17
tagged 113:25
Tajikistan 211:20
take 4:22 6:15 7:25 13:11 14:8,16
26:18 27:24 31:11,14 32:21 33:8
45:10 49:22 59:5 61:21 69:24
75:8 77:23,24 79:9,23 81:20
114:13 117:17 135:12 137:6
154:23 155:20,24 156:3,16
177:6 183:19 186:10 190:13
193:21 195:17 200:5 204:16
206:3,4,5
taken 66:13 67:16 68:2 73:2 77:6
104:8 113:6 148:22 165:2
takes 82:24
Taliban 125:11 165:5,5,6,7,10,16
165:21,22 166:12,16,18 167:8
167:11,19,21,22
talk 4:14 17:14 18:1,10 19:25 21:21
29:11 33:1 37:12 40:15 56:10
61:7 64:5 80:25 83:19 84:25
85:10,15 86:2,2,6 88:12 91:15
94:11 111:8,19 113:20 128:12
160:20 168:17 170:5 171:5
181:14,15 182:3,5,12,17 193:2
200:2
talked 9:8 20:20 36:13,15 37:2
85:13 87:12,13 91:13 92:17
123:18 125:5 136:7 184:4
talking 14:17,21 18:6 19:4,25
26:25 29:25 31:14 41:16 43:5
49:25 78:19 79:10 80:25 82:14
82:15 83:16,16 85:24 86:17,20
88:7,8,17 90:25 91:9,14 103:9
103:21 105:13,15,16 118:15
155:19 156:4 157:2 169:11
178:10 181:18 183:11 184:18,21
185:2 190:24 205:24 207:17
talks 16:15 48:2 86:3 98:16 105:9
109:11,11 188:15 205:12 207:17
Tamil 121:20
tantamount 142:8
Tanzania 202:3
tape 76:8,14 77:5,22 81:10 184:5,8
184:8 185:19 186:8 187:24
192:11 193:6 197:20,25 198:13
200:6 202:21
tapes 83:4 193:3
target 13:18 159:16 209:17
targeted 163:16
targets 206:12
teach 34:5,14 35:7 117:1
teacher 39:9
teaches 51:14
team 125:8,12,12
teams 120:23
technique 78:24
Technological 115:19
technologies 175:23,23
telephone 5:10,11 6:21 12:1,12,21
13:2,18,21 60:11 64:8 87:4 48:2
50:17 53:23 89:24 159:17 201:9
television 191:4
tell 4:22 5:9 6:16 7:25 17:2 20:18
30:8 33:10 46:18 58:18 64:12

65:1 84:5 117:9 123:1 132:11
160:23 161:10 170:6 172:21
188:21 197:18 209:13 214:22
telling 23:12 46:17 200:17 209:1
tells 63:16
tempted 205:23
ten 126:14 128:14 143:20 153:12
173:15,16 174:8
tents 176:1
term 78:6 136:24 139:12,14 142:9
142:18,19,21 150:3 173:11,18
181:13 182:9
terms 60:19 72:6 74:18 110:13
135:21 166:9 178:24,25,25
195:15
terror 187:1,12,19
terrorism 114:18 115:5 116:4,6,11
116:14,18 117:2,13,15,19,21
118:1,4 119:17,21,22,24 120:2,5
120:9,20 121:14,16 124:15,19
124:23 125:3 126:22,25 127:6,6
127:8 128:15 129:25 130:2,2,5
130:20,20 131:14 134:8,22
terrorist 117:21,22,22 122:25
124:21,23 150:6,9 153:11
173:24,25 174:24 175:25
terrorists 118:5,7 119:25
test 64:16 65:15 71:3,6,13,21
tested 65:7,9 70:19
testified 31:3 40:4 46:11 71:18
92:23 97:13,14 99:19 113:22
141:24 150:20 155:14 157:12
testify 112:17 131:3 150:23 206:17
208:3 216:22
testifying 112:16 114:15 217:2
testimony 4:13 9:3 10:16 13:6
75:21 76:2 105:1 110:7,12,14,15
112:15,25 113:4 131:5 132:2
142:19 154:6 156:8 183:2
186:15 195:24 200:7 204:22
205:2 214:5 216:11
tests 64:17,18,23,25 71:19
text 14:18 183:25
texts 127:14
thank 11:18,23 12:4 20:5 74:15
80:12,17 94:17 95:25 96:22
97:20 100:24 103:14 104:15
109:22,23 113:25 114:6 156:20
188:11 200:12 203:7 205:22
208:12 217:22
that's 10:1 12:14 17:17 21:17 37:4
52:9,20 54:14 69:15 72:18 78:21
82:25 83:7,8,12,22,25 86:17,17
86:19 87:5,22,25 88:1 89:5 91:5
93:23 94:10,22 97:16 98:9 99:6
100:12,19 102:16,25 103:12
105:23,25 106:2,22,25 107:2,12
107:16,17,17,19 109:3,5,5,17
113:25 128:3 140:6 142:2
160:18 185:2 187:15,18,23
189:14 192:24 193:8 195:5,14
196:13,14,23 199:8 200:25
203:9 204:20 205:5,10,20
210:22,23 211:16,21 213:6
214:13,14 215:10 217:18
theme 135:10
theory 84:4 214:13
there's 87:7 106:8
thesis 122:22,24 123:10
thing 27:8 31:3 46:3 64:4 65:13
82:25 85:4 89:25 90:10 106:1,14
109:14 190:15 194:10
things 20:20 29:3 40:4 46:7 48:16
65:2 69:17 77:7 78:11 79:11
89:15 106:12,18 110:10 111:9
113:15 141:3,6,7 171:18 174:16
174:25 177:18 178:2 184:14
think 10:6 18:22,23 19:3 23:14
24:6 41:7 44:22 45:23 47:4
49:22 63:25 70:7,16,24 71:7,8
71:13 72:8,19 73:1,12,17 74:3,7
74:11 76:14 77:18 79:4 82:25
84:20,21 87:11 88:20 89:3,4,19
90:14 93:1,13,23 94:2 95:25
104:2 107:22 111:7,8,16,20,25
113:18,23 121:22 160:19 169:20
183:9 187:14,19 188:18
189:7,25 190:3 192:3,7,12 193:9
194:7 195:2 199:9 200:14 203:5

203:9,16,23 205:25 206:24
208:9,22 209:3 210:13 213:8,9
214:18 215:7,17
thinking 76:23 111:24 168:6
thinks 44:9,13 74:1 206:16 208:20
third 32:9 38:10,18 82:22 118:4
119:24 174:19 180:25 195:7,20
thought 77:11 79:7,9 85:15 89:6
103:11 185:2 195:9
threat 120:7,7
three 26:22 33:6 44:9 46:21 61:23
86:1,3 89:9,10 95:21 116:11
117:12,20 119:21 124:24 170:17
174:16 177:18 180:18 185:14
193:10 201:9 202:5 217:18
throw 209:8
thrust 70:4 83:25
Thursday 183:13
Thursday's 183:22
ticket 31:16 44:25
tickets 52:12
Tigers 121:20
tightly 26:17
time 5:11 8:16 9:5 10:20 11:6,21
13:16 14:23,24 18:8 24:14 25:14
28:8 31:24 48:6 49:16 50:10,16
57:11 58:24 61:13,16,18 62:12
63:22 64:5 69:24 72:5,6 78:17
79:25 80:19 84:24,25 85:11
91:13 99:5,11,12,15 103:25
104:3 106:12 107:18 108:3
120:7,15 124:11 134:6 138:10
139:5 140:4 143:6,6,13 146:24
149:19 152:6,22 154:15 156:11
156:15 157:25 158:23 160:19
161:18 162:5,7 164:24 165:3
166:23 167:21 169:9,10,18,20
169:23 170:1 182:15,20 183:21
183:22 186:7 191:3 193:7
202:13,23 203:20 205:25 208:9
211:9 212:3,6 213:6 215:17
times 35:19 95:4 126:14 185:14
197:24 200:25
timings 112:18
title 116:22,23
titled 128:18 139:3 148:2 153:9
today 77:2,5,19 80:24 93:25 111:9
121:13 192:23
told 14:24 19:11 30:3 32:15,18
46:6 49:5 52:6 71:18 86:16 94:3
99:13 102:22 141:2,5,7 183:3
187:14 196:10,11,15 209:9
210:8 211:13,21
tomorrow 22:5,6 44:7 182:19,21
182:23 183:4,11,16,18,19
186:10 188:7 193:22 200:8
203:2,9,11,20 217:6,19,22
tone 199:19
top 14:4 20:7 29:19 41:11,11 58:2
73:8 76:10 88:10 108:20 169:5
total 12:17 13:25 27:10,15
totally 147:3 207:8,24 212:3
touch 16:3,13
touches 22:7
tourism 9:9 36:15 84:15 141:1,2,7
town 183:10
TR 4:20 6:3
trade 14:7,16 25:7 133:22 196:21
196:24
train 145:17
training 35:13 46:25 47:5,9,15,17
48:4 120:8,10,11,22 145:13,20
145:24 155:11,12 170:20 171:20
172:15 173:1 174:14 212:19
transcript 1:13 4:25 5:13,15,17,21
19:4 20:1 24:20 52:5 76:12,25
81:17,20 105:3,23 107:24 184:4
184:6,7,10,13,23 185:6,9,15,22
186:14 188:13 193:11 195:1
206:15,19 207:8,11
transcription 218:3
transcripts 23:15 24:11 36:24
76:16,16,22 101:16 104:22
190:20 209:24,25
transfer 117:15
transform 148:23
translate 144:25
translated 7:1 127:22 145:3
translation 6:23,25 7:7,7 84:10,10
84:11,12 100:24 159:16 160:1

161:2 163:3 184:15,18
**translator** 85:14
**transmission** 6:19 7:2 161:1
**transportation** 174:13
**travel** 22:5,11,18 23:1 25:2 26:5
29:7 47:5 133:20 174:13 176:20
176:22 177:1 180:20 183:10
**traveled** 122:19 125:18,19 126:12
132:15 133:13,18 137:14,17
146:8 189:13
**traveling** 18:20 19:18 61:10,15
125:20,21,23 148:20 189:18
**Treaty** 117:10
**trial** 1:13 73:5 74:6 111:25 113:7
198:2 202:4,12 205:8 209:21
211:9 212:20
**tried** 74:12,17 78:15 85:20 197:23
198:1,12 205:25
**trip** 32:21 41:8 43:1,5 44:25 188:15
Tripoli 127:16,16,21,25 212:6
**troops** 191:14,17 192:25
**trouble** 89:5
**true** 99:6 108:22 151:11
**truly** 106:17
**trust** 15:19
**truth** 195:5 196:4 197:5 206:1
**try** 118:22 166:25 179:11
**trying** 10:14,17 61:14,19 85:6
105:4 186:4 196:13 198:6,21
203:17
**Tucker** 102:8
**Tufts** 116:2,20
**Turkey** 99:5
**turn** 12:6 81:13 103:20 160:1
**two** 9:11 10:5 31:16 38:10 41:10
42:2,16 44:8 59:24 61:23 71:11
80:4,4 83:22,23 84:18,25 86:7
87:13 98:25 109:7 126:15
129:24 170:8 173:22 175:22
180:18 181:15,23,23 185:14
187:20 192:9,10,13,15 193:9
194:17 195:7 201:9 204:15
213:2
**two-thirds** 34:4
**type** 7:8 12:22 35:24 53:18 80:8
**types** 12:24 17:22 132:11,12
175:22 181:4
**typically** 65:8,9
**T76** 82:18

**U**

U 116:22
**UBL** 77:5
**UF** 33:7
**uh** 16:16 17:5 31:15,20 32:16,17
32:17 43:1 44:22,22,22 46:6,8
48:16,16 50:2 52:12 106:2,8
107:5 108:24
UK 124:1,21 125:13 128:20 130:15
131:8 161:21 167:14
**ultimately** 207:3
**UM** 14:1 60:5 61:1
**UM2** 60:7,10
**unable** 78:1
**underline** 107:16
**understand** 76:6 82:1 94:16
110:12 156:9 182:10 183:4
189:25 196:23 198:6 203:8
204:2 212:10
**understandable** 184:17
**understanding** 14:15 72:10 82:5,9
82:19,22 103:4 128:7 159:21
186:23
**understandings** 142:12
**understands** 43:8
**understatement** 104:9
**understood** 32:16
**undertaking** 50:7,10
**unduly** 192:19
**unfair** 200:18 208:9
**Unfortunately** 106:25
**unfriendly** 120:1
**unhappy** 49:11
**unidentified** 14:1 33:7 53:25 56:13
59:6,25
**uniformly** 209:14
**uniforms** 176:1
**unintelligible** 120:22 168:21
**Union** 9:17 143:18,25 145:7 146:14

147:2,8,10
**unique** 136:6
**unIslamic** 214:4
**unit** 67:7,8 98:6 127:24,24
United 1:1,4,14,19,22 2:21 23:12
23:16,19 24:5,9 25:23 26:3,6
45:15 87:17,20 110:1 112:8
115:23,25 116:1,9,12 117:5
120:12,21 122:10,11,12,19
123:23 124:18,23 125:9 130:24
131:1,14,16,18 145:10 151:5
161:20 163:25 166:10 167:14
188:21 191:13 202:4 218:6
**units** 98:7
**unity** 101:4,5
**universe** 94:2
**universities** 115:22 130:14
**university** 51:8,10,12,14,22 115:16
115:19,20,21 116:3,20 117:5,6,8
122:13,18,20 124:8,12,25
126:20,22 128:21
**University's** 116:16
**unknown** 54:1
**unlawfully** 101:18
**unprofessional** 73:11
**unredacted** 90:23
**unreliable** 68:24 70:20
**untrue** 194:20
**upcoming** 17:11
**upgraded** 115:2
**upper** 160:3
**Urdu** 128:1,2
Usbat 203:10 205:3,13,17,20 206:3
206:11,16,20,21,25 207:2,20
208:1,16 211:2,24 212:7 215:12
216:15
**use** 134:3 138:2,8 139:11 140:1,1
142:8 158:10 167:1,2 173:18
178:1,9 180:16,17,18 185:5
186:17 191:22 210:13,15
**user** 175:23,23
**usual** 131:23
**usually** 75:11 177:7,20 182:6
U.N 125:10
U.S 18:8 25:3 120:22 123:25
128:22 130:15 131:7 168:3
191:4,14,17,17

**V**

**value** 66:18
**van** 189:18
**vanguard** 168:9 171:11
**variety** 115:9,13
**various** 147:19 168:21 191:10,10
196:10 199:7
**vehement** 78:22
**verify** 119:14
**version** 77:4,9,11,13 78:23 79:2,2
79:5,6,6,13 80:7 81:22 98:13
99:8 184:5,12 185:22 186:17,20
188:1,6 191:23 203:24
**versions** 78:6 80:5 81:4 153:15,16
185:12
**versus** 202:5
**victims** 191:14 209:11,14 211:18
**video** 78:10 79:16 81:19 110:6
111:9 156:14 184:24 185:7,8
188:10 191:21 195:11 197:6
200:16 201:21,24 217:17
**videotape** 80:7 192:8 197:4,4,9,15
197:18,24 198:2 199:1,3,21
203:2 217:10,11,12,13
**view** 137:23 138:2 141:15 147:4
166:18,18,19 168:15 179:7
197:4 215:25 217:10
**viewed** 187:6 197:8 213:25 217:11
217:12,13,17
**viewing** 202:21
**viewpoint** 216:13
**views** 141:25 148:1 168:12 180:2
**vigorously** 211:8
**violence** 114:18 116:6 117:19
120:5,25 130:2 132:6 133:11
138:2,8 141:18 142:6,7,8,14
167:3 168:13,16 171:23 172:13
182:13 214:20 215:23 216:6
**violent** 142:20 210:12 215:22
216:3,3,7
**virtue** 192:4

**vision** 149:12
**visited** 126:14 146:9
**visiting** 124:8,11 126:2,7,17,18
**voice** 12:16 21:24,25 114:13
188:13 189:19
**voir** 111:11,16 196:11
**volume** 153:12
**vs** 1:6

**W**

W 2:10
**WAEL** 1:8
**waged** 215:22
**waging** 216:7
**wait** 25:6 29:6 30:8 208:10,10,10
**waiting** 14:7 30:20 32:3 90:20
107:9 112:10 193:18
**wall** 92:22 93:1,4,20
**want** 4:13 10:24,25 12:6 13:12 18:1
31:16 40:15 44:1 48:19 50:1,1,2
50:3 53:4 56:15 61:7 64:5 65:13
65:17 66:23 70:12 72:20 73:10
73:25 75:19 78:5 80:8 81:6,9,13
81:16 83:12 84:23 85:15,16 86:4
86:8,9 87:3 89:11 92:10 93:17
94:11 95:2 100:15 105:3,12
106:5,17,18,22 107:12 108:23
108:24 109:1,4 111:10,15
112:13,23 132:4 137:6 138:10
140:7 147:21 157:5 160:2 182:7
182:8,17 187:1,4 190:8 195:4
203:2 206:15 214:12
**wanted** 19:1 70:9 74:23 77:7 85:7
86:22,25 89:14 95:24 147:6
149:4,4 187:2,13 188:18 190:11
190:24 191:5,13 192:13
**wanting** 26:2 51:23
**wants** 50:18 72:13 87:18 109:2,3
110:16 187:9 190:25 193:21
196:12 208:7
**war** 187:1,18 209:16 211:16
**warehouse** 17:2
**warriors** 144:11
Washington 1:24 116:15 117:4,6
124:18
**wasn't** 9:23 40:25 92:16 186:21
**wastage** 174:2
**watch** 79:17 96:18
**watched** 185:13,14
**watchers** 190:16
**way** 32:9,18 34:4 39:24 56:4 57:13
58:1 65:19 69:18 74:4 79:4
83:15 85:12 86:14 111:24
135:20 148:23 169:5 171:1
172:2 185:6,7 189:20 195:14
196:7 199:3,16 201:23 207:10
211:15 216:22
**ways** 68:14
**weapons** 125:10 173:1 175:22
**Wednesday** 183:12
**week** 58:21 92:19 98:17,25 102:6
203:15
**weekend** 24:15 72:25 183:10,18
**weeks** 20:6 31:16 61:23
**welcomed** 167:19
**welcoming** 41:12
**went** 44:22 54:13 59:13,13,13
70:24 83:7 84:21 85:5,12,19
87:15 88:9 92:14 93:1 95:9
100:13 102:17 106:11 108:7
122:12 146:11 153:21,21,25
154:2 167:7,10 169:5 187:11
**weren't** 10:6
**west** 1 16:1,10,22,25 117:1,3 137:2
**Western** 9:17
**we'll** 79:23 103:13 111:7 155:24
**we're** 4:15 73:23 112:10 211:16
**we've** 13:11 197:23
**whatsoever** 138:4 198:10
**what's** 28:2 33:9,10 56:10 100:25
**whereabouts** 57:10 59:10 60:3,14
**whisper** 209:16 211:21
**widely** 137:14
**wife** 20:3 53:25
**WILLIAM** 2:10
**willing** 22:8 25:9 30:6
**wing** 124:20
**wiretap** 7:4
**withdraw** 18:23 19:22 27:19 52:3

**withdrawal** 147:11,17 148:10
149:1
**withdrawing** 147:12
**withdrew** 143:20 147:10,18 153:18
**witness** 5:5 8:2,21 10:15,17 12:2
16:10 24:14 29:16 35:16 36:5
43:24 45:8 57:18 58:17,24 60:23
61:5 62:20 67:19 68:7,14,21
72:13,13,17,18 80:7 82:13
86:14 95:1,13 96:12,25 97:3
98:23 99:23,24 101:22 105:2,6
109:19,21,25 110:2 111:1,25
112:6 114:4,7 123:16 130:19,21
130:24 131:1 134:18 140:11,15
153:1 156:10 169:23 172:25
183:6,7 206:4 208:7 216:21,22
216:25 217:2,2
**witnesses** 3:1,2 110:9
**witness's** 105:1
**women** 166:4,4
**won't** 44:21 65:17 209:2 215:11
**woods** 74:12
**word** 9:8 57:8 84:12,13,14 88:4
105:12,12 135:13 139:13 142:11
142:12 158:9,9 181:13,20 182:3
195:4 210:13,13
**words** 36:13,20,25 37:3 41:9 67:24
78:14 81:21 84:9 87:7 181:15,21
181:22 182:9,12,16 185:19
187:12 194:21
**work** 31:17,20,23,25 99:14,18
102:24 105:14 109:1 112:16
117:2,9 118:8,10 120:25 121:1
122:6,9,22 124:10,13 125:2,17
127:3,14,21 134:4 137:21 186:4
200:10 208:4
**worked** 39:8 113:8,9 116:7 120:18
120:20 125:6 132:14 137:13
171:5 192:6
**workers** 17:4 87:19
**working** 24:14 53:2 105:9,24 115:6
117:12 132:22 146:19
**works** 115:25 116:2,3 189:12
**world** 15:10 106:19 115:5,15,23
117:21 118:9,12 119:2 127:17
128:10 129:25 133:10 135:16,17
135:18 144:7 145:10 171:17
191:5 196:21,24 210:9
**worlds** 188:18
**Worldwide** 9:1 10:3
**world's** 190:11,24
**worried** 185:4 196:16
**worst** 52:11
**wouldn't** 83:18 99:22 198:22
**wrap** 70:25
**write** 129:3,21
**writes** 100:20
**writing** 89:17 110:10 129:2 185:19
**writings** 132:9 137:19,21 141:25
**written** 6:24 13:7 122:22 135:1
184:6 194:10 217:8
**wrong** 104:2 107:19 111:24 185:11
194:18 200:17 203:15,16 208:8
**wrote** 46:17 48:17

**X**

X 112:22 187:21

**Y**

**yeah** 48:23 50:3 87:3 107:11
**year** 116:9 133:17 154:20 209:5
214:20
**years** 42:2 104:8 113:9 116:5,7
117:12 143:20 155:6,15 179:17
182:11 202:13
Yemen 22:18,25 23:9 41:20 43:2,6
43:9,13,18,20 54:16,18 59:21
84:21,22,23 85:1,3,3,6,7,7,8
yesterday 58:22,23
York 120:18
**young** 138:20
**younger** 29:22
**Youssef** 14:1,5,14,23 15:8,11,25
16:6 17:16,18 18:3,7,9,14 21:4
21:11,15,24 22:2,11 23:12 25:1
25:4,14,23 26:2,19,20,23 27:1,7
27:9 28:15,23 31:6,12,14,15,19
32:13,24 35:1 36:5 37:20,23
38:25 39:24 40:22 41:12,15 42:1

42:20 43:2,8 44:17 47:14 56:13
56:17 58:4,5 59:6,7,9,12 61:8,10
61:22 62:4,16 85:6,11 86:7
87:16 89:9,12,12,14 91:1 92:4
**Youssef's** 15:17 18:14 32:21,22
38:23
**You're** 10:19 140:14 190:23
**you've** 40:4 93:25 133:18

**Z**

**Zaki** 183:8
**Zaki's** 183:17
**Zaky** 93:10 99:14 106:11 109:11
**Zaky's** 98:18 99:13,18 102:24
**Zavertnik** 2:16
**Zawahiri** 168:24 169:16,25 170:2,5
170:8,12
**Zinney** 192:25
**Zinney's** 192:24
**zone** 179:5 180:21,22 181:1,3
**zones** 118:1,19 119:6 132:15
153:24 154:1,2 175:3,4,5,6,9,12
175:13,18 176:8,20,22,24 177:1
178:11,17,23 179:1,8,25 180:14

**$**

**$1,000** 9:20 10:1
**$2,500** 10:8
**$450** 9:21
**$5,000** 9:19

**0**

**04-60001-CR-COOKE** 1:3
**06** 209:6

**1**

**1** 85:17
**1:20** 79:22
**1:25** 79:22 81:8
**1:30** 79:22 80:24 81:1,8
**10** 19:3 35:23 42:7 48:2 53:21
**10th** 1:23 85:1
**10/17/99** 13:4
**10/23/96** 90:24
**100** 2:3
**1006** 84:8
**105** 88:21 89:7
**105TR** 40:17
**1065** 216:16
**11** 3:18 22:14 27:24 161:8 196:6
197:11
**11th** 161:7
**11:30** 69:23
**11:36** 13:17
**111TR** 38:20
**112TR** 18:1
**1125** 2:17
**114** 3:7,8 45:12
**114TR** 34:19 45:12
**116TR** 18:21 19:3 22:14 27:21
49:12
**117** 19:25,25
**117TR** 23:2 53:20
**118** 102:15,17
**118TR** 56:10 61:22
**119TR** 59:5
**12** 17:14 22:14 33:4
**12/31/96** 26:21,22
**12:14** 102:14
**12:15** 80:24
**12:30** 74:20
**123TR** 59:22
**126** 6:8
**126T** 3:14 4:20,21 6:3,9
**126TR** 3:15 4:21 5:5 6:9
**128** 102:1,5,13,15 103:7,20,23
**13** 22:14 23:2 52:5,9 54:7
**14** 3:16 52:11,21 55:4 59:9 183:9
**14:03** 104:1
**14:12** 6:20
**15** 69:24 183:9
**150** 2:10
**16** 209:10
**169** 2:17
**17** 40:19 41:24 49:14 89:1
**18** 42:15 48:8
**19** 3:17
**1970s** 125:23 137:17

**1979** 143:19
**1980s** 137:16,17,18 143:14,15,21
143:22 146:3,9,10,10 147:12
**1984** 145:5,5
**1988** 139:2
**1989** 125:21 143:20 147:11,11,15
148:10,14,17,18,19 149:3
153:19,20
**1990s** 150:11 151:11,12,17,24
152:11 153:6,8,16 154:10 157:4
158:16 169:11 170:9
**1991** 154:22,25 155:3,17 157:23
**1993** 125:20 126:2 196:22
**1994** 122:11 161:7,8,18
**1995** 92:22 99:3 101:1 122:12
**1996** 12:1 13:15 85:17,18 89:8
91:18 95:2 103:20,23 126:2
155:4,17 157:23 164:25 167:8
167:12,25 168:2,5
**1997** 20:21 29:15 33:4
**1998** 40:19 41:24 42:7,15,16 48:2
89:1
**1999** 49:14

**2**

**2** 60:5 161:2,2 162:18,19
**2:25** 111:23
**20** 18:2
**200F** 159:5 162:16,19
**200FT** 159:5,15 163:3
**2000** 35:23 43:17 53:21 56:11
129:3 169:11
**2001** 120:19 125:8 129:8 168:3
170:10,16 196:6 197:11 201:23
**2002** 92:14,18 115:1 129:1
**2004** 115:2
**2005** 64:11
**2006** 64:11,12,15,21
**2007** 1:7
**202** 2:5
**202/353-2357** 1:24
**203** 94:19,22,23 95:6 96:8 100:2
**20530** 1:24
**21** 3:14 18:2,9
**21st** 2:3
**21:22** 29:15
**21:43** 4:25 5:12
**215** 94:19,24 95:6,11 96:2,6 97:7
**215F** 3:16,17 6:14 7:19
**215FT** 3:16,17 6:14 7:19
**215F/FT** 6:13 7:11,18
**216** 94:19,24 95:6 96:8 97:20,23
**216F/FT** 82:7
**218** 3:9
**22** 3:18
**23** 3:18 85:18 91:18 94:19
**23rd** 85:19 91:21
**24** 116:7
**25** 1:7 116:7
**2649** 1:23
**268-8189** 159:19
**27th** 2:5
**28** 20:21 29:15
**29** 72:12
**2937** 2:5

**3**

**3** 19:25 20:1 26:18 33:8 34:19
38:20,21 40:24 41:10 42:19 46:2
49:22 184:20
**3rd** 61:20
**3:00** 182:21,22 183:17
**3:12** 103:23,25
**3:30** 182:21,22 183:20
**30** 12:1 13:15 89:8 103:20,23 190:1
**301** 2:21 218:7
**305/374-0544** 2:17
**305/443-1600** 2:6
**305/523-5158** 2:22 218:7
**305/579-9090** 2:3
**3060** 2:13
**313/967-0200** 2:14
**32** 1:15 115:6
**33128** 2:22 218:7
**33131** 2:11,17
**33132** 1:20 2:3
**33133** 2:6
**35T** 206:19

**4**

**4** 3:3,4,14 31:14 45:20 56:11,15
60:2 61:22 102:18 103:7,21
184:20 206:19
**4th** 1:20
**4/10/2000** 13:4
**4:00** 156:12
**4:15** 75:11
**4:30** 111:5 156:14
**4:34** 182:25
**403** 63:7 64:2
**450** 138:11 157:6
**451** 157:16
**48** 187:10,11
**48226** 2:14
**49** 187:13

**5**

**5** 24:25 105:12 106:1 206:24
212:17
**5/14/1997** 5:10
**5/14/97** 4:25
**50** 187:13
**50/50** 39:2
**51** 187:14
**54TR** 31:11

**6**

**6** 3:14,16 32:11 33:21,23 34:1,14
44:1 99:3 206:23,24
**6th** 2:21 218:7
**6/17/95** 102:14
**6:00** 72:11
**600E** 3:18 7:22,23 8:14 11:19,22
**600R** 3:19 7:22,23 11:22
**619** 159:19
**64** 89:8
**64TR** 11:25 13:11
**645** 2:14
**67TR** 17:14 24:25

**7**

**7** 3:17,18 108:2 206:19 207:8
**7th** 161:7
**7,000** 153:13
**7:00** 183:19
**7:30** 22:4
**701** 105:1
**702** 216:22
**703** 105:1
**75TR** 26:18

**8**

**8** 29:11 44:16 101:1 108:20 140:10
140:23 207:22,23
**8:33** 101:1
**80s** 157:3
**81TR** 21:21
**83** 140:6,9
**88TR** 29:11 32:9
**89** 149:1
**89TR** 33:1

**9**

**9** 3:14 13:12 14:3 90:1 109:10
141:6
**9/11** 112:14,16,20,25 113:2,3,7,22
195:11,15,18,21 196:11,12,13
196:19,20
**9/21/1994** 6:19
**9:30** 1:7 22:4 183:4
**902** 8:11 11:19
**94** 93:11
**95** 92:13,18 93:2
**96** 206:19
**97** 3:5 190:23
**99** 1:20